Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) Case No. 20-30805 (KRH) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
ASSUME THE CONSULTING AGREEMENT, (II) AUTHORIZING
AND APPROVING THE CONDUCT OF STORE CLOSING SALES,
WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS,
AND ENCUMBRANCES, (III) AUTHORIZING CUSTOMARY BONUSES TO
EMPLOYEES OF CLOSING STORES, AND (IV) GRANTING RELATED RELIEF**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

KE 65505902

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state as follows in support of this motion (this "Motion"):

## Relief Requested

1.     The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order"):  (a) authorizing the Debtors to assume that certain Store Closing Program Agreement dated as of January 28, 2009, as amended and restated by that certain Letter dated June 6, 2016, and further detailed by the Statements of Work Letters dated as of November 27, 2019, December 16, 2019, as amended and restated on January 23, 2020, and February 17, 2020, by and between Pier 1 Imports (U.S.), Inc. ("Pier 1 Imports" or the "Merchant") and Gordon Brothers Retail Partners, LLC ("Gordon Brothers" or the "Consultant") (collectively, the "Consulting Agreement"), copies of which are attached hereto as Schedule 1 to **Exhibit A**; (b) authorizing and approving the continuation or initiation of 398 store closings or similar themed sales at the stores listed on Schedule 1 to **Exhibit A** (collectively, the "Initial Closing Stores"); (c) authorizing the Debtors to conduct store closings at additional stores at a later date or dates pursuant to the procedures set forth herein (collectively, the "Additional Closing Stores," if any and, together with the Initial Closing Stores,

---

[2]     A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Robert J. Riesbeck, Chief Executive Officer of Pier 1 Imports, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration or as later defined herein, as applicable.

the "Closing Stores"), with such sales to be free and clear of all liens, claims, and encumbrances (the "Sales" or "Store Closings"), in accordance with the terms of the store closing sale guidelines (the "U.S. Sale Guidelines" with respect to stores located in the United States, the "Canada Sale Guidelines" with respect to stores located in Canada, and collectively, the "Sale Guidelines"), attached as Schedule 2 to **Exhibit A**, to the extent the Debtors determine in an exercise of their business judgment and in accordance with the terms set forth in the Interim Order and Final Order that such additional store closings are in the best interests of the Debtors' estates and stakeholders following lease negotiations with the Debtors' landlords; (d) authorizing customary bonuses to non-insider Closing Store employees who remain employed for the duration of the store closing process (the "Store Closing Bonuses"); and (e) granting related relief.   In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider entry of the Final Order.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105, 363, 365, and 554 of
the Bankruptcy Code, Bankruptcy Rules 2002, 6003, and 6004, and rule 9013-1(C) of the Local
Rules of the United States Bankruptcy Court for the Eastern District of Virginia
(the "Local Bankruptcy Rules").

5.      In support of this Motion, the Debtors respectfully submit the *Declaration of
Robert J. Riesbeck in Support of Debtors' Motion for Entry of an Order (I) Authorizing the Debtors
to Assume the Consulting Agreement, (II) Authorizing and Approving the Conduct of Store Closing
Sales, with Such Sales To Be Free and Clear of All Liens, Claims, and Encumbrances,
(III) Authorizing Customary Bonuses to Employees of Closing Stores, and (IV) Granting Related
Relief* (the "Riesbeck Declaration"), attached hereto as **Exhibit C**.

## Background

6.      The Debtors are a leading omni-channel retailer of unique home décor, furniture,
and accessories.  Their retail approach has focused on providing the discerning customer a curated
mix of home goods from artisans around the world.  The Debtors offer their merchandise through
923 stores throughout the United States and Canada as well as online through their U.S.
e-commerce website.  The Debtors are headquartered in Fort Worth, Texas and currently employ
approximately 17,000 non-seasonal employees.  On January 6, 2020, the Debtors announced the
closing of up to 450 of their stores, and in connection with the filing of these chapter 11 cases, the
Debtors announced the closing of all Canadian operations.

7.      The Debtors commenced these chapter 11 cases to facilitate a timely and efficient
process that will maximize the value of the Debtors' estates for the benefit of all stakeholders.  The
Debtors anticipate winding down the brick-and-mortar stores not part of their go-forward plan and

4

will seek to implement a value-maximizing going-concern transaction for the remaining operations.

8.      As of the Petition Date, each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors will also file for relief under the Companies' Creditors Arrangement Act (Canada).  The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b), and have requested that Pier 1 Imports, Inc. serve as foreign representative on behalf of the Debtors in any foreign country, including Canada.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## I.      The Store Closings.

9.      Over the past several years, the Debtors have faced a challenging commercial environment brought on by increased competition and the consumer shift away from shopping at brick-and-mortar stores.  Given the expenses associated with a substantial brick-and-mortar presence, and the issues affecting the retail industry as a whole, a significant number of the Debtors' stores are operating at sub-optimal performance levels.

10.      Recognizing the need to right-size the Debtors' store base in any go-forward business plan, the Debtors' management team and advisors, including AlixPartners LLP ("AlixPartners"), undertook an extensive performance analysis of all existing stores, evaluating, among other factors, historical and recent store profitability, historical and recent sales trends,

occupancy costs, the geographic market in which each store is located, the mall or property in which each store is located, the potential to negotiate rent reductions with applicable landlords, the outcome of the third-party sale, and specific operational circumstances related to each store's performance.

11.     Ultimately, the Debtors' management team and advisors determined that it was appropriate to close and wind down approximately 398 underperforming brick-and-mortar stores.  In late 2019, the Consultant commenced an ongoing Store Closing process with respect to 71 stores, a majority of which had naturally expiring leases.  On January 6, 2020, the Debtors announced an intention to close up to 450 stores.  On or around January 10, 2020 the Company initiated the Store Closings at approximately 270 Initial Closing Stores, which included 169 that had previously been converted to a clearance store format.  Within the next few days, the Debtors intend to initiate closings of the Debtors' 56 stores in Canada, and an additional U.S. store.  The Debtors expect all Sales at the Initial Store Closings to be completed and the properties vacated by March 31, 2020.  The Debtors estimate that the proceeds from all the Sales will be approximately $177 million.

12.     The Debtors, with the assistance of AlixPartners and A&G Realty Partners, LLC, also initiated lease modification negotiations with the Debtors' landlords for certain rent concessions and cure costs reductions with respect to leases not associated with the Initial Closing Stores (the "Lease Negotiations"), with the goal of improving the financial performance of the Debtors' remaining store base.  These Lease Negotiations are ongoing and the Debtors' ability to negotiate more favorable lease terms and rent reductions will drive the determination of whether or not to close additional stores.  Where the Debtors are unable to obtain sufficient relief in the

Lease Negotiations concerning stores that are on the cusp of failing to meet certain performance standards, the Debtors may determine that they need to close the Additional Closing Stores in order to maximize the value of their estates.

13.    Notably, the Debtors propose to close all of their stores located in Canada.  Pier 1 Imports, Inc., as proposed foreign representative, will shortly commence an ancillary proceeding in Canada (the "Canadian Proceedings") on behalf the Debtors' estates under Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended ("CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") to request that the Canadian Court recognize these chapter 11 cases as "foreign main proceedings" under the applicable provisions of the CCAA in order to, among other things, protect the Debtors' assets and operations in Canada and obtain a stay of proceedings with respect to landlords that may have remedies upon the Debtors' filing and in respect of the proposed Sale.  The Debtors will only begin Store Closings with respect to stores in Canada after the Canadian Court recognizes the Interim Order and allows the Debtors to proceed with the Store Closings.

**II.    The Consultant.**

14.    For more than ten (10) years, the Debtors engaged the Consultant to facilitate store closures for the Company—both in the United States and Canada.  As a result, the Consultant has significant expertise and expert knowledge of the Debtors' business, their merchandise, and their store operations.  Additionally, the Debtors and the Consultant are already party to the Consulting Agreement, which sets forth the terms pursuant to which the Consultant has operated store closings for the Debtors for a decade.  Further, the Debtors and the Consultant agreed to Statements of Work #78, 79, 80, and 81—which govern the closure of the 398 Closing Stores—on terms

materially consistent with their existing relationship.  In light of this and the Consultant's historic success in closing other stores for the Debtors, the Debtors concluded in their business judgment that (a) the services of the Consultant are necessary (i) for a seamless and efficient large-scale store closing process, as is contemplated by this Motion, and (ii) to maximize the value of the saleable inventory located in the Closing Stores (the "Merchandise"), and the associated furniture, fixtures, and equipment (the "FF&E" and, together with the Merchandise, the "Store Closure Assets"), and (b) the Consultant is qualified and capable of performing the required tasks in a value-maximizing manner.  Further, the Consultant is already in the process of liquidating inventory at most of the Closing Stores.  By this Motion, the Debtors seek to assume the Consulting Agreement, allow the Consultant to continue its work as described herein uninterrupted, and to enter into additional Statements of Work in connection with any Additional Closing Stores on terms materially consistent with the Debtors' historic practices.

15.    Following the Debtors' announcement on January 6, 2020, the Consultant began liquidating the Store Closure Assets and otherwise prepared these Closing Stores for turnover to the applicable landlords on the terms set forth in the Consulting Agreement.  The Debtors determined on February 16, 2020, to close all stores located in Canada, with such Sales expected to commence on or about February 21, 2020, subject to the Canadian Court granting a recognition order in respect of the proposed Interim Order.  The Store Closings are a critical component of the Debtors' go-forward business plan, and assumption of the Consulting Agreement will allow the Debtors to continue to conduct the Sales and Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates.  In fact, the relief requested in this Motion overall is integral to maximizing the value of the Debtors' estates.  It will permit the Debtors to continue the

8

Sales and commence the Store Closings in a timely manner and will establish fair and uniform

store closing procedures to assist the Debtors and their creditors through the Debtors' transition to

a smaller, more profitable enterprise.

## III.    The Consulting Agreement.

16.    Pursuant to the Consulting Agreement, the Consultant will serve as the exclusive

independent consultant to the Debtors in connection with the sale of the Store Closure Assets.

What follows is a summary of the material terms of the Consulting Agreement.[3]

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Services Provided by Consultant** | Gordon Brothers will be retained as the Debtors' agent to conduct the Sales at certain identified Closing Stores during the Sale Term (as defined below) to, among other things: (a) recommend appropriate point-of-purchase, point-of-sale, presentation and external and internal advertising and signage necessary to effectively sell all of the Merchandise in accordance with a "this store location closing" or other mutually agreeable theme; (b) provide qualified supervisors with respect to the stores, to oversee the conduct of the Sale, and to oversee the Sale process in the Stores; (c) maintain focused and constant communication with Store-level employees and managers to keep them abreast of strategy and timing and to properly effect Store-level communication by Merchant's employees to customers and others about the sale: (d) establish and provide oversight of accounting functions for the Sale, including evaluation of sales of Merchandise by category, sales reporting, and expense monitoring; (e) coordinate with Merchant so that the operation of the Closing Stores is being properly maintained, including ongoing customer services and housekeeping activities; (f) recommend appropriate staffing levels for the Stores and appropriate bonus and/or incentive programs for Store employees; (g) provide recommendations for loss prevention initiatives; (h) advise Merchant with respect to the licensing requirements affecting the Sales as a "this store location closing" or other mutually agreed upon theme, subject to the Interim or Final Order, as applicable, in compliance with applicable state and local "going out of business" laws ("<u>GOB Laws</u>"). In connection with such obligation, Consultant will (i) advise Merchant of the applicable waiting period under the GOB laws, and/or (ii) prepare (in Merchant's name and for Merchant's signature) all licensing/permit paperwork as may be necessary under such GOB Laws, deliver all such paperwork to Merchant, and file, on behalf of Merchant, all such paperwork where necessary, and/or (iii) advise where permitting paperwork and/or waiting |

---

[3]    The following summary chart is for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects.  Capitalized terms used but not defined in the following summary shall have the meaning ascribed to them in the Consulting Agreement.

| TERM | CONSULTING AGREEMENT |
|---|---|
| | periods do not apply; and (iv) perform such other related services mutually deemed by the parties to be necessary or prudent to facilitate the Sale. |
| **Term of Sale** | As used in the Consulting Agreement, the term "Sale Term" with respect to each respective Store shall be the period commencing on the Sale Commencement Date and ending on the Sale Termination Date as set forth in the respective Statement of Work; Attached as Exhibit A to each Statement of Work will be identified the Store(s) to be subject to such Statement of Work, as well as the Sale Commencement Date and the Sale Termination Date with respect to such Store(s); *provided, however,* that the Consultant may from time to time establish an earlier "Sale Termination Date" with respect to any one or more Store subject to each Statement of Work (on a per Store basis) upon five (5) days prior notice to Merchant.<br><br>Upon the conclusion of the Sale Term at each Store, the Consultant shall leave such Store in broom clean condition, subject to the Consultant's right pursuant to the Consulting Agreement to abandon in a neat and orderly manner all unsold FF&E. |
| **Expenses of Consultant** | All expenses incident to the conduct of the Sale and the operation of the Stores during the Sale Term shall be borne by Merchant; *except* solely for any of the "Consultant's Controlled Expenses" that exceed the budgeted amount per line item (as provided in Section 3(B) of the applicable Consulting Agreement) for such Consultant Controlled Expenses, which excess such expenses shall be at the sole cost and expense of the Consultant. Without limiting the generality of the foregoing, during the Sale Term, Merchant shall provide the Consultant, at no cost or expense to the Consultant, with (i) central administrative services and distribution center services reasonably necessary to administer the Sale (and consistent with the services provided in the ordinary course consistent with historic periods), (ii) store-level employees at the Stores (to the extent reasonably agreed upon by Merchant and the Consultant necessary to effect the Sale), (iii) reasonable use of Store-level assets (including, but not limited to, trade names, logos, customer lists (including email lists), all credit card facilities, bank accounts, tax identification numbers, computer hardware and software, and furniture, fixtures and equipment), and (iv) peaceful use and occupancy of, and reasonable access (including reasonable before and after hours access and normal utilities/phone service) to, the Stores for the purpose of preparing for, conducting, and completing the Sale as contemplated hereby, without interruption by landlords, labor actions, or otherwise. Without limiting the generality of the foregoing, the Consultant and Merchant shall agree upon an incentive program for Merchant's employees at the Stores, to be funded solely by Merchant, in an amount not to exceed 10% of aggregate payroll during the Sale Term.<br><br>Attached as Exhibit B to each Statement of Work will be an expense budget for the "Consultant Controlled Expenses" with respect to the Stores subject to such Statement of Work. The Consultant will advance funds for its Consultant Controlled Expenses; Merchant shall reimburse the Consultant therefor (up to the aggregate budgeted amount per line item) in connection with each weekly reconciliation contemplated by Section 5(B) of the applicable Consulting Agreement upon presentation of reasonable documentation for such actually-incurred expenses. Merchant shall be obligated to reimburse the Consultant for Consultant Controlled Expenses in addition to the Base Fee, and in addition to the Incentive Fee, if earned. |

10

| TERM | CONSULTING AGREEMENT |
|------|---------------------|
| **Compensation for Consultant** | As used in the Consulting Agreement, the following terms shall have the following meanings: (a) "Gross Proceeds" shall mean the gross proceeds of all sales of Merchandise made in the Stores during the Sale Term, net only of sales taxes; (b) "Merchandise" shall mean all merchandise sold in the Stores during the Sale Term; (c) "Recovery Percentage" shall mean (i) Gross Proceeds, divided by (ii) the aggregate "Retail Value" of the Merchandise; (d) "Retail Value" with respect to each item of Merchandise shall be determined using the "gross rings" method. For purposes of determining "gross rings" with respect to the Merchandise, the Consultant and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store. Register receipts shall show for each item of Merchandise sold the Merchant's retail price for such item, and the markdown or other discount granted in connection with the Sale as agreed to by Merchant and the Consultant. All such records and reports shall be made available to the Consultant and Merchant during regular business hours upon reasonable notice.<br><br>Merchant shall pay Consultant a "Base Fee" equal to three thousand dollars ($3,000) per Store. The Base Fee with respect to the Stores shall be earned concurrently with the execution of each Statement of Work, and shall be paid no later than the first weekly reconciliation following the execution of the respective Statement of Work.<br><br>Merchant shall pay Consultant an "Incentive Fee" (which, if earned, shall be in addition to the Base Fee) as provided in each Statement of Work based upon the applicable Recovery Percentage for the Stores subject to each such Statement of Work. |
| **Conduct of Sale; Other Sale Matters** | Merchant shall have control over the personnel in the Stores and shall handle the cash, debit and charge card payments for all Merchandise sold during the Sale Term in accordance with the Merchant's normal cash management procedures, subject to the Consultant's right to audit any such terms.<br><br>The parties will meet on each Wednesday during the Sale Term to review any Sale matters reasonably requested by either party; and all amounts payable or reimbursable to the Consultant for the prior week (or the partial week in the case of the first and last weeks) shall be reconciled and paid immediately thereafter (i.e. the Base Fee and all reimbursable Consultant Controlled Expenses and/or FF&E Expenses). No later than thirty (30) days following the end of the Sale under each Statement of Work, the parties shall complete a final reconciliation and settlement of all amounts contemplated by the Consulting Agreement and such Statement of Work ("Final Reconciliation"), including without limitation a final determination and payment of (i) any remaining reimbursements to the Consultant, (ii) any remaining payments on account of the Base Fee, and (iii) a determination of the Recovery Percentage, and payment (if any) due to the Consultant on account of the Incentive Fee (based upon the Recovery Percentage). From time to time upon request, each party shall prepare and deliver to the other party such other reports as either party may reasonably request. Each party to the Consulting Agreement shall, at all times during the Sale Term and during the one (1) year period thereafter, provide the other with access to all information, books and records reasonably relating to the Sale and to the Consulting Agreement. All records and reports shall be made available to the Consultant and Merchant during regular business hours upon reasonable notice. |

11

| TERM | CONSULTING AGREEMENT |
|------|---------------------|
|  | Merchant shall collect all sales taxes associated with the sale of Merchandise during the Sale Term, and Merchant shall be solely responsible for reporting and paying the same to the appropriate taxing authorities in accordance with applicable law. |

Merchant shall collect all sales taxes associated with the sale of Merchandise during the Sale Term, and Merchant shall be solely responsible for reporting and paying the same to the appropriate taxing authorities in accordance with applicable law.

Each of Consultant and Merchant shall comply with all federal, state and local laws, rules and regulations applicable to them in connection with the transactions contemplated by this Agreement.

Merchant will prior to the execution of each Statement of Work, inform the Consultant in writing (with specificity) of any restrictions in the leases governing such Store(s) which would potentially conflict with this Agreement and the transactions contemplated thereby so that the parties may determine the Consultant Controlled Expenses and the Incentive Fee performance hurdles with reference to such restrictions.

To the extent Merchant has informed Consultant in writing (prior to the execution of a Statement of Work) of any rules relating to its employees in the Stores that are the subject of the Sale under such Statement of Work, the Consultant shall adhere to such rules.

Merchant acknowledges that the parties are not conducting an inventory of the Merchandise and that Consultant has made no independent assessment of the beginning levels of Merchandise, and Consultant shall not bear any liability for shrink or other loss to the Merchandise.

All sales of Merchandise in the Stores during the Sale shall be made in the name, and on behalf, of Merchant. All such sales shall be "final sales" and "as is," and all advertisements and sales receipts will reflect the same.

The Sale will be advertised as a "this store location closing" or other mutually agreed upon handle throughout the term of the Sale, and Consultant shall be permitted to use signs and internal and external banners and sign walkers reflecting this message, subject to the terms and provisions of applicable law.

Throughout the Sale Term, Merchant's employees used in the conduct of the Sale shall remain employees of Merchant (and shall not be employees of Consultant) and shall continue to be eligible to receive/participate in all of Merchant's benefits/benefits programs consistent with Merchant's ordinary course practices consistent with historic periods. Merchant represents that it has paid, and through the Sale Term will pay, all Store rent and/or occupancy and occupancy-related expenses.

Consultant shall have the right to sell all agreed upon furniture, fixtures and equipment located at the Stores which are owned by Merchant, on a commission basis equal to twenty-five percent (25%) of the gross sales of FF&E (net only of sales tax). Merchant shall reimburse Consultant for its reasonable sale expenses associated with the FF&E pursuant to a budget to be mutually agreed upon by the parties based upon the composition of the FF&E that Merchant desires to have Consultant sell ("FF&E Expenses"). Such budget may be included on each Statement of Work, or it may be agreed upon in a separate writing with respect to each Statement of Work as soon as practicable following the execution of each Statement of Work. In lieu of such commission arrangement for the sale of FF&E, Consultant and Merchant may mutually agree upon an FF&E guarantee in connection with

| TERM | CONSULTING AGREEMENT |
|---|---|
| | each Statement of Work. In either event, Consultant shall have the right to abandon any unsold FF&E at the Stores at the conclusion of the Sale Term. |
| Statements of Work | Merchant shall pay Consultant an "Incentive Fee" (which, if earned, shall be in addition to the Base Fee) as <u>one</u> of the following (e.g., back to the first dollar), based upon the applicable Recovery Percentage relating to the Sale at the Stores subject to such Statement of Work: |

| Recovery Percentage | GBRP's Incentive Fee |
|---|---|
| Below 50.00% | None |
| 50.00% - 51.99% | 0.25% of the Retail Value of the Merchandise |
| 52.00% - 53.99% | 0.75% of the Retail Value of the Merchandise |
| 54.00% and Above | 1.00% of the Retail Value of the Merchandise; plus an amount equal to $500 per Store subject to this Statement of Work |

The performance hurdles set forth above have been established based upon Merchant's representation to the Consultant that (i) the composition of the Merchandise shall be consistent with the information summarized on <u>Exhibit C</u> (attached to each Statement of Work), and (ii) from and after the date thereof and through the Sale Commencement Date, (y) the Stores will be (and have been) operated in the ordinary course consistent with historic practices (including without limitation with respect to replenishment, transfers of merchandise and FF&E in and out, PLU file administration, store hours, and promotion/advertising), and (z) there shall be no increases or decreases to the Merchant's retail prices of any items of Merchandise outside of the ordinary course of business consistent with historic periods.

For the avoidance of doubt, the Gross Proceeds and Retail Value of Merchandise calculations shall be made with reference to the Sale at the Stores subject to this Statement of Work in the aggregate and not on a per-Store basis (but not with reference to any of Merchant's other stores subject to any other Statement(s) of Work).

All other terms and conditions of the Letter Agreement are hereby affirmed and incorporated into this Statement of Work.

<u>Statement of Work 78:</u>

Concurrently with the execution of, and as a condition to Consultant's obligations under this Statement of Work, Merchant shall fund to Consultant $310,000.00 (the "<u>Special Purpose Payment</u>") which shall be held by Consultant until the Final Reconciliation (and Merchant shall not apply the Special Purpose Payment to, or otherwise offset any portion of the Special Purpose Payment against, any weekly reimbursement, payment of fees, or other amount owing to Consultant under this Statement of Work prior to the Final Reconciliation). Without limiting any of Consultant's other rights, Consultant may apply the Special Purpose Payment to any unpaid obligation owing by the Merchant to Consultant under this Agreement. Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by this Agreement shall be returned to Merchant within three days following the Final Reconciliation.

Notwithstanding anything to the contrary in the Agreement, Consultant will advance funds for the Consultant's Controlled Expenses, and Merchant shall reimburse Consultant weekly therefor (up to the aggregate budgeted amount) in connection with a weekly reconciliation upon presentation of reasonable documentation for such actually-incurred expenses. In addition to, and not as part of, reimbursement of any Consultant Controlled Expenses,

| TERM | CONSULTING AGREEMENT |
|---|---|
|  | Merchant shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with this Agreement.<br><br>Statement of Work 79:<br><br>Notwithstanding anything to the contrary herein, Consultant acknowledges and agrees that the Stores subject to this SOW are to be part of a "Storewide Sale" program, and therefore the product mix and inventory levels will vary from prior SOW's which performed "Store Closing" or "Going Out of Business" programs.<br><br>Concurrently with the execution of, and as a condition to Consultant's obligations under this Statement of Work, Merchant shall fund to Consultant $832,000.00 (the "Special Purpose Payment") which shall be held by Consultant until the Final Reconciliation (and Merchant shall not apply the Special Purpose Payment to, or otherwise offset any portion of the Special Purpose Payment against, any weekly reimbursement, payment of fees, or other amount owing to Consultant under this Statement of Work prior to the Final Reconciliation).  Without limiting any of Consultant's other rights, Consultant may apply the Special Purpose Payment to any unpaid obligation owing by the Merchant to Consultant under this Agreement.  Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by this Agreement shall be returned to Merchant within three days following the Final Reconciliation.<br><br>Notwithstanding anything to the contrary in the Agreement, Consultant will advance funds for the Consultant's Controlled Expenses, and Merchant shall reimburse Consultant weekly therefor (up to the aggregate budgeted amount) in connection with a weekly reconciliation upon presentation of reasonable documentation for such actually-incurred expenses.  In addition to, and not as part of, reimbursement of any Consultant Controlled Expenses, Merchant shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with this Agreement.<br><br>Statement of Work 80:<br><br>Concurrently with the execution of, and as a condition to Consultant's obligations under this Statement of Work, Merchant shall fund to Consultant $750,000.00 (the "Special Purpose Payment") which shall be held by Consultant until the Final Reconciliation (and Merchant shall not apply the Special Purpose Payment to, or otherwise offset any portion of the Special Purpose Payment against, any weekly reimbursement, payment of fees, or other amount owing to Consultant under this Statement of Work prior to the Final Reconciliation).  Without limiting any of Consultant's other rights, Consultant may apply the Special Purpose Payment to any unpaid obligation owing by the Merchant to Consultant under this Agreement.  Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by this Agreement shall be returned to Merchant within three days following the Final Reconciliation.<br><br>Notwithstanding anything to the contrary in the Agreement, Consultant will advance funds for the Consultant's Controlled Expenses, and Merchant shall reimburse Consultant weekly therefor (up to the aggregate budgeted amount) in connection with a weekly reconciliation upon presentation of reasonable documentation for such actually-incurred expenses.  In |

| TERM | CONSULTING AGREEMENT |
|---|---|
| | addition to, and not as part of, reimbursement of any Consultant Controlled Expenses, Merchant shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with this Agreement.<br><br><br>Statement of Work 81:<br><br>Notwithstanding anything to the contrary in the Agreement, Consultant will advance funds for the Consultant's Controlled Expenses, and Merchant shall reimburse Consultant weekly therefor (up to the aggregate budgeted amount) in connection with a weekly reconciliation upon presentation of reasonable documentation for such actually-incurred expenses.  In addition to, and not as part of, reimbursement of any Consultant Controlled Expenses, Merchant shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with this Agreement. |
| **Insurance Obligations** | During the Sale Term: Merchant agrees to maintain (at its expense) its normal and customary products liability insurance with respect to the Merchandise; as well such other insurance that Merchant has maintained in the ordinary course consistent with historic periods (including without limitation for example commercial general liability insurance, comprehensive automobile liability insurance, workers compensation insurance, employer's liability insurance).<br><br>During the Sale Term, Consultant shall, at its sole cost and expense, maintain in effect at all times during the Sale Term insurance coverages with limits not less than those set forth below with insurers licensed to do business in the state(s) in which the services are performed: (i) Commercial general liability, including contractual liability coverage with respect to the Services, bodily injury, property damage liability, independent contractor coverage and completed operations coverage, all in broad form having a combined single limit of $1,000,000.000; (ii) Comprehensive automobile liability, having a combined single limit of $1,000,000.00; (iii) Workers' Compensation as required by the laws of the state(s) where the Stores are located containing a waiver of subrogation in favor of Merchant; (iv) Employer's liability with a $500,000.00 limit, and; (v) Such other insurance as may be reasonably requested from time to time by Merchant.<br><br>None of the requirements contained herein as to types, limits or the parties' approval of insurance coverage to be maintained by the parties is intended to and shall not in any manner limit, qualify or quantify the liabilities and obligations assumed by Consultant or Merchant under this Agreement or otherwise provided by law.<br><br>Evidence of the insurance coverage required to be maintained by Consultant and Merchant under this Agreement, represented by certificates of insurance issued by the insurance carrier(s), must be furnished to Merchant or Consultant (as the case may be) as soon as practicable following execution of this Agreement and as such policies are renewed.  Such certificate of insurance shall state that Merchant or Consultant (as the case may be) will be notified in writing sixty (60) days prior to cancellation, material change, or nonrenewal of insurance. |

| TERM | CONSULTING AGREEMENT |
|---|---|
| | Notwithstanding any other provision of the Consulting Agreement, Merchant and Consultant agree that Consultant shall not be deemed to be in possession or control of the Stores or the Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores. |
| **Indemnification by Consultant** | To the fullest extent permitted by applicable law, Consultant hereby agrees to indemnify, protect, defend and hold harmless Merchant, and Merchant's parent(s), subsidiary and affiliated companies (corporate and non-corporate), and its and their respective officers, directors, shareholders, employees and agents for, from and against all liabilities, claims, damages, losses, liens, causes of action, suits, judgments and expenses, including attorney fees, of any nature, kind or description of any third-party person or entity directly or indirectly arising out of, caused by, or resulting from (in whole or in part) any negligent or grossly negligent act, error or omission of Consultant or anyone employed by it. |
| **Indemnification by Merchant** | To the fullest extent permitted by applicable law, Merchant hereby agrees to indemnify, protect, defend and hold harmless Consultant, and Consultant's parent(s), subsidiary and affiliated companies (corporate and non-corporate), and its and their respective officers, directors, shareholders, employees and agents for, from and against all liabilities, claims, damages, losses, liens, causes of action, suits, judgments and expenses, including attorney fees, of any nature, kind or description of any third-party person or entity directly or indirectly arising out of, caused by, or resulting from (in whole or in part) any negligent or grossly negligent act, error or omission of Merchant or anyone employed by it. |

## IV.    The U.S. and Canada Sale Guidelines.

17.    The Debtors seek approval of streamlined procedures (*i.e.*, the Sale Guidelines) to sell the Store Closure Assets, in each case free and clear of liens, claims, and encumbrances. Specifically, the Debtors seek approval of two sets of Sale Guidelines: The U.S. Sale Guidelines and the Canada Sale Guidelines.  As set forth below, the U.S. Sale Guidelines are substantially similar to sale guideline approved in this Court and other U.S. Courts.  The Canada Sale Guidelines are substantially similar to relief more customary in Canada, and are being approved by this Motion so that Debtors can seek recognition of this Motion in the Debtors' proceeding in Canada.  The Debtors also seek approval of the Sale Guidelines to provide newspapers and other advertising media in which the Sales may be advertised with comfort that the Debtors are conducting the Sales in compliance with applicable law and with the Bankruptcy Court's approval.  The Debtors seek

interim approval of the Sale Guidelines to allow the continuation of the Sales at the Initial Closing Stores and commencement of the Sales at the Additional Closing Stores, if any.

18.     The Debtors have determined, in the exercise of their reasonable business judgment and in consultation with their advisors, that the Sale Guidelines will provide the best and most efficient means of selling the Store Closure Assets in order to maximize their value to the estates. The Debtors estimate that the currently contemplated Store Closings will continue until no later than March 31, 2020.

**V.      Liquidation Sale Laws and Dispute Resolution Procedures.**

19.     Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state, provincial, and local laws, statutes, rules, regulations, and ordinances (collectively, the "Liquidation Sale Laws").  The Liquidation Sale Laws may establish licensing, permitting or bonding requirements, waiting periods, time limits, bulk sale restrictions, and augmentation limitations that would otherwise apply to the Store Closings.  Such requirements hamper the Debtors' ability to maximize value in selling their inventory.  Subject to the Bankruptcy Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Sale Guidelines, and to the extent such guidelines conflict with the Liquidation Sale Laws, the Sale Guidelines shall control (provided that, subject to recognition of the Interim Order or Final Order, as applicable, by the Canadian Court, these Dispute Resolution Procedures shall not apply with respect to the sale of Store Closure Assets in Canadian stores, and that any such disputes shall be dealt with by the Canadian Court).

