Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state as follows in support of this motion (this "Motion"):

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith. The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

[2] A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Robert J. Riesbeck, Chief Executive Officer of Pier 1 Imports, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the

## Relief Requested

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively), (a) authorizing the Debtors to (i) pay all prepetition wages, salaries, reimbursable expenses, and other obligations on account of the Employee Compensation and Benefits Programs (as defined below) in the ordinary course of business and (ii) continue to administer the Employee Compensation and Benefits Programs in the ordinary course of business and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within 21 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and rule 9013-1 of the

United States Code (the "Bankruptcy Code"). Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration or as later defined herein, as applicable.

Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

## Background

5. The Debtors are a leading omni-channel retailer of unique home décor, furniture, and accessories. Their retail approach has focused on providing the discerning customer a curated mix of home goods from artisans around the world. The Debtors offer their merchandise through 923 stores throughout the United States and Canada as well as online through their U.S. e-commerce website. The Debtors are headquartered in Fort Worth, Texas and currently employ approximately 17,000 non-seasonal employees. On January 6, 2020, the Debtors announced the closing of up to 450 of their stores, and in connection with the filing of these chapter 11 cases, the Debtors announced the closing of all Canadian operations.

6. The Debtors commenced these chapter 11 cases to facilitate a timely and efficient process that will maximize the value of the Debtors' estates for the benefit of all stakeholders. The Debtors will wind down those brick-and-mortar stores not part of their go-forward plan and will seek to implement a value-maximizing going-concern transaction for the remaining operations.

7. As of the Petition Date, each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors will also file for relief under the Companies' Creditors Arrangement Act (Canada). The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

**<u>The Debtors' Workforce</u>**

8. The Debtors employ over 3,600 individuals on a full-time basis and 14,100 individuals on a part-time basis (collectively, the "<u>Employees</u>") in the United States and Canada.[3] Approximately 16,100 Employees are paid on an hourly basis, and approximately 1,600 Employees earn a salary.[4] The Employees are not party to any collective bargaining agreements.

9. In addition to the Employees, the Debtors also periodically retain specialized individuals as independent contractors (the "<u>Independent Contractors</u>"), as well as temporary workers to fulfill certain duties when the Debtors are otherwise unable to fill required positions (the "<u>Temporary Staff</u>"). The Debtors source the Temporary Staff either directly or from various staffing agencies and do not pay the individual workers directly. The Independent Contractors and Temporary Staff are an important supplement to the efforts of the Debtors' Employees. At this time, the Debtors retain approximately 50 Independent Contractors.

10. The Debtors' Employees, Independent Contractors, and Temporary Staff perform a wide variety of functions critical to the Debtors' operations at the Debtors' home office, distribution centers, and stores. Certain of these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced. Additionally, certain of the Temporary Staff provide services necessary to continue the Debtors' store-level operations, and without their continued utilization would require the Debtors to expend additional resources in this current, competitive labor market. Without the continued, uninterrupted services

---

[3] On January 6, 2020, the Debtors announced the closing of up to 450 stores and reduction of workforce in the home office. The Debtors estimate that approximately 6,000 employees will be terminated during these chapter 11 cases.

[4] The included figures do not include seasonal staff which the Debtors do not anticipate utilizing during these chapter 11 cases.

of their Employees, Independent Contractors, and Temporary Staff, the Debtors' reorganization efforts will be severely hampered.

**Employee Compensation and Benefits Programs**

11. The Debtors maintain the following compensation and benefits programs and pay various administrative fees and premiums in connection therewith (each as defined herein, and together, the "Employee Compensation and Benefits Programs"):

- Employee Compensation;
- Independent Contractor and Temporary Staff Compensation;
- Payroll Processing Fees;
- Withholding Obligations;
- Reimbursable Expenses;
- Charitable Donations;
- Relocation Expenses;
- Employee Discount;
- Non-Insider Employee Incentive Programs;
- U.S. Health Programs;
- Canada Health Programs;
- U.S. Life Insurance and Disability Programs;
- Canada Life Insurance and Disability Programs;
- Workers' Compensation Program;
- Retirement Plans;
- Paid Leave and Unpaid Leave;
- Non-Insider Employee Severance Program; and
- Postpetition Non-Employee Director Compensation.

12. The vast majority of Employees rely exclusively or primarily on the Employee Compensation and Benefits Programs to pay their daily living expenses and support themselves or their families. Thus, Employees will face significant financial consequences if the Debtors are not

permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business. The Debtors seek to minimize the personal hardship the Employees and Temporary Employees would suffer if employee obligations are not paid when due or as expected. Consequently, the relief requested is necessary and appropriate.

13. Subject to the Court's approval, the Debtors intend to continue their Employee Compensation and Benefits Programs in the ordinary course, including honoring prepetition obligations due thereunder. The Debtors further request confirmation of their right to modify, change, and discontinue any of their Employee Compensation and Benefits Programs and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases, in each case, in their discretion and without the need for further Court approval, subject to other orders entered in these chapter 11 cases, any agreements executed in contemplation of these chapter 11 cases, and the requirements of the Bankruptcy Code.

14. Specifically, by this Motion, the Debtors seek authority, but not direction, to pay the following aggregate prepetition amounts on account of the Employee Compensation and Benefits Programs:

| **Employee-Related Obligations** | **Interim Amount** | **Final Amount** |
|---|---|---|
| Employee Compensation | $9,600,000 | $9,600,000 |
| Independent Contractor and Temporary Staff Compensation | $347,000 | $347,000 |
| Payroll Processing Fees | $0 | $0 |
| Withholding Obligations | $3,800,000 | $3,800,000 |
| Reimbursable Expenses | $187,100 | $187,100 |
| Charitable Donations | N/A | $0 |
| Relocation Expenses | $0 | $30,000 |
| Employee Discount | $0 | $0 |
| Non-Insider Employee Incentive Programs | $0 | $0 |
| U.S. Health Programs | $2,220,220 | $4,820,220 |
| Canada Health Programs | $50,000 | $50,000 |
| U.S. Life Insurance and Disability Programs | $51,000 | $51,000 |

| Employee-Related Obligations | Interim Amount | Final Amount |
|---|---|---|
| Canada Life Insurance and Disability Programs | $33,000 | $33,000 |
| Workers' Compensation Programs | $910,000 | $24,110,000[5] |
| Retirement Plans | $112,000 | $155,200 |
| Paid and Unpaid Leave | $0 | $8,300,000[6] |
| Non-Insider Employee Severance Program | N/A | $0 |
| Postpetition Non-Employee Director Compensation | N/A | $0 |

15. The Debtors do not believe that amounts owed to any Employees on account of the Employee Compensation and Benefits Programs will exceed the statutory cap of $13,650 under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. For the avoidance of doubt, the Debtors do not seek authority to pay any amounts in excess of $13,650 per Employee pursuant to the Interim Order. The Debtors do, however, seek authority to pay amounts in excess of $13,650, solely pursuant to the Final Order, in the event that it is determined that payment of certain prepetition amounts owed on account of Employee Compensation and Benefits are in excess of $13,650. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts on account of the Educational Reimbursements, Charitable Donations, certain of the Retirement Plans, Non-Insider Employee Severance Program, and Director Compensation (each as defined herein) only pursuant to the Final Order.

## I. Compensation and Withholding Obligations.

### A. Employee Compensation.

16. The Debtors pay Employees' wages, salaries, and other compensation (excluding reimbursable expenses, non-insider Employee incentive programs, non-insider

---

[5] This amount includes all prepetition claims on account of the Workers' Compensation Programs, the overwhelming majority of which will not come due during these chapter 11 cases.

[6] For the avoidance of doubt, the Paid and Unpaid Leave is not a current cash payment obligation.

Employee severance programs, and paid leave) on a weekly or bi-weekly basis (collectively, the "Employee Compensation"). Approximately 2,300 Employees are paid on a weekly basis and 15,400 are paid on a bi-weekly basis. Because Employees are paid in arrears, many Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date. Employee Compensation may also be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees, or as a result of Employees holding uncashed paper paychecks as of the Petition Date. In the 12 months before the Petition Date, the Debtors spent an average of approximately $24.7 million per month on Employee Compensation.

17. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees is approximately $9.6 million on account of Employee Compensation earned before the Petition Date, all of which is expected to come due during the first 21 days of these chapter 11 cases (the "Interim Period"). The Debtors do not believe they owe any Employees amounts in excess of $13,650.