20.    For the purpose of orderly resolving any disputes between the Debtors and any

Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Sale

Guidelines and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully

request that the Bankruptcy Court authorize the Debtors to implement the following dispute

resolution procedures (the "Dispute Resolution Procedures"), as set forth in the Interim and Final

Orders:

i.    Provided that the Sales are conducted in accordance with this Order, any Final Order, and the Sale Guidelines, the Debtors, the Consultant, and the Debtors' landlords, shall be deemed to be in compliance with any requirements of all county, parish, or municipal or other local government (hereinafter referred to as "Local") and State requirements governing the conduct of the Sales of the Store Closure Assets, including but not limited to Local statutes, regulation and ordinances establishing licensing or permitting requirements, waiting periods or time limits, or bulk sale restrictions that would otherwise apply to the Sales and sales of the Store Closure Assets (collectively, the "Liquidation Sale Laws") of any state or local Governmental Unit (as defined in Bankruptcy Code section 101(27); provided, that the term "Liquidation Sale Laws" shall be deemed not to include any public health or safety laws or any state (collectively, "Safety Laws"), and the Debtors and the Consultant shall continue to be required to comply, as applicable, with such Safety Laws and General Laws, subject to any applicable provision of the Bankruptcy Code and federal law, and nothing in this Order shall be deemed to bar Governmental Units (as defined in section 101(27) of the Bankruptcy Code) or public officials from enforcing Safety Laws or General Laws.

ii.    Within three (3) business days after entry of the Interim Order, the Debtors will serve by first-class mail, copies of the Interim Order, the proposed Final Order, the Consulting Agreement, and the Sale Guidelines on the following: (a) the Attorney General's office for each state where the Sales are being held; (b) the county consumer protection agency or similar agency for each county where the Sales are being held; (c) the division of consumer protection for each state where the Sales are being held; and (d) the landlords for the Closing Stores (collectively, the "Dispute Notice Parties").

iii.    With respect to any Additional Closing Stores, within three (3) business days after filing any Additional Closing Store List (as defined below) with the Bankruptcy Court, the Debtors will serve by first-class mail, copies of the Interim Order, or the

18

Final Order, as applicable, the Consulting Agreement, and the Sale Guidelines on the Dispute Notice Parties.

iv.    To the extent that there is a dispute arising from or relating to the Sales, the Order, the Consulting Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Bankruptcy Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten (10) days following entry of the Interim Order, or service of an Additional Store Closing List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., Emily E. Geier, and AnnElyse Scarlett Gains, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Joshua M. Altman; (b) Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia, Attn: Michael A. Condyles, Peter J. Barrett, Jeremy S. Williams, and Brian H. Richardson; (c) on behalf of Gordon Brothers Retail Partners, LLC, Prudential Tower, 800 Boylston Street, 27th Floor, Boston, Massachusetts 02199, Attn: Mackenzie Shea; and (d) Riemer Braunstein LLP, 7 Times Square, Suite 2506, New York, New York 10036, Attn: Steven Fox. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the notice, the Governmental Unit may file a motion with the Bankruptcy Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

v.    In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to the Interim Order or the Final Order, as applicable, absent further order of the Bankruptcy Court. Upon the entry of the Interim or Final Order, the Debtors and the Consultant shall be authorized to conduct the Sales pursuant to the terms of the Interim Order or the Final Order, the Consulting Agreement, and the Sale Guidelines and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will

constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

vi.    If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (iv) and (v) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs.    Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

## VI.    Fast Pay Laws.

21.    Many U.S. states and certain Canadian provinces in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws" and together with the Liquidation Sale Laws, the "Applicable State Laws").  These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

22.    The nature of the Store Closings contemplated by this Motion will result in a substantial number of employees being terminated during the Store Closings.  To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures.  However, the Debtors' payroll systems will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with the Fast Pay Laws.  Under ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by applicable law.  This process requires the Debtors' payroll department to calculate individual payments upon termination, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing.  Given the number

of employees who will likely be terminated during the Store Closings, this process could easily take several days, making compliance with the Fast Pay Laws burdensome to the Debtors' estates, if not impossible.

## VII.    Lease Restrictions.

23.    The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closings and Sales.  In certain cases, the contemplated Store Closings and Sales may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions.  Such restrictions would also hamper the Debtors' ability to maximize value in selling their inventory.

24.    The Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf shall interfere with or otherwise impede the conduct of the Store Closings, the Sales or institute any action against the Debtors in any court (other than in the Bankruptcy Court or, with respect to Canadian stores, the Canadian Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings, the Sales or the advertising and promotion (including through the posting of signs) of the Sales.

21

25.    Given that Debtors are seeking this relief on an interim basis, the Debtors seek to resolve the concerns of landlords as expeditiously as possible.  In other similar cases, other debtors have proposed store closing procedures with materially similar lease restrictions.  Other debtors in these situations have obtained store closing orders which included a provision allowing for "side letters" between a debtor and landlord to resolve landlord concerns.  *See, e.g., In re Toys "R" Us, Inc.*, No 17-34665 (KLP) (Bankr. E. D. Va. Feb. 6, 2018); *In re The Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E. D. Va. July 11, 2017).  The Debtors have included this provision in the Interim Order so as to expeditiously address landlord concerns.

## VIII.    Abandonment.

26.    The Debtors respectfully request that the Court authorize the abandonment of certain owned FF&E remaining in the Closing Stores.  The Debtors intend to sell any marketable owned FF&E present in the Closing Stores.  However, the Debtors may determine that the cost associated with holding or selling that property exceeds the proceeds that will be realized from its sale, or such property may not be saleable at all.  In such cases, retaining the property would be burdensome to the estate and the property would be of inconsequential value.  For the avoidance of doubt, the Debtors will not sell any personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) as part of the Store Closings, and all personal identifying information will be removed from any FF&E prior to abandonment of same.  Accordingly, the Debtors respectfully submit that abandonment of such property is in the best interests of their estates and request that the Court authorize them to do so

22

where they determine in their business judgment that abandonment is the appropriate course of action.

**IX.     Store Closing Bonus Plan.**

27.     Through this Motion, the Debtors are requesting the authority, but not the obligation, to pay Store Closing Bonuses (the "Store Closing Bonus Plan") to store-level non-insider employees, who remain in the employ of the Debtors during the Sales.  The Debtors believe that the Store Closing Bonus Plan will motivate employees during the Sales and will enable the Debtors to retain those employees necessary to successfully complete the Sales.

28.     The Debtors' Store Closing Bonus Plan is composed of two programs.  One has been in place for more than five years, while the other has been active since September 2019. Payments under both programs are made exclusively to non-insiders and on the condition of employment through the date on which the respective employee's store closes.

29.     The amount of the bonuses offered under the Store Closing Bonus Plan vary depending upon a number of factors, including the employee's position with the Debtors and duration of employment.

30.     The total aggregate cost of the Store Closing Bonus Plan will also vary depending on how many Closing Stores are ultimately closed.  If the Debtors were to close every Closing Store the aggregate amount of Store Closing Bonuses paid will not be more than $1.65 million, assuming one hundred percent of the eligible employees remain employed through the duration of the Closing Sales at every Closing Store.

31.     Providing such non-insider bonus benefits is critical to ensuring that key employees that will be affected by the reduction in the Debtors' work force due to the Store Closings will

continue to provide critical services to the Debtors during the ongoing Store Closing process.  For the avoidance of doubt, the Debtors do not propose to make any payment on account of Store Closing Bonuses to any insiders.

32.     In order to ensure a successful Store Closing and Sale process and maximize revenues for the benefit of the Debtors' estates, the Store Closing Bonuses incentivize store management to provide uninterrupted leadership during this challenging period, and ties payment to maintaining employment with the Debtors through the conclusion of the Sales.

33.     Accordingly, the Debtors respectfully submit that the Store Closing Bonus Plan is in the best interests of their estates and request that the Court authorize payments under the Store Closing Bonus Plan as a sound exercise of their business judgment.

### Basis for Relief

### I.     The Court Should Authorize the Assumption of the Consulting Agreement.

34.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  Courts in the Fourth Circuit have determined that a debtor's assumption or rejection of a contract should be "accorded the deference mandated by the sound business judgment rule as generally applied by courts to discretionary actions or decisions of corporate directors."  *See, e.g.*, *In re Alpha Nat. Res., Inc.*, 555 B.R. 520, 529 (Bankr. E.D. Va. 2016) (holding that the debtors' decision to reject an executory contract was based in sound business judgment as the contract was unnecessary to the debtors' ongoing business efforts); *Lubrizol Enters. Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1045–46 (4th Cir. 1985) (holding that rejection of a contract is the debtor's decision and "is to be accorded

the deference mandated by the sound business judgment rule as generally applied by courts to discretionary actions or decisions of corporate directors").

35.     Here, the Debtors have exercised their sound business judgment in determining to assume the Consulting Agreement.   By continuing the engagement of the Consultant—the Debtors' previous inventory appraiser and store closing liquidator—the Debtors determined that they could capitalize on the knowledge of a consultant already familiar with the Debtors' liquidation performance in order to ultimately deliver the best results for the Debtors.  Further, the Debtors believe that the terms set forth in the Consulting Agreement are fair and reasonable and present the best path for the Sales.  Moreover, the Consultant has extensive expertise in conducting liquidation sales and will be able to effectively oversee and implement the Sales in an efficient and cost-effective manner.

36.     Courts hearing chapter 11 cases filed by retailers have recently approved the assumption and/or approval of similar consulting agreements.  *See, e.g., In re Gemstone Solutions Group, Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. Jan. 17, 2019) (authorizing entry into consulting   agreement);   *In   re   Toys   "R"   Us,   Inc.,*   No.   17-34665   (KLP) (Bankr. E.D. Va. Feb. 6, 2018)  (same);  *In  re  The  Gymboree  Corp.*,  No. 17-32986  (KLP) (Bankr. E.D. Va.  July 11, 2017) (same); *In re Vitamin World, Inc.*, No. 17-11933 (KJC) (Bankr. D. Del. Nov. 21, 2017)   (same);   *In   re   rue21,   inc.,*   No. 17-22045   (GLT) (Bankr. W.D. Pa. June 12, 2017) (same).[4]

---

[4]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

25

37.     The Debtors submit that they have exercised reasonable business judgment in engaging the Consultant to conduct the Store Closings and Sales.  Given the number of stores and the Consultant's in-depth knowledge of the Debtors' process of running Store Closings and Sales, as discussed above, it is unlikely the Debtors could retain a liquidator able to conduct the process as efficiently and effectively as the Consultant.  If the Consulting Agreement is not assumed on a final basis, the Sales would lose the benefit of the Consultant's oversight and might be delayed or suspended entirely, leading to loss of additional liquidity and increased administrative expense. Accordingly, the Debtors respectfully request that the Court authorize their assumption of the Consulting Agreement.

## II.     The Court Should Approve the Sale Guidelines.

38.     The Court may authorize the Debtors to consummate the Store Closings pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that, "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1). Further, section 105(a) of the Bankruptcy Code provides, in relevant part, that, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

39.     As discussed herein, pursuant to section 363(b) of the Bankruptcy Code, for the purpose of conducting the Store Closings, the Debtors need only show a legitimate business justification for the proposed action.  *See, e.g.*, *On-Site Sourcing, Inc.*, 412 B.R. at 822; *In re U.S. Airways Grp., Inc.*, No. 02-83984 (SSM), 2002 WL 31829093, at *1 (Bankr. E.D. Va. Dec. 16, 2002).

26

40.    In addition, the Court may authorize the Store Closings based on section 105(a) of the Bankruptcy Code.  Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a), courts may authorize any action that is essential to the continued operation of a debtor's businesses.  *See In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (holding that a court may permit pre-plan payments of prepetition obligations when essential to the continued operation of the debtor); *see also In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (holding that the "'doctrine of necessity' stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's organization").

41.    The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors and their advisors believe that the Sale Guidelines represent the most efficient and appropriate means of maximizing the value of the Store Closure Assets, while balancing the potentially competing concerns of landlords and other parties in interest.

42.    Furthermore, ample business justification exists to conduct the Store Closings. Prior to the Petition Date, the Debtors, with the assistance of their advisors, engaged in an extensive review of each of their stores to:  (a) identify underperforming stores; (b) consider whether the store's performance can be improved by various initiatives, including through the negotiation of lease concessions with landlords; (c) determine which stores were candidates for downsizing; (d) assess the potential to consolidate certain Pier 1 Imports stores within a reasonable proximity

27

of one another; and (e) determine what stores should be closed promptly to eliminate their ongoing

negative impact on the Debtors' financial performance and to improve the Debtors' liquidity.  This

process has resulted in the Debtors' identification of the Initial Closing Stores and is ongoing with

respect to Additional Closing Stores.

43.     Further delay in consummating the Store Closings would diminish the recovery tied

to monetization of the Store Closure Assets for a number of reasons, chief among them is that the

Closing Stores are a drain on liquidity.  Thus, the Debtors will realize an immediate benefit in

terms of financial liquidity upon the sale of the Store Closure Assets and the termination of

operations at the Closing Stores.  Further, the swift and orderly commencement of the Store

Closings will allow the Debtors to timely reject the applicable store leases, and therefore avoid the

accrual of unnecessary administrative expenses for rent payment.  Delaying the Store Closings

may cause the Debtors to pay postpetition rent at many of these stores.  Additionally, given the

Debtors' current section 365(d)(4) deadline, there is a finite number of days that the Sales can run

without obtaining further consents from landlords.

44.     Courts in this jurisdiction and other districts have recently approved sale guidelines

in chapter 11 cases, and numerous courts have granted retail debtors authority to implement such

procedures.   *See, e.g.*, *In re Gemstone Solutions Group, Inc.*, No. 19-30258 (KLP)

(Bankr. E.D. Va. Jan. 17, 2019) (authorizing the debtors, pursuant to sections 105(a) and 363(b)(1)

of the Bankruptcy Code, to sell inventory and assets from closing stores); *In re Toys "R" Us, Inc.,*

No. 17-34665 (KLP) (Bankr. E.D. Va. Feb. 6, 2018) (same); *In re Vitamin World, Inc.*,

No. 17-11933 (KJC) (Bankr. D. Del. Nov. 21, 2017) (same); *In re rue21, inc.,* No. 17-22045

(GLT)      (Bankr. W.D. Pa. July      11,      2017)      (same);      *see      also*

28

*In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. Mar. 2, 2017) (authorizing the debtors, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct the contemplated store closings).[5]  The sale guidelines approved in the foregoing cases are substantially similar to the Sale Guidelines attached hereto.

III.    **The Court Should Approve the Sale of the Store Closure Assets Free and Clear of all Liens, Encumbrances, and Other Interests under section 363(f) of the Bankruptcy Code.**

45.    The Debtors request approval to sell the Store Closure Assets on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.   A debtor in possession may sell property under sections 363(b) and 363(f) of the Bankruptcy Code "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:  (i) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (ii) such entity consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such interest is in *bona fide* dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.   11 U.S.C. § 363(f); *see also In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).

---

[5]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

46.     The Debtors anticipate that, to the extent there are liens on the Store Closure Assets, all holders of such liens will consent to the Sales because they provide the most effective, efficient, and time-sensitive approach to realizing proceeds for, among other things, the repayment of amounts due to such parties.  Any and all liens on the Store Closure Assets sold under the Sales would attach to the remaining net proceeds of such sales with the same force, effect, and priority as such liens currently have on these assets, subject to the rights and defenses, if any, of the Debtors and of any party-in-interest with respect thereto.  Moreover, all identified lienholders have received sufficient notice and have been given sufficient opportunity to object to the relief requested.

47.     Accordingly, the Debtors submit that the sale of the Store Closure Assets satisfies the statutory requirements of section 365(f) of the Bankruptcy Code and should, therefore, be free and clear of any liens, claims, encumbrances, and other interests.

**IV.     The Court Should Waive Compliance with Applicable State Laws and Approve the Dispute Resolution Procedures.**

48.     The Debtors' ability to conduct the Sales in accordance with the Sale Guidelines and without complying with Applicable State Laws is critical to the Sales' success.  Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws in conducting the Sales, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales. Additionally, compliance with Fast Pay Laws would require the Debtors to pay terminated

30

employees within a time frame that would be detrimental to the conduct of these chapter 11 cases, if not impossible.

49.     To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Applicable State Laws, the Debtors propose the Sale Guidelines as a way to streamline the administrative burdens on their estates while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closings.  As such, the Debtors believe the Sale Guidelines mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closings, and therefore, the below requested relief is in compliance with any applicable Liquidation Sale Laws.

50.     The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sale Laws, subject to the Sale Guidelines.  *First*, it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sale Laws.  *See, e.g.*, Ark. Code Ann. § 4-74-103 (exempting from the provisions of the chapter sales pursuant to any court order); Ga. Code Ann. § 10-1-393(b)(24)(C)(iv) (same); 815 ILCS 350/3 (same); La. Rev. Stat. Ann. § 51:43(1) (same); N.Y. Gen. Bus. Law § 584(a) (same); Or. Rev. Stat. Ann. § 646A.100(2)(b) ("'Going out of business sale' does not include a sale conducted by a bankruptcy trustee."); Tex. Bus. & Com. Code Ann. § 17.91(3) (exempting from subchapter sales conducted pursuant to court order).  *Second*, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closings to proceed notwithstanding any contrary Applicable State Laws as it is essential to the continued operation of the Debtors' business.  *Third*, this Court

31

will be able to supervise the Store Closings because the Debtors and their assets are subject to this

Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. As such, creditors and the public interest

are adequately protected by notice of this Motion and the ongoing jurisdiction and supervision of

the Bankruptcy Court.

51. Further, bankruptcy courts have consistently recognized, with limited exception,

that federal bankruptcy law preempts state and local laws that contravene the underlying policies

of the Bankruptcy Code. *See In re Williams,* No. 06-32921 (KHR), 2007 WL 2122131, at *9

(Bankr. E.D. Va. July 19, 2007) ("When a conflict exists between state law and bankruptcy laws

enacted by Congress, the state law is superseded."); *In re WBQ P'ship*, 189 B.R. 97, 108

(Bankr. E.D. Va. 1995) (holding that the Bankruptcy Code preempted the provisions of Va. Code

§ 32.1-329 since Virginia law inhibited the sale of assets free and clear in contravention of

section 363(f)); *see also In re LandAmerica Fin. Grp., Inc.*, 470 B.R. 759, 780

(Bankr. E.D. Va. 2012) (holding that the "scope of preemption under § 1123(a) of the Bankruptcy

Code is broad enough to preempt any state law that would restrict the objectives and operation of

a debtor's reorganization plan"); *In re Harrison*, No. ADV. 93-3129S, 1994 WL 16191613, at *2

(Bankr. E.D. Va. Jan. 14, 1994) (holding that the provisions of the Bankruptcy Code preempt the

holdings of the state supreme court as it pertains to treatment of interest on arrearages).

52. Courts in some jurisdictions have found that preemption of state law is not

appropriate if the laws deal with public health and safety. *See Baker & Drake. Inc. v. Pub. Serv.*

*Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that

Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in

part as public safety measure). However, preemption is appropriate where, as is the case here, the

32

only state laws involved concern economic regulation rather than the protection of public health

and safety.  *See In re Baker & Drake. Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy

preemption is more likely . . . where a state statute is concerned with economic regulation rather

than with protecting the public health and safety").

53.     Under the circumstances of these chapter 11 cases, enforcing the strict requirements

of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the

Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the

benefit of creditors.  Accordingly, authorizing the Sales without the delays and burdens associated

with obtaining various state and local licenses, observing state and local waiting periods or time

limits, and/or satisfying any additional requirements with respect to advertising, sales, and similar

items is necessary and appropriate.  The Debtors do not seek a general waiver of all state and local

law requirements, but only those that apply specifically to retail liquidation sales.  Indeed, the

requested waiver is narrowly tailored to facilitate the successful consummation of the Sales.

Moreover, the Debtors will comply with applicable state and local public health and safety laws,

and applicable tax, labor, employment, environmental, and consumer protection laws, including

consumer laws regulating deceptive practices and false advertising.   Finally, the Dispute

Resolution Procedures provide an ordered means for resolving any disputes arising between the

Debtors and any Governmental Units with respect to the applicability of any Liquidation Sale

Laws, and should therefore be approved.

54.     Based on the foregoing, courts in this district and other jurisdictions have granted

similar relief in other bankruptcy cases under similar circumstances.  *See, e.g.*, *In re Gemstone*

*Solutions Group, Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. Jan. 17, 2019) (authorizing store

33

closing sales while presuming compliance with laws affecting store closing or liquidation sales);

*In re Toys "R" Us, Inc.,* No. 17-34665 (KLP) (Bankr. E.D. Va. Feb. 6, 2018) (same); *In re The*

*Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 11, 2017) (authorizing the

assumption of consulting agreement); *In re rue21, inc.,* No. 17-22045 (GLT)

(Bankr. W.D. Pa. July 11, 2017) (same); *In re BCBG Max Azria Glob. Holdings, LLC*,

No. 17-10466 (Bankr. S.D.N.Y. Mar. 2, 2017) (authorizing store closing sales while presuming

compliance with laws affecting store closing or liquidation sales).[6]

55.    Courts have also granted similar relief from Fast Pay Laws in other bankruptcy

cases under similar circumstances. *See, e.g.*, *In re Gemstone Solutions Group, Inc.*, No. 19-30258

(KLP) (Bankr. E.D. Va. Jan. 17, 2019) (authorizing store closing sales and deeming presumed

compliance with "Fast Pay Laws"); *In re Toys "R" Us, Inc.,* No. 17-34665 (KLP)

(Bankr. E.D. Va. Feb. 6, 2018) (same); *In re The Gymboree Corp.*, No. 17-32986 (KLP)

(Bankr. E.D. Va. July 11, 2017) (same); *In re rue21, inc.,* No. 17-22045 (GLT)

(Bankr. W.D. Pa. July 11, 2017) (same); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033

(Bankr. D. Del. Oct. 13, 2016) (granting relief from federal, state or local laws including "any fast

pay laws" in connection with store closing sales).[7]

---

[6]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.
Copies of these orders are available upon request of the Debtors' proposed counsel.

[7]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.
Copies of these orders are available upon request of the Debtors' proposed counsel.

**V.      The Court Should Waive Compliance with Restrictions in the Debtors' Leases.**

56.      Certain of the Debtors' leases governing the premises of the stores subject to the
Store Closings may contain provisions purporting to restrict or prohibit the Debtors from
conducting store closing, liquidation, or similar sales.  Such provisions have been held to be
unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability
to properly administer its reorganization case and maximize the value of its assets under
section 363 of the Bankruptcy Code.  *See In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359
(Bankr. S.D.N.Y. 1992) (deciding that enforcement of such lease restrictions would "contravene
overriding federal policy requiring [the debtor] to maximize estate assets. . ."); *In re R.H. Macy
and Co., Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not
recover damages for breach of a covenant to remain open throughout the lease term, because the
debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by
holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463,
467–68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be
significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from
liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695
(Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case
where the debtor sought to conduct a liquidation sale).

57.      Store closing sales are a routine part of chapter 11 cases involving retail debtors.
Such sales are consistently approved by courts, despite provisions in recorded documents or
agreements purporting to forbid such sales.  Indeed, courts have repeatedly overlooked such
restrictive contractual provisions in order to authorize a retail debtor's store closings.  *See, e.g.,*

*In re Gemstone Solutions Group, Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. Jan. 17, 2019) (authorizing store closing sales without requiring compliance with lease provisions affecting store closing or liquidation sales); *In re Toys "R" Us, Inc.,* No. 17-34665 (KLP) (Bankr. E.D. Va. Feb. 6, 2018) (same); *In re The Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 11, 2017) (same); *In re rue21, inc.,* No. 17-22045 (GLT) (Bankr. W.D. Pa. July 11, 2017) (same); *In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. Mar. 2, 2017) (same).[8]

58.     Thus, to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Store Closings, the Debtors request that the Court authorize the Debtors and the Consultant to conduct any liquidation sales without interference by any landlords or other persons affected, directly or indirectly, by the liquidation sales.

## VI.     The Court Should Approve the Abandonment of Certain Property in Connection with any Liquidation Sales.

59.     After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. §554(a); *see also In re Jalajel*, No. 09-11453 (RGM), 2010 WL 3946420, at *4 (Bankr. E.D. Va. Oct. 8, 2010) (stating that if a trustee "believes the assets are of *de minimus* value, he will abandon them").

60.     The Debtors are seeking to sell all owned FF&E remaining in the Closing Stores. However, the Debtors may determine that the costs associated with holding or selling certain

---

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

property or FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.

61.    To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon any of their remaining FF&E or other property located at any of the Closing Stores without incurring liability to any person or entity. The Debtors further request that the landlord of each Closing Store with any abandoned FF&E or other property be authorized to dispose of such property without liability to any third parties.

62.    Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

**VII.    The Bankruptcy Court Should Approve the Procedures Relating to the Additional Closing Stores.**

63.    The Debtors request that the Sale Guidelines and the Interim Order or the Final Order, as applicable, apply to any Additional Closing Stores.  In order to provide landlords and other parties in interest with information regarding the ultimate disposition of the Closing Stores, to the extent that the Debtors seek to conduct the Sales at any Additional Closing Store, the Debtors will consult with the DIP Agents, file a list of such Additional Closing Stores with the Bankruptcy

Court (the "Additional Closing Store List"), and serve a notice of their intent to conduct the Sales

at the Additional Closing Stores on the applicable landlords

(the "Additional Closing Store Landlords") and any other interested parties, including counsel to

the DIP Agents, by email (to the extent available to the Debtors) or overnight mail.  With respect

to Additional Closing Store Landlords, the Debtors will mail such notice to the notice address set

forth in the lease for such Additional Closing Store (or, if none, at the last known address available

to the Debtors).

64.    The Debtors propose that the Additional Closing Store Landlords (each of whom

will have already been served with this Motion, the Interim Order, and the Final Order) and any

interested parties have seven days after service of the applicable Additional Closing Store List to

object to the application of the Interim or Final Order to their Closing Stores.  If no timely

objections are filed with respect to the application of the Interim Order or the Final Order to an

Additional Closing Store, then the Debtors should be authorized, pursuant to sections 105(a), and

363(b) and (f) of the Bankruptcy Code, to proceed with conducting the Sales at the Additional

Closing Store in accordance with the Interim Order or the Final Order, the Sale Guidelines, and

the Consulting Agreement.  If any objections are filed with respect to the application of the Interim

Order or the Final Order, as applicable, to an Additional Closing Store, and such objections are

not resolved, the objections and the application of the Interim Order or the Final Order, as

applicable, to the Additional Closing Store will be considered by the Court at the next regularly

scheduled omnibus hearing, subject to the rights of any party to seek relief on an emergency basis

on shortened notice, to the extent necessary so that the Debtors can move promptly to maximize

value and minimize expenses for the benefit of their creditors and stakeholders.  Similar relief has

38

been granted in recent retail bankruptcy cases.  *See e.g., In re Gemstone Solutions Group, Inc.*,

No. 19-30258 (KLP) (Bankr. E.D. Va. Jan. 17, 2019) (approving similar procedures for additional

stores); *In re Toys "R" Us, Inc.,* No. 17-34665 (KLP) (Bankr. E.D. Va. Feb. 6, 2018) (same);

*In re The Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 11, 2017) (same);

*In re rue21, inc.*, No. 17-22045 (Bankr. W.D. Pa. July 11, 2017) (same);

*In re APP Winddown, LLC (f/k/a American Apparel, LLC)*, No. 16-12551

(Bankr. D. Del. Dec. 19, 2016) (same).[9]

## VIII.    The Store Closing Bonus Plan Is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved.

65.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor],

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  Under this section, a court may authorize a debtor

to use property of the estate when such use has a "sound business purpose" and when the use of

the property is proposed in good faith.  *See In re W.A. Mallory Co.*, 214 B.R. 834, 836

(Bankr. E.D. Va. 1997); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

66.     Courts generally require a debtor to demonstrate that a valid business purpose exists

for the use of estate property in a manner that is not in the ordinary course of business.  *See In re*

*Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983).  Once the debtor has articulated a valid

business justification, a presumption arises that the debtor's decision was made on an informed

basis, in good faith, and in the honest belief the action was in the best interest of the company.  *See*

---

[9]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

*In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).  Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  The business judgment rule shields a debtor's management from judicial second-guessing.  *See Integrated Res.*, 147 B.R. at 656; *Johns-Manville*, 60 B.R. at 615–16 (noting that "the Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions").  Thus, if a debtor's actions satisfy the business judgment rule, then the actions in question should be approved under section 363(b)(1).

67.    In this case, the Store Closing Bonus Plan is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors and all their estates' stakeholders. The store employees—along with their skills, knowledge, and hard work—are more critical now than ever.  Through their commitment and performance, they can ensure that the Debtors continue to maximize stakeholder value in a challenging economic environment and at a time when those employees' positions will soon be terminated.

68.    Additionally, the total cost of the Store Closing Bonus Plan is reasonable in light of the total revenue projected from the Sales and competitive market practice and involves compensation structures often used in other restructuring situations to incentivize employees to continue optimal performance despite the added stress inherent in the chapter 11 process.

69.    The Store Closing Bonus Plan is comparable to employee incentive and retention plans regularly paid in other "store closing" and similar-themed sales.  As in those other instances, some aspects of the Store Closing Bonus Plan here were devised with the input of the Consultant

based upon their views of maximizing the sale process and recoveries for creditors.  As such, courts have approved incentive payments similar to those completed in the Store Closing Bonus Plan. *See e.g. In re Toys "R" Us, Inc.,* No. 17-34665 (KLP) (Bankr. E.D. Va. Feb. 6, 2018) (authorizing store closing retention bonus program on a final basis); *In re rue21, inc.*, No. 17-22045 (GLT) (Bankr. W.D. Pa. June 12, 2017) (same); *In re Payless Holdings LLC*, No. 17-42267 (KAS) (Bankr. E.D. Mo. May 9, 2017) (same); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) (Bankr. D. Del. Oct. 13, 2016) (same).

70.     Accordingly, the Debtors submit that the relief requested with respect to the Store Closing Bonus Plan is a valid exercise of the Debtors' business judgment and the approval of the Store Closing Bonus Plan is appropriate under section 363 of the Bankruptcy Code and is in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases.

## IX.     The Store Closing Bonus Plan is Justified by the Facts and Circumstances of these Chapter 11 Cases.

71.     Section 503(c)(3) of the Bankruptcy Code generally prohibits certain transfers made to officers, managers, consultants, and others that are not justified by the facts and circumstances of the case.  *See* 11 U.S.C. § 503(c)(3).  Though section 503(c)(3) is not applicable here because this Motion does not seek authorization to pay Store Closing Bonuses to insiders, if it did apply, the Store Closing Bonus Plan would be well within the "facts and circumstances" test articulated therein.  Importantly, section 503(c)(3)'s "facts and circumstances" justification test "creates a standard no different than the business judgment standard under section 363(b) [of the Bankruptcy Code]."  *In re Borders Grp., Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011); *see also In re Global Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the key employee

41

retention program is] intended to incentivize management, the analysis utilizes the more liberal

business judgment review under § 363."); *In re Nobex Corp.*, No. 05-20050 (MFW), 2006 WL

4063024, at *3 (Bankr. D. Del. Jan. 19, 2006) (concluding that the standard under section 503(c)(3)

of the Bankruptcy Code reiterates the business judgment standard).   For the reasons discussed

above, a possible loss of the employees would disrupt the Debtors' ability to effectively close the

Closing Stores and maximize value for the benefit of all stakeholders.  Because implementation of

the Store Closing Bonus Plan will incentivize store level employees to enhance the value of the

Debtors' estates, the Store Closing Bonus Plan is justified by the facts and circumstances of these

chapter 11 cases and is a sound exercise of the Debtors' business judgment.  *See, e.g., In re Mesa

Air Grp., Inc.*, No. 10-10018 (MG), 2010 WL 3810899, *4 (Bankr. S.D.N.Y. Sept. 24, 2010)

(holding that bonus payments are "'justified by the facts and circumstances of the case' under

section 503(c)(3) [where] they are within the 'sound business judgment' of the Debtors") (citation

omitted).

### **Request for Waiver of Stay**

72.     The Debtors also seek a waiver of any stay of the effectiveness of the orders

approving the relief requested in this Motion and the order.  Bankruptcy Rule 6003(b) provides, in

relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable

harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a

motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate."

Further, pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of

property other than cash collateral is stayed until the expiration of 14 days after entry of the order,

unless the court orders otherwise."  As set forth above, the Debtors submit that ample cause exists

to justify (a) the immediate entry of an order granting the relief sought herein, and (b) a waiver of

the fourteen-day stay imposed by Bankruptcy Rule 6004(h).

**Waiver of Memorandum of Points and Authorities**

73.     The Debtors respectfully request that this Court treat this Motion as a written

memorandum of points and authorities or waive any requirement that this Motion be accompanied

by a written memorandum of points and authorities as described in Local Bankruptcy

Rule 9013-1(G).