**B. Independent Contractors and Temporary Staff.**

18. The Debtors rely on Independent Contractors and Temporary Staff in the ordinary course of their business. These Independent Contractors and Temporary Staff perform certain services critical to the Debtors' operations, including, among other things, administrative functions, such as accounting support, advertising and information technology services, creative freelancing, and operational functions related to the Debtors' retail business. The Debtors rely on Independent Contractors and Temporary Staff to complete discrete projects in furtherance of the Debtors' business and to fill positions that are not economically feasible to employ on a full- or

part-time basis. The Debtors believe the authority to continue paying Independent Contractors, Temporary Staff is critical to minimize disruption of the Debtors' continued business operations.

19. On a monthly basis, the Debtors spend on average approximately $500,000 on Independent Contractors and Temporary Staff (the "Independent Contractor and Temporary Staff Compensation"). As of the Petition Date, the Debtors estimate that Independent Contractors and Temporary Staff are owed an aggregate of approximately $347,000 on account of accrued services rendered prior to the Petition Date, all of which is expected to come due during the Interim Period. The Debtors do not believe they owe any Independent Contractors or Temporary Staff amounts in excess of $13,650.

**C. Payroll Processing Fees.**

20. The Debtors utilize the services of third-party payroll processors ADP, LLC and ADP Canada Co. (together, "ADP") to process employment taxes, and provide remittance services for the U.S.-based Employees and administer payroll and several other employee related benefits programs for the Canada-based Employees. The Debtors utilize their own systems and accounts to process payroll for U.S.-based Employees, outside of ADP's role in processing employment taxes.[7] On an average monthly basis, the Debtors pay administration fees of approximately $23,000 to ADP (the "Payroll Processing Fees"). As of the Petition Date, the Debtors do not believe that there are any amounts outstanding on account of the Payroll Processing Fees.

[7] Additional details regarding the accounts and features of the Debtors' U.S.-based payroll processing is set forth in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief* filed contemporaneously herewith.

**D. Withholding Obligations.**

21. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support and related fees, and pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, legally ordered deductions, and miscellaneous deductions, such as employee-elected charitable contributions (collectively, the "Deductions"), and forward such amounts to various third-party recipients. In the 12 months before the Petition Date, average monthly Deductions were approximately $1.6 million. The Debtors estimate that as of the Petition Date, they hold (or have accrued an obligation to deduct from the upcoming Employee paychecks) approximately $600,000 in such Deductions.

22. In addition to the Deductions, federal, state and foreign laws require the Debtors to withhold certain amounts related to federal, state, provincial and local income taxes, Medicare taxes and Social Security, and in Canada, Canada Pension Plan ("CPP") and federal unemployment insurance (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, provincial or local taxing authority. The Debtors must then match Employee Payroll Taxes and pay, from their own account, certain amounts for Social Security, Medicare taxes, CPP, federal and state unemployment insurance, and certain other provincial taxes (the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes"). The majority of Payroll Taxes are processed and forwarded to the appropriate federal, state, provincial, or local taxing authority within a few days of when Employees' payroll checks are disbursed, or on a monthly or quarterly basis in accordance with applicable state, provincial, and local taxing authority requirements. In the 12 months before the Petition Date, average monthly Payroll Taxes were approximately $6.6 million.

23. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $3.8 million, all of which is expected to come due during the Interim Period. By this Motion, the Debtors seek authority, but not direction, to pay or deduct in a manner consistent with historical practice any unpaid, prepetition Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course of the Debtors' business on a postpetition basis.

**E. Reimbursable Expenses.**

24. The Debtors reimburse certain Employees (including members of the board of directors) for certain expenses incurred in the scope of their duties (the "Reimbursable Expenses"). Reimbursable Expenses are typically associated with travel, transportation, lodging, and meals incurred in connection with business travel, and certain other work-related expenses. By this Motion, the Debtors seek authority, but not direction, to continue and pay amounts relating to Reimbursable Expenses, including unpaid amounts owed on account of Reimbursable Expenses incurred through Employees' personal funds and/or corporate credit cards, administrative fees related to Reimbursable Expenses, as well as the Business Vehicle Reimbursement Plan, the Business Travel Account, the Educational Reimbursements, and the Technology Reimbursements (each as defined below).

**1. Personal Funds.**

25. Eligible Employees and directors may elect to use their personal credit cards or cash (collectively, the "Personal Funds") and seek reimbursement from the Debtors for Reimbursable Expenses, excluding certain travel expenses. Because these expenses are incurred through the use of Personal Funds, the Employee or director is personally liable for any unpaid obligations. The Debtors' inability to reimburse such expenses would impose hardship on such individuals where the obligations were incurred for the Debtors' benefit.

26. In the ordinary course of business, Employees submit their Reimbursable Expenses on an online platform called Expense Source. The Debtors then process reimbursement requests and pay the Employee or director for approved expenses. Expense Source greatly reduces the administrative burden that would otherwise fall on the Debtors related to the prompt payment of Reimbursement Expenses. The Debtors pay in advance approximately $2,500 per month for Expense Source's services.

27. In the 12 months before the Petition Date, the Debtors spent approximately $52,000 per month on account of Reimbursable Expenses incurred through use of Employees' Personal Funds. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed to Employees and directors on account of Reimbursable Expenses incurred through their Personal Funds is $82,000, all of which is expected to come due during the Interim Period.

**2. Corporate Credit Cards.**

28. The Debtors also provide certain Employees with corporate credit cards, issued through Bank of America (the "Corporate Credit Cards"). Currently, approximately 160 Corporate Credit Cards are used by Employees for Reimbursable Expenses. Additionally, directors at the Debtors' distribution centers have access to Corporate Credit Cards to make emergency purchases when the normal procurement process is insufficient to meet timing obligations. The Corporate Credit Cards are issued to Employees in each Employee's own name, however monthly statements are sent to the Debtors for administration. At the end of the month, the Debtors receive an aggregate invoice for all charges made on the Corporate Credit Cards. The Debtors are obligated to submit payment by the seventh day of the following month. Employees and the Debtors are liable on account of the Corporate Credit Cards and must make payments in a timely manner.

29. In the 12 months before the Petition Date, the average monthly amount paid on account of the Corporate Credit Cards was approximately $184,000. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed on account of the Corporate Credit Cards is approximately $104,000, all of which is expected to come due during the Interim Period. Given the importance of Employees' ability to use the Corporate Credit Cards, the Debtors request authority to continue utilizing and making payments on account of the Corporate Credit Cards in the ordinary course of business.

**3. Business Vehicle Reimbursement Plan.**

30. The Debtors offer a business vehicle reimbursement plan to certain store director Employees (the "Business Vehicle Reimbursement Plan"). As of the Petition Date, four Employees participate in the Business Vehicle Reimbursement Plan. Store director-level Employees are eligible for reimbursement under the Business Vehicle Reimbursement Plan if the Employee is required to utilize a personal vehicle to monitor multiple stores as part of their normal obligations. Under the Business Vehicle Reimbursement Plan, the Debtors provide a flat payment of $500 per month to each eligible Employee participating in the Business Vehicle Plan to cover vehicle costs, including insurance, license and registration fees, and taxes. There are no fees associated with administering the Business Vehicle Reimbursement Program. The Debtors estimate that the average annual cost of the Business Vehicle Reimbursement Plan is approximately $36,000 per month. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed on account of the Business Vehicle Reimbursement Plan is approximately $1,000, all of which is expected to come due during the Interim Period.

**4. Business Travel Account.**

31. The Debtors also maintain a business travel account (the "Business Travel Account"). All travel reservations and modifications are required to be

made utilizing the Business Travel Account and related services provided by ETC Group, Inc. ("ETC"). These travel expenses are billed to the Corporate Credit Cards maintained by the Debtors' corporate offices and paid directly by the Debtors. Fees associated with ETC's services are paid as part of the applicable travel booking. No reimbursements are made to Employees on account of travel expenses and fees billed through the Business Travel Account. The Debtors do not believe any amounts are outstanding as of the Petition Date. Accordingly, the Debtors seek the authority, but not direction, to maintain the Business Travel Account and their use of ETC in the ordinary course of business.

**5. Educational Reimbursements (Final Order Only).**

32. In the ordinary course of business, the Debtors provide educational assistance payments to a limited group of non-Insider Employees (the "Educational Reimbursements"). The Debtors have discontinued the Educational Reimbursements, however maintain the program for Employees who have been in the process of completing a degree during or before 2018. The Educational Reimbursements are approved after the Employee has already completed the course, and are subject to a 12-month clawback. The Debtors pay approximately $28,000 on an annual basis on account of the Educational Reimbursements. As of the Petition Date, the Debtors do not believe any amounts are outstanding on account of the Educational Reimbursements. Accordingly, the Debtors seek the authority, but not direction, to maintain the Educational Reimbursements.