**Notice**

74.     The Debtors will provide notice of this Motion via first class mail, facsimile or

email (where available) to:   (a) the United States Trustee for the Eastern District of Virginia,

Attn: Kenneth N. Whitehurst III and Shannon F. Pecoraro; (b) the holders of the 30 largest

unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors'

prepetition secured facilities and counsel thereto; (d) the DIP Agents and their respective counsel

thereto; (e) the indenture trustee to the Debtors' industrial revenue bonds; (f) counsel to the ad hoc

group of term loan lenders; (g) the lenders under certain Company-owned life insurance policies;

(h) the Debtors' Canadian counsel; (i) the United States Attorney's Office for the Eastern District

of Virginia; (j) the Internal Revenue Service; (k) the office of the attorneys general for the states

in which the Debtors operate; (l) the Securities and Exchange Commission; (m) the landlords for

the Initial Closing Stores; (n) Riemer Braunstein LLP, 7 Times Square, Suite 2506, New York,

New York 10036, Attn: Steven Fox; (o) proposed Canadian counsel to the Debtors, Osler, Hoskin

& Harcourt LLP, 100 King Street West, Suite 6200, Toronto, Ontario, M5X 1B8, Attn: Marc

Wasserman and John MacDonald; and (p) other parties that have requested notice pursuant to

Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors submit that, in light of the

nature of the relief requested, no other or further notice need be given.

### No Prior Request

75.     No prior request for the relief sought in this Motion has been made to this or any

other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and

Final Order granting the relief requested herein and such other relief as the Court deems

appropriate under the circumstances.

Richmond, Virginia
Dated:   February 17, 2020

*/s/ Jeremy S. Williams*

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:       (804) 783-6192
Email:       Michael.Condyles@KutakRock.com
              Peter.Barrett@KutakRock.com
              Jeremy.Williams@KutakRock.com
              Brian.Richardson@KutakRock.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
(*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains
(*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:       joshua.sussberg@kirkland.com
              emily.geier@kirkland.com
              annelyse.gains@kirkland.com

**-**and-

Joshua M. Altman (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:       josh.altman@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

## Exhibit A

**Proposed Interim Order**

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO ASSUME THE CONSULTING AGREEMENT, (II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE CLOSING SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, (III) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING STORES, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an interim order (this "Interim Order"):  (a) authorizing

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

the Debtors to assume the Consulting Agreement, (b) authorizing and approving the continuation

or initiation of the Store Closings in accordance with the terms of the Consulting Agreement and

the Sale Guidelines, with such sales to be free and clear of all liens, claims, and encumbrances,

(c) authorizing the Debtors to conduct Store Closings with respect to the Additional Closing Stores

at a later date or dates, (d) authorizing customary bonuses to non-insider Closing Store employees

who remain employed for the duration of the store closing process, (e) scheduling a final hearing

to consider approval of the Motion on a final basis, and (f) granting related relief, all as more fully

set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over

this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the*

*United States District Court for the Eastern District of Virginia*, dated August 15, 1984; and this

Court having found that it may enter a final order consistent with Article III of the United States

Constitution; and this Court having found that venue of this proceeding and the Motion in this

district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the

relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and

other parties in interest; and this Court having found that the Debtors' notice of the Motion and

opportunity for a hearing on the Motion were appropriate under the circumstances and that no

other notice need be provided; and this Court having reviewed the Motion and having heard the

statements in support of the relief requested therein at a hearing before this Court (the "Hearing");

and this Court having determined that the legal and factual bases set forth in the Motion and at the

Hearing establish just cause for the relief granted herein; and upon all of the proceedings had

before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby:

FOUND AND DETERMINED THAT:[3]

A.      The Debtors have advanced sound business reasons for assuming the Consulting Agreement and adopting the Sale Guidelines, on an interim basis subject to the Final Hearing, as set forth in the Motion and at the Hearing, and assuming the Consulting Agreement is a reasonable exercise of the Debtors' business judgement and in the best interest of the Debtors and their estates.

B.      The Consulting Agreement, a copy of which is attached to this Interim Order as **Schedule 1**, was negotiated, proposed, and entered into by the Consultant and the Debtors without collusion, in good faith and from arm's length bargaining positions.

C.      The assumption of the Consulting Agreement on an interim basis is a sound exercise of the Debtors' business judgment.

D.      The Sale Guidelines, which are attached hereto as **Schedule 2**, are reasonable and appropriate, and the conduct of the Sales in accordance with the Sale Guidelines will provide an efficient means for the Debtors to dispose of the Store Closure Assets, and are in the best interest of the Debtors' estates.

E.      The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient and sound business purposes and justifications for the relief approved herein.

F.      The Store Closings and Sales are in the best interest of the Debtors' estates.

G.      The Dispute Resolution Procedures are fair and reasonable, and comply with applicable law.

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  *See* Fed. R. Bankr. P. 7052.

H.      The Debtors have represented that they intend to neither sell nor lease personally identifiable information pursuant to the relief requested in the Motion, although the Consultant will be authorized to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information.

I.      The entry of this Interim Order is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is hereby

ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth in this Interim Order.

2.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2020, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time on _____, 2020, and served on the Notice Parties.  In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3.      The Debtors are authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Interim Order.

4.      The Debtors are authorized, but not directed, to make payments under the Store Closing Bonus Plan, as may be amended and modified from time to time.

5.      To the extent any conflict between this Interim Order, the Sale Guidelines, and the Consulting Agreement, the terms of this Interim Order shall control over all other documents and the Sale Guidelines shall control over the Consulting Agreement.

6.      Notwithstanding Bankruptcy Rule 6004(4), this Interim Order shall take effect immediately upon its entry.

4

**I.      Authority to Assume the Consulting Agreement.**

7.      The assumption of the Consulting Agreement by the Debtors pursuant to section 365 of the Bankruptcy Code is approved on an interim basis.  The Debtors are authorized to act and perform in accordance with the terms of the Consulting Agreement, including making payments required by the Consulting Agreement, including fees and reimbursement of expenses to the Consultant without the need for any application of the Consultant or a further order of this Court.  All such payments of fees and reimbursement of expenses shall be free and clear of any and all encumbrances.

8.      Subject to the restrictions set forth in this Interim Order and the Sale Guidelines, the Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement and the Sales, and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and/or the Sales prior to the date of this Interim Order, are hereby approved and ratified.

9.      The Consulting Agreement and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court.  The Debtors are hereby authorized to enter into additional Statements of Work in connection with any Additional Closing Stores on terms materially consistent with the Debtors' historic practices.

10.      Notwithstanding anything contrary in the Consulting Agreement, the Debtors and their estates shall not indemnify the Consultant for any damages arising primarily out of the Consultant's fraud, willful misconduct, or gross negligence.

II.    **Authority to Engage in Sales and Conduct Store Closings.**

11.    The Debtors are authorized, on an interim basis pending the Final Hearing, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct the Sales at the Closing Stores in accordance with this Interim Order, the Sale Guidelines, and the Consulting Agreement, as may be modified by any Side Letters (as defined below) between the Debtors and/or the Consultant and the landlords at the Closing Stores.

12.    The Sale Guidelines are approved in their entirety on an interim basis.

13.    The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Interim Order and the Sale Guidelines.

14.    All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the Consulting Agreement or this Interim Order hereby are directed to surrender possession of such Merchandise or FF&E to the Debtors or the Consultant.

15.    Neither the Debtors nor the Consultant nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined under section 101(27) of the Bankruptcy Code) or landlord, to conduct the Sales and Store Closings and to take the related actions authorized herein.

III.    **Conduct of the Sales.**

16.    All newspapers and other advertising media in which the Sales and Store Closings may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Sales and Store Closings pursuant to the Consulting Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise and FF&E in the manner contemplated by and in accordance with this Interim Order, the Sale Guidelines, and the Consulting Agreement.

17.     The Debtors and Consultant are hereby authorized to take such actions as may be necessary and appropriate to implement the Consulting Agreement and to conduct the Sales and Store Closings without necessity of further order of this Court as provided in the Consulting Agreement and the Sale Guidelines (subject to any Side Letters), including, but not limited to, advertising the sale as a "store closing sale", "sale on everything", "everything must go", or similar-themed sales as contemplated in the Sale Guidelines through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of signwalkers, A-frames, and other street signage, as contemplated in the Sale Guidelines.

18.     Except as expressly provided in the Consulting Agreement and the Sale Guidelines, the sale of the Merchandise and FF&E shall be conducted by the Debtors and the Consultant notwithstanding any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closings or the Sales (including the sale of the Merchandise and FF&E), the rejection of leases, abandonment of assets, or "going dark" provisions shall not be enforceable in conjunction with the Store Closings or the Sales.  Breach of any such provisions in these chapter 11 cases in conjunction with the Store Closings or the Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closings and Sales are conducted in accordance with the terms of this Interim Order, any Side Letter, and the Sale Guidelines.  The Debtors and/or Consultant and landlords of the Closing Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Debtors, the Consultant

7

and any such landlords, *provided* that nothing in such Side Letters affects the provisions of this Interim Order.  In the event of any conflict between the Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.

19.     Except as expressly provided for herein or in the Sale Guidelines, no person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, or creditors, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sales or the sale of Merchandise or FF&E, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service providers, utilities, and creditors and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Store Closings, and/or (b) instituting any action or proceeding in any court (other than in the Bankruptcy Court or, upon recognition of this Interim Order by the Canadian Court, the Canadian Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Consultant, or the landlords at the closing locations that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales or sale of the Merchandise or FF&E or other liquidation sales at the closing locations and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

20.     In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment and other assets of the Debtors for the purpose of

conducting the Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Interim Order.

21.     All sales of Store Closure Assets shall be "as is" and final.  No returns related to the purchase of Store Closure Assets shall be accepted at any Closing Stores or any stores that are not participating in the Store Closings.

22.     The Consultant shall accept return of any goods that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within the time period proscribed by the Debtors' return policy that was in effect when the merchandise was purchased, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.

23.     The Consultant shall not be liable for sales taxes except as expressly provided in the Consulting Agreement and the payment of any and all sales taxes is the responsibility of the Debtors.  The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due, *provided* that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of such dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  The Consultant shall collect, remit to the Debtors, and account for sales taxes as and to the extent provided in the Consulting Agreement.  This Interim Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state, provincial or federal law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state, provincial or federal law.

24.     Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell the Store Closure Assets and all sales of Store Closure Assets, whether by the Consultant or the Debtors, shall be free and clear of any and all liens, claims, encumbrances, and other interests; *provided, however*, that any such liens, claims, encumbrances, and other interests shall attach to the proceeds of the sale of the Store Closure Assets with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Store Closure Assets, subject to any claims and defenses that the Debtors may possess with respect thereto and the Consultant's fees and expenses (as provided in the Consulting Agreement).

25.     The Debtors and/or the Consultant (as the case may be) are authorized and empowered to transfer Store Closure Assets among, and into, the Closing Stores in accordance with the Sale Guidelines, as applicable.  The Consultant is authorized to sell the Debtors' FF&E and abandon the same, in each case, as provided for and in accordance with the terms of the Consulting Agreement and the Sale Guidelines.

26.     Neither the Sale Guidelines, Consulting Agreement, nor this Interim Order authorize the Debtors to transfer or sell to Consultant or any other party the personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including but not limited to an individual's first name (or initial) and last name, physical address, electronic address, telephone number, social security number, date of birth, government-issued identification number, account number and credit or debit card number ("PII") of any customers unless such sale or transfer is permitted by the Debtors' privacy policy and state, provincial or federal privacy and/or identity theft prevention laws and rules (collectively, the "Applicable Privacy Laws").  The foregoing shall not limit the Consultant's use of the Debtors'

customer lists and mailing lists in accordance with the Consulting Agreement solely for purposes of advertising and promoting the Sales.

27.     The Debtors shall remove or cause to be removed any confidential and/or PII in any of the Debtors hardware, software, computers or cash registers or similar equipment which are to be sold or abandoned so as to render the PII unreadable or undecipherable.  At the conclusion of the Sales, the Consultant shall provide the Debtors with written verification that the Consultant has not removed, copied, or transferred any customer PII and that any records containing PII were shredded, erased or otherwise modified to render the PII unreadable or undecipherable.

**IV.    Procedures Relating to Additional Closing Stores.**

28.     To the extent that the Debtors seek to conduct Sales at any Additional Closing Store, the Sale Guidelines and this Interim Order shall apply to the Additional Closing Stores.

29.     Prior to conducting the Sales at any Additional Closing Store, the Debtors will consult with the DIP Agents, file a list including such Additional Closing Store with this Court (each, an "Additional Closing Store List"), and serve a notice of their intent to conduct the Sales at the Additional Closing Store on the applicable landlords (collectively, the "Additional Closing Store Landlords") and other interested parties, including counsel to the DIP Agents, by email (to the extent available to the Debtors) or overnight mail.  With respect to Additional Closing Store Landlords, the Debtors will mail, if applicable, such notice to the notice address set forth in the lease for such Additional Closing Store (or, if none, at the last known address available to the Debtors).

30.     The Additional Closing Store Landlords and any interested parties shall have seven days after service of the applicable Additional Closing Store List to object to the application of this Interim Order.  If no timely objections are filed with respect to the application of this Interim Order to an Additional Closing Store, the Debtors all be authorized, pursuant to sections 105(a),

11

and 363(b) and (f) of the Bankruptcy Code, to proceed with conducting the Sales at the Additional

Closing Stores in accordance with this Interim Order, the Sale Guidelines, and the Consulting

Agreement.  If any objections are filed with respect to the application of this Interim Order, to an

Additional Closing Store, and such objections are not resolved, the objections and the application

of this Interim Order or the Final Order to the Additional Closing Store will be considered by the

Court at the next regularly scheduled omnibus hearing, subject to the rights of any party to seek

relief on an emergency basis on shortened notice, to the extent necessary.

**V.     Dispute Resolution Procedures with Governmental Units.**

31.     Nothing in this Interim Order, the Consulting Agreement, or the Sale Guidelines,

releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under

environmental laws or regulations (or any associated liabilities for penalties, damages, cost

recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or

operator of the property after the date of entry of this Interim Order.  Nothing contained in this

Interim Order, the Consulting Agreement, or the Sale Guidelines shall in any way: (a) diminish

the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of

the Debtors to comply with environmental laws consistent with their rights and obligations as

debtors in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be

exempt from laws of general applicability, including, without limitation, public health and safety,

criminal, tax, (including, but not limited to, the collection of Sales Taxes), labor, employment,

environmental, antitrust, fair competition, traffic and consumer protection laws, including

consumer laws regulating deceptive practices and false advertising, consumer protection, the sale

of gift certificates, layaway programs, return of goods, express or implied warranties of goods, and

"weights and measures" regulation and monitoring (collectively, "<u>General Laws</u>").  Nothing in

this Interim Order, the Consulting Agreement, or the Sale Guidelines, shall alter or affect

obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Interim Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' rights to assert in that forum or before this Court or, upon recognition of this Interim Order by the Canadian Court, the Canadian Court, that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code or this Interim Order (or, upon recognition of this Interim Order by the Canadian Court, the CCAA or any Order of the Canadian Court).  Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code or the CCAA, as applicable.  Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

32.     To the extent that the sale of Store Closure Assets is subject to any Liquidation Sale Laws, including any federal, state or local statute, ordinance, rule, or licensing requirement directed at regulating "going out of business," "store closing," or similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, signage, and use of sign-walkers solely in connection with the sale of the Store Closing Assets, including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of the Store Closure Assets, the dispute resolution procedures in this section shall apply (provided that, subject to recognition of this Interim Order by the Canadian Court, these Dispute Resolution Procedures shall not apply with respect to the sale of Store Closure Assets in Canadian stores, and that any such disputes shall be dealt with by the Canadian Court):

i.    Provided that the Sales are conducted in accordance with this Order, any Final Order, and the Sale Guidelines, the Debtors, the Consultant, and the Debtors' landlords, shall be deemed to be in compliance with any requirements of all county, parish, or municipal or other local government (hereinafter referred to as "Local") and State requirements governing the conduct of the Sales of the Store Closure Assets, including but not limited to Local statutes, regulation and ordinances establishing licensing or permitting requirements, waiting periods or time limits, or bulk sale restrictions that would otherwise apply to the Sales and sales of the Store Closure Assets (collectively, the "Liquidation Sale Laws") of any state or local Governmental Unit (as defined in Bankruptcy Code section 101(27); provided, that the term "Liquidation Sale Laws" shall be deemed not to include any public health or safety laws or any state (collectively, "Safety Laws"), and the Debtors and the Consultant shall continue to be required to comply, as applicable, with such Safety Laws and General Laws, subject to any applicable provision of the Bankruptcy Code and federal law, and nothing in this Order shall be deemed to bar Governmental Units (as defined in section 101(27) of the Bankruptcy Code) or public officials from enforcing Safety Laws or General Laws.

ii.    Within three (3) business days after entry of this Interim Order, the Debtors will serve by first-class mail, copies of this Interim Order, the proposed Final Order, the Consulting Agreement, and the Sale Guidelines on the following: (a) the Attorney General's office for each state where the Sales are being held; (b) the county consumer protection agency or similar agency for each county where the Sales are being held; (c) the division of consumer protection for each state where the Sales are being held; and (d) the landlords for the Closing Stores (collectively, the "Dispute Notice Parties").

iii.    With respect to any Additional Closing Stores, within three (3) business days after filing any Additional Closing Store List with the Bankruptcy Court, the Debtors will serve by first-class mail, copies of the Interim Order or Final Order, as applicable, the Consulting Agreement, and the Sale Guidelines on the Dispute Notice Parties.

iv.    To the extent that there is a dispute arising from or relating to the Sales, this Interim Order, the Consulting Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Bankruptcy Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten (10) days following entry of this Interim Order, or service of an Additional Store Closing List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. and Emily E. Geier, and AnnElyse Scarlett Gains, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Joshua M. Altman; (b) Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia, Attn: Michael A. Condyles, Peter J. Barrett, Jeremy S. Williams, and Brian H. Richardson; (c) on behalf of Gordon Brothers Retail Partners, LLC, Prudential Tower, 800 Boylston Street, 27th Floor, Boston,

14

Massachusetts 02199, Attn: Mackenzie Shea; and (d) Riemer Braunstein LLP, 7 Times Square, Suite 2506, New York, New York 10036, Attn: Steven Fox. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the notice, the Governmental Unit may file a motion with the Bankruptcy Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

v.    In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to the Interim Order or Final Order, as applicable, absent further order of the Bankruptcy Court. Upon the entry of the Interim Order or Final Order, the Bankruptcy Court grants authority for the Debtors and the Consultant to conduct the Sales pursuant to the terms of the Interim Order or the Final Order, the Consulting Agreement, and the Sale Guidelines and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

vi.   If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (iv) and (v) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo.*

33.    Subject to paragraphs 31 and 32 above, each and every federal, state, or local agency, departmental, or Governmental Unit with regulatory authority over the Sales and all newspapers and other advertising media in which the Sales are advertised shall consider this Interim Order as binding authority that no further approval, license, or permit of any Governmental

Unit shall be required, nor shall the Debtors or the Consultant be required to post any bond, to conduct the Sales.

34.     Provided that the Sales are conducted in accordance with the terms of this Interim Order, the Consulting Agreement, and the Sale Guidelines, and in light of the provisions in the laws that exempt court-ordered sales from their provisions, the Debtors and Consultant shall be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of this Interim Order and the Sale Guidelines without the necessity of further showing compliance with any such Liquidation Sale Laws.

35.     Nothing in this Interim Order, the Consulting Agreement, or the Sale Guidelines releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order, the Consulting Agreement, or the Sale Guidelines shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.

**VI.    Other Provisions.**

36.     To the extent the Debtors are subject to any state Fast Pay Laws in connection with the Store Closings, the Debtors shall be presumed to be in compliance with such laws to the extent, in applicable states, such payroll payments are made by the later of: (a) the Debtors' next regularly scheduled payroll; and (b) seven calendar days following the termination date of the relevant employee, and in all such cases consistent with, and subject to, any previous orders of this Court regarding payment of same.

16

37.     Neither the Consultant nor any of its respective affiliates (whether individually, as part of a joint venture, or otherwise), shall be precluded from providing additional services to the Debtors and/or bidding on the Debtors' assets in connection with any other future process that may or may not be undertaken by the Debtors to close additional stores, *provided* that any such services and/or transactions is approved by separate order of this Court.

38.     On a confidential basis and for professionals' "eyes only" and upon the written (including email) request of the U.S. Trustee or counsel to the DIP Agent, the Debtors shall provide such requesting party, if any, with copies of periodic reports concerning the Sales that are prepared by the Debtors, their professionals or the Consultant, *provided*, that the foregoing shall not require the Debtors, their professionals, or the Consultant to prepare or undertake to prepare any additional or new reporting not otherwise being prepared by the Debtors, their professionals, or the Consultant in connection with the Sales.

39.     Not later than five (5) business days prior to the objection deadline related to entry of an order approving the Motion on a final basis, the Consultant shall file a declaration disclosing connections to the Debtors, their creditors, and other parties in interest in these chapter 11 cases.

40.     Consultant shall act solely as an independent consultant to the Debtors and shall not be liable for any claims against the Debtors other than as expressly provided in the Consulting Agreement (including the Consultant's indemnity obligations thereunder) or the Sale Guidelines, with the exception of acts of gross negligence or willful misconduct and, for greater certainty, the Consultant shall not be deemed to be an employer, or a joint or successor employer or a related or common employer or payor within the meaning of any legislation governing employment or labor standards or pension benefits or health and safety or other statute, regulation or rule of law or equity for any purpose whatsoever, and shall not incur any successor liability whatsoever.

17

41.     The Debtors are authorized and permitted to transfer to the Consultant personal information in the Debtors' custody and control solely for the purposes of assisting with and conducting the Sale and only to the extent necessary for such purposes, *provided* that Consultant removes such personal information from the FF&E prior to the abandonment of the same.

42.     Notwithstanding the relief granted herein and any actions taken pursuant to such relief, nothing contained in the Motion or this Interim Order shall constitute, nor is intended to constitute:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease, other than the Consulting Agreement, pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Interim Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens.  Any payment made pursuant to this Interim Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim, other than with respect to payments made to the Consultant, which are governed by the reconciliation procedures in the Consulting Agreement.

43.     Notwithstanding the relief granted in this Interim Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to the provisions of the *Interim*

*Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (VII) Granting Related Relief*, (the "Interim DIP Order"), and the DIP Senior Credit Facility Documentation (as defined in the Interim DIP Order), and shall be made strictly in accordance with the Budget (as defined in the Interim DIP Order), subject to such variances as permitted by the DIP Senior Credit Facility Documentation; provided, however, that the DIP Senior Credit Facility Documentation shall not require a cap or reduction on amounts due to the Consultant under the Consulting Agreement other than any such cap or reduction resulting from the Debtors' required compliance with the Budget. Additionally, not later than two (2) business days after entry of this Interim Order the Debtors shall deliver to the Consultant a cash deposit in the amount of $500,000 as provided in the Budget as security for payment of Consultant's fees and expenses earned and incurred under the Consulting Agreement (the "Consultant's Deposit"); any remaining balance of Consultant's Deposit being held by Consultant upon completion of the Sale shall be applied by Consultant as shall be set forth in a final reconciliation of the Sale as contemplated by Section 5(B) of the Consulting Agreement.  Following such final reconciliation payment of all amounts due to the Consultant, any remaining balance of the Consultant's Deposit shall be part of the "Cash Collateral" (as defined in the Interim DIP Order) and shall be subject to all provisions relating to Cash Collateral set forth in the Interim DIP Order.

44.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

45.     Notice of the Motion as provided therein is deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules of this Court are satisfied by such notice.

46.     Notwithstanding Bankruptcy Rules 6003(b) and 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

47.     Cause exists to shorten the notice period set forth in Bankruptcy Rule 2002, to the extent applicable.

48.     The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived to the extent necessary.

49.     This Court shall retain jurisdiction with regard to all issues or disputes relating to this Interim Order or the Consulting Agreement, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords and/or the Consultant for protection from interference with the Store Closings or Sales, (c) any other disputes related to the Store Closings or Sales, and (d) protect the Debtors and/or the Consultant against any assertions of any liens, claims, encumbrances, and other interests; provided that, notwithstanding the foregoing and subject to recognition of this Interim Order by the Canadian Court, the Canadian Court shall retain jurisdiction with regard to all issues or disputes in respect of the Sale at the Canadian Closing Stores.  No such parties or person shall take any action against the Debtors, the Consultant, the landlords, the Store Closings, or the Sales until this Court or the Canadian Court, as applicable, has resolved such dispute.  This Court shall

hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

50.     Within 30 days of conclusion of the Sale, the Debtors shall (a) file with the Court a summary report of the store closing process that will include (i) a list of the stores closed and (ii) gross revenue from the store closing assets sold, and (b) file with the Court and serve on the U.S. Trustee, any statutory committee, and any other party in interest who may so request, a report showing payment of each of the Consultant's fees, setting forth detail and information regarding the calculation of such fees paid to the Consultant and expenses reimbursed to the Consultant. Only the U.S. Trustee (and no other party) shall have 20 days after the date on which such report is filed to object, under the standards of section 328(a) of the Bankruptcy Code, solely as to the reasonableness of the compensation paid or expenses reimbursed to the Consultant; provided, however, that with respect to any such objection: (i) the Consultant's "Base Fee" and reimbursement of expenses in accordance with the aggregate budget set forth on Exhibit B to the Consulting Agreement (including any individual Statement of Work thereunder) shall be reviewed under the standards of section 328(a) and are found to be reasonable as of the date hereof, and such Base Fee shall not be later deemed unreasonable on the basis that the success of the Sale, whether on account of sales, recovery, or otherwise, resulted in the Consultant receiving compensation, in dollar terms, that was greater than any budget or forecast provided by the Debtors, their advisors, and/or the Consultant; and (ii) the Consultant's "Incentive Fee" or any other fee not reflected in the Consulting Agreement, and any additional expenses reimbursed in excess of the aggregate budget, shall not receive the same presumption and shall be reviewed under the standards of section 330 of the Bankruptcy Code.  To the extent an objection is filed by the U.S. Trustee and cannot be resolved, the parties shall coordinate to have the objection to the Consultant's compensation

brought before the Court at the next scheduled omnibus hearing or such other date and time as

shall be agreed by the parties.

Dated: _____

Richmond, Virginia                                          _____

United States Bankruptcy Judge

WE ASK FOR THIS:

 /s/ *Jeremy S. Williams*
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

- and -

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

Joshua M. Altman (*pro hac vice* admission pending)
300 North LaSalle Street
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

### CERTIFICATION OF ENDORSEMENT
### UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

     /s/ *Jeremy S. Williams*

## **Schedule 1-A**

**Consulting Agreement**

January 28, 2009

Pier 1 Imports (U.S.), Inc.
100 Pier 1 Place
Fort Worth, TX  76102

   Re:  Store Closing Program

Ladies and Gentlemen:

This letter shall serve as the agreement of Gordon Brothers Retail Partners, LLC ("GBRP") pursuant to which GBRP shall serve as an independent contractor to Pier 1 Imports (U.S.), Inc. ("Merchant") to conduct a "this store location closing" or other mutually agreed upon themed sale of Merchandise (as defined below) ("Sale") at groups of one or more of Merchant's retail stores which Merchant determines to close.

Attached as Exhibit 1 is the form of "Statement of Work" that will govern each store (or group of stores) to be closed pursuant to, and subject to the terms and conditions of, this Agreement ("Stores"). Each such Statement of Work shall be incorporated by reference into this Agreement (and this Agreement shall be incorporated by reference into each Statement of Work); but otherwise each Statement of Work shall stand-alone and shall not be dependent upon any other Statement of Work.

## 1. <u>RETENTION</u>

(A) Merchant hereby retains GBRP as its exclusive, independent consultant to conduct the Sale at the Stores during the Sale Term, and in connection therewith, GBRP shall, throughout the Sale Term:

  (i)  Recommend appropriate point-of-purchase, point-of-sale, presentation and external and internal advertising and signage necessary to effectively sell all of the Merchandise in accordance with a "this store location closing" or other mutually agreeable theme.

  (ii)  Provide qualified supervisors with respect to the Stores, to oversee the conduct of the Sale, and to oversee the Sale process in the Stores.

  (iii)  Maintain focused and constant communication with Store-level employees and managers to keep them abreast of strategy and timing and to properly effect Store-level communication by Merchant's employees to customers and others about the Sale.

  (iv)  Establish and provide oversight of accounting functions for the Sale, including evaluation of sales of Merchandise by category, sales reporting and expense monitoring.

  (v)  Coordinate with Merchant so that the operation of the Stores is being properly maintained including ongoing customer service and housekeeping activities.

  (vi)  Recommend appropriate staffing levels for the Stores and appropriate bonus and/or incentive programs for Store employees.

  (vii)  Provide recommendations for loss prevention initiatives.

1

(viii)    Advise Merchant with respect to the licensing requirements affecting the Sale as a "this store location closing" or other mutually agreed upon theme in compliance with applicable state and local "going out of business" laws ("GOB Laws"). In connection with such obligation, GBRP will (i) advise Merchant of the applicable waiting period under the GOB Laws, and/or (ii) prepare (in Merchant's name and for Merchant's signature) all licensing/permit paperwork as may be necessary under such GOB Laws, deliver all such paperwork to Merchant, and file, on behalf of Merchant, all such paperwork where necessary, and/or (iii) advise where licensing paperwork and/or waiting periods do not apply.

(ix)    Perform such other related services mutually deemed by the parties to be necessary or prudent to facilitate the Sale.

(B)    Merchant is entering into this Agreement in reliance on GBRP's special abilities with respect to performing the above described services (herein "Services"). GBRP accepts the relationship of trust and confidence established between GBRP and Merchant by this Agreement. GBRP covenants with Merchant to (a) use its best efforts, skill, judgment, and abilities in performing the Services, (b) cooperate with Merchant, and (c) perform the Services in accordance with the highest generally accepted national standards of care, skill, diligence and professional competence applicable to businesses engaged in providing services identical or similar to the Services provided by GBRP. Notwithstanding the foregoing provisions of this Section 1(B), Merchant expressly acknowledges that GBRP is not: (i) serving in a fiduciary capacity in favor of Merchant; (ii) guaranteeing the results of the Sale; or (iii) acting as Merchant's agent in performing the Services.

**2.    SALE TERM; VACATING STORES**

(A)    As used herein, the term "Sale Term" with respect to each respective Store shall be the period commencing on the Sale Commencement Date and ending on the Sale Termination Date as set forth in the respective Statement of Work. Attached as Exhibit A to each Statement of Work will be identified the Store(s) to be subject to such Statement of Work, as well as the Sale Commencement Date and the Sale Termination Date with respect to such Store(s); provided, however, that GBRP may from time to time establish an earlier "Sale Termination Date" with respect to any one or more Stores subject to each Statement of Work (on a per Store basis) upon five (5) days prior notice to Merchant.

(B)    Upon the conclusion of the Sale Term at each Store, GBRP shall leave such Store in broom clean condition, subject to GBRP's right pursuant to Section 6 below to abandon in a neat and orderly manner all unsold FF&E.

**3.    EXPENSES**

(A)    All expenses incident to the conduct of the Sale and the operation of the Stores during the Sale Term shall be borne by Merchant; except solely for any of "GBRP's Controlled Expenses" that exceed the budgeted amount per line item (as provided in Section 3(B) below) for such GBRP Controlled Expenses, which excess such expenses shall be at the sole cost and expense of GBRP. Without limiting the generality of the foregoing, during the Sale Term, Merchant shall provide GBRP, at no cost or expense to GBRP, with (i) central administrative services and distribution center services reasonably necessary to administer the Sale (and consistent with the services provided in the ordinary course consistent with historic periods), (ii) store-level employees at the Stores (to the extent reasonably agreed upon by Merchant and GBRP necessary to effect the Sale), (iii) reasonable use of Store-level assets (including, but not limited to, trade names, logos, customer lists (including email lists), all credit card facilities, bank accounts, tax identification numbers, computer hardware and software, and furniture, fixtures and equipment), and (iv) peaceful use and occupancy of, and reasonable access (including reasonable before and after hours access and normal utilities/phone service) to, the Stores for the purpose

2

of preparing for, conducting, and completing the Sale as contemplated hereby, without interruption by landlords, labor actions, or otherwise. Without limiting the generality of the foregoing, GBRP and Merchant shall agree upon an incentive program for Merchant's employees at the Stores, to be funded solely by Merchant, in an amount not to exceed 10% of aggregate payroll during the Sale Term.