**6. Technology Reimbursements.**

33. In the ordinary course of business, certain of the Debtors' Employees utilize their personal cell phones as part of their job functions. In compliance with laws in certain states in which the Debtors operate, the Debtors reimburse a portion of Employees' voice and data charges each month (the "Technology Reimbursements"). The Debtors pay approximately $30 to $50 per

month, per Employee to five Employees on account of the Technology Reimbursements. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed for Technology Reimbursements is approximately $100, all of which is expected to come due during the Interim Period.

### F. Charitable Donations (Final Order Only).[8]

34. In the ordinary course of business, the Debtors have provided support to various local and national charitable organizations (collectively, the "Charitable Donations"). As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Charitable Donations. By this Motion, the Debtors seek authority, but not direction, to continue the Charitable Donations in the ordinary course of business.

### G. Relocation Expenses.

35. In the ordinary course of business, the Debtors also pay certain expenses of Employees that are transferred in connection with their job (the "Relocation Expenses"). The majority of Relocation Expenses are either reimbursed to the Employees or directly billed to the Debtors by TRC Global Mobility, Inc., the Debtors' relocation provider. The Relocation Expenses include, but are not limited to, costs associated with the transportation of household goods, lease cancellation expenses, certain tax assistance, eligible home sale and purchase closing cost expenses, temporary living accommodations, and other covered expenses. The amount of Relocation Expenses depends on the applicable Employee's level and the complexity of the

---

[8] In the ordinary course of business, the Debtors maintain programs whereby charitable donations are accepted from customers at stores on behalf of various charitable organizations. The Debtors seek relief regarding these programs pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief* filed contemporaneously herewith.

relocation. Currently there are six Employees who are in the process of transferring in connection with their job.

36. On an annual basis, the Debtors spend on average approximately $320,000 on account of Relocation Expenses. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Relocation Expenses is approximately $30,000, none of which is expected to come due during the Interim Period.

### H. Employee Discount.

37. Employees are entitled to a 25% discount off merchandise in the Debtors' store and on the Debtors' website (the "Employee Discount"). The Employee Discount is taken at the point of sale, so the Debtors are not liable for any amounts on account of the Employee Discount. The debtors request the authority, but not direction, to continue the Employee Discount in the ordinary course of business.

## II. Non-Insider Employee Incentive Programs.[9]

38. The Debtors maintain Short-Term Incentive Programs and Long-Term Incentive Programs to motivate, reward, and retain certain of their non-insider Employees (each defined herein and collectively, the "Non-Insider Employee Incentive Programs").[10]

---

[9] The Non-Insider Employee Incentive Programs are highly targeted programs with specific aims of incentivizing, retaining, and motivating certain Employees. Maintaining these programs is vital to the Debtors' operations. Out of an abundance of caution, to the extent that a Non-Insider Employee Incentive Program is not described herein, the Debtors request the authority, but not the direction, to maintain these Non-Insider Employee Incentive Programs in the ordinary course of business.

[10] The Debtors also maintain a store closing bonus program for Employees at closing stores. The Debtors seek relief on account of such program pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, (III) Authorizing Customary Bonuses to Employees of Closing Stores, and (IV) Granting Related Relief* (the "Store Closing Motion"), filed contemporaneously herewith. For the avoidance of doubt, no payments on account of the Store Closing Bonus Plan (as defined in the Store Closing Motion) will be paid pursuant to the Non-Insider Incentive Programs.

**A. Short-Term Incentive Programs.**

39. In order to motivate and retain Employees, the Debtors maintain various short-term incentive programs, including the Field Programs, Home Office Programs, and DC Program (each as defined herein and together, the "Short-Term Incentive Programs"). The Debtors believe that the Short-Term Incentive Programs are integral to the Debtors' business operations and align Employee interests with those of the Debtors and their key stakeholders. The Debtors maintain a cap on the Short-Term Incentive Programs of 200% of the applicable Employee's benefit target.

**1. Field Programs.**

40. The Debtors maintain six Short-Term Incentive Programs for certain eligible Employees that work in or manage the Debtors' stores (the "Field Programs"). The Field Programs are based on certain factors such as store sales levels and earned payroll hours and are paid out either monthly or quarterly depending on the program. Target payouts for Employees participating in the Field Programs range from $2,250 per year in the case of hourly supervisors to 25% of base compensation in the case of the territory director.

**2. Corporate Programs.**

41. The Debtors maintain two Short-Term Incentive Programs for certain eligible corporate Employees (the "Corporate Programs"). The Corporate Programs are semi-annual and based on various company-wide performance metrics including revenue, EBITDA, and cost savings. Target payouts for Employees participating in the Corporate Programs range from $400 per year in the case of hourly home office associates, to 75% of the applicable Employee's base salary for the highest level non-Insider corporate Employees.

**3. DC Program.**

42. The Debtors also maintain one Short-Term Incentive Program for certain eligible Employees that work in the Debtors' distribution center (the "DC Program"). The DC Program

rewards certain Employees monthly for increased productivity and additional hours worked. Target payouts for Employees participating in the DC program range from 5% to 20% of the applicable Employee's base-pay.

43. In anticipation of certain distribution center closings, the Debtors will utilize a retention program for certain distribution center Employees. For the avoidance of doubt, the Debtors will not incur any prepetition liabilities on account of this retention program.

**B. Long-Term Incentive Programs (Final Order Only).**

44. The Debtors also maintain ten long-term incentive programs for certain non-insider Employees (together, the "Long-Term Incentive Programs"). The Long-Term Incentive Programs provide cash and equity awards to certain Employees depending on their role within the organization and vest based on various metrics including the Employee's tenure and the Debtors' financial performance.

45. Payments on account of the Non-Insider Employee Incentive Programs totaled approximately $5,100,000 and $8,100,000 in 2018 and 2019, respectively. However, no prepetition amounts are currently outstanding on account of either the Short-Term Incentive Programs or the Long-Term Incentive Programs. Further, the Debtors do not anticipate any payments will come due on account of the Long-Term Incentive Program until at least June 2020.

46. The Debtors believe that the Non-Insider Employee Incentive Programs align Employee interests to the longevity of the Debtors and ensure that critical Employees remain with the Debtors. Further, eliminating or interrupting these Non-Insider Employee Incentive Programs would heavily affect Employee morale and commitment to the Debtors during the pendency of these chapter 11 cases.

47. As of the Petition Date, the Debtors to not believe there are any accrued but unpaid amounts owed on account of the Non-Insider Employee Incentive Programs. For the avoidance

of doubt, the Debtors seek the authority, but not direction, to continue the Non-Insider Employee Incentive Programs in the ordinary course of business.

**III. Employee Benefit Programs.**

**A. Health and Welfare Programs.**

48. The Debtors offer several health and welfare benefits programs to eligible current and former Employees, including the U.S. Health Programs, the Canada Health Programs, the U.S. Insurance and Disability Programs, the Canada Insurance and Disability Programs, the Workers' Compensation Program, and the Retirement Plans, and pay certain administrative fees to third-party providers associated with such programs (each as defined herein, and collectively, the "Health and Welfare Programs").

**1. U.S. Health Programs.**

49. U.S. Employees are offered the opportunity to participate in, or are otherwise provided, a number of health benefit plans, including the U.S. Medical Plans, the HSA, the FSA, the Vision Plans, the Dental Plans, the U.S. EAP, the Supplemental Benefit Plans, and the Wellness Programs (each as defined herein, and collectively, the "U.S. Health Programs"). The Debtors also subsidize or continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

**2. U.S. Medical Plans.**

50. The Debtors offer medical and prescription drug benefit programs (the "U.S. Medical Plans") to current and certain former Employees, which are administered to U.S. Employees by Aetna, Inc. ("Aetna") and Express Scripts, Inc. ("Express Scripts"). U.S. Employees can choose from three U.S. Medical Plans, which have different premiums and coverage limits, and can choose to enroll a spouse and/or dependents.

51. The total cost of the U.S. Medical Plans is approximately $2.1 million per month, of which approximately $600,000 is covered by premiums paid by Employees and approximately $1.4 million is paid by the Debtors. The total cost of the U.S. Medical Plans includes administrative fees of approximately $240,000 per month and approximately $1.8 million per month on account of medical claims asserted under the U.S. Medical Plans.