(B)    Attached as <u>Exhibit B</u> to each Statement of Work will be an expense budget for the "GBRP's Controlled Expenses" with respect to the Stores subject to such Statement of Work.

(C)    GBRP will advance funds for the GBRP's Controlled Expenses; Merchant shall reimburse GBRP therefore (up to the budgeted amount per line item) in connection with each weekly reconciliation contemplated by Section 5(B) upon presentation of reasonable documentation for such actually-incurred expenses. Merchant shall be obligated to reimburse GBRP for GBRP Controlled Expenses in addition to the Base Fee, and in addition to the Incentive Fee, if earned. 

## 4.    GBRP COMPENSATION
(A)    As used herein, the following terms shall have the following meanings:
   (i)    "Gross Proceeds" shall mean the gross proceeds of all sales of Merchandise made in the Stores during the Sale Term, net only of sales taxes.
   (ii)    "Merchandise" shall mean all merchandise sold in the Stores during the Sale Term.
   (iii)    "Recovery Percentage" shall mean (a) Gross Proceeds; divided by (b) the aggregate "Retail Value" of the Merchandise.
   (iv)    "Retail Value" with respect to each item of Merchandise shall be determined using the "gross rings" method. For purposes of determining "gross rings" with respect to the Merchandise, GBRP and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store. Register receipts shall show for each item of Merchandise sold the Merchant' retail price for such item, and the markdown or other discount granted in connection with the Sale as agreed to by Merchant and GBRP. All such records and reports shall be made available to GBRP and Merchant during regular business hours upon reasonable notice.

(B)    Merchant shall pay GBRP a "Base Fee" equal to three thousand dollars ($3,000) per Store. The Base Fee with respect to the Stores shall be earned concurrently with the execution of each Statement of Work; and shall be paid no later than the first weekly reconciliation following the execution of the respective Statement of Work.

(C)    Merchant shall pay GBRP an "Incentive Fee" (which, if earned, shall be in addition to the Base Fee) as provided in each Statement of Work based upon the applicable Recovery Percentage for the Stores subject to each such Statement of Work.

## 5.    CONDUCT OF SALE; OTHER SALE MATTERS
(A)    Merchant shall have control over the personnel in the Stores and shall handle the cash, debit and charge card payments for all Merchandise sold during the Sale Term in accordance with Merchant's normal cash management procedures, subject to GBRP's right to audit any such items.

(B)    The parties will meet on each Wednesday during the Sale Term to review any Sale matters reasonably requested by either party; and all amounts payable or reimbursable to GBRP for the prior week (or the partial week in the case of the first and last weeks) shall be reconciled and paid immediately thereafter (i.e. the Base Fee and all reimbursable GBRP Controlled Expenses and/or FF&E Expenses). No later than thirty (30) days following the end of the Sale under each Statement of Work, the parties shall complete a final reconciliation and settlement of all amounts contemplated by this Agreement and such Statement of Work ("Final Reconciliation"), including without limitation a final determination and payment of (i) any remaining reimbursements to GBRP; (ii) any remaining payments on account of the

3

Base Fee; and (iii) a determination of the Recovery Percentage, and the payment (if any) due to GBRP on account of the Incentive Fee (based upon the Recovery Percentage). From time to time upon request, each party shall prepare and deliver to the other party such other reports as either party may reasonably request. Each party to this Agreement shall, at all times during the Sale Term and during the one (1)-year period thereafter, provide the other with access to all information, books and records relating to the Sale and to this Agreement. All records and reports shall be made available to GBRP and Merchant during regular business hours upon reasonable notice.

(C)     Merchant shall collect all sales taxes associated with the sale of Merchandise during the Sale Term, and Merchant shall be solely responsible for reporting and paying the same to the appropriate taxing authorities in accordance with applicable law.

(D)     Each of GBRP and Merchant shall comply with all federal, state and local laws, rules and regulations applicable to them in connection with the transactions contemplated by this Agreement.

(E)     Merchant will prior to the execution of each Statement of Work, inform GBRP in writing (with specificity) of any restrictions in the leases governing such Store(s) which would potentially conflict with this Agreement and the transactions contemplated thereby so that the parties may determine the GBRP Controlled Expenses and the Incentive Fee performance hurdles with reference to such restrictions.

(F)     To the extent Merchant has informed GBRP in writing (prior to the execution of a Statement of Work) of any rules relating to its employees in the Stores that are the subject of the Sale under such Statement of Work, GBRP shall adhere to such rules.

(G)     Merchant acknowledges that the parties are not conducting an inventory of the Merchandise and that GBRP has made no independent assessment of the beginning levels of Merchandise, and GBRP shall not bear any liability for shrink or other loss to the Merchandise.

(H)     All sales of Merchandise in the Stores during the Sale shall be made in the name, and on behalf, of Merchant. All such sales shall be "final sales" and "as is," and all advertisements and sales receipts will reflect the same.

(I)     The Sale will be advertised as a "this store location closing" or other mutually agreed upon handle throughout the term of the Sale, and GBRP shall be permitted to use signs and internal and external banners and sign walkers reflecting this message, subject to the terms and provisions of applicable law.

(J)     Throughout the Sale Term, Merchant's employees used in the conduct of the Sale shall remain employees of Merchant (and shall not be employees of GBRP) and shall continue to be eligible to receive/participate in all of Merchant's benefits/benefits programs consistent with Merchant's ordinary course practices consistent with historic periods. Merchant represents that it has paid, and through the Sale Term will pay, all Store rent and/or occupancy and occupancy-related expenses.

**6.     FF&E**

GBRP shall have the right to sell all agreed upon furniture, fixtures and equipment located at the Stores which are owned by Merchant, on a commission basis equal to twenty-five percent (25%) of the gross sales of FF&E (net only of sales tax). Merchant shall reimburse GBRP for its reasonable sale expenses associated with the FF&E pursuant to a budget to be mutually agreed upon by the parties based upon the composition of the FF&E that Merchant desires to have GBRP sell ("FF&E Expenses"). Such budget may be included on each Statement of Work, or it may be agreed upon in a separate writing with respect to each Statement of Work as soon as practicable following the execution of each Statement of Work. In

4

lieu of such commission arrangement for the sale of FF&E, GBRP and Merchant may mutually agree upon an FF&E guarantee in connection with each Statement of Work. In either event, GBRP shall have the right to abandon any unsold FF&E at the Stores at the conclusion of the Sale Term.

**7.    INSURANCE; RISK OF LOSS**

(A)     During the Sale Term, Merchant agrees to maintain (at its expense) its normal and customary products liability insurance with respect to the Merchandise; as well such other insurance that Merchant has maintained in the ordinary course consistent with historic periods (including without limitation for example commercial general liability insurance, comprehensive automobile liability insurance, workers compensation insurance, employer's liability insurance**).**



(B)     During the Sale Term, GBRP shall, at its sole cost and expense, maintain in effect at all times during the Sale Term insurance coverages with limits not less than those set forth below with insurers licensed to do business in the state(s) in which the services are performed:

(i)     Commercial general liability, including contractual liability coverage with respect to the Services, bodily injury liability, property damage liability, independent contractor coverage and completed operations coverage, all in broad form having a combined single limit of $1,000,000.00.

(ii)     Comprehensive automobile liability, having a combined single limit of $1,000,000.00.

(iii)     Workers' Compensation as required by the laws of the state(s) where the Stores are located containing a waiver of subrogation in favor of Merchant.

(iv)     Employer's liability with a $500,000.00 limit.

(v)     Such other insurance as may be reasonably requested from time to time by Merchant.

None of the requirements contained herein as to types, limits or the parties' approval of insurance coverage to be maintained by the parties is intended to and shall not in any manner limit, qualify or quantify the liabilities and obligations assumed by GBRP or Merchant under this Agreement or otherwise provided by law.

(C)     Evidence of the insurance coverage required to be maintained by GBRP and Merchant under this Agreement, represented by certificates of insurance issued by the insurance carrier(s), must be furnished to Merchant or GBRP (as the case may be) as soon as practicable following execution of this Agreement and as such policies are renewed. Such certificate of insurance shall state that Merchant or GBRP (as the case may be) will be notified in writing sixty (60) days prior to cancellation, material change, or non-renewal of insurance.

(D)     Notwithstanding any other provision of this Agreement, Merchant and GBRP agree that GBRP shall not be deemed to be in possession or control of the Stores or the Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores.

**8.    INDEMNIFICATION**

(A)     To the fullest extent permitted by applicable law, GBRP hereby agrees to indemnify, protect, defend and hold harmless Merchant, and Merchant's parent(s), subsidiary and affiliated companies (corporate and non-corporate), and its and their respective officers, directors, shareholders, employees and agents for, from and against all liabilities, claims, damages, losses, liens, causes of action, suits, judgments and expenses, including attorney fees, of any nature, kind or description of any third-party person or entity directly or indirectly arising out of, caused by, or resulting from (in whole or in part) any negligent or grossly negligent act, error or omission of GBRP or anyone employed by it.

(B)     To the fullest extent permitted by applicable law, Merchant hereby agrees to indemnify, protect, defend and hold harmless GBRP, and GBRP's parent(s), subsidiary and affiliated companies (corporate

5

and non-corporate), and its and their respective officers, directors, shareholders, employees and agents for, from and against all liabilities, claims, damages, losses, liens, causes of action, suits, judgments and expenses, including attorney fees, of any nature, kind or description of any third-party person or entity directly or indirectly arising out of, caused by, or resulting from (in whole or in part) any negligent or grossly negligent act, error or omission of Merchant or anyone employed by it.

9.    **MISCELLANEOUS**

GBRP acknowledges and agrees that this Agreement and its Exhibits plus the information, memorandum, notes, records, drawings, manuals, disks and other documents or media provided by or on behalf of Merchant to GBRP pursuant to performance of the Services is secret and valuable to Merchant and constitutes and shall be Confidential Information as defined in the below-referenced Confidentiality Agreement and as such shall be governed and controlled by such agreement in addition to this Agreement.

GBRP acknowledges that Pier 1 Imports, Inc., is a publicly-traded corporation. Specifically GBRP agrees that it shall not at any time make any representation, warranty or statement regarding the financial performance, financial statements or results of operation, whether past, present or future, of the Merchant, its parent, subsidiaries, affiliates or consolidated group. In each respect, GBRP shall refer any such inquiries to the public filings of Pier 1 Imports, Inc.

GBRP acknowledges and agrees that the Merchant does not grant to GBRP any right, title or interest of any kind in any intellectual property contained in or relating to the Confidential Information and/or owned by Merchant's parent, subsidiaries, affiliates or consolidated group (except to the extent necessary to use any such intellectual property solely for the benefit of the Sale).

This Agreement, with all associated Statement of Work, constitutes the entire agreement between the parties with respect to the matters contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect to the services described herein. Notwithstanding the preceding sentence, GBRP ratifies and affirms the terms and provisions of the Confidentiality Agreement dated January 6, 2009 between Merchant and Gordon Brothers Group, LLC ("GBG") and shall be bound as if it were a direct party thereto; and each of GBG and GBRP shall be responsible for any breaches of such Confidentiality Agreement by its/their respective officers, directors or employees. This Agreement may not be modified except in a written instrument executed by each of the parties hereto. No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party. The failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder. In the event of any breach or default by GBRP in the performance of its obligations hereunder, GBRP shall immediately cure such breach or default upon receipt from Merchant of written or electronic notice of such breach or default. Should GBRP not immediately cure such breach or default (after opportunity to cure reasonable to the circumstances) then Merchant may terminate this Agreement upon notice to GBRP. Unless expressly set forth herein to the contrary, to the extent that either party's consent is required/requested hereunder, such consent shall not be unreasonably withheld or delayed, and any consent withheld by Merchant because of the possible negative impact on Merchant's brand or reputation, as determined by Merchant in its sole and absolute discretion, shall not be deemed unreasonable. This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns; provided, however, that this Agreement may not be assigned nor may the duties hereunder be delegated by either party without the prior written consent of the other. Written

6

notices contemplated by this Agreement shall be sent by email (i) if to Merchant c/o Cary Turner at chturner@pier1.com; and (ii) if to GBRP c/o Michael Chartock at mchartock@gordonbrothers.com.

Very truly yours,
**Gordon Brothers Retail Partners, LLC**

By: _____
Print Name and Title: _____

*Robert Grosskopf*
*Principal & Managing Director*

Agreed and Accepted:
**Pier 1 Imports (U.S.), Inc.**

By: _____
Print Name and Title: CHARLES H. TURNER
EX. V.P. - CFO

Exhibit:
1      Form of Statement of Work

7

Exhibit 1

Pier 1 Imports (U.S.), Inc./Gordon Brothers Retail Partners, LLC
Statement of Work No. 1
_____, 2009

Reference is made to the Store Closing Program Letter Agreement dated January 28, 2009 between Pier 1 Imports (U.S.), Inc. and Gordon Brothers Retail Partners, LLC ("Letter Agreement"). Capitalized terms used herein and not defined herein shall have the respective meanings assigned to such terms in the Letter Agreement.

The parties hereto agree as follows:

1.      This is a "Statement of Work" as contemplated by the Letter Agreement.

2.      Attached hereto as Exhibit A is a list of Merchant's _____ (___) retail stores to be closed pursuant to, and subject to the terms and conditions of, the Letter Agreement and this Statement of Work. Also included on Exhibit A are the respective "Sale Commencement Date(s)" and "Sale Termination Date(s)" with respect to each Store subject to this Statement of Work; provided, however, that (as provided in the Letter Agreement) GBRP may from time to time establish an earlier "Sale Termination Date" with respect to any one or more Stores (on a per Store basis) upon five (5) days prior notice to Merchant.

3.      Attached as Exhibit B is the expense budget for the "GBRP's Controlled Expenses" with respect to the Stores subject to this Statement of Work.

4.      Merchant shall pay GBRP an "Incentive Fee" (which, if earned, shall be in addition to the Base Fee) as one of the following (e.g., back to the first dollar), based upon the applicable Recovery Percentage relating to the Sale at the Stores subject to this Statement of Work:

| Recovery Percentage | GBRP's Incentive Fee |
|---|---|
| Below 50.00% | None |
| 50.00% - 51.99% | 0.25% of the Retail Value of the Merchandise |
| 52.00% - 53.99% | 0.75% of the Retail Value of the Merchandise |
| 54.00% and Above | 1.00% of the Retail Value of the Merchandise; plus an amount equal to $500 per Store subject to this Statement of Work |

The performance hurdles set forth above have been established based upon Merchant's representation to GBRP that: (i) the composition of the Merchandise shall be consistent with the information summarized on Exhibit C attached hereto; and (ii) from and after the date hereof and through the Sale Commencement Date, (y) the Stores will be (and have been) operated in the ordinary course consistent with historic practices (including without limitation with respect to replenishment, transfers of merchandise and FF&E in and out, PLU file administration, store hours, and promotion/advertising), and (z) there shall be no increases or decreases to the Merchant's retail prices of any items of Merchandise outside of the ordinary course of business consistent with historic periods.

8

For the avoidance of doubt, the Gross Proceeds and Retail Value of Merchandise calculations shall be made with reference to the Sale at the Stores subject to this Statement of Work in the aggregate and not on a per-Store basis (but not with reference to any of Merchant's other stores subject to any other Statement(s) of Work).

5.      All other terms and conditions of the Letter Agreement are hereby affirmed and incorporated into this Statement of Work.

**Gordon Brothers Retail Partners, LLC**          **Pier 1 Imports (U.S.), Inc.**

By: _____          By: _____
Print Name and Title:                              Print Name and Title:

Exhibits:
     A- Stores
     B- GBRP Controlled Expenses
     C- Merchandise Composition

9

## Schedule 1-B

**Amendment to Consulting Agreement**

100 Pier 1 Place
Fort Worth, Texas 76102
Direct: 817-252-8032
Fax: 817-334-0191
hrraiden@pier1.com

# Pier1 imports

June 6, 2016

Gordon Brothers Retail Partners, LLC
Michael Chartock (mchartock@gordonbrothers.com)

Re: Store Closing Program Agreement dated January 28, 2009 (as amended, the "Agreement")
by and between Gordon Brothers Retail Partners, LLC ("GBRP") and Pier 1 Imports (U.S.) Inc.
("Merchant")

Dear GBRP:

The parties hereby amend Section 1 of the Agreement to include permission for GBRP to retain contract manual labor in order to facilitate the store closing services recited therein, at times and costs as agreed to in writing by the parties. GBRP acknowledges and agrees that any such contractors will be the responsibility of GBRP to manage, and that GBRP will indemnify Merchant in the event of any damage caused by such contractors, as if such contractors were employees of GBRP.

Additionally, GBRP will require any contractors to provide the same insurance coverage required to be provided by GBRP under the Agreement, or will include such contractors under the coverage provided to Merchant by GBRP, and will provide certificates evidencing such coverage to Merchant upon request.

GBRP evidences its acknowledgement and agreement to the above modifications to the Agreement by signing where indicated below. Except as modified herein, all other terms of the Agreement remain effective and unchanged.

Sincerely,

Heather R. Raiden
Senior Corporate Counsel

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____

Printed
Name: _____

Title: _____

Date: June 10, 2016

## **Schedule 1-C**

**Consulting Agreement: Statement of Work 78**

Pier 1 Imports (U.S.), Inc./Gordon Brothers Retail Partners, LLC
Statement of Work No. 78
As of November 27th, 2019

Reference is made to the Store Closing Program Letter Agreement dated January 28, 2009 between Pier 1 Imports (U.S.), Inc. and Gordon Brothers Retail Partners, LLC ("Letter Agreement"). Capitalized terms used herein and not defined herein shall have the respective meanings assigned to such terms in the Letter Agreement.

The parties hereto agree as follows:

1.      This is a "Statement of Work" as contemplated by the Letter Agreement.

2.      Attached hereto as Exhibit A is a list of Merchant's seventy-one (71) retail stores to be closed pursuant to, and subject to the terms and conditions of, the Letter Agreement and this Statement of Work. Also included on Exhibit A are the respective "Sale Commencement Date(s)" and "Sale Termination Date(s)" with respect to each Store subject to this Statement of Work; provided, however, that (as provided in the Letter Agreement) GBRP may from time to time establish an earlier "Sale Termination Date" with respect to any one or more Stores (on a per Store basis) upon five (5) days prior notice to Merchant.

3.      Attached as Exhibit B is the expense budget for the "GBRP's Controlled Expenses" with respect to the Stores subject to this Statement of Work.

4.      Merchant shall pay GBRP an "Incentive Fee" (which, if earned, shall be in addition to the Base Fee) as one of the following (e.g., back to the first dollar), based upon the applicable Recovery Percentage relating to the Sale at the Stores subject to this Statement of Work:

| Recovery Percentage | GBRP's Incentive Fee |
|---|---|
| Below 50.00% | None |
| 50.00% - 51.99% | 0.25% of the Retail Value of the Merchandise |
| 52.00% - 53.99% | 0.75% of the Retail Value of the Merchandise |
| 54.00% and Above | 1.00% of the Retail Value of the Merchandise; plus an amount equal to $500 per Store subject to this Statement of Work |

The performance hurdles set forth above have been established based upon Merchant's representation to GBRP that: (i) the composition of the Merchandise shall be consistent with the information summarized on Exhibit C attached hereto; and (ii) from and after the date hereof and through the Sale Commencement Date, (y) the Stores will be (and have been) operated in the ordinary course consistent with historic practices (including without limitation with respect to replenishment, transfers of merchandise and FF&E in and out, PLU file administration, store hours, and promotion/advertising), and (z) there shall be no increases or decreases to the Merchant's retail prices of any items of Merchandise outside of the ordinary course of business consistent with historic periods.

For the avoidance of doubt, the Gross Proceeds and Retail Value of Merchandise calculations shall be made with reference to the Sale at the Stores subject to this Statement of Work in the

aggregate and not on a per-Store basis (but not with reference to any of Merchant's other stores subject to any other Statement(s) of Work).

5.      All other terms and conditions of the Letter Agreement are hereby affirmed and incorporated into this Statement of Work.

6.      Concurrently with the execution of, and as a condition to Consultant's obligations under this Statement of Work, Merchant shall fund to Consultant $310,000.00 (the "Special Purpose Payment") which shall be held by Consultant until the Final Reconciliation (and Merchant shall not apply the Special Purpose Payment to, or otherwise offset any portion of the Special Purpose Payment against, any weekly reimbursement, payment of fees, or other amount owing to Consultant under this Statement of Work prior to the Final Reconciliation). Without limiting any of Consultant's other rights, Consultant may apply the Special Purpose Payment to any unpaid obligation owing by Merchant to Consultant under this Agreement. Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by this Agreement shall be returned to Merchant within three days following the Final Reconciliation.

7.      Notwithstanding anything to the contrary in the Agreement, Consultant will advance funds for the Consultant's Controlled Expenses, and Merchant shall reimburse Consultant weekly therefor (up to the aggregate budgeted amount) in connection with a weekly reconciliation upon presentation of reasonable documentation for such actually-incurred expenses.   In addition to, and not as part of, reimbursement of any Consultant Controlled Expenses, Merchant shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with this Agreement.

**Gordon Brothers Retail Partners, LLC**          **Pier 1 Imports (U.S.), Inc.**

By:                                                        By: Nicole Jowers (Dec 3, 2019)

Print Name and Title:                                     Print Name and Title:
Richard P. Edwards                                        Nicole Jowers
Co-President - Retail
                                                          Vice President Store Operations

Exhibits:
  A- Stores                                               Dec 3, 2019
  B- GBRP Controlled Expenses
  C- Merchandise Composition

2

## Pier One
### EXHIBIT A

| Store No. | Store | Address | City | State | Zip Code | Sale Start Date | Last day of sales |
|---|---|---|---|---|---|---|---|
| 0014 | LA/Monclair CA | 5440 Moreno St | Monclair | CA | 91763-4631 | 12/6/2019 | 2/26/2020 |
| 0051 | Sacramento/Sunrise CA | 6245 Sunrise Blvd | Citrus Heights | CA | 95610-5911 | 12/6/2019 | 2/26/2020 |
| 0080 | Dallas/635 & Macarthur TX | 7805 N Macarthur Suite 110 | Irving | TX | 75063 | 12/6/2019 | 2/26/2020 |
| 0092 | Salinas CA | 1520 North Main St | Salinas | CA | 93906-5101 | 12/6/2019 | 2/26/2020 |
| 0094 | Dayton/Beavercreek OH | 2781-A Centre Dr | Fairborn | OH | 45324-2676 | 12/6/2019 | 2/26/2020 |
| 0115 | New Orleans/Tchoupitoulas LA | 5300 Tchoupitoules St | New Orleans | LA | 70115-1903 | 12/6/2019 | 2/26/2020 |
| 0144 | Bradley/Nothfield Sq IL | 1660 North State Rte 50 | Bourbonnais | IL | 60914-9306 | 12/6/2019 | 2/26/2020 |
| 0151 | Elizabethtown KY | 1820 N Dixie Hwy | Elizabethtown | KY | 42701-9492 | 12/6/2019 | 2/26/2020 |
| 0155 | Ft Laud/Davie FL | 3470 South University Dr | Davie | FL | 33328-2000 | 12/6/2019 | 1/12/2020 |
| 0190 | San Diego/Del Mar CA | 2671 Via De La Valle | Del Mar | CA | 92014-1903 | 12/6/2019 | 2/26/2020 |
| 0196 | LA/Aliso Viejo CA | 26771 Aliso Creek Rd | Aliso Viejo | CA | 92656-2887 | 12/6/2019 | 2/26/2020 |
| 0229 | Atlanta/Ansley GA | 1544 Piedmont Rd | Atlanta | GA | 30324-5018 | 12/6/2019 | 2/26/2020 |
| 0268 | Phoenix/Paradise Valley AZ | 12657 North Tatum Boulevard | Phoenix | AZ | 85032-7795 | 12/6/2019 | 2/26/2020 |
| 0295 | MPLS/Minnetonka MN | 11315 Hwy 7 | Minnetonka | MN | 55305-5300 | 12/6/2019 | 2/26/2020 |
| 0431 | Springfield VA | 6751-A Frontier Dr | Springfield | VA | 22150-1412 | 12/6/2019 | 2/26/2020 |
| 0452 | NJ/Paramus Route 4 NJ | 58-64 Rte4 E | Paramus | NJ | 076522621 | 12/6/2019 | 2/26/2020 |
| 0491 | Jackson/County Line Rd MS | 900 East County Line Rd | Ridgeland | MS | 39157-1922 | 12/6/2019 | 1/28/2020 |
| 0496 | Ok City/Penn Square OK | 5517 North Pennsylvania Ave | Oklahoma City | OK | 73112-7753 | 12/6/2019 | 2/26/2020 |
| 0508 | Manhattan Beach CA | 1800 C Rosecrans Ave | Manhattan Beach | CA | 90266-3776 | 12/6/2019 | 2/26/2020 |
| 0547 | Calgary/Shawnessy AB | 200-303 Shawville Blvd SE | Calgary | AB | T2Y3W6 | 12/6/2019 | 2/26/2020 |
| 0548 | Vancouver/Langley BC | 20195 Langley Bypass | Langley | BC | V3A 6K9 | 12/6/2019 | 2/26/2020 |
| 0549 | Victoria BC | 755 Finlayson St | Victoria | BC | V8T4W4 | 12/6/2019 | 2/26/2020 |
| 0690 | Larchmont NY | 1329 Boston Post Rd | Larchmont | NY | 10538-3902 | 12/6/2019 | 2/26/2020 |
| 0823 | Arl TX/Parks Mall TX | 4145 South Cooper St | Arlington | TX | 76015-4128 | 12/6/2019 | 2/26/2020 |
| 0834 | Charleston/Rivers Ave SC | 7643 North Rivers Ave | North Charleston | SC | 29406-4073 | 12/6/2019 | 2/26/2020 |
| 0853 | Holyoke MA | 98 Lower Westfield Rd | Holyoke | MA | 01040-2712 | 12/6/2019 | 2/26/2020 |
| 0863 | MPLS/Rosedale MN | 2397 North Fairview Ave | Roseville | MN | 55113-2707 | 12/6/2019 | 2/26/2020 |
| 1021 | Kokomo IN | 1429 S Reed Rd | Kokomo | IN | 46902-1927 | 12/6/2019 | 2/26/2020 |
| 1059 | Jefferson City MO | 3535 Missouri Blvd | Jefferson City | MO | 65109-5769 | 12/6/2019 | 2/26/2020 |
| 1068 | Dekalb IL | 2371 Sycamore Rd | Dekalb | IL | 60115-2007 | 12/6/2019 | 2/16/2020 |
| 1076 | Winnipeg/St Vital Centre MB | 785 Dakota Street | Winnipeg | MB | R2M5M2 | 12/6/2019 | 2/26/2020 |
| 1121 | Beaver PA | 135 Wagner Road | Monaca | PA | 15061-2421 | 12/6/2019 | 2/26/2020 |
| 1127 | Akron/Chapel Hill OH | 392 Howe Avenue | Cuyahoga Falls | OH | 44221-4819 | 12/6/2019 | 2/26/2020 |
| 1232 | Va paraiso IN | 150 Silhavy Road | Valparaiso | IN | 46383-6971 | 12/6/2019 | 2/26/2020 |
| 1235 | Ithaca NY | 722 South Meadow Street | Ithaca | NY | 14850-6321 | 12/6/2019 | 2/26/2020 |
| 1246 | Boston/Acton MA | 143 Onest Road | Acton | MA | 01720-5673 | 12/6/2019 | 2/26/2020 |
| 1250 | Sudbury ON | 1400 Marcus Drive | Sudbury | ON | P3B 4K5 | 12/6/2019 | 2/26/2020 |
| 1289 | Kalispell MT | 2375 US Highway 93 North | Kalispell | MT | 59901-7531 | 12/6/2019 | 2/26/2020 |
| 1325 | Merced CA | 1778 W Olive Ave | Merced | CA | 95348-1201 | 12/6/2019 | 2/26/2020 |
| 1334 | Anderson SC | 120 Station Drive | Anderson | SC | 29621-1173 | 12/6/2019 | 2/26/2020 |
| 1340 | St Cloud MN | 3701 W Division Street | St Cloud | MN | 56301-3300 | 12/6/2019 | 2/26/2020 |
| 1359 | Las Vegas/Montecito NV | 6680 N Durango Drive | Las Vegas | NV | 89149-4430 | 12/6/2019 | 2/26/2020 |
| 1378 | Phoenix/Happy Valley AZ | 2501 W Happy Valley Pkwy | Phoenix | AZ | 85027-3710 | 12/6/2019 | 2/26/2020 |
| 1380 | Mpls/Ne Blaine MN | 4325 Pheasant Ridge Drive | Blaine | MN | 55449-4540 | 12/6/2019 | 1/28/2020 |
| 1385 | Ottawa/South Keys ON | 1009 Daae Street Unit 5 | Ottawa | ON | K1V 2G3 | 12/6/2019 | 2/26/2020 |
| 1392 | Toronto/Oshawa ON | 1425 Harmony Road North | Oshawa | ON | L1H 7K5 | 12/6/2019 | 2/26/2020 |
| 1419 | Toronto/Etobicoke ON | 125 The Queensway | Etobicoke | ON | M8Y 1H6 | 12/6/2019 | 2/26/2020 |
| 1430 | Manhattan KS | 320 Southwend Place | Manhattan | KS | 66503-3110 | 12/6/2019 | 2/26/2020 |
| 1431 | Newport Coast CA | 8872 East Coast Highway | Newport Coast | CA | 92657-2040 | 12/6/2019 | 2/26/2020 |
| 1443 | Mankato MN | 1901 E Madison Avenue | Mankato | MN | 56001-6266 | 12/6/2019 | 2/26/2020 |
| 1449 | Hadley MA | 351 Russell Street | Hadley | MA | 01035-3536 | 12/6/2019 | 2/26/2020 |
| 1455 | Kingston NY | 1165 Ulster Avenue | Kingston | NY | 12401-1513 | 12/6/2019 | 2/26/2020 |
| 1459 | LI/Sayville NY | 5187 Sunrise Highway | Bohemia | NY | 11716-4617 | 12/6/2019 | 1/28/2020 |
| 1461 | Philadelphia/Columbus Commons PA | 23 10 S Christopher Columbus | Philadelphia | PA | 19148-9000 | 12/6/2019 | 2/26/2020 |
| 1469 | KansasCity/Olathe KS | 15340 West 119th Street | Olathe | KS | 66062-1073 | 12/6/2019 | 2/26/2020 |
| 1471 | Guelph ON | 435 Stone Road West Unit L10 | Guelph | ON | N1G 2X6 | 12/6/2019 | 2/26/2020 |
| 1480 | Houston/Willowbrook TX | 17725 Tomball Parkway | Houston | TX | 77064-1010 | 12/6/2019 | 2/26/2020 |
| 1491 | Studio City CA | 12160 Ventura Boulevard | Studio City | CA | 91604-2514 | 12/6/2019 | 2/26/2020 |
| 1563 | Stillwater OK | 2144 N Perkins Road | Stillwater | OK | 74075-3075 | 12/6/2019 | 2/26/2020 |
| 1617 | Marina Del Rey CA | 13455 Maxella Ave | Marina Del Rey | CA | 90292-5683 | 12/6/2019 | 1/28/2020 |
| 1642 | South Loop 11, | 1014 S Canal St | Chicago | IL | 60607-4907 | 12/6/2019 | 1/23/2020 |
| 0530 | Anchorage AK | 8535 Old Seward Hwy | Anchorage | AK | 99515-2015 | 11/27/2019 | 2/26/2020 |
| 1600 | Fairbanks AK | 340 Merhar Avenue | Fairbanks | AK | 99701-3166 | 11/27/2019 | 2/26/2020 |
| 1669 | Anchorage AK | 1124 N Muldoon Rd | Anchorage | AK | 99504-6101 | 11/27/2019 | 2/26/2020 |
| 0371 | Maui/Market Place HI | 270 Dairy Rd | Kahului | HI | 96732-2987 | 11/27/2019 | 2/26/2020 |
| 1581 | Kona HI | 74-6586 Palani Road | Kailua - Kona | HI | 96740-3119 | 11/27/2019 | 2/26/2020 |
| 1613 | Honolulu HI | 1170 Auahi St | Honolulu | HI | 96814-4900 | 11/27/2019 | 2/26/2020 |
| 1641 | Kauai HI | 4303 Nawiliwili Rd | Lihue | HI | 96766-9581 | 11/27/2019 | 2/26/2020 |
| 1672 | Hilo HI | 111 E Puainako St | Hilo | HI | 96720-5278 | 11/27/2019 | 2/26/2020 |
| 1678 | Pearl City HI | 1000 Kamehameha Hwy | Pearl City | HI | 96782-2596 | 11/27/2019 | 2/26/2020 |
| 1624 | Alexandria VA | 7684 Richmond Hwy | Alexandria | VA | 22306-2843 | 12/27/2019 | 2/26/2020 |

71

## Exhibit B
## 71 Store
## Budget of GBRP's Controlled Expenses

| | |
|---|---|
| Number of Stores | 71 |
| Sale Commencement | 27-Nov-19 |
| Sale End Date | 26-Feb-20 |
| Number of Days | 92 |
| Number of Weeks | 13.1 |

| | Total Dollars |
|---|---|
| **Advertising Budget** | |
| Signs and Banners | $92,300 |
| Signwalkers | $743,014 |
| **Total Advertising** | **$835,314** |
| | |
| **Supervision** | |
| Lead Consultant | 0 |
| Field Consultants | 417,700 |
| Supervision Travel | 107,658 |
| **Total Supervision Budget** | **525,358** |
| | |
| **Miscellaneous** | **$181,050** |
| | |
| **Total Expense Budget** | **$1,541,722** |

Notes:

*Supervision Fees includes base weekly fee, bonus and living expenses*

*Changes in inventory levels, sale term or other factors may affect the above expense budget*

# Exhibit C
## Merchandise Breakdown


**(Information as previously provided by Merchant)**

## **Schedule 1-D**

**Consulting Agreement: Statement of Work 79**

Pier 1 Imports (U.S.), Inc./Gordon Brothers Retail Partners, LLC
Statement of Work No. 79
As of November 27th, 2019

Reference is made to the Store Closing Program Letter Agreement dated January 28, 2009
between Pier 1 Imports (U.S.), Inc. and Gordon Brothers Retail Partners, LLC ("Letter
Agreement"). Capitalized terms used herein and not defined herein shall have the respective
meanings assigned to such terms in the Letter Agreement.