52. Aetna and Express Scripts receive claims from Employees and make payments to health care providers on account of such claims. The Debtors make payments on account of medical claims asserted under the U.S. Medical Plans on a weekly basis. On average, Employees submit claims approximately 6 weeks after incurring such expense, so the Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the U.S. Medical Plans. Based on historical trends, the Debtors estimate that as of the Petition Date they owe approximately $4.1 million for unreimbursed prepetition medical claims, approximately $1.5 million of which is expected to come due during the Interim Period. In addition, the Debtors estimate that as of the Petition Date they owe approximately $370,000 on account of administrative fees under the U.S. Medical Plans, all of which is expected to come due during the Interim Period. Additionally, the Debtors hold approximately $200,000 on behalf of premium contributions from employees on account of the U.S. Medical Plans, all of which is expected to come due during the Interim Period.

**3. Health Savings Accounts**

53. U.S. Employees who participate in certain of the U.S. Medical Plans may contribute a portion of their compensation into a health savings account (the "HSA"), administered by Amino Health, Inc., which may be used for incidental medical, dental, and vision expenses. Participating Employees can make before-tax contributions to the HSA through payroll deductions to cover reimbursements under the program up to the maximum amount permitted by the IRS.

Additionally, the Debtors provide per pay-period contributions to each participating Employee's HSA based on the Employee's choice of medical plan. The Debtors contribute $19.23 bi-weekly or $9.62 weekly per Employee for Employees enrolled in single coverage or $38.46 bi-weekly or $19.25 weekly per Employee for Employees enrolled in family coverage. Currently, approximately 1,163 Employees utilize the HSA. While the Debtors only began offering the HSA to Employees at the beginning of 2020, the monthly administration fee on account of the HSA is estimated to be approximately $5,500. As of the Petition Date, the Debtors estimate that they owe approximately $9,000 in HSA administrative fees, all of which is expected to come due during the Interim Period. As of the Petition Date, the Debtors estimate that they are obligated to pay approximately $60,000 of Employee HSA withholdings and Debtor contributions, in the aggregate, to Employees on account of the HSA, all of which is expected to come due during the Interim Period.

**4. Flexible Spending Accounts.**

54. The Debtors also provide U.S. Employees who participate in certain of the U.S. Medical Plans with access to two flexible spending accounts (each, an "FSA") administered by Discovery Benefits, Inc. ("Discovery Benefits"). The Debtors offer an FSA which can be used to cover qualified medical, dental, and vision expenses and an FSA that can be used to cover dependent child/elder care. Currently, approximately 200 Employees use the FSA for medical costs and 40 Employees use the FSA for dependent child/elder care. The Debtors do not make any contributions to any Employee's FSA. The Debtors utilize FSA plan forfeitures from the year prior to pay administration fees to Discovery Benefits on account of the FSAs. As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of administrative fees in connection with the FSA, and estimate that previous FSA plan forfeitures are sufficient to pay all anticipated premiums. As of the Petition Date, the Debtors estimate that they hold approximately

$16,000 in accrued but unremitted Employee contributions on account of the FSA, all of which is expected to come due during the Interim Period. On occasion, the Debtors use Employees' unused FSA funds to cover premiums for the benefit of Employees.

**5. Vision Plans.**

55. The Debtors also offer U.S. Employees the option of participating in vision insurance plans administered by Aetna (the "Vision Plans"). The total cost of the Vision Plans is approximately $26,000 per month, which is fully covered by premiums paid by Employees. As of the Petition Date, the Debtors estimate that they hold approximately $8,200 in accrued but unremitted Employee-contributed premiums on account of the Vision Plans, all of which is expected to come due during the Interim Period.

**6. Dental Plans.**

56. The Debtors offer U.S. Employees the option of participating in dental insurance plans (the "Dental Plans") administered by Connecticut General Life Insurance Company ("Cigna"). The total cost of the Dental Plans is approximately $109,000 per month, which is fully covered by premiums paid by Employees. As of the Petition Date, the Debtors estimate that they hold approximately $36,000 in accrued but unremitted Employee-contributed premiums on account of the Dental Plans, all of which is expected to come due during the Interim Period.

**7. U.S. Employee Assistance Plan.**

57. The Debtors provide U.S.-based Employees an employee assistance program (the "U.S. EAP") administered by LifeWorks US, Inc. The U.S. EAP provides confidential counseling for issues related to work, family, legal, and financial issues, among others. The Debtors cover the full amount of the U.S. EAP, which costs $3,680 on an annual basis. As of the Petition Date, the Debtors believe that $1,000 is outstanding on account of the U.S. EAP, all of which is expected to come due during the interim period.

**8. Supplemental Benefit Plans.**

58. The Debtors offer their U.S. Employees supplemental benefit programs (collectively, the "Supplemental Benefit Plans"). Specifically, eligible U.S. Employees may enroll in an accident plan, a critical illness plan, and an in-patient hospital plan administered by Unum Provident Life and Accident Insurance Company, and an identity theft protection plan administered by InfoArmor, Inc. Enrollment in a U.S. Medical Plan is not required for an otherwise eligible Employee to elect to participate in these Supplemental Benefit Plans. The Debtors are not obligated to make any payments with respect to the Supplemental Benefit Plans, as all costs are covered by premiums paid by Employees. As of the Petition Date, the Debtors estimate that they hold approximately $20,000 in accrued but unremitted Employee-contributed premiums on account of the Supplemental Benefit Plans, all of which is expected to come due during the Interim Period.

**9. Wellness Programs.**

59. The Debtors also offer their eligible U.S. Employees the option to participate in various miscellaneous wellness programs (collectively, the "Wellness Programs"). The Debtors offer programs which encourage Employees to maintain healthy lifestyles and learn about health benefits offered by the Debtors. The Wellness Programs are organized through the company and reimbursed by Aetna to a maximum of $100,000 per year, pursuant to the Debtors' policy. As of the Petition Date, the Debtors do not believe there are any amounts owed on account of the Wellness Programs.

60. The Debtors seek the authority but not the direction to continue the Wellness Programs in the ordinary course of business. For the avoidance of doubt, all amounts payable will be reimbursed by Aetna, pursuant to the policy, and the Debtors will not exceed the policy limit of $100,000 on an annual basis on account of the Wellness Programs.

**10. Canada Health Programs.**[11]

61. Canada-based Employees are provided the opportunity to participate in the Canada Medical Plan (as defined herein), as well as the Canadian EAP (as defined herein, and together with the Canada Medical Plan, the "Canada Health Programs"). While the Canadian government provides certain health benefits, the Canada Health Programs provide additional coverage and support for the Debtors' Canada-based Employees.

**11. Canada Medical Plan.**

62. For Canada-based Employees, the Debtors offer a benefit plan which provides extended coverage for healthcare, vision, dental claims, as well as other coverage described below (the "Canada Medical Plan"). The Canada Medical Plan is administered by Desjardins Financial Security Life Assurance Company ("Desjardins"). The total cost of the Canada Medical Plan is approximately $32,000 per month, of which approximately $8,000 is covered by premiums paid by Employees and approximately $24,000 is paid by the Debtors.

63. The Canada Medical Plan is fully insured, so the Debtors are not liable for any claim amounts on account of the Canada Medical Plan. The Debtors estimate that as of the Petition Date they owe approximately $50,000 for premiums on account of the Canada Medical Plan, all of which is expected to come due during the Interim Period.

**12. Canadian EAP.**

64. The Debtors offer Canada-based Employees an employee assistance program (the "Canadian EAP"). The Canadian EAP is administered by Lifeworks Canada LTD and

[11] As previously mentioned, the Debtors are in the process of winding-down the Canadian operations. It is imperative to maintain the Canada Health Programs throughout these chapter 11 cases to ensure Canada-based Employees are able to receive medical care and associated benefits during the wind-down. For the avoidance of doubt, the Company commits to maintaining the Canada Health Programs during the winding-down of the Canadian operations.

provides enrolled Employees with confidential counseling for issues related to work, family, legal, and financial issues, among others. The total cost of the Canadian EAP is approximately $2,000 per month which is payable in whole by the Debtors in advance. As of the Petition Date, the Debtors do not believe that there are any amounts outstanding on account of the Canadian EAP however for the avoidance of doubt, the Debtors seek to maintain the Canadian EAP in the ordinary course of business.