The parties hereto agree as follows:

1.       This is a "Statement of Work" as contemplated by the Letter Agreement.

2.       Attached hereto as Exhibit A is a list of Merchant's one hundred and sixty-nine (169)
retail stores to be part of a "Storewide Sale" program pursuant to, and subject to the terms and
conditions of, the Letter Agreement and this Statement of Work. Also included on Exhibit A are
the respective "Sale Commencement Date(s)" and "Sale Termination Date(s)" which are marked
"TBD" as no decision to close the Stores subject to this Statement of Work has been made by Pier
1 Imports (U.S.), Inc.; provided, however, that (as provided in the Letter Agreement) GBRP may
from time to time establish an earlier "Sale Termination Date" with respect to any one or more
Stores (on a per Store basis) upon five (5) days prior notice to Merchant.

3.       Attached as Exhibit B is the expense budget for the "GBRP's Controlled Expenses" with
respect to the Stores subject to this Statement of Work.

4.       Merchant shall pay GBRP an "Incentive Fee" (which, if earned, shall be in addition to the
Base Fee) as one of the following (e.g., back to the first dollar), based upon the applicable
Recovery Percentage relating to the Sale at the Stores subject to this Statement of Work:

| Recovery Percentage | GBRP's Incentive Fee |
|---|---|
| Below 50.00% | None |
| 50.00% - 51.99% | 0.25% of the Retail Value of the Merchandise |
| 52.00% - 53.99% | 0.75% of the Retail Value of the Merchandise |
| 54.00% and Above | 1.00% of the Retail Value of the Merchandise; plus an amount equal to $500 per Store subject to this Statement of Work |

The performance hurdles set forth above have been established based upon Merchant's
representation to GBRP that: (i) the composition of the Merchandise shall be consistent with the
information summarized on Exhibit C attached hereto; and (ii) from and after the date hereof and
through the Sale Commencement Date, (y) the Stores will be (and have been) operated in the
ordinary course consistent with historic practices (including without limitation with respect to
replenishment, transfers of merchandise and FF&E in and out, PLU file administration, store
hours, and promotion/advertising), and (z) there shall be no increases or decreases to the
Merchant's retail prices of any items of Merchandise outside of the ordinary course of business
consistent with historic periods.

For the avoidance of doubt, the Gross Proceeds and Retail Value of Merchandise calculations
shall be made with reference to the Sale at the Stores subject to this Statement of Work in the

aggregate and not on a per-Store basis (but not with reference to any of Merchant's other stores subject to any other Statement(s) of Work).

5.    Notwithstanding anything to the contrary herein, GBRP acknowledges and agrees that the Stores subject to this SOW are to be part of a "Storewide Sale" program, and therefore the product mix and inventory levels will vary from prior SOW's which performed "Store Closing" or "Going Out of Business" programs.

6.    All other terms and conditions of the Letter Agreement are hereby affirmed and incorporated into this Statement of Work.

7.    Concurrently with the execution of, and as a condition to Consultant's obligations under this Statement of Work, Merchant shall fund to Consultant $832,000.00 (the "Special Purpose Payment") which shall be held by Consultant until the Final Reconciliation (and Merchant shall not apply the Special Purpose Payment to, or otherwise offset any portion of the Special Purpose Payment against, any weekly reimbursement, payment of fees, or other amount owing to Consultant under this Statement of Work prior to the Final Reconciliation). Without limiting any of Consultant's other rights, Consultant may apply the Special Purpose Payment to any unpaid obligation owing by Merchant to Consultant under this Agreement. Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by this Agreement shall be returned to Merchant within three days following the Final Reconciliation.

8.    Notwithstanding anything to the contrary in the Agreement, Consultant will advance funds for the Consultant's Controlled Expenses, and Merchant shall reimburse Consultant weekly therefor (up to the aggregate budgeted amount) in connection with a weekly reconciliation upon presentation of reasonable documentation for such actually-incurred expenses.   In addition to, and not as part of, reimbursement of any Consultant Controlled Expenses, Merchant shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with this Agreement.


**Gordon Brothers Retail Partners, LLC**          **Pier 1 Imports (U.S.), Inc.**

By: _____          By: _____
                                          Nicole Jowers (Dec 3, 2019)
Print Name and Title:                     Print Name and Title:

Richard P Edwards
Co- President - Retail                     Nicole Jowers

Exhibits:                                  Vice President Store Operations
    A- Stores
    B- GBRP Controlled Expenses            Dec 3, 2019
    C- Merchandise Composition

2

Pier One
EXHIBIT A

| StoreNo. | Store | Address | City | State | Zip Code | Sale Start Date | Last day of sales |
|---|---|---|---|---|---|---|---|
| 22 | PHIL/KING OF PRUSSIA PA | 140 ALLENDALE RD COURTSIDE SQ SUITE 100 | KING OF PRUSSIA | PA | 19406 | 11/27/2019 | TBD |
| 30 | REDMOND WA | 7225 170TH AVE. NE #101 | REDMOND | WA | 98052 | 11/27/2019 | TBD |
| 31 | WASH OC/MANASSAS VA | 8105 SUDLEY RD | MANASSAS | VA | 20109 | 11/27/2019 | TBD |
| 46 | HOLLAND MI | 2308 NORTH PARK DR | HOLLAND | MI | 49424 | 11/27/2019 | TBD |
| 47 | GASTONIA NC | 3714 EAST FRANKLIN BLVD | GASTONIA | NC | 28056 | 11/27/2019 | TBD |
| 61 | LI/CARLE PLACE NY | 216 GLEN COVE | CARLE PLACE | NY | 11514 | 11/27/2019 | TBD |
| 63 | PHIL/OXFORD VALLEY PA | 630 COMMERCE BLVD | FAIRLESS HILLS | PA | 19030 | 11/23/2019 | TBD |
| 69 | ROCKY MOUNT NC | 1472 JEFFREYS RDAD | ROCKY MOUNT | NC | 27804 | 11/27/2019 | TBD |
| 71 | HARRISBURG/EAST SHORE PA | 5104 JONESTOWN RD | HARRISBURG | PA | 17112 | 11/27/2019 | TBD |
| 102 | BISMARCK ND | 715 SOUTH WASHINGTON ST | BISMARCK | ND | 58504 | 11/27/2019 | TBD |
| 157 | MPLS/GRAND AVE MN | 733 GRAND AVE | SAINT PAUL | MN | 55105 | 11/23/2019 | TBD |
| 162 | WESTMINSTER MD | 405 NORTH CENTER ST SUITE 13 | WESTMINSTER | MD | 21157 | 11/27/2019 | TBD |
| 174 | SEATTLE/AURORA SQUARE WA | 15725 WESTMINSTER WAY | SEATTLE | WA | 98133 | 11/27/2019 | TBD |
| 194 | DETROIT/ROYAL OAK MI | 31800 WOODWARD AVE | ROYAL OAK | MI | 48073 | 11/27/2019 | TBD |
| 218 | BALTIMORE/WHITE MARSH MD | 8165-A HONEYGO BLVD | NOTTINGHAM | MD | 21236 | 11/27/2019 | TBD |
| 232 | TOLEDO/MONROE ST OH | 5203 MONROE ST | TOLEDO | OH | 43623 | 11/23/2019 | TBD |
| 246 | MT KISCO NY | 792 BEDFORD ROAD | BEDFORD HILLS | NY | 10507 | 11/23/2019 | TBD |
| 249 | MILWAUKEE/BAY SHORE WI | 6010 NORTH PORT WASH RD | GLENDALE | WI | 53217 | 11/27/2019 | TBD |
| 298 | SIOUX CITY IA | 4265 SERGEANT RD | SIOUX CITY | IA | 51106 | 11/27/2019 | TBD |
| 300 | SALISBURY MD | 2320 NORTH SALISBURY BLVD | SALISBURY | MD | 21801 | 11/27/2019 | TBD |
| 309 | LOUISVILLE/HURSTBURN KY | 2000 SOUTH HURSTBORNE PKWY | LOUISVILLE | KY | 40220 | 11/27/2019 | TBD |
| 332 | WASH DC/BAILEYS CROSSROADS VA | 5857-A LEESBURG PIKE | FALLS CHURCH | VA | 22041 | 11/27/2019 | TBD |
| 344 | FORT WAYNE/APPLE GLEN IN | 1750 APPLE GLEN BLVD | FORT WAYNE | IN | 46804 | 11/27/2019 | TBD |
| 357 | CHIC/MERRILLVILLE IN | 1685 EAST 80TH AVE | MERRILLVILLE | IN | 46410 | 11/27/2019 | TBD |
| 364 | SEATTLE/EVERETT WA | 1425 SE EVERETT MALL WAY | EVERETT | WA | 98208 | 11/27/2019 | TBD |
| 372 | NASHVILLE/RIVERGATE TN | 2021 N GALLATIN RD SUITE 200 | MADISON | TN | 37115 | 11/27/2019 | TBD |
| 378 | BOULDER CO | 2530 ARAPAHOE | BOULDER | CO | 80302 | 11/27/2019 | TBD |
| 400 | OAK PARK IL | 1143 WEST LAKE ST | OAK PARK | IL | 60301 | 11/27/2019 | TBD |
| 408 | PARK CITY UT | 6535 LANDMARK DRIVE | PARK CITY | UT | 84098 | 11/27/2019 | TBD |
| 411 | CINC/HYDE PARK OH | 2689 EDMONDSON ROAD | CINCINNATI | OH | 45209 | 11/27/2019 | TBD |
| 432 | LEXINGTON/NICHOLASVILLE KY | 4001 NICHOLASVILLE RD | LEXINGTON | KY | 40503 | 11/27/2019 | TBD |
| 445 | MOHEGAN LAKE NY | 3128 E MAIN ST | MOHEGAN LAKE | NY | 10547 | 11/27/2019 | TBD |
| 456 | LI/HUNTINGTON STATION NY | 7 EAST JERICHO TURNPIKE | HUNTINGTON STATION | NY | 11746 | 11/27/2019 | TBD |
| 498 | MPLS/EAGAN MN | 1275 PROMENADE PLACE | EAGAN | MN | 55121 | 11/27/2019 | TBD |
| 501 | OWENSBORO KY | 5221 FREDERICA ST SUITE 101 | OWENSBORO | KY | 42301 | 11/23/2019 | TBD |
| 506 | ROCHESTER/GREECE NY | 2475 W RIDGE ROAD | ROCHESTER | NY | 14626 | 11/27/2019 | TBD |
| 509 | GAITHERSBURG MD | 30 GRAND CORNER AVENUE | GAITHERSBURG | MD | 20878 | 11/27/2019 | TBD |
| 510 | WESTERLY RI | 100 FRANKLIN STREET #M | WESTERLY | RI | 2891 | 11/27/2019 | TBD |
| 511 | ELKHART/OOSHEN IN | 4024 ELKHART RD SUITE 20A | GOSHEN | IN | 46526 | 11/27/2019 | TBD |
| 512 | WARSAW IN | 2802 FRONTAGE RD | WARSAW | IN | 46580 | 11/27/2019 | TBD |
| 517 | HANOVER PA | 422 EISENHOWER DR | HANOVER | PA | 17331 | 11/27/2019 | TBD |
| 525 | IOWA CITY/CORAL RIDGE IA | 1401 CORAL RIDGE AVE | CORALVILLE | IA | 52241 | 11/27/2019 | TBD |
| 527 | PROVIDENCE/SEEKONK MA | 145 HIGHLAND AVE | SEEKONK | MA | 2771 | 11/27/2019 | TBD |
| 542 | COLUMBUS/EASTON OH | 3970 MORSE CROSSING | COLUMBUS | OH | 43219 | 11/27/2019 | TBD |
| 594 | SEATTLE/TACOMA WA | 4301 SOUTH STEELE ST | TACOMA | WA | 98409 | 11/27/2019 | TBD |
| 596 | HAMDEN CT | 2335 DIXWELL AVE | HAMDEN | CT | 6514 | 11/27/2019 | TBD |
| 611 | CHIC/AURORA IL | 4362 EAST NEW YORK | AURORA | IL | 60504 | 11/27/2019 | TBD |
| 631 | MISSOULA MT | 2800 NORTH RESERVE | MISSOULA | MT | 59808 | 11/23/2019 | TBD |
| 645 | DECATUR IL | 987 S ROUTE 51 | FORSYTH | IL | 62535 | 11/27/2019 | TBD |
| 656 | GREAT FALLS MT | 1601 MARKETPLACE DR SUITE 1 | GREAT FALLS | MT | 59404 | 11/27/2019 | TBD |
| 668 | ROCHESTER/MARKETPLACE NY | 300 HYLAN OR | ROCHESTER | NY | 14623 | 11/27/2019 | TBD |
| 669 | LI/BAYSHORE NY | 1871 SUNRISE HWY | BAYSHORE | NY | 11706 | 11/23/2019 | TBD |
| 680 | WHITE PLAINS NY | 499 TARRYTOWN RD | WHITE PLAINS | NY | 10607 | 11/27/2019 | TBD |
| 695 | WASH DC/STERLING VA | 21050 SOUTHBANK | STERLING | VA | 20165 | 11/27/2019 | TBD |
| 695 | BRUNSWICK GA | 181 GOLDEN ISLES PLAZA | BRUNSWICK | GA | 31520 | 11/27/2019 | TBD |
| 706 | LI/LONG BEACH NY | 214 EAST PARK AVE | LONG BEACH | NY | 11561 | 11/27/2019 | TBD |
| 707 | BATAVIA IL | 481 NORTH RANDALL | BATAVIA | IL | 60510 | 11/27/2019 | TBD |
| 753 | BRISTOL CT | 594 FARMINGTON AVE | BRISTOL | CT | 6010 | 11/23/2019 | TBD |
| 767 | COLUMBIA/HARBISON SC | 250 HARBISON BLVD | COLUMBIA | SC | 29212 | 11/27/2019 | TBD |
| 793 | EAST HANOVER NJ | 375 RTE 10 | EAST HANOVER | NJ | 7936 | 11/27/2019 | TBD |
| 802 | AVON CT | 345 WEST MAIN ST UNIT A | AVON | CT | 6001 | 11/27/2019 | TBD |
| 824 | PITTSFIELD MA | 555 HUBBARD AVE | PITTSFIELD | MA | 1201 | 11/27/2019 | TBD |
| 832 | DELAWARE/DOVER OE | 1231 NORTH DUPONT HWY | DOVER | DE | 19901 | 11/23/2019 | TBD |
| 835 | MPLS/SOUTHDALE MN | 2900 WEST 66TH ST | RICHFIELD | MN | 55423 | 11/27/2019 | TBD |
| 841 | DANBURY CT | 1 SUGAR HOLLOW RD | DANBURY | CT | 6810 | 11/27/2019 | TBD |
| 845 | CLARKSVILLE/GOV SQ TN | 2819 WILMA RUDOLPH BLVD STE A | CLARKSVILLE | TN | 37040 | 11/27/2019 | TBD |
| 849 | BLOOMINGTON IN | 869 AUTOMALL RD | BLOOMINGTON | IN | 47401 | 11/23/2019 | TBD |
| 855 | GRAND RAPIDS/ALPINE MI | 3909 ALPINE AVE NW | COMSTOCK PARK | MI | 49321 | 11/27/2019 | TBD |
| 874 | SEATTLE/FEDERAL WAY-WA | 2424 SOUTH 320TH ST | FEDERAL WAY | WA | 98003 | 11/27/2019 | TBD |
| 880 | RACINE/REGENCY WI | 2621 SOUTH GREEN BAY RD | RACINE | WI | 53406 | 11/27/2019 | TBD |
| 890 | BALTIMORE/PIKESVILLE MD | 1809 REISTERSTOWN RD SUITE 101 | BALTIMORE | MD | 21208 | 11/27/2019 | TBD |
| 1004 | NORWALK CT | 777 CONNECTICUT AVE | NORWALK | CT | 6854 | 11/23/2019 | TBD |
| 1005 | GREENWOOD SC | 525 BYPASS 72 NW SUITE C | GREENWOOD | SC | 29649 | 11/27/2019 | TBD |
| 1009 | EDGEWATER NJ | 11 THE PROMENADE | EDGEWATER | NJ | 7020 | 11/27/2019 | TBD |
| 1013 | FOND DU LAC WI | 516 N ROLLING MEADOWS DR | FOND DULAC | WI | 54937 | 11/27/2019 | TBD |
| 1023 | FLEMINGTON NJ | 39 REAVILLE AVE | FLEMINGTON | NJ | 8822 | 11/27/2019 | TBD |
| 1029 | BOSTON/BRAINTREE MA | 120 GRANITE ST | BRAINTREE | MA | 2184 | 11/23/2019 | TBD |
| 1041 | CALIFORNIA MD | 45098 WORTH AVE | CALIFORNIA | MD | 20619 | 11/27/2019 | TBD |
| 1050 | LEOMINSTER MA | 289 NORTH MAIN STREET 15 WATER TOWER PL | LEOMINSTER | MA | 1453 | 11/27/2019 | TBD |
| 1052 | ST CLAIRS VILLE OH | 50850 VALLEY CENTRE BLVD | SAINT CLAIRSVILLE | OH | 43950 | 11/27/2019 | TBD |
| 1056 | CONCORD PA | 975 BALTIMORE PIKE | GLENMILLS | PA | 19342 | 11/27/2019 | TBD |
| 1058 | PITTSBURG/MCKNIGHT PA | 7219 B MCKNIGHT RD | PITTSBURGH | PA | 15237 | 11/27/2019 | TBD |
| 1069 | HENDERSONVILLE NC | 88 HIGHLAND SQUARE OR | HENDERSONVILLE | NC | 28792 | 11/27/2019 | TBD |
| 1108 | CHRISTIANSBURG VA | 35 CONSTON AVENUE | CHRISTIANSBURG | VA | 24073 | 11/27/2019 | TBD |
| 1113 | PHILADELPHIA/PAOLI PA | 82 E LANCASTER AVE SUITE 2A | PAOLI | PA | 19301 | 11/27/2019 | TBD |
| 1115 | DENVER/ASPEN GROVE CO | 7301 S SANTA FE DRIVE #710 | LITTLETON | CO | 80120 | 11/23/2019 | TBD |
| 1131 | LANSING/WEST MI | 647 N MARKET PLACE BLVD | LANSING | MI | 48917 | 11/27/2019 | TBD |
| 1148 | CHICAGO/SOUTH ELGIN IL | 358 RANDALL ROAD | SOUTH ELGIN | IL | 60177 | 11/27/2019 | TBD |

## Pier One
### EXHIBIT A

| StoreNo. | Store | Address | City | State | Zip Code | Sale Start Date | Last day of sales |
|---|---|---|---|---|---|---|---|
| 1162 | NORFOLK/RED MILL COMMONS VA | 1169 NIMMO PARKWAY SUITE 218 | VIRGINIA BEACH | VA | 23456 | 11/27/2019 | TBD |
| 1171 | CLEVELAND/NORTH OLMSTED OH | 25953 GREAT NORTHERN SHOP CTR | NORTH OLMSTED | OH | 44070 | 11/27/2019 | TBD |
| 1182 | MOUNT OLIVE NJ | 30 INTERNATIONAL DR SOUTH SUITE F2 | FLANDERS | NJ | 7836 | 11/27/2019 | TBD |
| 1189 | BUFFALO/WALDEN NY | 1740 WALDEN AVE SUITE 300 | CHEEKTOWAGA | NY | 14225 | 11/27/2019 | TBD |
| 1190 | WASHINGTON PA | 351 WASHINGTON ROAD | WASHINGTON | PA | 15301 | 11/27/2019 | TBD |
| 1218 | UTICANY | 4799 COMMERCIAL DRIVE | NEW HARTFORD | NY | 13413 | 11/27/2019 | TBD |
| 1222 | GREENSBORO/WENOOVER & I-40 NC | 1210-C BRIDFORD PARKWAY | GREENSBORO | NC | 27407 | 11/27/2019 | TBD |
| 1237 | COMMACK NY | 118 VETERANS MEMORIAL HWY | COMMACK | NY | 11725 | 11/27/2019 | TBD |
| 1251 | PHILADELPHIA/FEASTERVILLE PA | 120 EAST STREET ROAD | FEASTERVILLE | PA | 19053 | 11/27/2019 | TBD |
| 1252 | DURHAM/SOUTHPOINT NC | 6807 FAYETTEVILLE RD SUITE 102 | DURHAM | NC | 27713 | 11/27/2019 | TBD |
| 1261 | CHICAGO/GLENVIEW IL | 2331 WILLOW ROAD | GLENVIEW | IL | 60025 | 11/27/2019 | TBD |
| 1275 | RALEIGH/BRIER CREEK NC | 8391 BRIER CREEK PARKWAY | RALEIGH | NC | 27617 | 11/27/2019 | TBD |
| 1282 | MARQUETTE MI | 3155 US HIGHWAY 41 WEST | MARQUETTE | MI | 49855 | 11/27/2019 | TBD |
| 1284 | HOWELL NJ | 4759 ROUTE 9 NORTH | HOWELL | NJ | 7731 | 11/27/2019 | TBD |
| 1287 | AUGUSTA ME | 12 STEPHEN KING DR SUITE 3 | AUGUSTA | ME | 4330 | 11/27/2019 | TBD |
| 1294 | MINNEAPOLIS/EDEN PRAIRIE MN | 574 PRAIRIE CENTER DRIVE SUITE 165 | EDEN PRAIRIE | MN | 55344 | 11/27/2019 | TBD |
| 1296 | MILWAUKEE/GERMANTOWN WI | N96W18766 COUNTY LINE ROAD | GERMANTOWN | WI | 53022 | 11/27/2019 | TBD |
| 1297 | COLORADO SPRINGS/BRIARGATE CO | 1685 BRIARGATE PKWY STE 311 | COLORADO SPRINGS | CO | 80920 | 11/27/2019 | TBD |
| 1302 | LI/RIVERHEAD NY | 1470 OLD COUNTRY RD | RIVERHEAD | NY | 11901 | 11/27/2019 | TBD |
| 1306 | COLORADO SPRINGS/FIRST & MAIN CO | 3030 NEW CENTER POINT | COLORADO SPRINGS | CO | 80922 | 11/27/2019 | TBD |
| 1311 | WASH DC/POTOMAC YARDS VA | 3901 RICHMOND HWY | ALEXANDRIA | VA | 22305 | 11/27/2019 | TBD |
| 1313 | KENOSHA WI | 6830 GREENBAY ROAD | KENOSHA | WI | 53142 | 11/27/2019 | TBD |
| 1316 | CAPE MAY NJ | 5 COURT HOUSE SOUTH DENNIS | CAPE MAY COURT HOUSE | NJ | 8210 | 11/23/2019 | TBD |
| 1317 | CHICAGO/ALGONQUIN IL | 718 SOUTH RANDALL ROAD | ALGONQUIN | IL | 60102 | 11/27/2019 | TBD |
| 1318 | PHILADELPHIA/SPRINGFIELD PA | 1014 BALTIMORE PIKE | SPRINGFIELD | PA | 19064 | 11/27/2019 | TBD |
| 1330 | MINNEAPOLIS/COON RAPIDS MN | 12260 RIVERDALE BLVD | COON RAPIDS | MN | 55448 | 11/27/2019 | TBD |
| 1337 | CLEVELAND/STRONGSVILLE OH | 18604 ROYALTON ROAD | STRONGSVILLE | OH | 44136 | 11/27/2019 | TBD |
| 1346 | AVON CO | 220 BEAVER CREEK PLACE PO BOX 8274 | AVON | CO | 81620 | 11/27/2019 | TBD |
| 1349 | WEST WINDSOR NJ | 3512 BRUNSWICK PIKE | PRINCETON | NJ | 8540 | 11/27/2019 | TBD |
| 1350 | KEENE NH | 36 ASH BROOK ROAD | KEENE | NH | 3431 | 11/27/2019 | TBD |
| 1369 | LI/LAKE SUCCESS NY | 1454 UNION TURNPIKE | NEW HYDE PARK | NY | 11040 | 11/27/2019 | TBD |
| 1383 | JANESVILLE WI | 2800 DEERFIELD DRIVE | JANESVILLE | WI | 53546 | 11/27/2019 | TBD |
| 1386 | LAS VEGAS/TROPICANA NV | 4950 SOUTH FORT APACHE RD | LAS VEGAS | NV | 89148 | 11/27/2019 | TBD |
| 1391 | CROFTON MD | 1352 MAIN CHAPEL WAY | GAMBRILLS | MD | 21054 | 11/27/2019 | TBD |
| 1406 | COLUMBUS/DUBLIN OH | 6672 SAWMILL RD | COLUMBUS | OH | 43235 | 11/27/2019 | TBD |
| 1420 | MINNEAPOLIS/STILLWATER MN | 5855 KRUEGER LANE | OAK PARK HEIGHTS | MN | 55082 | 11/27/2019 | TBD |
| 1460 | MINNEAPOLIS/SHAKOPEE MN | 8085 OLD CARRIAGE COURT | SHAKOPEE | MN | 55379 | 11/27/2019 | TBD |
| 1470 | COLONIAL HEIGHTS VA | 729 SOUTHPARK BOULEVARD | COLONIAL HEIGHTS | VA | 23834 | 11/27/2019 | TBD |
| 1482 | ROSEBURG OR | 780 NW GARDEN VALLEY BLVD SUITE 200 | ROSEBURG | OR | 97471 | 11/27/2019 | TBD |
| 1487 | NORTH ANDOVER MA | 133 TURNPIKE STREET | NORTH ANDOVER | MA | 1845 | 11/27/2019 | TBD |
| 1488 | NEWPORT NEWS VA | 12551 JEFFERSON AVENUE SUITE 161 | NEWPORT NEWS | VA | 23602 | 11/27/2019 | TBD |
| 1489 | OCEAN TOWNSHIP NJ | 1100 HIGHWAY 35 | OCEAN | NJ | 7712 | 11/23/2019 | TBD |
| 1493 | CENTERVILLE UT | 120 NORTH FRONTAGE ROAD | CENTERVILLE | UT | 84014 | 11/27/2019 | TBD |
| 1495 | STAFFORD VA | 1250 STAFFORD MARKET PLACE | STAFFORD | VA | 22556 | 11/27/2019 | TBD |
| 1517 | WOODBRIDGE NJ | 889 SAINT GEORGE AVENUE | WOODBRIDGE | NJ | 7095 | 11/27/2019 | TBD |
| 1526 | CHICAGO/MUNDELEIN IL | 3062 W, RT 60 | MUNDELEIN | IL | 60060 | 11/27/2019 | TBD |
| 1536 | RALEIGH/CAMERON VILLAGE NC | 416 DANIELS STREET | RALEIGH | NC | 27605 | 11/27/2019 | TBD |
| 1546 | DETROIT/ALLEN PARK MI | 3200 FAIRLANE DRIVE | ALLEN PARK | MI | 48101 | 11/27/2019 | TBD |
| 1552 | POTTSTOWN PA | 351 W. SCHUYLKILL RD STE, A-1 | POTTSTOWN | PA | 19465 | 11/27/2019 | TBD |
| 1567 | FLUSHING NY | 191-24 NORTHERN BLVD | FLUSHING | NY | 11358 | 11/27/2019 | TBD |
| 1569 | DUBUQUE IA | 2531 NW ARTERIAL | DUBUQUE | IA | 52002 | 11/27/2019 | TBD |
| 1572 | QUEENS/REGO PARK NY | 61-35 JUNCTION BLVD SUITE A5 | REGO PARK | NY | 11374 | 11/27/2019 | TBD |
| 1578 | ATLANTA BUCKHEAD/BUCKHEAD PLA | 3232 PEACHTREE RD UNIT A1 | ATLANTA | GA | 30305 | 11/27/2019 | TBD |
| 1582 | BRONX/BAY PLAZA NY | 2146 BARTOW AVENUE | BRONX | NY | 10475 | 11/27/2019 | TBD |
| 1584 | EAST BRUNSWICK NJ | 615 ROUTE 18 SOUTH | EAST BRUNSWICK | NJ | 8816 | 11/27/2019 | TBD |
| 1590 | MILLVILLE NJ | 2148 NORTH 2ND STREET A | MILLVILLE | NJ | 8332 | 11/27/2019 | TBD |
| 1592 | CHARLOTTESVILLE VA | 1951 SWANSON DR | CHARLOTTESVILLE | VA | 22901 | 11/27/2019 | TBD |
| 1598 | OCEAN CITY MD | 12641 OCEAN GI WY STE 104 | OCEAN CITY | MD | 21842 | 11/27/2019 | TBD |
| 1599 | LEGACY VILLAGE/LYNDHURST OH | 24703 CEDAR RD. | LYNDHURST | OH | 44124 | 11/27/2019 | TBD |
| 1608 | BOLINGBROOK IL | 130 W ROUGHTON RD | BOLINGBROOK | IL | 60440 | 11/27/2019 | TBD |
| 1609 | PORT CHESTER NY | 427 BOSTON POST RD | PORT CHESTER | NY | 10573 | 11/27/2019 | TBD |
| 1611 | YORK PA | 2975 CONCORD RD | YORK | PA | 17402 | 11/27/2019 | TBD |
| 1612 | JORDAN CREEK IA | 6305 MILLS CIVIC PKWY, SUITE 2115 | WEST DES MOINES | IA | 50266 | 11/27/2019 | TBD |
| 1614 | BROOKLYN/GATEWAY NY | 410 GATEWAY DRIVE BOX 1 UNIT 8 | BROOKLYN | NY | 11239 | 11/27/2019 | TBD |
| 1616 | STATEN ISLAND NY | 2385 RICHMOND AVE | STATEN ISLAND | NY | 10314 | 11/27/2019 | TBD |
| 1626 | PHIL/CHERRY HILL NJ | 801 HADDONFIELD ROAD | CHERRY HILL | NJ | 8002 | 11/27/2019 | TBD |
| 1637 | WASH DC/ROCKVILLE MD | 12137 ROCKVILLE PIKE B | ROCKVILLE | MD | 20852 | 11/27/2019 | TBD |
| 1639 | WASH DC/ROSSLYN VA | 1717 CLARENDON BLVD | ARLINGTON | VA | 22209 | 11/27/2019 | TBD |
| 1652 | West Corvina CA | 2700 E Workman Ave | West Corvina | CA | 91791-1628 | 12/6/2019 | TBD |
| 1657 | MORRISVILLE/PARK WEST VILLAGE NC | 2108 VILLAGE MARKET PL. | MORRISVILLE | NC | 27560 | 11/27/2019 | TBD |
| 1659 | BURLINGTON VT | 59 GARDEN STREET | SOUTH BURLINGTON | VT | 5403 | 11/27/2019 | TBD |
| 1661 | FRANKFORT KY | 7800 JOHN DAVIS DR STE 200 | FRANKFORT | KY | 40601 | 11/27/2019 | TBD |
| 1662 | PLYMOUTH MA | 122 COLONY PLACE RD. | PLYMOUTH | MA | 2360 | 11/27/2019 | TBD |
| 1665 | CHICAGO/LINCOLN PARK IL | 1574 N KINGSBURY ST UNIT A | CHICAGO | IL | 60642 | 11/27/2019 | TBD |
| 1666 | WASH DC/ALEXANDRIA VA | 4609 DUKE STREET | ALEXANDRIA | VA | 22304 | 11/27/2019 | TBD |
| 1667 | OREM UT | 334 E. UNIVERSITY PKWY | OREM | UT | 84058 | 11/23/2019 | TBD |
| 1676 | SOUTH WINDSOR/EVERGREEN WALK CO | 69 EVERGREEN WAY | SOUTH WINDSOR | CT | 6074 | 11/27/2019 | TBD |
| 1679 | CASPER WY | 555 NEWPORT RD | CASPER | WY | 82609 | 11/24/2019 | TBD |
| 1680 | BOSTON/FRAMINGHAM MA | 1 WORCESTER RD #9950 | FRAMINGHAM | MA | 1701 | 11/27/2019 | TBD |
| 1685 | BLOOMINGDALE IL | 360 W ARMY TRAIL RD | BLOOMINGDALE | IL | 60108 | 11/27/2019 | TBD |
| 1688 | SCHAUMBURG IL | 1522 E GOLF RD | SCHAUMBURG | IL | 60173 | 11/27/2019 | TBD |

169

# Exhibit B
## 168 Store
## Budget of GBRP's Controlled Expenses

| | |
|---|---|
| Number of Stores | 169 |
| Sale Commencement | 27-Nov-19 |
| Sale End Date | TBD |
| Number of Days | 152 * |
| Number of Weeks | 21.7 * |

| | Total Dollars |
|---|---|
| **Advertising Budget** | |
| Signs and Banners | $219,700 |
| Signwalkers | $3,298,757 |
| **Total Advertising** | **$3,518,457** |
| | |
| **Supervision** | |
| Lead Consultant | 115,869 |
| Field Consultants | 2,658,146 |
| Supervision Travel | 605,860 |
| **Total Supervision Budget** | 3,379,875 |
| | |
| **Miscellaneous** | **$430,950** |
| | |
| **Total Expense Budget** | **$7,329,282** |

Notes:

*Supervision Fees includes base weekly fee , bonus and living expenses*

*Changes in inventory levels, sale term or other factors may affect the above expense budget*

* Number of Days and Number of Weeks is an estimate; No decision to close the Stores subject to this SOW has been made.