**B. U.S. Life Insurance and Disability Programs.**

**1. U.S. Life and AD&D Insurance Programs.**

65. The Debtors provide current U.S. full-time Employees life and accidental death and dismemberment insurance coverage (the "U.S. Basic Life and AD&D Insurance") through Metropolitan Life Insurance Company ("MetLife"). The U.S. Basic Life and AD&D Insurance provides a maximum coverage of two times base salary up to $100,000 for distribution center Employees and one times base salary, up to $100,000, for all other Employees in the event of an Employee's death or dismemberment. Current full-time U.S. Employees may also purchase supplemental life insurance (the "U.S. Supplemental Life Insurance") administered through MetLife and supplemental accidental death and dismemberment insurance through Sun Life Assurance Company of Canada (the "U.S. Supplemental AD&D Insurance" and, collectively with the U.S. Supplemental Life Insurance, and U.S. Basic Life and AD&D Insurance, the "U.S. Life and AD&D Insurance"). The total cost of the U.S. Life and AD&D Insurance is approximately $65,000 each month, of which approximately $37,000 is paid by Employees and $28,000 is paid by the Debtors. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the U.S. Life and AD&D Insurance is approximately $22,000, all of which is expected to come due during the Interim Period.

**2. U.S. Disability Benefits.**

66. The Debtors provide full-time U.S. Employees with short- and long-term disability benefits (the "U.S. Disability Benefits" and, together with the U.S. Life and AD&D Insurance, the "U.S. Life Insurance and Disability Programs") administered by MetLife. Employees are eligible for Disability Benefits upon completion of a benefit eligibility waiting period. Under the short-term disability benefits program, U.S. Employees are entitled to, among other things, salary continuation of up to 40 percent of their base wages, with the ability for the applicable Employee to purchase an additional 20 percent of coverage, in the event of a short-term medical disability due to an illness, injury, or pregnancy-related condition. Additionally, the Debtors maintain a salary continuation plan, which provides an additional 40 percent of base wages for Employees receiving U.S. Disability Benefits, subject to limitations based on length of service and insurance coverage. Payments on account of the U.S. Disability Benefits are made out of the Debtors' ordinary payroll processing. The length of short-term disability benefits provided is based on insurance carrier approval and the applicable Employee's tenure with Debtors.

67. Under the long-term disability benefits program, full-time U.S. Employees are entitled to, among other things, continuation of up to 60 percent of their wages, up to a maximum monthly benefit of $10,000 or $12,500 for non-executive Employees, depending on corporate title,[12] in the event of a long-term medical disability due to illness or injury. The maximum duration of such long-term disability benefits is determined based on the individual's age at the time such long-term disability benefits begin.

[12] Certain executive Employees are entitled to a maximum monthly disability benefit of 65% of their wages. For the avoidance of doubt, the Debtors do not seek to pay any amounts to insiders pursuant to this Motion on account of the U.S. Life Insurance and Disability Programs.

68. Currently, 20 U.S. Employees receive short-term disability benefits and 14 Employees receive long-term disability benefits. The average premium cost of the U.S. Life Insurance and Disability Programs is approximately $100,000 each month, of which approximately $11,000 is paid by Employees and $89,000 is paid by the Debtors. For the avoidance of doubt, all administration costs on account of the U.S. Disability Benefits are included in the monthly premium costs. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the U.S. Disability Benefits is approximately $29,000, all of which is expected to come due during the Interim Period. The Debtors seek authority, but not direction, to pay all prepetition amounts due under the Disability Benefits and to continue the Disability Benefits on a postpetition basis in the ordinary course of business during the wind-down of the Canadian operations.

**C. Canada Life Insurance and Disability Programs.**

**1. Canada Life and AD&D Insurance Programs.**

69. The Debtors provide current Canada-based Employees life and accidental death and dismemberment insurance coverage (the "Canada Basic Life and AD&D Insurance") through Desjardins. The Canada Basic Life and AD&D Insurance provides a maximum coverage of two times the Employee's base salary, up to $250,000 in the event of an Employee's death or dismemberment. Current Canada-based Employees may also purchase supplemental life insurance and supplemental accidental death and dismemberment insurance, administered through Desjardins (collectively with the Canada Basic Life and AD&D Insurance, the "Canada Life and AD&D Insurance"). The total cost of the Canada Life and AD&D Insurance is approximately $6,000 each month, of which approximately $1,200 is paid by Employees and $4,800 is paid by the Debtors. As of the Petition Date, the Debtors estimate that the amount of

accrued but unpaid obligations on account of the Canada Life and AD&D Insurance is approximately $9,000, all of which is expected to come due during the Interim Period.

**2. Canada Disability Benefits.**

70. Canada-based Employees are eligible to enroll in supplemental short-term and long-term disability benefit programs administered by Desjardins (the "Canada Disability Benefits" and, together with the Canada Life and AD&D Insurance, the "Canada Life Insurance and Disability Programs"). Under the Canada Disability Benefits, Canada-based Employees are entitled to, among other things, salary continuation of up to 66.67 percent of their base wages, up to a maximum weekly benefit of $1,250 in the event of a short-term medical disability due to an accident or hospitalization. In the event of a long-term medical disability due to illness or injury, Canada-based Employees are entitled to, among other things, continuation of up to 60 percent of their wages, up to a maximum monthly benefit of $5,000 pursuant to the Canada Disability Benefits.

71. In the 12 months before the Petition Date, the Debtors paid an average of approximately $16,000 per month in premiums with respect to the Canada Disability Benefits. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Canada Disability Benefits is approximately $24,000, all of which is expected to come due during the Interim Period. The Debtors seek authority to pay all prepetition amounts due under the Canada Disability Benefits and to continue the Disability Benefits on a postpetition basis in the ordinary course of business.

**D. Workers' Compensation Program.**

72. The Debtors maintain workers' compensation insurance for their Employees (or are otherwise self-insured) at the statutorily required level for each U.S. state or Canadian province in which the Debtors have Employees (collectively, the "Workers' Compensation Program"). The

Debtors maintain coverage for the Workers' Compensation Program through Safety National Casualty Corporation. The Debtors also continue to process claims under legacy polices through Zurich American Insurance Company, Lumbermens Mutual Casualty Company, in Liquidation, and Safety National Casualty Corporation. Additionally, the Debtors utilize Sedgwick Claims Management Services, Inc., Sheakley UniService, Inc., and Windley Ely to administer the Workers' Compensation Program in the United States and Canada and ensure the Debtors are in compliance with all applicable state and provincial laws (collectively, the "Workers' Compensation Administrators"). The Debtors pay approximately $2,650,000 in premiums, expenses, and fees annually to maintain the Workers' Compensation Program including approximately $800,000 in fees to the Workers' Compensation Administrators. By this Motion, the Debtors seek authority, but not direction, to pay accrued but unpaid prepetition amounts related to the Workers' Compensation Program, continue and maintain the Workers' Compensation Program in the ordinary course of business, and modify the automatic stay to allow Employees to assert claims under the Workers' Compensation Program to the extent applicable. As of the Petition Date, the Debtors believe there are no accrued and unpaid premiums and fees on account of the Workers' Compensation Program.

73. In certain states, including North Dakota, Ohio, Wyoming, and Washington, and in the Canadian provinces in which the Debtors operate (the "Governmental Jurisdictions"), the Debtors are required to make payments into workers' compensation replenishment funds (the "Workers' Compensation Funds") to pay workers' compensation claims as they are adjudicated. The Debtors have historically contributed to the Workers' Compensation Funds on a quarterly, bi-monthly, or annual basis depending on the Governmental Jurisdiction. The Debtors estimate that, as of the Petition Date, $110,000 in accrued but unpaid obligations are owed to the

Governmental Jurisdictions on account of the Workers' Compensation Program, all of which is expected to come due during the Interim Period.

74. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[13] There are currently 343 open claims under the Workers' Compensation Program.[14] As of the Petition Date, the Debtors estimate that the amount of accrued and unpaid claims on account of the Workers' Compensation Program is approximately $24 million, approximately $800,000 of which is expected to come due during the Interim Period.

75. The Workers' Compensation Program is subject to regular audits (the "Workers' Compensation Audits"), which may result in an adjustment of the premiums owed on account thereof. Workers' Compensation Audits for prepetition premium payments will not conclude until after the Petition Date. As a result, the aggregate amount of the Debtors' obligations arising from the Workers' Compensation Audits is not known at this time. Accordingly, the Debtors seek authority, but not direction, to honor any amounts owed on account of any Workers' Compensation Audits in the ordinary course of business.

**E. Retirement Plans.**

76. The Debtors offer certain U.S. and Canada-based Employees the opportunity to participate in the 401(k) Plan, Stock Purchase Plan, Additional Retirement Programs, Retiree

---

13 The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.

14 This figure does not include claims under the Governmental Jurisdictions, as the Debtors do not adjust workers compensation claims in these jurisdictions.