**Exhibit C**
**Merchandise Breakdown**

**(Information as previously
provided by Merchant)**

## Schedule 1-E

**Consulting Agreement: Statement of Work 80**

Pier 1 Imports (U.S.), Inc./Gordon Brothers Retail Partners, LLC
Amended and Restated Statement of Work No. 80
As of January 23rd, 2020 (replacing that as of December 16th, 2019)

Reference is made to the Store Closing Program Letter Agreement dated January 28, 2009 between Pier 1 Imports (U.S.), Inc. and Gordon Brothers Retail Partners, LLC ("Letter Agreement"). Capitalized terms used herein and not defined herein shall have the respective meanings assigned to such terms in the Letter Agreement.

The parties hereto agree as follows:

1.      This is a "Statement of Work" as contemplated by the Letter Agreement.

2.      Attached hereto as Exhibit A is a list of Merchant's one hundred and one (101) retail stores to be closed pursuant to, and subject to the terms and conditions of, the Letter Agreement and this Statement of Work. Also included on Exhibit A are the respective "Sale Commencement Date(s)" and "Sale Termination Date(s)" with respect to each Store subject to this Statement of Work; provided, however, that (as provided in the Letter Agreement) GBRP may from time to time establish an earlier "Sale Termination Date" with respect to any one or more Stores (on a per Store basis) upon five (5) days prior notice to Merchant.

3.      Attached as Exhibit B is the expense budget for the "GBRP's Controlled Expenses" with respect to the Stores subject to this Statement of Work.

4.      Merchant shall pay GBRP an "Incentive Fee" (which, if earned, shall be in addition to the Base Fee) as one of the following (e.g., back to the first dollar), based upon the applicable Recovery Percentage relating to the Sale at the Stores subject to this Statement of Work:

| Recovery Percentage | GBRP's Incentive Fee |
|---|---|
| Below 50.00% | None |
| 50.00% - 51.99% | 0.25% of the Retail Value of the Merchandise |
| 52.00% - 53.99% | 0.75% of the Retail Value of the Merchandise |
| 54.00% and Above | 1.00% of the Retail Value of the Merchandise; plus an amount equal to $500 per Store subject to this Statement of Work |

The performance hurdles set forth above have been established based upon Merchant's representation to GBRP that: (i) the composition of the Merchandise shall be consistent with the information summarized on Exhibit C attached hereto; and (ii) from and after the date hereof and through the Sale Commencement Date, (y) the Stores will be (and have been) operated in the ordinary course consistent with historic practices (including without limitation with respect to replenishment, transfers of merchandise and FF&E in and out, PLU file administration, store hours, and promotion/advertising), and (z) there shall be no increases or decreases to the Merchant's retail prices of any items of Merchandise outside of the ordinary course of business consistent with historic periods.

For the avoidance of doubt, the Gross Proceeds and Retail Value of Merchandise calculations shall be made with reference to the Sale at the Stores subject to this Statement of Work in the

aggregate and not on a per-Store basis (but not with reference to any of Merchant's other stores subject to any other Statement(s) of Work).

5.      All other terms and conditions of the Letter Agreement are hereby affirmed and incorporated into this Statement of Work.

6.      Concurrently with the execution of, and as a condition to Consultant's obligations under this Statement of Work, Merchant shall fund to Consultant $750,000.00 (the "Special Purpose Payment") which shall be held by Consultant until the Final Reconciliation (and Merchant shall not apply the Special Purpose Payment to, or otherwise offset any portion of the Special Purpose Payment against, any weekly reimbursement, payment of fees, or other amount owing to Consultant under this Statement of Work prior to the Final Reconciliation). Without limiting any of Consultant's other rights, Consultant may apply the Special Purpose Payment to any unpaid obligation owing by Merchant to Consultant under this Agreement. Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by this Agreement shall be returned to Merchant within three days following the Final Reconciliation.

7.      Notwithstanding anything to the contrary in the Agreement, Consultant will advance funds for the Consultant's Controlled Expenses, and Merchant shall reimburse Consultant weekly therefor (up to the aggregate budgeted amount) in connection with a weekly reconciliation upon presentation of reasonable documentation for such actually-incurred expenses. In addition to, and not as part of, reimbursement of any Consultant Controlled Expenses, Merchant shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with this Agreement.

**Gordon Brothers Retail Partners, LLC**          **Pier 1 Imports (U.S.), Inc.**

By: _Sandra Yee_                           By: _____
Print Name and Title:                       Print Name and Title: Robert J. Riesbeck
                                                        CEO and CFO
Sandra Yee
Managing Director - Retail

Exhibits:
   A- Stores
   B- GBRP Controlled Expenses
   C- Merchandise Composition

# Pier One
## EXHIBIT A

| Store No. | Store | Address | City | State | Zip Code | Sale Start Date | Last day of sales |
|---|---|---|---|---|---|---|---|
| 8 | MONTEREY CA | 490 LIGHTHOUSE AVE | PACIFIC GROVE | CA | 93950 | 1/10/2020 | 4/26/2020 |
| 45 | JACKSONVILLE/ATLANTIC BEACH FL | 1071 ATLANTIC BLVD | ATLANTIC BEACH | FL | 32233 | 1/10/2020 | 4/26/2020 |
| 57 | OMAHA/DODGE NE | 7405 DODGE ST | OMAHA | NE | 68114 | 1/10/2020 | 4/26/2020 |
| 83 | ATLANTA/MERCHANTS | 1401 JOHNSON FERRY RD SUITE 172 | MARIETTA | GA | 30062 | 1/10/2020 | 4/26/2020 |
| 101 | HOUMA LA | 1556 MARTIN LUTHER KING BLVD | HOUMA | LA | 70360 | 1/10/2020 | 4/26/2020 |
| 136 | N ORLEANS/VET HWY LA | 8832 VETERANS MEMORIAL HWY | METAIRIE | LA | 70003 | 1/10/2020 | 4/26/2020 |
| 140 | LA/RIVERSIDE CA | 3784 TYLER STREET | RIVERSIDE | CA | 92503 | 1/10/2020 | 4/26/2020 |
| 184 | HOUSTON/COPPERFIELD TX | 6815 HWY 6 N | HOUSTON | TX | 77084 | 1/10/2020 | 4/26/2020 |
| 191 | LA/HOLLYWOOD CA | 5711 HOLLYWOOD BLVD | LOS ANGELES | CA | 90028 | 1/10/2020 | 4/26/2020 |
| 192 | DOTHAN/WIREGRASS COMMONS AL | 200 BUYERS DR | DOTHAN | AL | 36303 | 1/10/2020 | 4/26/2020 |
| 199 | LA/WILSHIRE CA | 3000 WILSHIRE BLVD | SANTA MONICA | CA | 90403 | 1/10/2020 | 4/26/2020 |
| 204 | HATTIESBURG MS | 1600 TURTLE CREEK DR SUITE 4 | HATTIESBURG | MS | 39402 | 1/10/2020 | 4/26/2020 |
| 212 | WICHITA FALLS TX | 4400 KEMP BLVD | WICHITA FALLS | TX | 76308 | 1/10/2020 | 4/26/2020 |
| 239 | HOUSTON/VILLAGE TX | 2501 RICE BLVD | HOUSTON | TX | 77005 | 1/10/2020 | 4/26/2020 |
| 247 | SAN MATEO CA | 2003 CHESS DR | SAN MATEO | CA | 94404 | 1/10/2020 | 4/26/2020 |
| 286 | BAY AREA/GEARY BLVD CA | 3535 GEARY BLVD | SAN FRANCISCO | CA | 94118 | 1/10/2020 | 4/26/2020 |
| 303 | KNOXVILLE/KINGSTON TN | 8301 KINGSTON PIKE | KNOXVILLE | TN | 37919 | 1/10/2020 | 4/26/2020 |
| 308 | PHOENIX/COLONADE AZ | 1743 EAST CAMELBACK RD SUITE A-3 | PHOENIX | AZ | 85016 | 1/10/2020 | 4/26/2020 |
| 315 | TUPELO MS | 3436 NORTH GLOSTER ST | TUPELO | MS | 38804 | 1/10/2020 | 4/26/2020 |
| 323 | LA/PASADENA CA | 423 SOUTH LAKE AVE | PASADENA | CA | 91101 | 1/10/2020 | 4/26/2020 |
| 343 | BIRMINGHAM/RIVERCHASE AL | 1727 MONTGOMERY HWY RIVERCHASE | HOOVER | AL | 35244 | 1/10/2020 | 4/26/2020 |
| 374 | BAY AREA/CUPERTINO | 20610 STEVENS CREEK BLVD | CUPERTINO | CA | 95014 | 1/10/2020 | 4/26/2020 |
| 404 | ALBANY GA | 2620 DAWSON RD | ALBANY | GA | 31707 | 1/10/2020 | 4/26/2020 |
| 414 | W LITTLE ROCK AR | 724 SOUTH BOWMAN RD | LITTLE ROCK | AR | 72211 | 1/10/2020 | 4/26/2020 |
| 421 | CLEARWATER/LARGO FL | 2351 JUIST STREET | LARGO | FL | 33771 | 1/10/2020 | 4/26/2020 |
| 485 | BAY AREA/COLMA CA | 101 COLMA BLVD | COLMA | CA | 94014 | 1/10/2020 | 4/26/2020 |
| 503 | ATLANTA/DOUGLASVILLE GA | 2850 CHAPEL HILL ROAD | DOUGLASVILLE | GA | 30135 | 1/10/2020 | 4/26/2020 |
| 520 | VALDOSTA GA | 1819 NORMAN DRIVE | VALDOSTA | GA | 31601 | 1/10/2020 | 4/26/2020 |
| 523 | ESCONDIDO/ESCONDIDO PROMENADE CA | 1272 AUTO PARKWAY SUITE D | ESCONDIDO | CA | 92029 | 1/10/2020 | 4/26/2020 |
| 537 | MOBILE AL | 3787 AIRPORT BLVD | MOBILE | AL | 36608 | 1/10/2020 | 4/26/2020 |
| 554 | PHOENIX/AHWATUKEE AZ | 4717 EAST RAY RD | PHOENIX | AZ | 85044 | 1/10/2020 | 4/26/2020 |
| 556 | CARBONDALE IL | 1400 EAST MAIN ST PO BOX 3636 | CARBONDALE | IL | 62901 | 1/10/2020 | 4/26/2020 |
| 567 | GAINESVILLE GA | 300 PEARL NIX PKWY | GAINESVILLE | GA | 30501 | 1/10/2020 | 4/26/2020 |
| 642 | FREMONT CA | 39198 FREMONT BLVD  THE HUB | FREMONT | CA | 94538 | 1/10/2020 | 4/26/2020 |
| 657 | LA/NORTHRIDGE CA | 8940 TAMPA AVE | NORTHRIDGE | CA | 91324 | 1/10/2020 | 4/26/2020 |
| 662 | AMARILLO TX | 8511 WEST INTERSTATE HWY 40 | AMARILLO | TX | 79121 | 1/10/2020 | 4/26/2020 |
| 671 | TUSCALOOSA AL | 1525 SKYLAND BLVD E | TUSCALOOSA | AL | 35405 | 1/10/2020 | 4/26/2020 |
| 675 | TAMPA/DALE MABRY FL | 16318 NORTH DALE MABRY | TAMPA | FL | 33618 | 1/10/2020 | 4/26/2020 |
| 694 | MEMPHIS/GERMANTOWN TN | 7730 POPLAR AVE SUITE 7 | GERMANTOWN | TN | 38138 | 1/10/2020 | 4/26/2020 |
| 711 | MONROE/PECANLAND LA | 4681 PECANLAND MALL DR | MONROE | LA | 71203 | 1/10/2020 | 4/26/2020 |
| 781 | SANTA MARIA CA | 230 EAST BETTERAVIA RD | SANTA MARIA | CA | 93455 | 1/10/2020 | 4/26/2020 |
| 822 | LA/SAN CLEMENTE CA | 415 EAST AVENIDA PICO SUITE L | SAN CLEMENTE | CA | 92672 | 1/10/2020 | 4/26/2020 |
| 865 | LONGVIEW TX | 307 WEST LOOP 281 | LONGVIEW | TX | 75604 | 1/10/2020 | 4/26/2020 |
| 878 | ATLANTA/MARKET SQUARE GA | 3795 NORTH DRUID HILLS RD | DECATUR | GA | 30033 | 1/10/2020 | 4/26/2020 |
| 1003 | JONESBORO AR | 2300 E. HIGHLAND DR  STE A | JONESBORO | AR | 72401 | 1/10/2020 | 4/26/2020 |
| 1036 | SAN DIEGO/LA JOLLA CA | 8657 VILLA LA JOLLA DR SUITE 221 | LA JOLLA | CA | 92037 | 1/10/2020 | 4/26/2020 |
| 1051 | NEW ORLEANS/WESTBANK LA | 1629 WESTBANK EXPRESSWAY SUITE A | HARVEY | LA | 70058 | 1/10/2020 | 4/26/2020 |
| 1073 | ST LOUIS/GALLERIA MO | 1805 S BRENTWOOD BLVD | SAINT LOUIS | MO | 63144 | 1/10/2020 | 4/26/2020 |
| 1089 | HOUSTON/PASADENA TX | 5660 FAIRMONT PKWY | PASADENA | TX | 77505 | 1/10/2020 | 4/26/2020 |
| 1095 | SAN ANTONIO/LOOP 1604 & BANDERA POINT TX | 11625 BANDERA ROAD | SAN ANTONIO | TX | 78250 | 1/10/2020 | 4/26/2020 |
| 1141 | FOLEY AL | 2863 S MCKENZIE ST | FOLEY | AL | 36535 | 1/10/2020 | 4/26/2020 |
| 1147 | BURLESON TX | 1107 N BURLESON BLVD | BURLESON | TX | 76028 | 1/10/2020 | 4/26/2020 |
| 1169 | LOS GATOS CA | 636 BLOSSOM HILL RD | LOS GATOS | CA | 95032 | 1/10/2020 | 4/26/2020 |
| 1186 | NOVATO CA | 108 VINTAGE WAY B-1 | NOVATO | CA | 94945 | 1/10/2020 | 4/26/2020 |
| 1196 | KANSAS CITY/LEES SUMMIT MO | 1712 NW CHIPMAN ROAD | LEES SUMMIT | MO | 64081 | 1/10/2020 | 4/26/2020 |
| 1208 | LONG BEACH CA | 7641 CARSON BLVD | LONG BEACH | CA | 90808 | 1/10/2020 | 4/26/2020 |
| 1214 | ATLANTA/CUMBERLAND GA | 3101 COBB PARKWAY SE SUITE 100 | ATLANTA | GA | 30339 | 1/10/2020 | 4/26/2020 |
| 1217 | SANTA ANA CA | 763 S MAIN STREET SUITE 150 | ORANGE | CA | 92868 | 1/10/2020 | 4/26/2020 |
| 1233 | LINCOLN/SOUTH POINTE NE | 2950 PINE LAKE ROAD SUITE C | LINCOLN | NE | 68516 | 1/10/2020 | 4/26/2020 |
| 1248 | DENTON TX | 1800 S. LOOP 288 STE. 360 | DENTON | TX | 76205 | 1/10/2020 | 4/26/2020 |
| 1265 | HOUSTON/PEARLAND TX | 3113 SILVERLAKE VILLAGE DR | PEARLAND | TX | 77584 | 1/10/2020 | 4/26/2020 |
| 1279 | KANSAS CITY/SHAWNEE KS | 15309 SHAWNEE MISSION PARKWAY | SHAWNEE | KS | 66217 | 1/10/2020 | 4/26/2020 |
| 1285 | ROME GA | 1438 TURNER MCCALL BLVD SW | ROME | GA | 30161 | 1/10/2020 | 4/26/2020 |
| 1291 | TAMPA/CITRUS PARK FL | 6907 GUNN HWY | TAMPA | FL | 33625 | 1/10/2020 | 4/26/2020 |
| 1292 | KANSAS CITY/STATE LINE STATION MO | 1011 W 136TH STREET | KANSAS CITY | MO | 64145 | 1/10/2020 | 4/26/2020 |
| 1323 | EAST RIVERSIDE CA | 2800 CAMPUS PARKWAY SUITE 101 | RIVERSIDE | CA | 92507 | 1/10/2020 | 4/26/2020 |
| 1331 | KANSAS CITY/LIBERTY MO | 8530 N EVANSTON RD | KANSAS CITY | MO | 64157 | 1/10/2020 | 4/26/2020 |
| 1345 | ORLANDO/COLONIAL PLAZA FL | 2788 E COLONIAL DRIVE | ORLANDO | FL | 32803 | 1/10/2020 | 4/26/2020 |
| 1363 | THOUSAND OAKS CA | 33 N MOORPARK ROAD SUITE K | THOUSAND OAKS | CA | 91360 | 1/10/2020 | 4/26/2020 |
| 1363 | OMAHA/WEST DODGE & 168TH ST NE | 17110 DAVENPORT STREET SUITE 114 | OMAHA | NE | 68118 | 1/10/2020 | 4/26/2020 |
| 1366 | LA/TUSTIN CA | 2832 EL CAMINO REAL | TUSTIN | CA | 92782 | 1/10/2020 | 4/26/2020 |
| 1398 | GALVESTON TX | 6228 BROADWAY STREET SUITE C | GALVESTON | TX | 77551 | 1/10/2020 | 4/26/2020 |
| 1429 | TUCSON/BROADWAY AZ | 5919 EAST BROADWAY BOULEVARD | TUCSON | AZ | 85711 | 1/10/2020 | 4/26/2020 |
| 1429 | ARLINGTON/LINCOLN SQUARE TX | 780 ROAD TO SIX FLAGS ST EAST SUITE 262 | ARLINGTON | TX | 76011 | 1/10/2020 | 4/26/2020 |
| 1441 | FLORIDA KEYS/TAVERNIER FL | 91214 OVERSEAS HIGHWAY | TAVERNIER | FL | 33070 | 1/10/2020 | 4/26/2020 |
| 1463 | COLLEGE STATION TX | 1424 TEXAS AVENUE SOUTH | COLLEGE STATION | TX | 77840 | 1/10/2020 | 4/26/2020 |
| 1503 | HOUSTON/MEYERLAND TX | 110 MEYERLAND PLAZA MALL | HOUSTON | TX | 77096 | 1/10/2020 | 4/26/2020 |
| 1506 | POMPANO BEACH FL | 1981 NORTH FEDERAL HWY | POMPANO BEACH | FL | 33062 | 1/10/2020 | 4/26/2020 |
| 1509 | GEORGETOWN TX | 1019 WEST UNIVERSITY AVE  SUITE 800 | GEORGETOWN | TX | 78628 | 1/10/2020 | 4/26/2020 |
| 1553 | EUREKA CA | 3300 BROADWAY STREET SUITE 622 | EUREKA | CA | 95501 | 1/10/2020 | 4/26/2020 |
| 1558 | SD/EASTLAKE CA | 878 EASTLAKE PARKWAY SUITE 1110 | CHULA VISTA | CA | 91914 | 1/10/2020 | 4/26/2020 |
| 1565 | PHOENIX/LAKE PLEASANT AZ | 10091 WEST HAPPY VALLEY ROAD | PEORIA | AZ | 85383 | 1/10/2020 | 4/26/2020 |
| 1570 | MISSION VIEJO CA | 28371 MARGUERITE PARKWAY | MISSION VIEJO | CA | 92692 | 1/10/2020 | 4/26/2020 |
| 1585 | REDWOOD CITY CA | 1087 EL CAMINO REAL UNIT E | REDWOOD CITY | CA | 94063 | 1/10/2020 | 4/26/2020 |
| 1595 | GOLETA CA | 6996 MARKETPLACE DR | GOLETA | CA | 93117 | 1/10/2020 | 4/26/2020 |
| 1597 | ARROYO GRANDE CA | 901 RANCHO PKWY | ARROYO GRANDE | CA | 93420 | 1/10/2020 | 4/26/2020 |
| 1601 | WALNUT CREEK CA | 1902 MT DIABLO BLVD | WALNUT CREEK | CA | 94596 | 1/10/2020 | 4/26/2020 |
| 1604 | PAPILLION NE | 7809 TOWNE CENTER PKWY SUITE 115 | PAPILLION | NE | 68046 | 1/10/2020 | 4/26/2020 |
| 1605 | SAN RAFAEL CA | 409 3RD STREET | SAN RAFAEL | CA | 94901 | 1/10/2020 | 4/26/2020 |
| 1606 | NAPA CA | 3900 BEL AIRE PLZ  STE A | NAPA | CA | 94558 | 1/10/2020 | 4/26/2020 |
| 1610 | SHOPPES AT THE COLUMNS/JACKSON TN | 1241 VANN DR | JACKSON | TN | 38305 | 1/10/2020 | 4/26/2020 |
| 1618 | BRANSON MO | 1041 BRANSON HILLS PKWY | BRANSON | MO | 65616 | 1/10/2020 | 4/26/2020 |

# Pier One

## EXHIBIT A

| Store No. | Store | Address | City | State | Zip Code | Sale Start Date | Last day of sales |
|---|---|---|---|---|---|---|---|
| 1632 | EL PASO TX | 8889 GATEWAY BLVD W STE 570 | EL PASO | TX | 79925 | 1/10/2020 | 4/26/2020 |
| 1643 | LEWISVILLE TX | 500 E ROUND GROVE RD. SUITE 101 | LEWISVILLE | TX | 75067 | 1/10/2020 | 4/26/2020 |
| 1645 | ACADIAN VILLAGE/BATON ROUGE LA | 3535 PERKINS RD. STE. 300 | BATON ROUGE | LA | 70808 | 1/10/2020 | 4/26/2020 |
| 1648 | CHANDLER AZ | 2600 W. CHANDLER BLVD. STE. 12 | CHANDLER | AZ | 85224 | 1/10/2020 | 4/26/2020 |
| 1677 | MACON/SHOPPES AT RIVER CROSSING GA | 5080 RIVERSIDE DR STE 602 | MACON | GA | 31210 | 1/10/2020 | 4/26/2020 |
| 1682 | SLIDELL/FREMAUX TOWN CENTER LA | 690 TOWN CENTER PKWY | SLIDELL | LA | 70458 | 1/10/2020 | 4/26/2020 |
| 1528 | TAUNTON MA | 9 MOZZONE BOULEVARD | TAUNTON | MA | 02780-6965 | 12/13/2019 | 1/29/2020 |
| 659 | SAGINAW MI | 2508 TITTABAWASSEE RD | SAGINAW | MI | 48604-9477 | 1/24/2020 | 3/29/2020 |
| 1360 | TORRANCE CA | 23000 HAWTHORNE BLVD. | TORRANCE | CA | 90505-3703 | 1/24/2020 | 4/26/2020 |

101

# Exhibit B
## 101 Store
## Budget of GBRP's Controlled Expenses

| | |
|---|---|
| **Number of Stores** | 101 |
| **Sale Commencement** | 10-Jan-20 |
| **Sale End Date** | 26-Apr-20 |
| **Number of Days** | 108 |
| **Number of Weeks** | 15.4 |

| | **Total Dollars** |
|---|---|
| **Advertising Budget** | |
| Signs and Banners | $431,300 |
| Signwalkers | $1,404,396 |
| **Total Advertising** | **$1,835,696** |
| | |
| **Supervision** | |
| Lead Consultant | 0 |
| Field Consultants | 1,149,270 |
| Supervision Travel | 290,116 |
| **Total Supervision Budget** | **1,439,385** |
| | |
| **Miscellaneous** | **$0** |
| | |
| **Total Expense Budget** | **$3,275,081** |

**Notes:**

*Supervision Fees includes base weekly fee , bonus and living expenses*

*Changes in inventory levels, sale term or other factors may affect the above expense budget*

**Exhibit C**
**Merchandise Breakdown**


**(Information as previously
provided by Merchant)**

## Schedule 1-F

**Consulting Agreement: Statement of Work 81**

Pier 1 Imports (U.S.), Inc./Gordon Brothers Retail Partners, LLC
Statement of Work No. 81
As of February *17, 2020*

Reference is made to the Store Closing Program Letter Agreement dated January 28, 2009 between Pier 1 Imports (U.S.), Inc. and Gordon Brothers Retail Partners, LLC ("Letter Agreement"). Capitalized terms used herein and not defined herein shall have the respective meanings assigned to such terms in the Letter Agreement.

The parties hereto agree as follows:

1.      This is a "Statement of Work" as contemplated by the Letter Agreement.

2.      Attached hereto as Exhibit A is a list of Merchant's fifty-seven (57) retail stores to be closed pursuant to, and subject to the terms and conditions of, the Letter Agreement and this Statement of Work. Also included on Exhibit A are the respective "Sale Commencement Date(s)" and "Sale Termination Date(s)" with respect to each Store subject to this Statement of Work; provided, however, that (as provided in the Letter Agreement) GBRP may from time to time establish an earlier "Sale Termination Date" with respect to any one or more Stores (on a per Store basis) upon five (5) days prior notice to Merchant.

3.      Attached as Exhibit B is the expense budget for the "GBRP's Controlled Expenses" with respect to the Stores subject to this Statement of Work.

4.      Merchant shall pay GBRP an "Incentive Fee" (which, if earned, shall be in addition to the Base Fee) as one of the following (e.g., back to the first dollar), based upon the applicable Recovery Percentage relating to the Sale at the Stores subject to this Statement of Work:

| Recovery Percentage | GBRP's Incentive Fee |
| --- | --- |
| Below 50.00% | None |
| 50.00% - 51.99% | 0.25% of the Retail Value of the Merchandise |
| 52.00% - 53.99% | 0.75% of the Retail Value of the Merchandise |
| 54.00% and Above | 1.00% of the Retail Value of the Merchandise; plus an amount equal to $500 per Store subject to this Statement of Work |

The performance hurdles set forth above have been established based upon Merchant's representation to GBRP that: (i) the composition of the Merchandise shall be consistent with the information summarized on Exhibit C attached hereto; and (ii) from and after the date hereof and through the Sale Commencement Date, (y) the Stores will be (and have been) operated in the ordinary course consistent with historic practices (including without limitation with respect to replenishment, transfers of merchandise and FF&E in and out, PLU file administration, store hours, and promotion/advertising), and (z) there shall be no increases or decreases to the Merchant's retail prices of any items of Merchandise outside of the ordinary course of business consistent with historic periods.

For the avoidance of doubt, the Gross Proceeds and Retail Value of Merchandise calculations shall be made with reference to the Sale at the Stores subject to this Statement of Work in the

aggregate and not on a per-Store basis (but not with reference to any of Merchant's other stores subject to any other Statement(s) of Work).

5.      All other terms and conditions of the Letter Agreement are hereby affirmed and incorporated into this Statement of Work.

6.      Notwithstanding anything to the contrary in the Agreement, Consultant will advance funds for the Consultant's Controlled Expenses, and Merchant shall reimburse Consultant weekly therefor (up to the aggregate budgeted amount) in connection with a weekly reconciliation upon presentation of reasonable documentation for such actually-incurred expenses.   In addition to, and not as part of, reimbursement of any Consultant Controlled Expenses, Merchant shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with this Agreement.