Health Programs, and the Canadian RRSP and DPSP (each as defined herein and together, the "Retirement Plans").

**1. 401(k) Plan.**

77. The Debtors offer eligible United States-based Employees the opportunity to participate in a 401(k) plan (the "401(k) Plan"). The 401(k) Plan is administered by T. Rowe Price Retirement Plan Services, Inc. ("T. Rowe Price") and allows for automatic pre-tax wage deductions and Roth contributions of eligible compensation up to the limits set forth by the Internal Revenue Code. Each Employee's 401(k) contributions are deducted automatically from each paycheck. The Debtors match 50% of an Employee's 401(k) Plan contributions up to an amount equal to an Employee's first eight percent of eligible compensation (the "401(k) Contributions"). Generally, the 401(k) Contributions are made by the Debtors one to two business days following each pay date. In the 12 months before the Petition Date, the Debtors' monthly payments and disbursements on account of 401(k) Contributions averaged approximately $230,000 and the Employee monthly contributions averaged approximately $707,000. As of the Petition Date, the Debtors estimate that the Employees are owed an aggregate of approximately $81,000 on account of 401(k) Contributions, all of which will come due during the Interim Period. Additionally, the Debtors seek authority to honor their commitment to 401(k) Contributions (whether due prepetition or arising postposition) in the ordinary course on a postpetition basis.

78. The Debtors utilize Aon Hewitt Investment Consulting, Inc. ("Aon") for investment consulting services on account of the 401(k) Plan. Aon is paid approximately $185,000 annually on account of its services. The Debtors do not pay T. Rowe Price any fees for administering the 401(k) Plan; however, the Debtors do reimburse certain expenses, which average approximately $50,000 per year. As of the Petition Date, the Debtors estimate that they owe approximately

$3,000 on account of fees associated with the 401(k) Plan, all of which is expected to come due during the Interim Period.

**2. Stock Purchase Program.**

79. The Debtors have historically maintained a program for eligible Employees to purchase equity in the Debtors (the "Stock Purchase Program") through Computershare Trust Company, N.A. ("Computershare"). The Debtors pay Computershare on average approximately $2,300 per month solely for administrating the Stock Purchase Program.

80. The Debtors have currently suspended the Stock Purchase Program; however, the Debtors still utilize Computershare for administration to ensure the Employee accounts are maintained. While the Debtors do not anticipate reinstating the Stock Purchase Program during these chapter 11 cases, the Debtors seek authority, but not direction, to continue utilizing Computershare in order to maintain Employee accounts. As of the Petition Date, the Debtors estimate that they owe approximately $16,000 on account of the Stock Purchase Program, all of which is expected to come due during the Interim Period.

**3. Additional Retirement Programs (Final Order Only).**

81. The Debtors also maintain additional retirement plans for certain current and former Employees. Specifically, the Debtors maintain a supplemental retirement plan, a deferred compensation plan, a supplemental executive retirement plan, and a benefit restoration plan (collectively, the "Additional Retirement Programs"). Approximately 27 former Employees and their families depend on the Additional Retirement Programs. The Debtors pay fees on account of the Additional Retirement Programs to MGC Northwest, LLC for administration, Mullin Barens Sanford Financial & Insurance Services, LLC for benefits consulting, and Wells Fargo Bank, N.A. for trust services (collectively, the "Additional Retirement Programs Fees").

82. On an annual basis the Debtors pay approximately $60,000 in Additional Retirement Programs Fees. As of the Petition Date, the Debtors estimate that they owe approximately $15,000 on account of the Additional Retirement Programs Fees, all of which is expected to come due during the Interim Period.

83. The Debtors seek the authority, but not direction, to continue the Additional Retirement Programs in the ordinary course of business on a postpetition basis. For the avoidance of doubt, no payments under the Additional Retirement Programs will be made to Insiders.

**4. Retiree Health Coverage (Final Order Only).**

84. In addition, the Debtors also offer several retired former Employees and their spouses access to their Health and Welfare and Benefits (the "Retiree Health Coverage"). In the 12 months before the Petition Date, the Debtors' monthly payments on account of the Retiree Health Coverage averaged approximately $18,000 and the retired Employees' monthly contributions averaged approximately $3,500. As of the Petition Date, the Debtors estimate that they owe approximately $28,200 on account of the Retiree Health Coverage, all of which is expected to come due during the Interim Period.

85. Additionally, The Debtors seek authority to continue to pay amounts incurred on account of the Retiree Health Coverage and to continue this program in the ordinary course of business on a postpetition basis.

**5. Canadian RRSP and DPSP.**

86. The Debtors offer eligible Canada-based employees the opportunity to participate in a Registered Retirement Savings Plan and a Deferred Profit Sharing Plan. The Registered Retirement Savings Plan (the "RRSP") generally provides for pre-tax salary deductions of compensation up to limits set up by the Income Tax Act (Canada) and the Deferred Profit Sharing Plan ("DPSP") allows for the Debtors to match contributions certain Employees make to their

RRSP. Each Employee's contributions are deducted automatically from each paycheck. The Debtors match an Employee's RRSP contributions dollar-for-dollar up to an amount equal to an Employee's first one percent of eligible compensation, and 50% of the next four percent of eligible compensation (the "DPSP Contributions"). Generally, the DPSP Contributions are made by the Debtors two business days following each pay date. In the previous 12 months the Debtors contributed on average approximately $12,000 per month on account of DPSP Contribution matching amounts.

87. As of the Petition Date, the Debtors estimate that they owe approximately $12,000 on account of the RRSP and DPSP, all of which is expected to come due during the Interim Period.

**F. Paid and Unpaid Leave.**

88. The Debtors provide paid to Employees leave in the form of Paid Time Off (as defined below), and certain other paid leave (together, the "Paid Leave"). The Debtors also provide Unpaid Leave in certain situations (as defined below).

89. In the ordinary course of business, the Debtors provide paid time off and non-statutory sick pay ("Paid Time Off") to the Employees as a Paid Leave benefit that may be used for any reason. Paid Time Off generally accrues at specified rates up to a maximum amount based on the Employee's level, area of employment, and years of service. Unless provided for by state or provincial law, the Debtors' policy provides for payments on account of accrued and unused Paid Time Off to certain Employees upon separation from the Debtors. Pursuant to the Debtors' policy, upon separation from the Debtors, Employees who have been employed by the Debtors for at least a year will be paid a maximum of ten vacation days. However, hourly store associate Employees and non-supervisor distribution center Employees who have been employed by the Debtors for at least a year will receive all unused Paid Time Off accrued in the last 12 months, and salaried home office Employees do not receive any payout of unused Paid Time

Off. As of the Petition Date, the Debtors estimate that approximately $8.3 million in Paid Time Off has accrued but has not been used by Employees. This amount, however, is not a current cash payment obligation. By this Motion, the Debtors seek authority, but not direction, to pay any "cash out" amounts due with respect to earned but unused Paid Time Off and to continue the Paid Time Off policies in the ordinary course. For the avoidance of doubt, the Debtors do not seek to pay Paid Time Off to any Employee in excess of the $13,650 priority cap imposed by section 507(a)(4) of the Bankruptcy Code pursuant to the Interim Order.

90. In addition, the Debtors provide certain other forms of Paid Leave and Unpaid Leave, including:

- paid holidays throughout the year for certain employees (the "Holidays");
- leave under the Family and Medical Leave Act (the "FMLA") for: (a) birth, adoption, or foster care, (b) family care, (c) medical emergencies, (d) military exigencies, and (e) military caregiving needs; and
- other paid and unpaid leaves of absence for personal reasons, many of which are required by law, including statutory sick leave, workers' compensation leave, missed work time in the ordinary course of business for bereavement leave, jury or court attendance, or time spent voting (the "Other Paid Leave") and unpaid leaves of absence for family medical leaves, military leaves, and other Employee-specific leaves at the Debtors' discretion (the "Unpaid Leave").

These other forms of Paid Leave and Unpaid Leave do not involve incremental cash outlays beyond standard payroll obligations.

91. The Debtors believe that the continuation of the Paid Leave and Unpaid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow obligations beyond the Debtors' regular payroll obligations.