**Gordon Brothers Retail Partners, LLC**          **Pier 1 Imports (U.S.), Inc.**

By: _Sondra Yee_                          By: _[signature]_
Print Name and Title:                     Print Name and Title: Robert J. Riesbeck
Sondra Yee                                              CEO and CFO
Managing Director - Retail

Exhibits:
   A- Stores
   B- GBRP Controlled Expenses
   C- Merchandise Composition

## Pier One
### EXHIBIT A

| Store No. | Store | Address | City | State | Zip Code | Country | Sale Start Date | Last day of sales |
|---|---|---|---|---|---|---|---|---|
| 145 | LONDON/MASONVILLE ON | 94 FANSHAWE PK RD E | LONDON | ON | N5X 4C5 | CANADA | 2/21/2020 | 3/29/2020 |
| 171 | OTTAWA/MERIVALE RD ON | 1595 MERIVALE ROAD | OTTAWA | ON | K2G 3J4 | CANADA | 2/21/2020 | 3/29/2020 |
| 241 | TORONTO/AJAX ON | 90 KINGSTON RD E UNIT 2 | AJAX | ON | L1Z 1G1 | CANADA | 2/21/2020 | 3/29/2020 |
| 336 | VANCOUVER/BW BROADWAY BC | 1702 WEST BROADWAY | VANCOUVER | BC | V6J 1Y1 | CANADA | 2/21/2020 | 3/29/2020 |
| 377 | TORONTO/HEARTLAND ON | 5980 MCLAUGHLIN RD UNIT 1 | MISSISSAUGA | ON | L5R 3X9 | CANADA | 2/21/2020 | 3/29/2020 |
| 500 | TORONTO/BRAMPTON ON | 200 GREAT LAKES DRIVE UNIT #142 | BRAMPTON | ON | L6R 2K7 | CANADA | 2/21/2020 | 3/29/2020 |
| 505 | CALGARY/BRENTWOOD VILLAGE AB | 3630 BRENTWOOD RD NW #700 | CALGARY | AB | T2L 1K8 | CANADA | 2/21/2020 | 3/29/2020 |
| 522 | TORONTO/ERIN MILLS ON | 2501 HAMPSHIRE GATE #1 | OAKVILLE | ON | L6H 6C8 | CANADA | 2/21/2020 | 3/29/2020 |
| 524 | WATERLOO ON | 564 KING STREET NORTH | WATERLOO | ON | N2L 6L3 | CANADA | 2/21/2020 | 3/29/2020 |
| 529 | CALGARY/SIGNAL HILL AB | 5506 SIGNAL HILL CENTER | CALGARY | AB | T3H 3P8 | CANADA | 2/21/2020 | 3/29/2020 |
| 546 | PEN CENTRE/NIAGARA ON | 221 GLENDALE AVE. #601 | ST. CATHARINES | ON | L2T 2K9 | CANADA | 2/21/2020 | 3/29/2020 |
| 630 | TORONTO/NEWMARKET ON | 17440 YONGE ST | NEWMARKET | ON | L3Y 6Y9 | CANADA | 2/21/2020 | 3/29/2020 |
| 661 | TORONTO/E YORK ON | 815 EGLINTON AVE E | EAST YORK | ON | M4G 4G9 | CANADA | 2/21/2020 | 3/29/2020 |
| 738 | TORONTO/WOODBRIDGE ON | 3900 HWY 7 UNIT 4 | WOODBRIDGE | ON | L4L 1A6 | CANADA | 2/21/2020 | 3/29/2020 |
| 827 | OTTAWA/ST LAURENT ON | 1163 ST LAURENT BLVD | OTTAWA | ON | K1K 3B7 | CANADA | 2/21/2020 | 3/29/2020 |
| 896 | BARRIE ON | 70 BARRIE VIEW DR | BARRIE | ON | L4N 8V4 | CANADA | 2/21/2020 | 3/29/2020 |
| 1001 | S EDMONTON AB | 1910 99 STREET NW SOUTH EDMONTON COMMON | EDMONTON | AB | T6N 1K9 | CANADA | 2/21/2020 | 3/29/2020 |
| 1064 | KINGSTON ON | 646 GARDINERS RD #15 | KINGSTON | ON | K7M 3X9 | CANADA | 2/21/2020 | 3/29/2020 |
| 1078 | VANCOUVER/RICHMOND BC | 9771 BRIDGEPORT RD | RICHMOND | BC | V6X 1S3 | CANADA | 2/21/2020 | 3/29/2020 |
| 1097 | KAMLOOPS BC | 1055 HILLSIDE DR | KAMLOOPS | BC | V2E 2S5 | CANADA | 2/21/2020 | 3/29/2020 |
| 1102 | VANCOUVER/WHITE ROCK BC | 3091 152ND STREET UNIT 360 | SURREY | BC | V4P 3K1 | CANADA | 2/21/2020 | 3/29/2020 |
| 1103 | ABBOTSFORD BC | 32720 S FRASER WAY | ABBOTSFORD | BC | V2T 4M5 | CANADA | 2/21/2020 | 3/29/2020 |
| 1119 | EDMONTON/SKYVIEW AB | 13530 137TH AVENUE NW | EDMONTON | AB | T5L 5E9 | CANADA | 2/21/2020 | 3/29/2020 |
| 1122 | WEST EDMONTON AB | 17515 STONY PLAIN RD NW | EDMONTON | AB | T5S 2S1 | CANADA | 2/21/2020 | 3/29/2020 |
| 1125 | TORONTO/BURLINGTON ON | 3230 FAIRVIEW STREET UNIT 2 | BURLINGTON | ON | L7N 3H5 | CANADA | 2/21/2020 | 3/29/2020 |
| 1154 | VANCOUVER/NORTH SHORE BC | 1595 MARINE DRIVE | NORTH VANCOUVER | BC | V7P 1T8 | CANADA | 2/21/2020 | 3/29/2020 |
| 1168 | WINDSOR ON | 4315 WALKER ROAD | WINDSOR | ON | N8W 3T6 | CANADA | 2/21/2020 | 3/29/2020 |
| 1175 | TORONTO/MARKHAM ON | 3135 HIGHWAY 7 | MARKHAM | ON | L3R 0T9 | CANADA | 2/21/2020 | 3/29/2020 |
| 1188 | OTTAWA/KANATA ON | 501 EARL GREY DRIVE | KANATA | ON | K2T 1K4 | CANADA | 2/21/2020 | 3/29/2020 |
| 1191 | MONCTON NB | 185 TRINITY DR | MONCTON | NB | E1G 2J7 | CANADA | 2/21/2020 | 3/29/2020 |
| 1197 | HALIFAX NS | 7010 MUMFORD ROAD UNIT B4-2 | HALIFAX | NS | B3L 4W7 | CANADA | 2/21/2020 | 3/29/2020 |
| 1206 | REGINA SK | 2030 PRINCE OF WALES DRIVE BUILDING H | REGINA | SK | S4V 3A6 | CANADA | 2/21/2020 | 3/29/2020 |
| 1210 | RED DEER AB | 2004-50TH AVE UNIT 189 | RED DEER | AB | T4R 3A2 | CANADA | 2/21/2020 | 3/29/2020 |
| 1216 | TORONTO/WINSTON CHURCHILL & 401 ON | 3135 ARGENTIA RD #4 | MISSISSAUGA | ON | L5N 8E1 | CANADA | 2/21/2020 | 3/29/2020 |
| 1229 | SASKATOON SK | 121-1715 PRESTON AVENUE NORTH | SASKATOON | SK | S7H 2V7 | CANADA | 2/21/2020 | 3/29/2020 |
| 1268 | EDMONTON/SHERWOOD PARK AB | 2020 SHERWOOD DRIVE UNIT 12 | SHERWOOD PARK | AB | T8A 3H9 | CANADA | 2/21/2020 | 3/29/2020 |
| 1269 | CALGARY/SUNRIDGE AB | 3221 SUNRIDGE WAY SUITE 700 | CALGARY | AB | T1Y 7M4 | CANADA | 2/21/2020 | 3/29/2020 |
| 1272 | NANAIMO BC | 6660 MARY ELLEN DR | NANAIMO | BC | V9V 1T7 | CANADA | 2/21/2020 | 3/29/2020 |
| 1283 | HAMILTON/ANCASTER ON | 737 GOLF LINKS RD UNIT 6 | ANCASTER | ON | L9K 1L5 | CANADA | 2/21/2020 | 3/29/2020 |
| 1288 | VANCOUVER/COQUITLAM BC | 2755 LOUGHEED HWY UNIT 8 | PORT COQUITLAM | BC | V3B 5Y9 | CANADA | 2/21/2020 | 3/29/2020 |
| 1344 | KELOWNA BC | 1500 BANKS ROAD UNIT # 502 | KELOWNA | BC | V1X 7Y1 | CANADA | 2/21/2020 | 3/29/2020 |
| 1348 | TORONTO/WHITBY ON | 1635 VICTORIA STREET EAST | WHITBY | ON | L1N 9W4 | CANADA | 2/21/2020 | 3/29/2020 |
| 1382 | LONDON/WHITE OAKS ON | 1230 WELLINGTON RD UNIT 101 | LONDON | ON | N6E 1M3 | CANADA | 2/21/2020 | 3/29/2020 |
| 1388 | KITCHENER/FAIRVIEW ON | 655 FAIRWAY RD S BLDG C | KITCHENER | ON | N2C 1X4 | CANADA | 2/21/2020 | 3/29/2020 |
| 1394 | ST JOHNS NL | 56 ABERDEEN AVENUE | ST. JOHN'S | NL | A1A 5T3 | CANADA | 2/21/2020 | 3/29/2020 |
| 1414 | TORONTO/RICHMOND HILL ON | 8825 YONGE STREET UNIT A1 | RICHMOND HILL | ON | L4C 6Z1 | CANADA | 2/21/2020 | 3/29/2020 |
| 1437 | THUNDER BAY ON | 389 MAIN STREET UNIT B 2 | THUNDER BAY | ON | P7B 5L6 | CANADA | 2/21/2020 | 3/29/2020 |
| 1440 | CALGARY/DEERFOOT MEADOWS AB | 8180 11TH STREET SE STE 700 | CALGARY | AB | T2H 3B5 | CANADA | 2/21/2020 | 3/29/2020 |
| 1504 | LETHBRIDGE AB | 745 1ST AVENUE SOUTH | LETHBRIDGE | AB | T1J 5A4 | CANADA | 2/21/2020 | 3/29/2020 |
| 1543 | VANCOUVER/PITT MEADOWS BC | 940-19800 LOUGHEED HWY | PITT MEADOWS | BC | V3Y 2W1 | CANADA | 2/21/2020 | 3/29/2020 |
| 1556 | VICTORIA/LANGFORD BC | 117-2401C MILLSTREAM ROAD | VICTORIA | BC | V9B 3R5 | CANADA | 2/21/2020 | 3/29/2020 |
| 1574 | OTTAWA/BARRHAVEN ON | 3161 GREENBANK ROAD UNIT 1 | OTTAWA | ON | K2J 4H9 | CANADA | 2/21/2020 | 3/29/2020 |
| 1579 | DARTMOUTH NS | 205 HECTOR GATE | DARTMOUTH | NS | B3B 0E5 | CANADA | 2/21/2020 | 3/29/2020 |
| 1615 | GRANDE PRAIRIE AB | 105-11517 WESTGATE DRIVE | GRANDE PRAIRIE | AB | T8V 3B1 | CANADA | 2/21/2020 | 3/29/2020 |
| 1640 | TORONTO/STOCKYARDS ON | 30 WESTON ROAD UNIT 209 | TORONTO | ON | M6N 0A7 | CANADA | 2/21/2020 | 3/29/2020 |
| 1679 | TORONTO/SHERWAY GARDENS ON | 170 NORTH QUEEN ST UNIT D | TORONTO | ON | M9C 1A7 | CANADA | 2/21/2020 | 3/29/2020 |
| 1450 | VISALIA/CA | 4018 SOUTH MOONEY BOULEVARD | VISALIA | CA | 93277 | USA | 2/14/2020 | 2/29/2020 |

57

# Exhibit B
## *57 Store*
## Budget of GBRP's Controlled Expenses

| | |
|---|---|
| **Number of Stores** | 57 |
| **Sale Commencement** | 21-Feb-20 |
| **Sale End Date** | 29-Mar-20 |
| **Number of Days** | 38 |
| **Number of Weeks** | 5.4 |

| | **Total Dollars** |
|---|---|
| **Advertising Budget** | |
| Signs and Banners | $114,000 |
| Signwalkers | $283,800 |
| **Total Advertising** | **$397,800** |
| | |
| **Supervision** | |
| Lead Consultant | 0 |
| Field Consultants | 262,066 |
| Supervision Travel | 72,334 |
| **Total Supervision Budget** | **334,400** |
| | |
| **Miscellaneous** | **$26,000** |
| | |
| **Total Expense Budget** | $758,200 |

**Notes:**

*Supervision Fees includes base weekly fee , bonus and living expenses*

*Changes in inventory levels, sale term or other factors may affect the above expense budget*

**Exhibit C**
**Merchandise Breakdown**

**(Information as previously
provided by Merchant)**

## Schedule 2-A

**U.S. Sale Guidelines**

## Sale Guidelines[1]

1.  The Sales shall be conducted so that the Closing Stores in which sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Closing Stores.

2.  The Sales shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Closing Store on a Sunday prior to the commencement of the Sales.

3.  On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Closing Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Closing Store is located; *provided* that the Consultant may solicit customers in the Closing Stores themselves.  On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.  At the conclusion of the Sale, the Consultant shall vacate the Closing Stores in broom clean condition; *provided* that Consultant may abandon any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking) ("FF&E") not sold in the Sales at the conclusion of the Sales (the "Termination Date"), without cost or liability of any kind to the Consultant.  The Consultant shall notify the Merchant of its intention to abandon any FF&E at least two (2) days prior to the Termination Date.  The Merchant will have the option to remove the FF&E, at its own cost prior to the Termination Date.  Any abandoned FF&E left in a Closing Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.  For the avoidance of doubt, as of the Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any FF&E.

5.  The Consultant may advertise the Sales as "store closing", "sale on everything", "everything must go", "everything on sale" or similar-themed sales.  The Consultant may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.  All signs, banners, ads and other advertising material, promotions, and campaigns will be approved by the Merchant, prior to purchase, in accordance with these Sale Guidelines.

6.  The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Merchant and Consultant shall not use neon or day-glo on its

---

[1]  Capitalized terms used but not defined in these Sale Guidelines have the meanings given to them in the Motion.

sign walkers, display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Merchant and Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Closing Stores and (ii) enclosed mall Closing Stores to the extent the entrance to the applicable Closing Store does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Sales are being conducted only at the affected Closing Store, and shall not be wider than the storefront of the Closing Store.  In addition, the Merchant and Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Consultant any additional restrictions not contained in the applicable lease agreement.

7.      Conspicuous signs shall be posted in the cash register areas of each of the affected Closing Stores to effect that "all sales are final."

8.      Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Closing Stores, except as authorized by the applicable lease.

9.      The Consultant shall not make any alterations to interior or exterior Closing Store lighting, except as authorized by the applicable lease.  No property of the landlord of a Closing Store shall be removed or sold during the Sales.  The hanging of exterior banners or in-Closing Store signage and banners shall not constitute an alteration to a Closing Store.

10.     The Consultant shall keep Closing Store premises and surrounding areas clear and orderly consistent with present practices.

11.     The Consultant, at the direction of the Debtors, and the landlord of any Store are authorized to enter into Side Letters without further order of the Court, provided that such agreements do not have a material adverse effect on the Debtors or their estates.

12.     Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all FF&E owned by the Merchant (the "Owned FF&E"), approved by the Merchant.  The Consultant may advertise the sale of the Owned FF&E in a manner consistent with these guidelines.  The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* FF&E sales made whereby the item can be carried out of the Closing Store in a shopping bag.  For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility, any FF&E.

13.     At the conclusion of the Sales at each Closing Store, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases.  The Merchant, Consultant

2

and their agents and representatives shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.    The rights of landlords against Merchant for any damages to a Closing Store shall be reserved in accordance with the provisions of the applicable lease.

15.    If and to the extent that the landlord of any Closing Store affected hereby contends that the Merchant or Consultant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant and Consultant as follows:

<u>If to Gordon Brothers:</u>

Gordon Brothers Retail Partners, LLC
Prudential Tower
800 Boylston Street
27th Floor
Boston, MA 02199
Attn: Mackenzie Shea
Email:  mshea@gordonbrothers.com

- and -

Riemer Braunstein LLP
7 Times Square
Suite 2506
New York, New York 10036
Attn: Steven Fox
Email:  SFox@riemerlaw.com

<u>If to Merchant</u>:

Pier 1 Imports, Inc.
100 Pier 1 Place
Fort Worth, Texas 76102
Attention:  Legal Department
Facsimile:

with copies (which shall not constitute notice) to:

Kutak Rock LLP
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Attention:  Michael A. Condyles, Peter J. Barrett, and Jeremy S. Williams
Email:  Michael.Condyles@KutakRock.com
       Peter.Barrett@KutakRock.com

Jeremy.Williams@KutakRock.com
Brian.Richardson@KutakRock.com


- and -

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua A. Sussberg, P.C., Emily E. Geier, and AnnElyse Scarlett Gains
Email:  joshua.sussberg@kirkland.com
        emily.geier@kirkland.com
        annelyse.gains@kirkland.com

- and -

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:  Joshua M. Altman
E-mail: josh.altman@kirkland.com

## Schedule 2-B

### Canada Sale Guidelines

**<u>Canadian Sale Guidelines</u>**

The following procedures shall apply to any Sales to be held at the Debtors' Canadian retail stores
(the "<u>Stores</u>").  Terms capitalized but not defined in these Sale Guidelines have the meanings
ascribed to them in the Motion.

1.      Except as otherwise expressly set out herein, and subject to: (i) the Interim Order
        and Final Order of the Bankruptcy Court made in the cases commenced by the
        Debtors under the Bankruptcy Code (the "<u>Chapter 11 Cases</u>") authorizing, among
        other things, the Debtors to assume that certain Store Closing Program Agreement
        dated as of January 28, 2009, as amended and restated by that certain letter dated
        June 6, 2016, and further detailed by the Statements of Work Letters dated as of
        November 27, 2019, December 16, 2019, as amended and restated on January 23,
        2020, and February 17, 2020, by and between Pier 1 Imports (U.S.), Inc.
        (the "<u>Merchant</u>") and Gordon Brothers Retail Partners, LLC (the "<u>Consultant</u>")
        (collectively, the "<u>Consulting Agreement</u>") and the transactions contemplated
        thereunder (collectively, the Interim Order and the Final Order,
        the "<u>US Store Closing Order</u>"); or (ii) the Orders of the Canadian Court
        recognizing and giving full force and effect to the US Store Closing Order in
        Canada, subject to the terms of such Orders, pursuant to section 49 of the CCAA
        (such recognition proceedings under the CCAA, the "<u>CCAA Proceedings</u>"); or (iii)
        further Order of the Canadian Court or recognition of a further Order of the
        Bankruptcy Court by the Canadian Court, as applicable; or (iv) any subsequent
        written agreement or Side Letter between any applicable Debtor and/or the
        Consultant, at the direction of the Debtors, and the applicable landlord(s)
        (individually, a "<u>Landlord</u>" and, collectively, the "<u>Landlords</u>") and approved by the
        Consultant, the Sale shall be conducted in accordance with the terms of the
        applicable leases/or other occupancy agreements for each of the affected Stores
        (individually, a "<u>Lease</u>" and, collectively, the "<u>Leases</u>").  However, nothing
        contained herein shall be construed to create or impose upon the Debtors or the
        Consultant any additional restrictions not contained in the applicable Lease or other
        occupancy agreement.

2.      The Sale shall be conducted so that each of the Stores remain open during their
        normal hours of operation provided for in the respective Leases for the Stores until
        the applicable premises vacate date for each Store under the Consulting Agreement
        (the "<u>Vacate Date</u>"), and in all cases no later than March 31, 2020, unless otherwise
        agreed by the applicable Landlord.  Rent payable under the respective Leases shall
        be paid as required pursuant to the Chapter 11 Cases.

3.      The Sale shall be conducted in accordance with applicable federal, provincial and
        municipal laws, unless otherwise ordered by the Canadian Court in the CCAA
        Proceedings.

4.      All display and hanging signs used by the Consultant in connection with the Sale
        shall be professionally produced and all hanging signs shall be hung in a
        professional manner.  Notwithstanding anything to the contrary contained in the

6

Leases, the Consultant may advertise the Sale at the Stores as a "everything on sale", "everything must go", "store closing" or similar theme sale at the Stores (provided however that no signs shall advertise the Sale as a "bankruptcy", a "liquidation" or a "going out of business" sale, it being understood that the French equivalent of "clearance" is "liquidation" and is permitted to be used). Forthwith upon request, the Consultant shall provide the proposed signage packages along with proposed dimensions by e-mail or facsimile to the applicable Landlords or to their counsel of record and the applicable Landlord shall notify the Consultant of any requirement for such signage to otherwise comply with the terms of the Lease and/or the Sale Guidelines and where the provisions of the Lease conflict with these Sale Guidelines, these Sale Guidelines shall govern. The Consultant shall not use neon or day-glow signs or any handwritten signage (save that handwritten "you pay" or "topper" signs may be used). If a Landlord is concerned with "Store Closing" signs being placed in the front window of a Store or with the number or size of the signs in the front window, the Merchant, the Consultant and the Landlord will work together to resolve the dispute. Furthermore, with respect to enclosed mall Store locations without a separate entrance from the exterior of the enclosed mall, no exterior signs or signs in common areas of a mall shall be used unless explicitly permitted by the applicable Lease. In addition, the Consultant shall be permitted to utilize exterior banners/signs at stand alone or strip mall Stores or enclosed mall Store locations with a separate entrance from the exterior of the enclosed mall; provided, however, that: (i) no signage in any other common areas of a mall shall be used; and (ii) where such banners are not explicitly permitted by the applicable Lease and the Landlord requests in writing that banners are not to be used, no banners shall be used absent further Order of the Canadian Court or recognition of a further Order of the Bankruptcy Court by the Canadian Court, as applicable, which may be sought on an expedited basis on notice to the applicable Landlord(s). Any banners used shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store and shall not be wider than the premises occupied by the affected Store. All exterior banners shall be professionally hung and to the extent that there is any damage to the facade of the premises of a Store as a result of the hanging or removal of the exterior banner, such damage shall be professionally repaired at the expense of the Consultant. The Consultant shall not utilize any commercial trucks to advertise the Sale on the Landlord's property or mall ring roads.

5.      The Consultant shall be permitted to utilize sign walkers and street signage; provided, however, such sign walkers and street signage shall not be located on the shopping centre or mall premises.

6.      The Consultant shall be entitled to include additional merchandise in the Sale; provided that (a) the additional merchandise is currently in the possession of the Debtors (including in any distribution centres owned or leased by the Debtors) or has previously been ordered by or on behalf of the Debtors and is currently in transit to the Debtors; and (b) the additional merchandise of the Debtors is of like kind and category and no lessor quality to the Merchandise, and consistent with any restriction on usage of the Stores set out in the applicable Leases.

7.      Conspicuous signs shall be posted in the cash register areas of each Store to the effect that all sales are "final" and customers with any questions or complaints are to call the Merchant's hotline number.

8.      The Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any of the Stores on Landlord's property, unless explicitly permitted by the applicable Lease or, if distribution is customary in the shopping centre in which the Store is located.  Otherwise, the Consultant may solicit customers in the Stores themselves.  The Consultant shall not use any giant balloons, flashing lights or amplified sound to advertise the Sale or solicit customers, except as explicitly permitted under the applicable Lease or agreed to by the Landlord.

9.      At the conclusion of the Sale in each Store, the Consultant and the Merchant shall arrange that the premises for each Store are in "broom-swept" and clean condition, and shall arrange that the Stores are in the same condition as on the commencement of the Sale, ordinary wear and tear excepted.  No property of any Landlord of a Store shall be removed or sold during the Sale. No permanent fixtures (other than the Pier 1 FF&E (as defined below) for clarity) may be removed without the Landlord's written consent unless otherwise provided by the applicable Lease and in accordance with the US Store Closing Order and any other Orders of the Canadian Court in the CCAA Proceedings.  Any trade fixtures or personal property left in a Store after the applicable Vacate Date in respect of which the applicable Lease has been rejected by the applicable Debtor shall be deemed abandoned, with the applicable Landlord having the right to dispose of the same as the Landlord chooses, without any liability whatsoever on the part of the Landlord.  Nothing in this paragraph shall derogate from the Consultant's obligations under the Consulting Agreement.

10.     Subject to the terms of paragraph 9 above, the Consultant shall have the right to sell furniture, fixtures and equipment owned by the Debtors ("Pier 1 FF&E") and located in the Stores during the Sale. For greater certainty, Pier 1 FF&E does not include any portion of the Stores' HVAC, sprinkler, fire suppression, or fire alarm systems.  The Merchant and the Consultant may advertise the sale of Pier 1 FF&E consistent with these Sale Guidelines on the understanding that the Landlord may require such signs to be placed in discreet locations within the Stores reasonably acceptable to the Landlord.  Additionally, the purchasers of any Pier 1 FF&E sold during the Sale shall only be permitted to remove the Pier 1 FF&E either through the back shipping areas designated by the Landlord or through other areas after regular Store business hours or, through the front door of the Store during Store business hours if the Pier 1 FF&E can fit in a shopping bag, with Landlord's supervision as required by the Landlord and in accordance with the US Store Closing Order and any other Orders of the Canadian Court in the CCAA Proceedings.  The Consultant shall repair any damage to the Stores resulting from the removal of any Pier 1 FF&E by Consultant or by third party purchasers of Pier 1 FF&E from Consultant.

11.     The Consultant shall not make any alterations to interior or exterior Store lighting, except as authorized pursuant to the affected Lease.  The hanging of exterior banners or other signage, where permitted in accordance with the terms of these Sale Guidelines, shall not constitute an alteration to a Store.

12.     The Debtors hereby provide notice to the Landlords of the Debtors' and the Consultant's intention to sell and remove Pier 1 FF&E from the Stores.  The Consultant shall make commercially reasonable efforts to arrange with each Landlord represented by counsel and with any other Landlord that so requests, a walk-through with the Consultant to identify the Pier 1 FF&E subject to the Sale. The relevant Landlord shall be entitled to have a representative present in the applicable Stores to observe such removal.  If the Landlord disputes the Consultant's entitlement to sell or remove any Pier 1 FF&E under the provisions of the Lease, such Pier 1 FF&E shall remain on the premises and shall be dealt with as agreed between the applicable Debtor, the Consultant and such Landlord, or by further Order of the Canadian Court or recognition of a further Order of the Bankruptcy Court by the Canadian Court, as applicable, upon application by the Debtors on at least two (2) days' notice to such Landlord and any Information Officer appointed by the Canadian Court.  If the Debtors have rejected the Lease governing such Store in accordance with an Order of the Bankruptcy Court, they shall not be required to pay rent under such Lease pending resolution of any such dispute (other than rent payable for the notice period provided for in any Order of the Bankruptcy Court), and the rejection of the Lease shall be without prejudice to the Debtors' or the Consultant's claim to the Pier 1 FF&E in dispute.

13.     If a notice of rejection is delivered pursuant to an Order of the Bankruptcy Court to a Landlord while the Sale is ongoing and the Store in question has not yet been vacated, then: (a) during the notice period prior to the effective time of the rejection, the Landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Debtors, any Information Officer appointed by the Canadian Court and the Consultant 24 hours' prior written notice; and (b) at the effective time of the rejection, the relevant Landlord shall be entitled to take possession of any such Store without waiver of or prejudice to any claims or rights such Landlord may have against the applicable Debtor in respect of such Lease or Store, provided that nothing herein shall relieve such Landlord of any obligation to mitigate any damages claimed in connection therewith.

14.     The Consultant and its agents and representatives shall have the same access rights to the Stores as the applicable Debtor under the terms of the applicable Lease, and the Landlords shall have the rights of access to the Stores during the Sale provided for in the applicable Lease (subject, for greater certainty, to any applicable stay of proceedings).

15.     The Merchant and the Consultant shall not conduct any auctions of Merchandise or Pier 1 FF&E at any of the Stores.

16.     The Consultant shall designate a party to be contacted by the Landlords should a dispute arise concerning the conduct of the Sale. The initial contact person for Consultant shall be Jane Dietrich of Cassels Brock & Blackwell LLP who may be reached by phone at 416-860-5223 or email at jdietrich@casselsbrock.com.  If the parties are unable to resolve the dispute between themselves, the Landlord or the Debtors shall have the right to schedule a "status hearing" before the Bankruptcy Court or the Canadian Court, as applicable, on no less than two (2) days' written notice to the other party or parties, during which time the Consultant shall cease all activity in dispute other than activity expressly permitted herein, pending determination of the matter by the Bankruptcy Court or the Canadian Court, as applicable; provided, however, subject to paragraph 4 of these Sale Guidelines, if a banner has been hung in accordance with these Sale Guidelines and is the subject of a dispute, the Consultant shall not be required to take any such banner down pending determination of any dispute.

17.     Nothing herein or in the Consulting Agreement is, or shall be deemed to be a consent by any Landlord to the sale, assignment or transfer of any Lease, or shall, or shall be deemed to, or grant to the Landlord any greater rights than already exist under the terms of any applicable Lease.

18.     These Sale Guidelines may be amended by written agreement between the Consultant, the applicable Debtor(s) and the applicable Landlord.

10

**<u>Exhibit B</u>**

**Proposed Final Order**

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO**
**ASSUME THE CONSULTING AGREEMENT, (II) AUTHORIZING AND**
**APPROVING THE CONDUCT OF STORE CLOSING SALES, WITH**
**SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS,**
**AND ENCUMBRANCES, (III) AUTHORIZING CUSTOMARY BONUSES TO**
**EMPLOYEES OF CLOSING STORES, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of a final order (this "Final Order"):  (a) authorizing the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Debtors to assume the Consulting Agreement, (b) authorizing and approving the continuation or initiation of the Store Closings in accordance with the terms of the Consulting Agreement and the Sale Guidelines, with such sales to be free and clear of all liens, claims, and encumbrances, (c) authorizing the Debtors to conduct Store Closings with respect to the Additional Closing Stores at a later date or dates, (d) authorizing customary bonuses to non-insider Closing Store employees who remain employed for the duration of the store closing process, and (e) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby:

FOUND AND DETERMINED THAT:[3]

A.     The Debtors have advanced sound business reasons for assuming the Consulting Agreement and adopting the Sale Guidelines, as set forth in the Motion and at the Hearing, and assuming the Consulting Agreement is a reasonable exercise of the Debtors' business judgement and in the best interest of the Debtors and their estates.

B.     The Consulting Agreement, a copy of which is attached to this Final Order as **Schedule 1**, was negotiated, proposed, and entered into by the Consultant and the Debtors without collusion, in good faith and from arm's length bargaining positions.

C.     The assumption of the Consulting Agreement is a sound exercise of the Debtors' business judgment.

D.     The Sale Guidelines, which are attached hereto as **Schedule 2**, are reasonable and appropriate, and the conduct of the Sales in accordance with the Sale Guidelines will provide an efficient means for the Debtors to dispose of the Store Closure Assets, and are in the best interest of the Debtors' estates.

E.     The Store Closings and Sales are in the best interest of the Debtors' estates.

F.     The Dispute Resolution Procedures are fair and reasonable, and comply with applicable law.

G.     The Debtors have represented that they intend to neither sell nor lease personally identifiable information pursuant to the relief requested in the Motion, although the Consultant will be authorized to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information.

---

[3]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  *See* Fed. R. Bankr. P. 7052.

H.      The entry of this Final Order is in the best interests of the Debtors and their estates,

creditors, and interest holders and all other parties in interest herein; and now therefore it is hereby

ORDERED THAT:

1.      The Motion is granted on a final basis as set forth in this Final Order.

2.      The Debtors are authorized and empowered to take any and all further actions as

may be reasonably necessary or appropriate to give effect to this Final Order.

3.      The Debtors are authorized, but not directed, to make payments under the Store

Closing Bonus Plan, as may be amended and modified from time to time.

4.      To the extent of any conflict between this Final Order, the Sale Guidelines, and the

Consulting Agreement, the terms of this Final Order shall control over all other documents and the

Sale Guidelines shall control over the Consulting Agreement.

**I.      Authority to Assume the Consulting Agreement.**

5.      The assumption of the Consulting Agreement by the Debtors pursuant to

section 365 of the Bankruptcy Code is approved.  The Debtors are authorized to act and perform

in accordance with the terms of the Consulting Agreement, including making payments required

by the Consulting Agreement, including fees and reimbursement of expenses to the Consultant

without the need for any application of the Consultant or a further order of this Court.  All such

payments of fees and reimbursement of expenses shall be free and clear of any and all

encumbrances.

6.      Subject to the restrictions set forth in this Final Order and the Sale Guidelines, the

Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary

or desirable to implement the Consulting Agreement and the Sales, and each of the transactions

contemplated by the Consulting Agreement, and any actions taken by the Debtors and the

4

Consultant necessary or desirable to implement the Consulting Agreement and/or the Sales prior to the date of this Final Order, are hereby approved and ratified.

7.       The Consulting Agreement and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court.  The Debtors are hereby authorized to enter into additional Statements of Work in connection with any Additional Closing Stores on terms materially consistent with the Debtors' historic practices.

8.       Notwithstanding anything contrary in the Consulting Agreement, the Debtors and their estates shall not indemnify the Consultant for any damages arising primarily out of the Consultant's fraud, willful misconduct, or gross negligence.

**II.      Authority to Engage in Sales and Conduct Store Closings.**

9.       The Debtors are authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to continue the Sales at the Closing Stores in accordance with this Final Order, the Sale Guidelines, and the Consulting Agreement, as may be modified by any Side Letters (as defined below) between the Debtors and/or the Consultant and the landlords at the Closing Stores.

10.      The Sale Guidelines are approved in their entirety on a final basis.

11.      The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Final Order and the Sale Guidelines.

12.      All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the Consulting Agreement or this Final Order hereby are directed to surrender possession of such Merchandise or FF&E to the Debtors or the Consultant.

13.      Neither the Debtors nor the Consultant nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation)

any Governmental Unit (as defined under section 101(27) of the Bankruptcy Code) or landlord, to

conduct the Sales and Store Closings and to take the related actions authorized herein.

**III.    Conduct of the Sales.**

14.    All newspapers and other advertising media in which the Sales and Store Closings

may be advertised and all landlords are directed to accept this Final Order as binding authority so

as to authorize the Debtors and the Consultant to conduct the Sales and Store Closings pursuant to

the Consulting Agreement, including, without limitation, to conduct and advertise the sale of the

Merchandise and FF&E in the manner contemplated by and in accordance with this Final Order,

the Sale Guidelines, and the Consulting Agreement.

15.    The Debtors and Consultant are hereby authorized to take such actions as may be

necessary and appropriate to implement the Consulting Agreement and to conduct the Sales and

Store Closings without necessity of further order of this Court as provided in the Consulting

Agreement and the Sale Guidelines (subject to any Side Letters), including, but not limited to,

advertising the sale as a "store closing sale", "sale on everything", "everything must go", or

similar-themed sales as contemplated in the Sale Guidelines through the posting of signs (including

the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing

locations to the extent the applicable closing location entrance does not require entry into the

enclosed mall common area), use of signwalkers, A-frames, and other street signage, as

contemplated in the Sale Guidelines.