### G. Non-Insider Employee Severance Program (Final Order Only).

92. In the ordinary course of business, the Debtors maintain a severance program for the benefit of certain non-Insider Employees[15] (the "Non-Insider Employee Severance Program").[16] Certain Employees are eligible for severance benefits if such non-executive, non-Insider Employees are terminated due to a work-force adjustment or any not-for-cause employer-initiated termination. Pursuant to the Non-Insider Employee Severance Program, eligible Employees, upon termination, are entitled to receive severance payments in accordance with standard company guidelines (the "Non-Insider Employee Severance Benefits"). These guidelines provide that non-insider Employees accrue Non-Insider Employee Severance Benefits at the end of each full year of employment at rates based on length of service and level of employment. Employees are eligible for levels of Non-Insider Employee Severance Benefits as follows:

- For non-exempt Employees (other than hourly store associates), one week of pay for each year of service, up to a maximum of thirteen weeks of pay. Non-exempt Employees with twenty or more years of service are eligible for Non-Insider Employee Severance Benefits of twenty weeks of pay;
- For exempt Employees, two weeks of pay for each year of service, up to a maximum of twenty weeks of pay. Exempt Employees with twenty or more years of service are eligible for Non-Insider Employee Severance Benefits of twenty-eight weeks of pay;
- For exempt director-level Employees, three weeks of pay for each year of service, up to a maximum of twenty weeks of pay. Exempt director-level Employees with twenty or more years of service are eligible for Non-Insider Employee Severance Benefits of twenty-eight weeks of pay; and

---

[15] Insiders may be afforded severance benefits pursuant to their employment agreements. However, for the avoidance of doubt, the Debtors are not seeking to pay any severance amounts to Insiders pursuant to this Motion.

[16] Prepetition, Employees in Canada were not covered by the Non-Insider Employee Severance Program as a result of the different statutory and common law termination entitlements in the various Canadian provinces. In order to treat all Employees fairly and equitably, with a view toward maintaining Employee morale and loyalty, the Debtors intend to extend the benefits under the Non-Insider Employee Severance Program postpetition to certain eligible Employees in Canada.

- For exempt officer-level Employees, three weeks of pay for each year of service, up to a maximum of thirty-six weeks of pay. Exempt officer-level Employees with twenty or more years of service are eligible for Non-Insider Employee Severance Benefits of forty-two weeks of pay.

93. The Debtors' ability to pay and provide severance amounts and other benefits has been critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to position themselves for long-term success. Further, unanticipated attrition will require the Debtors to expend additional resources and capital in maintaining their operations. As a condition to receiving Non-Insider Employee Severance Benefits as part of the Non-Insider Employee Severance Program, the Debtors typically require that each Employee execute a release agreement, whereby the Employee releases any claims held against the Debtors.[17] The Debtors believe that the Non-Insider Employee Severance Program and the Non-Insider Employee Severance Benefits reduce the time and expense that would be spent defending against the assertion of claims by any severed Employees.

94. As outlined in the First Day Declaration, prior to the filing of these chapter 11 cases, the Debtors took certain initiatives in conjunction with considering strategic alternatives. Utilizing their retail advisors A&G Realty Partners, LLC and Gordon Brothers Retails Partners, LLC, the Debtors made the difficult decision to close many of their under-performing brick and mortar locations. Prior to filing these chapter 11 cases, the Debtors announced the closure of up to 450 stores. The debtors estimate that these actions would result in up to approximately $13.82 million on account of the Non-Insider Employee Severance Benefits. By this Motion, the Debtors seek authority to continue the Non-Insider Employee Severance Program and pay obligations

[17] The Debtors may or may not require releases from Employees in Canada, given the different termination entitlements in the various Canadian provinces.

thereunder on a final basis. For the avoidance of doubt, the Debtors do not seek authority to pay obligations on account of the prepetition Non-Insider Employee Severance Program on an interim basis.

**IV. Postpetition Non-Employee Director Compensation (Final Order Only).**

95. Certain of the Debtors maintain boards of directors that include non-Employee directors (or managers, as applicable) (each, a "Director"). As of the Petition Date, the Debtors' boards of directors include 11 non-Employee Directors on an aggregate basis.

96. Each of the non-Employee Directors except for the Disinterested Directors currently receive a $185,000 annual retainer (the "Annual Retainer"). The Disinterested Directors receive a $300,000 annual retainer (the "Disinterested Director Retainer"). The non-Employee Directors who serve as board committee chairs also receive an annual retainer of $25,000 payable on a monthly basis, except for the chairman of the board who receives $125,000 annually (together, the "Chair Retainers"). Additionally, non-disinterested Directors who serve on the Restructuring Committee receive an annual retainer of $25,000 (the "Restructuring Retainer"). The non-Employee Directors are entitled to expense reimbursement for certain out-of-pocket expenses and the disinterested Directors are entitled to additional per diem compensation for special services (together with the Annual Retainer, Disinterested Director Retainer, Chair Retainers, and Restructuring Retainer the "Director Compensation"). The Director Compensation is payable in equal installments on a monthly basis.

97. As of the Petition Date, the Debtors do not believe they owe any amounts on account of Director Compensation and believe that they are authorized to pay any postpetition Director Compensation in the ordinary course. However, out of an abundance of caution, by this Motion, the Debtors seek authority to continue to pay the Director Compensation on a postpetition

basis in the ordinary course of business and consistent with their prepetition practices on a final basis.

## <u>Basis for Relief</u>

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits Programs.

#### A. Certain Employee Compensation and Benefits Programs Are Entitled to Priority Treatment.

98. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits Programs owed to the Employees to priority treatment, to the extent such payments do not exceed $13,650 for each individual as provided for under sections 507(a)(4) and (5) of the Bankruptcy Code. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). To the extent that an Employee receives more than $13.650 on account of claims entitled to priority, the relief requested herein only affects the timing of certain payments to the Employees, and does not have any materials negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits Programs at this time enhances value for the benefit of all interested parties.

#### B. Payment of Certain Employee Compensation and Benefits Programs Is Required by Law.

99. The Debtors seek authority, but not direction, to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors'

estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Furthermore, federal, state, and provincial laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business. *See In re Dameron*, 155 F.3d 718, 721 (4th Cir. 1998). The Debtors therefore request that the Court recognize that the Withholding Obligations are not property of the Debtors' estates and, regardless of whether the Debtors collected the amounts prior to the Petition Date, authorize the Debtors to transmit such monies to the proper parties in the ordinary course of business.

100. Similarly, state and provincial laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state and provincial laws may prohibit the Debtors from operating in those states and/or provinces. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring. The Debtors therefore request that the Court authorize the Debtors to maintain the Workers' Compensation Program.

## II. Payment of the Employee Compensation and Benefits Programs Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

101. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose" justifies the proposed use of property. *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (requiring a "good business reason" to approve a sale pursuant to section 363(b)); *In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) ("This Court follows the 'sound business purpose' test when examining § 363(b) sales.") (citing *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task."). Thus, if a transaction satisfies the business judgment rule, it should be approved under section 363(b) of the Bankruptcy Code.

102. Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity." 11 U.S.C. § 105(a). The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re*

*United Am., Inc.*, 327 B.R. 776, 781 (Bankr. E.D. Va. 2005) (acknowledging the doctrine of necessity "is a necessary deviation because otherwise there will be no reorganization and no creditor will have an opportunity to recoup any part of its pre-petition claim"); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under [section 105(a)] the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

103. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re*

*Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

104. Payment of the Employee Compensation and Benefits Programs is warranted under this authority and the facts of these chapter 11 cases. Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits Programs. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

105. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits Programs owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits Programs is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

106. Courts in this and other districts have granted similar relief to that requested in this Motion in previous chapter 11 cases. *See, e.g.*, *In re Gemstone Solutions Group, Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. Feb. 21, 2019); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 24, 2017); *In re Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 11, 2017); *In re Penn Virginia Corp.*, No. 16-32395 (KLP) (Bankr. E.D. Va. June 9, 2016); *In re Alpha Nat. Res., Inc.*, No. 15-33896 (KRH) (Bankr. E.D. Va. Aug. 5, 2015).[18] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits Programs in the ordinary course of business and consistent with past practice.

## III. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

107. Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ." 11 U.S.C. § 362(a)(1).

108. Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1). Cause exists here to modify the automatic stay to permit the Employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum. Staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees.