16.    Except as expressly provided in the Consulting Agreement and the Sale Guidelines,

the sale of the Merchandise and FF&E shall be conducted by the Debtors and the Consultant

notwithstanding any restrictive provision of any lease, sublease, restrictive covenant, or other

agreement relative to occupancy affecting or purporting to restrict the conduct of the Store

Closings or the Sales (including the sale of the Merchandise and FF&E), the rejection of leases,

abandonment of assets, or "going dark" provisions shall not be enforceable in conjunction with

the Store Closings or the Sales.  Breach of any such provisions in these chapter 11 cases in

conjunction with the Store Closings or the Sales shall not constitute a default under a lease or

provide a basis to terminate the lease; provided that the Store Closings and Sales are conducted in

accordance with the terms of this Final Order, any Side Letter and the Sale Guidelines.  The

Debtors and/or Consultant and landlords of the Closing Stores are authorized to enter into

agreements ("Side Letters") between themselves modifying the Sale Guidelines without further

order of the Court, and such Side Letters shall be binding as among the Debtors, the Consultant

and any such landlords, provided that nothing in such Side Letters affects the provisions of this

Final Order.  In the event of any conflict between the Sale Guidelines and any Side Letter, the

terms of such Side Letter shall control.

17.    Except as expressly provided for herein or in the Sale Guidelines, no person or

entity, including, but not limited to, any landlord, licensor, service providers, utilities, or creditors,

shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder

consummation of the Sales or the sale of Merchandise or FF&E, or the advertising and promotion

(including the posting of signs and exterior banners or the use of sign-walkers) of such sales, and

all such parties and persons of every nature and description, including, but not limited to, any

landlord, licensor, service providers, utilities, and creditors and all those acting for or on behalf of

such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or

otherwise impeding, the conduct of the Store Closings, and/or (b) instituting any action or

proceeding in any court (other than in the Bankruptcy Court or, upon recognition of this Final

Order by the Canadian Court, the Canadian Court) or administrative body seeking an order or

judgment against, among others, the Debtors, the Consultant, or the landlords at the closing

locations that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales or sale of the Merchandise or FF&E or other liquidation sales at the closing locations and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

18.    In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment and other assets of the Debtors for the purpose of conducting the Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Final Order.

19.    All sales of Store Closure Assets shall be "as is" and final.  No returns related to the purchase of Store Closure Assets shall be accepted at any Closing Stores or any stores that are not participating in the Store Closings.

20.    The Consultant shall accept return of any goods that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within the time period proscribed by the Debtors' return policy that was in effect when the merchandise was purchased, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.

21.    The Consultant shall not be liable for sales taxes except as expressly provided in the Consulting Agreement and the payment of any and all sales taxes is the responsibility of the Debtors.  The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due, provided that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of such dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales

taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected. The Consultant shall collect, remit to the Debtors, and account for sales taxes as and to the extent provided in the Consulting Agreement. This Final Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state, provincial or federal law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state, provincial or federal law.

22.     Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell the Store Closure Assets and all sales of Store Closure Assets, whether by the Consultant or the Debtors, shall be free and clear of any and all liens, claims, encumbrances, and other interests; *provided, however*, that any such liens, claims, encumbrances, and other interests shall attach to the proceeds of the sale of the Store Closure Assets with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Store Closure Assets, subject to any claims and defenses that the Debtors may possess with respect thereto and the Consultant's fees and expenses (as provided in the Consulting Agreement).

23.     The Debtors and/or the Consultant (as the case may be) are authorized and empowered to transfer Store Closure Assets among, and into, the Closing Stores in accordance with the Sale Guidelines, as applicable. The Consultant is authorized to sell the Debtors' FF&E and abandon the same, in each case, as provided for and in accordance with the terms of the Consulting Agreement and the Sale Guidelines.

24.     Neither the Sale Guidelines, Consulting Agreement, nor this Final Order authorize the Debtors to transfer or sell to Consultant or any other party the personal identifying information

9

(which means information which alone or in conjunction with other information identifies an individual, including but not limited to an individual's first name (or initial) and last name, physical address, electronic address, telephone number, social security number, date of birth, government-issued identification number, account number and credit or debit card number ("PII") of any customers unless such sale or transfer is permitted by the Debtors' privacy policy and state, provincial or federal privacy and/or identity theft prevention laws and rules (collectively, the "Applicable Privacy Laws").  The foregoing shall not limit the Consultant's use of the Debtors' customer lists and mailing lists in accordance with the Consulting Agreement solely for purposes of advertising and promoting the Sales.

25.     The Debtors shall remove or cause to be removed any confidential and/or PII in any of the Debtors hardware, software, computers or cash registers or similar equipment which are to be sold or abandoned so as to render the PII unreadable or undecipherable.  At the conclusion of the Sales, the Consultant shall provide the Debtors with written verification that the Consultant has not removed, copied, or transferred any customer PII and that any records containing PII were shredded, erased or otherwise modified to render the PII unreadable or undecipherable.

**IV.     Procedures Relating to Additional Closing Stores.**

26.     To the extent that the Debtors seek to conduct Sales at any Additional Closing Store, the Sale Guidelines and this Final Order shall apply to the Additional Closing Stores.

27.     Prior to conducting the Sales at any Additional Closing Store, the Debtors will consult with the DIP Agents, file a list including such Additional Closing Store with this Court (each, an "Additional Closing Store List"), and serve a notice of their intent to conduct the Sales at the Additional Closing Store on the applicable landlord (collectively, the "Additional Closing Store Landlords") and other interested parties, including counsel to the DIP Agents, by email (to the extent available to the Debtors) or overnight mail.  With respect to

Additional Closing Store Landlords, the Debtors will mail, if applicable, such notice to the notice address set forth in the lease for such Additional Closing Store (or, if none, at the last known address available to the Debtors).

28.      The Additional Closing Store Landlords and any interested parties shall have seven days after service of the applicable Additional Closing Store List to object to the application of this Final Order.  If no timely objections are filed with respect to the application of this Final Order to an Additional Closing Store, the Debtors all be authorized, pursuant to sections 105(a), and 363(b) and (f) of the Bankruptcy Code, to proceed with conducting the Sales at the Additional Closing Stores in accordance with this Final Order, the Sale Guidelines, and the Consulting Agreement.  If any objections are filed with respect to the application of this Final Order, to an Additional Closing Store, and such objections are not resolved, the objections and the application of this Final Order to the Additional Closing Store will be considered by the Court at the next regularly scheduled omnibus hearing, subject to the rights of any party to seek relief on an emergency basis on shortened notice, to the extent necessary.

**V.      Dispute Resolution Procedures with Governmental Units.**

29.      Nothing in this Final Order, the Consulting Agreement, or the Sale Guidelines, releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Final Order.  Nothing contained in this Final Order, the Consulting Agreement, or the Sale Guidelines shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt

11

from laws of general applicability, including, without limitation, public health and safety, criminal, tax (including, but not limited to, the collection of Sales Taxes), labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising, consumer protection, the sale of gift certificates, layaway programs, return of goods, express or implied warranties of goods, and "weights and measures" regulation and monitoring (collectively, "General Laws").  Nothing in this Final Order, the Consulting Agreement, or the Sale Guidelines, shall alter or affect obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Final Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' rights to assert in that forum or before this Court or, upon recognition of this Final Order by the Canadian Court, the Canadian Court, that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code or this Final Order (or, upon recognition of this Final Order by the Canadian Court, the CCAA or any Order of the Canadian Court).  Notwithstanding any other provision in this Final Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Final Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code or the CCAA, as applicable.  Nothing in this Final Order shall be deemed to have made any rulings on any such issues.

30.     To the extent that the sale of Store Closure Assets is subject to any Liquidation Sale Laws, including any federal, state or local statute, ordinance, rule, or licensing requirement directed at regulating "going out of business," "store closing," or similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary

advertising such as signs, banners, signage, and use of sign-walkers solely in connection with the

sale of the Store Closing Assets, including ordinances establishing license or permit requirements,

waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale

of the Store Closure Assets, the dispute resolution procedures in this section shall apply (provided

that, subject to recognition of this Final Order by the Canadian Court, these Dispute Resolution

Procedures shall not apply with respect to the sale of Store Closure Assets in Canadian stores, and

that any such disputes shall be dealt with by the Canadian Court):

i.  Provided that the Sales are conducted in accordance with this Order, any Final Order, and the Sale Guidelines, the Debtors, the Consultant, and the Debtors' landlords, shall be deemed to be in compliance with any requirements of all county, parish, or municipal or other local government (hereinafter referred to as "Local") and State requirements governing the conduct of the Sales of the Store Closure Assets, including but not limited to Local statutes, regulation and ordinances establishing licensing or permitting requirements, waiting periods or time limits, or bulk sale restrictions that would otherwise apply to the Sales and sales of the Store Closure Assets (collectively, the "Liquidation Sale Laws") of any state or local Governmental Unit (as defined in Bankruptcy Code section 101(27); provided, that the term "Liquidation Sale Laws" shall be deemed not to include any public health or safety laws or any state (collectively, "Safety Laws"), and the Debtors and the Consultant shall continue to be required to comply, as applicable, with such Safety Laws and General Laws, subject to any applicable provision of the Bankruptcy Code and federal law, and nothing in this Order shall be deemed to bar Governmental Units (as defined in section 101(27) of the Bankruptcy Code) or public officials from enforcing Safety Laws or General Laws.

ii. Within three (3) business days after entry of this Final Order, the Debtors will serve by first-class mail, copies of this Final Order, the Consulting Agreement, and the Sale Guidelines on the following: (a) the Attorney General's office for each state where the Sales are being held; (b) the county consumer protection agency or similar agency for each county where the Sales are being held; (c) the division of consumer protection for each state where the Sales are being held; and (d) the landlords for the Closing Stores (collectively, the "Dispute Notice Parties").

iii. With respect to any Additional Closing Stores, within three (3) business days after filing any Additional Closing Store List with the Bankruptcy Court, the Debtors will serve by first-class mail, copies of this Final Order, the Consulting Agreement, and the Sale Guidelines on the Dispute Notice Parties.

iv. To the extent that there is a dispute arising from or relating to the Sales, this Final Order, the Consulting Agreement, or the Sale Guidelines, which dispute relates to

13

any Liquidation Sale Laws (a "Reserved Dispute"), the Bankruptcy Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of this Final Order, or service of an Additional Store Closing List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., Emily E. Geier, and AnnElyse Scarlett Gains, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Joshua M. Altman; (b) Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia, Attn: Michael A. Condyles, Peter J. Barrett, Jeremy S. Williams, and Brian H. Richardson; (c) on behalf of Gordon Brothers Retail Partners, LLC, Prudential Tower, 800 Boylston Street, 27th Floor, Boston, Massachusetts 02199, Attn: Mackenzie Shea; and (d) Riemer Braunstein LLP, 7 Times Square, Suite 2506, New York, New York 10036, Attn: Steven Fox. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the notice, the Governmental Unit may file a motion with the Bankruptcy Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

v.     In the event that a Dispute Resolution Motion is filed, nothing in this Final Order shall preclude the Debtors, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of this Final Order nor the conduct of the Debtors pursuant to this Final Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to this Final Order, absent further order of the Bankruptcy Court. Upon the entry of this Final Order, the Bankruptcy Court grants authority for the Debtors and the Consultant to conduct the Sales pursuant to the terms of this Final Order, the Consulting Agreement, and the Sale Guidelines and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in this Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

vi.    If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in this Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (iv) and (v) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

31.     Subject to paragraphs 29 and 30 above, each and every federal, state, or local agency, departmental, or Governmental Unit with regulatory authority over the Sales and all newspapers and other advertising media in which the Sales are advertised shall consider this Final Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors or the Consultant be required to post any bond, to conduct the Sales.

32.     Provided that the Sales are conducted in accordance with the terms of this Final Order, the Consulting Agreement, and the Sale Guidelines, and in light of the provisions in the laws that exempt court-ordered sales from their provisions, the Debtors and Consultant shall be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of this Final Order and the Sale Guidelines without the necessity of further showing compliance with any such Liquidation Sale Laws.

33.     Nothing in this Final Order, the Consulting Agreement, or the Sale Guidelines releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Final Order.  Nothing contained in this Final Order, the Consulting Agreement, or the Sale Guidelines shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.

**VI.     Other Provisions.**

34.     To the extent the Debtors are subject to any state Fast Pay Laws in connection with the Store Closings, the Debtors shall be presumed to be in compliance with such laws to the extent,

15

in applicable states, such payroll payments are made by the later of: (a) the Debtors' next regularly scheduled payroll; and (b) seven calendar days following the termination date of the relevant employee, and in all such cases consistent with, and subject to, any previous orders of this Court regarding payment of same.

35.     Neither the Consultant nor any of its respective affiliates (whether individually, as part of a joint venture, or otherwise), shall be precluded from providing additional services to the Debtors and/or bidding on the Debtors' assets in connection with any other future process that may or may not be undertaken by the Debtors to close additional stores, *provided* that any such services and/or transactions is approved by separate order of this Court.

36.     On a confidential basis and for professionals' "eyes only" and upon the written (including email) request of the U.S. Trustee or counsel to the DIP Agent, the Debtors shall provide such requesting party, if any, with copies of periodic reports concerning the Sales that are prepared by the Debtors, their professionals or the Consultant, *provided*, that the foregoing shall not require the Debtors, their professionals, or the Consultant to prepare or undertake to prepare any additional or new reporting not otherwise being prepared by the Debtors, their professionals, or the Consultant in connection with the Sales.

37.     Not later than five (5) business days prior to the objection deadline related to entry of an order approving the Motion on a final basis, the Consultant shall file a declaration disclosing connections to the Debtors, their creditors, and other parties in interest in these chapter 11 cases.

38.     Consultant shall act solely as an independent consultant to the Debtors and shall not be liable for any claims against the Debtors other than as expressly provided in the Consulting Agreement (including the Consultant's indemnity obligations thereunder) or the Sale Guidelines, with the exception of acts of gross negligence or willful misconduct and, for greater certainty, the

Consultant shall not be deemed to be an employer, or a joint or successor employer or a related or common employer or payor within the meaning of any legislation governing employment or labor standards or pension benefits or health and safety or other statute, regulation or rule of law or equity for any purpose whatsoever, and shall not incur any successor liability whatsoever.

39.     The Debtors are authorized and permitted to transfer to the Consultant personal information in the Debtors' custody and control solely for the purposes of assisting with and conducting the Sale and only to the extent necessary for such purposes, provided that Consultant removes such personal information from the FF&E prior to the abandonment of the same.

40.     Notwithstanding the relief granted herein and any actions taken pursuant to such relief, nothing contained in the Motion or this Final Order shall constitute, nor is intended to constitute:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease, other than the Consulting Agreement, pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Final Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens.  Any payment made pursuant to this Final Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim, other than with respect to payments

17

made to the Consultant, which are governed by the reconciliation procedures in the Consulting Agreement.

41.    Notwithstanding the relief granted in this Final Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to the provisions of the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (VII) Granting Related Relief*, (the "Interim DIP Order"), and the DIP Senior Credit Facility Documentation (as defined in the Interim DIP Order), and shall be made strictly in accordance with the Budget (as defined in the Interim DIP Order), subject to such variances as permitted by the DIP Senior Credit Facility Documentation; provided, however, that the DIP Senior Credit Facility Documentation shall not require a cap or reduction on amounts due to the Consultant under the Consulting Agreement other than any such cap or reduction resulting from the Debtors' required compliance with the Budget. Additionally, not later than two (2) business days after entry of this Final Order the Debtors shall deliver to the Consultant a cash deposit in the amount of $500,000 as provided in the Budget as security for payment of Consultant's fees and expenses earned and incurred under the Consulting Agreement (the "Consultant's Deposit"); any remaining balance of Consultant's Deposit being held by Consultant upon completion of the Sale shall be applied by Consultant as shall be set forth in a final reconciliation of the Sale as contemplated by Section 5(B) of the Consulting Agreement.  Following such final reconciliation payment of all amounts due to the Consultant, any remaining balance of the Consultant's Deposit shall be part of the "Cash Collateral" (as

defined in the Interim DIP Order) and shall be subject to all provisions relating to Cash Collateral set forth in the Interim DIP Order.

42.    Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall take effect immediately upon its entry.

43.    Notice of the Motion as provided therein is deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules of this Court are satisfied by such notice.

44.    Notwithstanding Bankruptcy Rules 6003(b) and 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

45.    Cause exists to shorten the notice period set forth in Bankruptcy Rule 2002, to the extent applicable.

46.    The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived to the extent necessary.

47.    This Court shall retain jurisdiction with regard to all issues or disputes relating to this Final Order or the Consulting Agreement, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords and/or the Consultant for protection from interference with the Store Closings or Sales, (c) any other disputes related to the Store Closings or Sales, and (d) protect the Debtors and/or the Consultant against any assertions of any liens, claims, encumbrances, and other interests; provided that, notwithstanding the foregoing and subject to recognition of this Final Order by the Canadian Court, the Canadian Court shall retain jurisdiction with regard to all issues or disputes in respect

of the Sale at the Canadian Closing Stores.  No such parties or person shall take any action against

the Debtors, the Consultant, the landlords, the Store Closings, or the Sales until this Court or the

Canadian Court, as applicable, has resolved such dispute.  This Court shall hear the request of such

parties or persons with respect to any such disputes on an expedited basis, as may be appropriate

under the circumstances.

48.     Within 30 days of conclusion of the Sale, the Debtors shall (a) file with the Court

a summary report of the store closing process that will include (i) a list of the stores closed and (ii)

gross revenue from the store closing assets sold, and (b) file with the Court and serve on the U.S.

Trustee, any statutory committee, and any other party in interest who may so request, a report

showing payment of each of the Consultant's fees, setting forth detail and information regarding

the calculation of such fees paid to the Consultant and expenses reimbursed to the Consultant.

Only the U.S. Trustee (and no other party) shall have 20 days after the date on which such report

is filed to object, under the standards of section 328(a) of the Bankruptcy Code, solely as to the

reasonableness of the compensation paid or expenses reimbursed to the Consultant; provided,

however, that with respect to any such objection: (i) the Consultant's "Base Fee" and

reimbursement of expenses in accordance with the aggregate budget set forth on Exhibit B to the

Consulting Agreement (including any individual Statement of Work thereunder) shall be reviewed

under the standards of section 328(a) and are found to be reasonable as of the date hereof, and such

Base Fee shall not be later deemed unreasonable on the basis that the success of the Sale, whether

on account of sales, recovery, or otherwise, resulted in the Consultant receiving compensation, in

dollar terms, that was greater than any budget or forecast provided by the Debtors, their advisors,

and/or the Consultant; and (ii) the Consultant's "Incentive Fee" or any other fee not reflected in

the Consulting Agreement, and any additional expenses reimbursed in excess of the aggregate

budget, shall not receive the same presumption and shall be reviewed under the standards of section 330 of the Bankruptcy Code.  To the extent an objection is filed by the U.S. Trustee and cannot be resolved, the parties shall coordinate to have the objection to the Consultant's compensation brought before the Court at the next scheduled omnibus hearing or such other date and time as shall be agreed by the parties.

Dated: _____          _____
Richmond, Virginia                              United States Bankruptcy Judge

WE ASK FOR THIS:

 /s/ *Jeremy S. Williams*
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

- and -

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

Joshua M. Altman (*pro hac vice* admission pending)
300 North LaSalle Street
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

     /s/ *Jeremy S. Williams*

## <u>Schedule 1-A</u>

**Consulting Agreement**

## Schedule 1-B

**Amendment to Consulting Agreement**

## Schedule 1-C

**Consulting Agreement: Statement of Work 78**

## Schedule 1-D

**Consulting Agreement: Statement of Work 79**

## **Schedule 1-E**

**Consulting Agreement: Statement of Work 80**

## Schedule 1-F

**Consulting Agreement: Statement of Work 81**

## Schedule 2-A

### U.S. Sale Guidelines

## Schedule 2-B

**Canada Sale Guidelines**

## **Exhibit C**

**Riesbeck Declaration**

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DECLARATION OF ROBERT J. RIESBECK IN SUPPORT
## OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
## ORDERS (I) AUTHORIZING THE DEBTORS TO ASSUME THE CONSULTING
## AGREEMENT, (II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE
## CLOSING SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS,
## CLAIMS, AND ENCUMBRANCES, (III) AUTHORIZING CUSTOMARY BONUSES
## TO EMPLOYEES OF CLOSING STORES, AND (IV) GRANTING RELATED RELIEF

I, Robert J. Riesbeck, declare as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

1.      I am the Chief Executive Officer of Pier 1 Imports, Inc. and have served in that role

since November 4, 2019.  I also currently serve as the Chief Financial Officer of Pier 1 Imports,

Inc., having served in that role since July 2019.

2.      I submit this declaration (this "Declaration") in support of the *Debtors' Motion for

*Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement,*

*(II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free*

*and Clear of All Liens, Claims, and Encumbrances, (III) Authorizing Customary Bonuses to*

*Employees of Closing Stores, and (IV) Granting Related Relief* (the "Store Closing Motion"), filed

contemporaneously herewith.[2]  I have reviewed and am familiar with the Store Closing Motion

and the relief sought therein.

### Qualifications

3.      Prior to joining the company, I was Chief Financial Officer of FULLBEAUTY

Brands from June 2018 to February 2019.  Before FULLBEAUTY I served as the Chief Financial

officer of hhgregg, Inc. from September 2014 to June 2016, and then as Chief Executive Officer

from February 2016 to June 2017.  I also served as the Operating Executive of Sun Capital

Partners, Inc. from 2010 to 2014, and Chief Financial Officer of a Sun Capital Partners, Inc.

portfolio company, Marsh Supermarkets, from 2006 through 2010.  Prior to that, I served as the

Chief Operating Officer and Chief Financial Officer of subsidiaries of Nike, Inc. from 2000

through 2005.

4.      Except as otherwise indicated herein, the facts set forth in this Declaration are based

upon my personal knowledge, my review of relevant documents, information provided to me by

---

[2]      Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in
the Store Closing Motion, the Consulting Agreement, or as later defined herein, as applicable.

the Debtors' employees, the employees of Gordon Brothers Retail Partners, LLC (the "Consultant") working with the Debtors, and other advisors, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and the retail industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

## The Store Closing Motion

### A.    The Closing Stores

5.    A key component of the Debtors' strategy is to right-size their operations by closing underperforming stores and also selling excess and aged inventory during the store closing process. Such closures and sales will help improve profitability, increase the Debtors' liquidity, and allow the Debtors to focus their efforts around a smaller footprint of more profitable stores.

6.    Upon a review of its business and store footprint, it became evident that certain of the Debtors' stores would need to be closed in order to right-size their operations. The Debtors and their advisors have identified 398 stores for closure (the "Initial Closing Stores"), and are considering closure of additional stores, depending upon the outcome of, among other things, lease negotiations with the Debtors' landlords (the "Additional Closing Stores," and, together with the Initial Closing Stores, the "Closing Stores").

7.    In formulating the list of Closing Stores, the Debtors considered, among other factors, historical store profitability, recent sales trends, the geographic market in which each store is located, the potential to realize negotiated rent reductions with applicable landlords, and specific circumstances related to a store's performance. Many of the Closing Stores are located in geographic markets that the Debtors have made a strategic decision to exit or otherwise consolidate multiple stores in the region, have experienced poor or negative sales trends, and no longer fit

within the Debtors' go-forward business plan.  The liquidation of the saleable inventory located in the Closing Stores (the "Merchandise"), and the associated furniture, fixtures, and equipment (the "FF&E" and, together with the Merchandise, the "Store Closure Assets") is expected to yield approximately $177 million in proceeds.

8.    The determination of whether or not to close certain stores will depend, in part, on receiving more favorable lease terms and rent reductions from landlords.  The Debtors have retained A&G Real Estate Partners, LLC to assist with these negotiations, which are on-going at this time.

9.    In order to maximize value for their creditors, the Debtors may need to close Additional Closing Stores.  The determination of whether or not to close certain stores will depend, in part, on receiving more favorable lease terms and rent reductions from landlords.  The Debtors have retained A&G Real Estate Partners, LLC to assist with these negotiations, which are on-going at this time.  The decision will also be made by the Debtors in the exercise of their reasonable business judgment and in consultation with their advisors based upon continued evaluation of performance, whether the Debtors are able to negotiate rent concessions, and the outcome of the third-party sale process.  Although the Debtors have not yet definitively set any plans to close Additional Closing Stores, they will continue to evaluate their retail footprint on a store-by-store basis, and may close stores whose performance falls below benchmark performance metrics during these chapter 11 cases.

**B.    The Sale Guidelines**

10.    Based on my experience with other retail chapter 11 debtors, I believe that implementing the U.S. Sale Guidelines and the Canadian Sale Guidelines will provide the best and most efficient means for the Debtors to sell the Store Closure Assets to maximize their value to

4

the estates (such sales, the "Sales" or "Store Closings").  I believe that completion of the majority

(if not all) of the currently contemplated Sales will be completed no later than March 31, 2020.

The Debtors have also determined that the leases for the Closing Stores are not marketable and

have determined to reject those leases upon completion of the Sales.[3]

11.     I believe that conducting the Sales at the Closing Stores in accordance with the Sale

Guidelines will provide an efficient means for the Debtors to dispose of the assets in the Closing

Stores.  Any interruption or delay in the Debtors' ability to implement the Sale Guidelines at the

Closing Stores could cause serious and irreparable harm to the Debtors' estates.  In the event the

Debtors are forced to wait to commence the Sales, they will, by definition, have less time to

complete the Sales and will be forced to either pay additional rent to extend the sale timeline or

further reduce prices.

12.     The relief requested in the Store Closing Motion with respect to the Sale Guidelines

is integral to maximizing the value of the Debtors' estates.  It will permit the Debtors to execute

the Sales at the Closing Stores, resulting in a helpful boost to the Debtors' liquidity, and will

establish fair and uniform guidelines to assist the Debtors and their creditors through the Debtors'

transition to a more efficient and profitable enterprise.

## C.     The Consultant and Consulting Agreement

13.     For more than ten years, the Debtors engaged the Consultant to facilitate store

closures for the Company—both in the United States and Canada.  As a result, the Consultant has

significant expertise and expert knowledge of the Debtors' business, their merchandise, and their

---

[3]     The Debtors are continuing to analyze whether or not certain of the leases of the Closing Stores may have value
to potential purchasers and will consider any offers to purchase such lease received following the Petition Date.
Relevant lease information is available on A&G's website. In the event that the Debtors receive interest in any
particular lease, the Debtors will provide notice of an auction or otherwise negotiate between interested parties
for a highest and best offer and seek approval of such sale (and related assumption and assignment of the Lease)
as appropriate.

store operations. Additionally, the Debtors and the Consultant are already party to the Consulting

Agreement, which sets forth the terms pursuant to which the Consultant has operated store closings

for the Debtors for a decade. Further, the Debtors and the Consultant agreed to Statements of

Work #78, 79, 80, and 81—which govern the closure of the 398 Closing Stores—on terms

materially consistent with their existing relationship. In light of this and the Consultant's historic

success in closing other stores for the Debtors, the Debtors concluded in their business judgment

that (a) the services of the Consultant are necessary (i) for a seamless and efficient large-scale store

closing process, as is contemplated by the Store Closing Motion, and (ii) to maximize the value of

the Store Closure Assets, and (b) the Consultant is qualified and capable of performing the required

tasks in a value-maximizing manner.

14.    Members of my management team working at my direction were involved with

assisting the Debtors' in evaluating the terms and conditions of the relevant Statements of Work

and I believe that they were evaluated in good faith. I also believe that the Debtors' assumption

of the Consulting Agreement is a sound exercise of the Debtors' reasonable business judgment

and in the best interests of their estates.

15.    The Consulting Agreement generally provides that the Consultant will conduct the

Sales at certain identified Closing Stores during the Sale Term (as defined therein) and, among

other things:   (a) recommend appropriate point-of-purchase, point-of-sale, presentation and

external and internal advertising and signage necessary to effectively sell all of the Merchandise

in accordance with a "this store location closing" or other mutually agreeable theme; (b) provide

qualified supervisors with respect to the stores, to oversee the conduct of the Sale, and to oversee

the Sale process in the Closing Stores; (c) maintain focused and constant communication with

store-level employees and managers to keep them abreast of strategy and timing and to properly

effect store-level communication by Debtors' employees to customers and others about the sale: (d) establish and provide oversight of accounting functions for the Sale, including evaluation of sales of Merchandise by category, sales reporting, and expense monitoring; (e) coordinate with Merchant so that the operation of the Closing Stores is being properly maintained, including ongoing customer services and housekeeping activities; (f) recommend appropriate staffing levels for the Closing Stores and appropriate bonus and/or incentive programs for Store employees; (g) provide recommendations for loss prevention initiatives; (h) advise Merchant with respect to the licensing requirements affecting the Sales as a "this store location closing" or other mutually agreed upon theme in compliance with the Store Closing Order and applicable state and local "going out of business" laws.

16.     Under the terms of the Consulting Agreement, in consideration of the services to be rendered, the Debtors will provide the Consultant with a base fee equal to three thousand dollars ($3,000) per Closing Store.  The Consultant may also be entitled to an additional fee depending on the percentage amount that the gross proceeds from the Sale equal or exceed the cost value of the Merchandise sold, as set forth in the Statements of Work.  The Consultant may also sell furniture, fixtures, and equipment in the Stores at the direction of the Debtors, and will receive a commission equal to twenty-five percent (25%) of the gross sales of the FF&E, net of applicable sales taxes.  In addition, the Debtors will reimburse the Consultant for all costs and expenses of the Sale, including all Store level operating expenses, subject to an Expense Budget set forth in the applicable Statement of Work.

17.     Based on my experience with liquidation consultants and liquidation consulting agreements in similar contexts, I believe the terms proposed under the Consulting Agreement are reasonable.

**D.** **Basis for Assumption of the Consulting Agreement**

18.     Given the number of Closing Stores that need to be simultaneously closed and the additional excess and aged inventory to be sold in these stores, a national liquidator, such as the Consultant, with significant experience with large-scale liquidations can ensure a smooth liquidation process that will maximize the value of the Store Closure Assets.  The Consulting Agreement enables the Debtors to use the logistical capabilities, experience, skills, and resources of the Consultant to effectively and efficiently conduct the Sales and, thus, significantly improves the potential value to be received through the Sales for the benefit of all stakeholders.  Further, the Consultant knows the Debtors' business and has a proven track record of successfully closing the Debtors' stores.  Given that the Sales of the Initial Closing Stores are ongoing, I believe the relief requested in the Store Closing Motion is necessary in order to ensure the continuity and certainty of an orderly process so as to produce the most value for the Debtors' estates.  Value realized in the Sales will inure to the benefit of the Debtors' estates, which will more than offset any expenses incurred by reason of the assumption of the Consulting Agreement.  Further, the Consultant's fees are based on the results of the Sale, ensuring that the Consultant is incentivized to maximize value for the Debtors' estates.

**E.** **Store Closing Bonus Plan.**

19.     Through the Store Closing Motion, the Debtors are requesting the authority, but not the obligation, to pay Store Closing Bonuses (the "Store Closing Bonus Plan") to store-level non-insider employees, who remain in the employ of the Debtors during the Sales.  I believe that the Store Closing Bonus Plan will motivate employees during the Sales and will enable the Debtors to retain those employees necessary to successfully complete the Sales.  The Debtors will modify

the Store Closing Bonus Plan in the ordinary course of business, as they deem appropriate, to best incentivize employees.

20.     The total aggregate cost of the Store Closing Bonus Plan will also vary depending on how many Closing Stores are ultimately closed.  If the Debtors were to close every Closing Store the aggregate amount of Store Closing Bonuses paid will not be more than $1.65 million, assuming one hundred percent of the eligible employees remain employed through the duration of the Closing Sales at every Closing Store.

21.     I believe that providing such benefits is critical to ensuring that key employees that will be affected by the reduction in the Debtors' work force due to the Store Closings will continue to provide critical services to the Debtors during the ongoing Store Closing process.   The Debtors do not propose to make any payment on account of Store Closing Bonuses to any insiders.

### **Conclusion**

22.     Based on the foregoing, I submit that the relief requested in the Store Closing Motion is reasonable, necessary, and should be granted.

Dated:  February 17, 2020                             Respectfully submitted,

                                                                          */s/ Robert J. Riesbeck*
                                                                         Robert J. Riesbeck