[18] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

**IV. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.**

109. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, anticipated debtor-in-possession financing, and access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits Programs, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

110. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits Programs (as defined below) in the ordinary course of business, (b) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto, as well as granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors'

operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

111. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Waiver of Memorandum of Points and Authorities**

112. The Debtors respectfully request that this Court treat this Motion as a written memorandum of points and authorities or waive any requirement that this Motion be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

**Reservation of Rights**

113. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code, any foreign bankruptcy or insolvency law, or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made

pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **Notice**

114. The Debtors will provide notice of this Motion via first class mail, facsimile or email (where available) to: (a) the United States Trustee for the Eastern District of Virginia, Attn: Kenneth N. Whitehurst III and Shannon F. Pecoraro; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the DIP Agents and their respective counsel thereto; (e) the indenture trustee to the Debtors' industrial revenue bonds; (f) counsel to the ad hoc group of term loan lenders; (g) the lenders under certain Company-owned life insurance policies; (h) the Debtors' Canadian counsel; (i) the United States Attorney's Office for the Eastern District of Virginia; (j) the Internal Revenue Service; (k) the office of the attorneys general for the states in which the Debtors operate; (l) the Securities and Exchange Commission; (m) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

115. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Final Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Richmond, Virginia
Dated: February 17, 2020

*/s/ Jeremy S. Williams*
**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
Email: Michael.Condyles@KutakRock.com
Peter.Barrett@KutakRock.com
Jeremy.Williams@KutakRock.com
Brian.Richardson@KutakRock.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
(*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains
(*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
emily.geier@kirkland.com
annelyse.gains@kirkland.com

-and-

Joshua M. Altman (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: josh.altman@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# Exhibit A

## Proposed Interim Order

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
| Debtors. | ) | (Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"): (i) authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of the Employee

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith. The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Compensation and Benefits Programs in the ordinary course of business and (b) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto, (ii) granting related relief, and (iii) scheduling a final hearing to consider approval of the Motion on a final basis, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on an interim basis as set forth herein.

2. The final hearing (the "Final Hearing") on the Motion shall be held on __________, 2020, at__:__ _.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time on __________, 2020,

and served on the Notice Parties. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3. The Debtors are authorized, but not directed, to: (a) continue and discontinue the Employee Compensation and Benefits Programs in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law; and (b) pay and honor prepetition amounts outstanding under or related to the Employee Compensation and Benefits Programs in the ordinary course of business; *provided*, that pending entry of the Final Order, the Debtors are not authorized to pay any Educational Reimbursements, Charitable Donations, or any amounts due under the Long-Term Incentive Programs, certain of the Retirement Plans,[3] Non-Insider Employee Severance Program, or Director Compensation; *provided further* that pending entry of the Final Order, the Debtors shall not honor any Employee Compensation and Benefits Programs obligations that have not come due or exceed the priority amounts set forth in sections 507(a)(4) or 507(a)(5) of the Bankruptcy Code.

4. Notwithstanding anything to the contrary herein, pending entry of the Final Order, the Debtors are authorized, but not directed, in their sole discretion, to pay, remit, or reimburse, as applicable, the following prepetition amounts that become due and owing prior to entry of the final order on the Motion:

| **Employee-Related Obligations** | **Interim Amount** |
|---|---|
| Employee Compensation | $9,600,000 |
| Independent Contractor and Temporary Staff Compensation | $347,000 |
| Payroll Processing Fees | $0 |
| Withholding Obligations | $3,800,000 |
| Reimbursable Expenses | $187,100 |
| Charitable Donations | N/A |

[3] For the avoidance of doubt, the Debtors are not authorized to pay any amounts due under the Retirement Plans marked as “Final Order Only” in the Motion.

| Employee-Related Obligations | Interim Amount |
|---|---|
| Relocation Expenses | $0 |
| Employee Discount | $0 |
| Non-Insider Employee Incentive Programs | $0 |
| U.S. Health Programs | $2,220,220 |
| Canada Health Programs | $50,000 |
| U.S. Life Insurance and Disability Programs | $51,000 |
| Canada Life Insurance and Disability Programs | $33,000 |
| Workers' Compensation Programs | $910,000 |
| Retirement Plans | $112,000 |
| Paid and Unpaid Leave | $0 |
| Non-Insider Employee Severance Program | N/A |
| Postpetition Non-Employee Director Compensation | N/A |

5. Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

6. Nothing contained herein is intended or should be construed to create an administrative priority claim on account of any obligations owed under any Employee Compensation and Benefits Program.

7. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim

Order, without any duty of further inquiry and without liability for following the Debtors' instructions.

8. Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code, any foreign bankruptcy or insolvency law, or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission to the validity, priority, enforceability, or perfection of any lien on, security interest in, or encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law. Any payment made pursuant to this Interim Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

9. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

10. Notwithstanding anything to the contrary in this Interim Order, any payment made or action taken by any of the Debtors pursuant to the authority granted in this Interim Order must be in compliance with, and shall be subject to: (i) any interim or final order approving the Debtors'

use of cash collateral and/or any postpetition financing facility (in either case, the "DIP Order"), (ii) the documentation in respect of any such postpetition financing facility and/or use of cash collateral, and (iii) the budget governing any such postpetition financing and/or use of cash collateral.

11. To the extent there is any inconsistency between the terms of the DIP Order and this Interim Order, the terms of the DIP Order shall control.

12. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

13. The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

14. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

15. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

16. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order.

17. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

Dated: ___________, 2020
Richmond, Virginia

_________________________________________
United States Bankruptcy Judge

WE ASK FOR THIS:

/s/ *Jeremy S. Williams*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

- and -

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

Joshua M. Altman (*pro hac vice* admission pending)
300 North LaSalle Street
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT**
**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ *Jeremy S. Williams*

**Exhibit B**

**Proposed Final Order**

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
| Debtors. | ) | (Joint Administration Requested) |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"): (i) authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of the Employee

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith. The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Compensation and Benefits Programs in the ordinary course of business and (b) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto and (ii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth herein.

2. The Debtors are authorized, but not directed, to: (a) continue and discontinue the Employee Compensation and Benefits Programs in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law; and (b) pay and honor prepetition amounts outstanding under or related to the Employee Compensation and Benefits Programs in the ordinary course of business.

3. Notwithstanding anything to the contrary herein, the Debtors are authorized, but not directed, in their sole discretion, to pay, remit, or reimburse, as applicable, not more than the following prepetition amounts:

| Employee-Related Obligations | Final Amount |
|---|---|
| Employee Compensation | $9,600,000 |
| Independent Contractor and Temporary Staff Compensation | $347,000 |
| Payroll Processing Fees | $0 |
| Withholding Obligations | $3,800,000 |
| Reimbursable Expenses | $187,100 |
| Charitable Donations | $0 |
| Relocation Expenses | $30,000 |
| Employee Discount | $0 |
| Non-Insider Employee Incentive Programs | $0 |
| U.S. Health Programs | $4,820,220 |
| Canada Health Programs | $50,000 |
| U.S. Life Insurance and Disability Programs | $51,000 |
| Canada Life Insurance and Disability Programs | $33,000 |
| Workers' Compensation Programs | $24,110,000[3] |
| Retirement Plans | $155,200 |
| Paid and Unpaid Leave | $8,300,000[4] |
| Non-Insider Employee Severance Program | $0 |
| Postpetition Non-Employee Director Compensation | $0 |

4. Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

---

3 This amount includes all prepetition claims on account of the Workers' Compensation Programs, the overwhelming majority of which will not come due during these chapter 11 cases.

4 For the avoidance of doubt, the Paid and Unpaid Leave is not a current cash payment obligation.

5. Nothing herein shall be deemed to authorize the payment of any amounts which violates or implicates section 503(c) of the Bankruptcy Code; *provided*, that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

6. Nothing contained herein is intended or should be construed to create an administrative priority claim on account of any obligations owed under any Employee Compensation and Benefits Program.

7. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

8. Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code, any foreign bankruptcy or insolvency law, or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission to the validity, priority, enforceability, or perfection of any lien on, security interest in, or encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or

causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law. Any payment made pursuant to this Final Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

9. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

10. Notwithstanding anything to the contrary in this Final Order, any payment made or action taken by any of the Debtors pursuant to the authority granted in this Final Order must be in compliance with, and shall be subject to: (i) any interim or final order approving the Debtors' use of cash collateral and/or any postpetition financing facility (in either case, the "DIP Order"), (ii) the documentation in respect of any such postpetition financing facility and/or use of cash collateral, and (iii) the budget governing any such postpetition financing and/or use of cash collateral.

11. To the extent there is any inconsistency between the terms of the DIP Order and this Final Order, the terms of the DIP Order shall control.

12. The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

13. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

14. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

15. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order.

16. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

Dated: ___________, 2020
Richmond, Virginia

________________________________________
United States Bankruptcy Judge

WE ASK FOR THIS:

/s/ *Jeremy S. Williams*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

- and -

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

Joshua M. Altman (*pro hac vice* admission pending)
300 North LaSalle Street
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT**
**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ *Jeremy S. Williams*