Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:     (804) 644-1700
Facsimile:     (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## (I) ESTABLISHING BIDDING PROCEDURES, (II) SCHEDULING
## BID DEADLINES AND AN AUCTION, (III) APPROVING THE FORM
## AND MANNER OF NOTICE THEREOF, (IV) APPROVING THE FORM OF
## ASSET PURCHASE AGREEMENT, (V) AUTHORIZING THE ASSUMPTION
## OF THE PLAN SUPPORT AGREEMENT, AND (VI) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully state as follows in support of this motion (this "Motion"):[3]

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

[2]   A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Robert J. Riesbeck, Chief Executive Officer of Pier 1 Imports, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the

**Relief Requested**

1.      The Debtors respectfully seek entry of an order, substantially in the form attached

hereto as **Exhibit A** (the "Order"):

    a.    ***Bidding Procedures.*** Approving the proposed auction and bid
procedures, attached to the Order as Exhibit 1
(the "Bidding Procedures"), including the form asset purchase
agreement attached to the Bidding Procedures as Exhibit 1
(the "Form Purchase Agreement"), by which the Debtors will solicit
and select the highest or otherwise best offer(s) for the sale, or sales,
(the "Sales") of all, substantially all, or any portion of the Debtors'
assets (the "Assets");

    b.    ***Indication of Interest Deadline.*** Establishing the deadline by which
all Potential Bidders must provide the Debtors and their advisors
with a non-binding indication of interest (i) identifying whether the
party is interested in acquiring some or all of the Assets (and which
Assets with reasonable specificity) and (ii) setting forth a proposed
purchase price, including identifying separately any cash and non-
cash components of the proposed consideration (the "Indications of
Interest Deadline");

    c.    ***Bid Deadline.*** Establishing the deadline by which all bids must be
actually received pursuant to the Bidding Procedures
(the "Bid Deadline") and the date and time by which the Debtors
shall notify the bidders whether their bids are Qualified Bids
(as defined in the Bidding Procedures) (the "Notice of Qualified
Bidder Deadline");

---

United States Code (the "Bankruptcy Code"). Capitalized terms used but not otherwise defined in this Motion
shall have the meanings ascribed to them in the First Day Declaration, the Bidding Procedures, the Plan Support
Agreement, or as later defined herein, as applicable.

[3]    The Debtors also submit the *Declaration of Durc Savini in Support of the Debtors' Motion for Entry of an Order
(I) Establishing Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form
and Manner of Notice Thereof, (IV) Approving the Asset Purchase Agreement, (V) Authorizing the Assumption of
the Plan Support Agreement, and (VI) Granting Related Relief* (the "Savini Declaration"), the *Declaration of
Elise S. Frejka, CIPP/US in Support of the Debtors' Motion for Entry of an Order (I) Establishing Bidding
Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice
Thereof, (IV) Approving the Asset Purchase Agreement, (V) Authorizing the Assumption of the Plan Support
Agreement, and (VI) Granting Related Relief* (the "Frejka Declaration"), and the *Declaration of Robert J.
Riesbeck, Chief Executive Officer of Pier 1 Imports, Inc, in Support of the Debtors' Motion for Entry of an Order
(I) Establishing Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form
and Manner of Notice Thereof, (IV) Approving the Asset Purchase Agreement, (V) Authorizing the Assumption of
the Plan Support Agreement, and (VI) Granting Related Relief* (the "PSA Declaration"), filed contemporaneously
herewith in further support of the relief requested herein.

d.  ***Auction.***  Scheduling an auction or auctions to sell the Assets detailed in the Bidding Procedures (the "Auction");

e.  ***Auction Notice.***  Approving the form and manner of notice of the Auction attached to the Order as Exhibit 2 (the "Auction Notice");

f.  ***Notice of Successful Bidder.***  Approving the form and manner of notice of the Successful Bidder (as defined in the Bidding Procedures) at the Auction attached to the Order as Exhibit 3 (the "Notice of Successful Bidder");

g.  ***Plan Support Agreement.***  Authorizing the Debtors to assume that certain plan support agreement, dated as of February 16, 2020, a copy of which is attached to the Order as Exhibit 4 (together with all exhibits and schedules attached thereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Plan Support Agreement"); and

h.  granting related relief.

2.  In connection with the foregoing and subject to this Court's availability, the Debtors respectfully request that the Court approve the following schedule of proposed dates to govern the sale of the Assets (the "Sale Dates and Deadlines"):

| Event | Date |
|---|---|
| Indication of Interest Deadline | **Friday, February 28, 2020, at 5:00 p.m. (prevailing Eastern time)** |
| Bid Deadline | **Monday, March 23, 2020, at 5:00 p.m. (prevailing Eastern time)** |
| Notice of Qualified Bidder Deadline | **No later than 11:59 p.m. (prevailing Eastern time) on the date that is four (4) business days following the Bid Deadline** |
| Auction | **Tuesday, March 31, 2020, at [●]:00 a/p.m. (prevailing Eastern time),** or as may be adjourned to such later date by the Debtors |
| Notice of Successful Bidder | **As soon as reasonably practicable after the conclusion of the Auction** |

| | |
|---|---|
| Sale/Confirmation Hearing | **Thursday, April 23, 2020, at [●]:00 a/p.m.[4] (prevailing Eastern time)**, or such other date and time that the Court may later direct and as agreed upon by the Debtors |

## Jurisdiction and Venue

3.      The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, and rules 6004-1, 9013-1, and 9022-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

## Background

6.      The Debtors commenced these chapter 11 cases to facilitate a timely and efficient process that will maximize the value of the Debtors' estates for the benefit of all stakeholders.  As set forth in the First Day Declaration filed on the first day of these cases, the Debtors have the

---

[4]    This hearing will be subject to the Debtors' Plan solicitation process.  In accordance with the Milestones (as defined herein) set forth in the Plan Support Agreement, no later than Monday, February 24, 2020, the Debtors intend to file a Plan, disclosure statement, and motion to approve the disclosure statement and establish dates and deadlines concerning confirmation of the Plan.

support of the Consenting Term Lenders to simultaneously pursue a sale of any portion, all, or substantially all of the Debtors' Assets or any portion thereof, either as a going-concern or as a liquidation (whichever is most value maximizing to the estate) to third-party buyers while maintaining a commitment with the Consenting Term Lenders to potentially toggle to a standalone going-concern reorganization.   Ultimately, recovery to the Consenting Term Lenders under the Plan will be either the proceeds of any Sales or other disposition of the Debtors' Assets, and/or equity in a reorganized Pier 1.

7.      On February 16, 2020, holders of approximately 63.8 percent of the principal amount of the Term Loan Claims (the "Consenting Term Lenders") executed the Plan Support Agreement memorializing these terms.  Significantly, the Consenting Term Lenders are supportive of the Debtors' sale process and its formulation to maximize value.  Pursuant to the Plan Support Agreement, the Consenting Term Lenders and Debtors will negotiate and the Debtors will file a chapter 11 plan by Monday, February 24, 2020, which Plan will be reasonably acceptable in form and substance to the Required Consenting Term Lenders.  The Bidding Procedures provide, and the plan will provide, substantial flexibility with respect to the structure of any transaction, which provides the Debtors the latitude necessary to negotiate the precise terms of any deal to maximize the value of the Debtors' estates for all stakeholders in any scenario.

8.      The proposed Bidding Procedures are part-and-parcel of a robust marketing process that the Debtors have been pursuing since December 2019 to maximize the value of the Assets being sold.  The Debtors engaged Guggenheim Securities, LLC ("Guggenheim Securities") in August 2019 to serve as investment banker to explore various strategic alternatives, including the sale of all or substantially all of the Debtors' Assets.  Significantly, as discussed below, the Debtors have been engaging prospective purchasers and marketing their Assets for several weeks and the

proposed Indication of Interest Deadline is on Friday, February 28, 2020. The Debtors file this

Motion seeking approval of Bidding Procedures to continue these efforts already commenced.

9.      The Debtors believe that the proposed Bidding Procedures, including the related

timeline and Auction, will allow the Debtors to maximize value for their stakeholders by

capitalizing on the value of the Debtors' well-established brand and its optimized store footprint,

as more fully described in the First Day Declaration. The Debtors will consider all viable options

before determining if selling Assets will, in their business judgment, maximize value for the estate.

Indeed, not making every effort to obtain the highest and best offer for the Debtors' Assets would

abdicate the Debtors' responsibility to maximize value for all stakeholders.

10.     Moreover, the compromises and settlements embodied in the Plan Support

Agreement, to be implemented pursuant to the Plan, preserve value by enabling the Debtors to

avoid protracted, value-destructive litigation that would delay their emergence from chapter 11.

Instead of litigating with the Consenting Term Lenders over the sale and potential recoveries, the

Consenting Term Lenders have agreed to become parties to the Plan Support Agreement and

support the Debtors' sale efforts and Plan—each of which provides significant value to the Debtors

and their estates.

11.     To capture the full benefit of the compromises embodied in the Plan Support

Agreement, however, the Debtors must move efficiently through chapter 11. The Consenting

Term Lenders' various commitments are contingent upon the Debtors executing the Plan Support

Agreement's initiatives in accordance with certain milestones (the "Milestones"), including

conducting the Auction no later than Tuesday, March 31, 2020 prior to plan confirmation and

seeking approval of any Sale in conjunction with confirmation. Failure to adhere to the milestones

would have severe consequences and threaten the Debtors' ability to continue along the best path

for the Debtors and maximize the value of their estates. In light of the Consenting Term Lenders'

various concessions and their commitment to support the Debtors' Plan, including the proposed Sale(s), the Milestones are reasonable and the Debtors are prepared to implement these chapter 11 cases on that timeline.

12.     Preserving value for the benefit of the Debtors' estates depends in large part on the Debtors proceeding swiftly to confirmation of the Plan and minimizing the effects of the Debtors' chapter 11 cases on the value of the Debtors' "brand"—a critical component of the value of the Debtors' businesses.  After a thorough, comparative analysis of their alternatives, the Debtors concluded that the consensual path contemplated by the Plan Support Agreement maximizes value for all stakeholders.  Accordingly, assumption of the Plan Support Agreement is a reasonable exercise of the Debtors' business judgment.

13.     Further, the Bidding Procedures, incorporated into the Plan Support Agreement and attached as Exhibit 1 to the Order, are designed to—and the Debtors believe the Bidding Procedures will—maximize the likelihood of generating value for the benefit of enterprise-wide stakeholders as expeditiously as possible.  Given the nature of the market and the Debtors' advisors' experience conducting auctions similar to the Auction contemplated herein, the Debtors are confident that they have contacted a substantial number of the most likely interested bidders and will continue to make every effort to generate a competitive bidding process.  Based on the nature of the Assets being sold, the nature of general communications between potential bidders, and general public awareness and media coverage of these chapter 11 cases and the store closings, the Debtors believe that the marketing process will result in a competitive, value-maximizing Auction that will inure to the benefit of all stakeholders and maximize the value of the Debtors' estates.

### The Marketing Process

14.    Throughout the months leading up to the commencement of these chapter 11 cases, the Debtors have worked with Guggenheim Securities and the Debtors' other advisors to explore and develop various strategic alternatives to maximize the value of the Debtors' assets, including a potential conversion of the existing Term Loan Lenders' debt to equity and the potential sale of the Debtors' assets.  To ensure that these chapter 11 cases proceed as expeditiously as possible, the Debtors have dual-tracked these potential alternatives, and will implement the best path for the benefit of all stakeholders.  Indeed, the Debtors, with the assistance of Guggenheim Securities, have already contacted numerous potential bidders and intend to continue this process during these chapter 11 cases.

15.    Specifically, beginning in December 2019, the Debtors, with the assistance of Guggenheim Securities, contacted approximately 22 strategic buyers and investors. These strategic buyers and investors were selected based on their business model, historical acquisition activity and financial capabilities, among other factors.  Also, approximately 69 financial buyers and investors were contacted.  These financial buyers and investors were selected based on their historical interest in retail, consumer and branding opportunities, existing and past investment and financial capabilities and other factors.  Finally, approximately four brand/inventory buyers, who were selected based on their historical interest in individual retail assets, were also contacted. Thus, in total, approximately 95 strategic, financial and brand/inventory buyers were contacted and received introductory materials and non-disclosure agreements ("NDAs"), of which 35 parties have executed or are in the process of executing NDAs and 25 parties have received a Confidential Information Memorandum and other information containing business and brand overviews, product positioning, management team information, channel overviews, customer demographics, strategic plans, growth opportunities, and historical and projected financial information.

16.     The Proposed Indication of Interest Deadline is on Friday, February 28, 2020.

### Approval of the Bidding Procedures

17.     To efficiently solicit, receive, and evaluate bids in a fair and accessible manner, the

Debtors have developed and proposed the Bidding Procedures to govern the Sales.  The Bidding

Procedures are designed to encourage all entities to put their best bids forward and to maximize

the value of the Debtors' estates.  The key provisions of the Bidding Procedures are summarized

below:[5]

(a)     **Qualified Bidders**:  Only Qualified Bidders are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures.  Bidding Procedures § VII(A)(2).  A Qualified Bid is any proposal, solicitation, or offer to purchase any portion, all, or substantially all of the Debtors' Assets or a portion thereof (each, a "Bid") and will be considered a Qualified Bid only if the Bid is submitted in writing by an Acceptable Bidder, by the Bid Deadline, and is deemed to comply with all of the requirements set forth in the Bidding Procedures (including, but not limited to, the requirements set forth below) in the Debtors' business judgment.  Bidding Procedures § V(A).

(b)     **Assets**:  A Bid must clearly identify the following:  (a) the Assets, or the portion thereof, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the Acceptable Bidder intends to operate the Debtors' business as a going concern, or to liquidate the business.  Bidding Procedures § V(A)(1).

(c)     **Purchase Price**:  The Bid must (a) clearly set forth the purchase price to be paid (the "Purchase Price"), (b) identify separately the cash and non-cash components of the Purchase Price, (c) use commercially reasonable efforts to indicate the allocation of the Purchase Price between ABL Priority Collateral and Term Priority Collateral (each as defined in the Intercreditor Agreement), and (d) with respect to the Purchase Price attributable to the sale of the ABL Priority Collateral, include a cash component in an amount sufficient to pay in full in cash all outstanding obligations owed by the Debtors under the DIP Documents (as defined in the DIP Orders) and all obligations under the Prepetition ABL Documents (as defined in the DIP Order), to the extent that any Prepetition ABL Obligations (as defined in the DIP Order) are still outstanding.  Bidding Procedures § V(A)(2).

---

[5]     This summary is qualified in its entirety by the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

(d)    **Committed Financing**:  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtors (upon consultation with the Consenting Term Lenders) that demonstrates that the Acceptable Bidder has received sufficient unconditional debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid, including providing adequate assurance of future performance under all contracts proposed to be Assumed Contracts by such Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with their advisors, and upon consultation with the Consenting Term Lenders and the DIP Agents.  Bidding Procedures § V(A)(6).

(e)    **Deposit**:  A Bid must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the aggregate proposed purchase price. Bidding Procedures § V(A)(3).

(f)    **Markup of Purchase Agreement**:  A Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents"), including but not limited to (a) a clearly marked version of the form purchase agreement attached to the Bidding Procedures as Exhibit 1 showing all changes requested by the Acceptable Bidder and (b) a schedule of Assumed Contracts to the extent applicable to the Bid. Bidding Procedures § V(A)(4).

(g)    **Authorization**:  The Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors with respect to the submission, execution, and delivery of its Bid, participation in the Auction, and closing of the proposed transaction(s) contemplated in such Bid.  The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder.  Bidding Procedures § V(A)(12).

(h)    **Due Diligence**:  Any Acceptable Bidder may request diligence from the Debtors, and the Debtors may grant or deny any such request that they deem to be unreasonable.  The Debtors may require such Acceptable Bidder to execute a non-disclosure agreement prior to providing diligence to such Qualified Bidder. Bidding Procedures § IV(A), (B).

(i)    **No Contingencies**:  The offer must not contain any contingencies as to the validity, effectiveness, and/or binding nature of the bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance, conditions, or prospects) and all diligence must be completed before the Bid Deadline.  Bidding Procedures § V(A)(7).

(j)    **Irrevocability**:    **ALL BIDS SHALL BE DEEMED IRREVOCABLE, NOTWITHSTANDING ANY CONDITIONS LISTED IN THE APPLICABLE AGREEMENT.  IN THE EVENT THAT AN ACCEPTABLE BIDDER SEEKS TO REVOKE SUCH BID, THE DEBTORS SHALL BE ENTITLED TO KEEP SUCH BIDDER'S DEPOSIT AND PURSUE ALL OTHER CONTRACTUAL REMEDIES UNDER LAW OR EQUITY.**  Bidding Procedures § V(A)(9).

(k)    **As-Is, Where-Is**:    The Bid must include the following representations and warranties (or the Acceptable Bidder otherwise agrees that such representations and warranties may be incorporated into the applicable Bid Documents should the Bid be selected as the Successful Bid) that upon closing the Debtors shall sell and transfer the Assets to the Successful Bidder and the Successful Bidder shall accept the Assets "AS IS, WHERE IS, WITH ALL FAULTS."  Bidding Procedures § V(A)(11).

(l)    **Initial Overbid**:    Qualified Bidders may submit successive Bids higher than the previous Bid, based on and increased from the Baseline Bid for the relevant Assets (each such Bid, an "Overbid").  Any Qualified Bidder's initial Overbid and each subsequent Overbid shall be at least a 2% increase in cash, cash equivalents, or such other consideration that the Debtors deem equivalent, over the previous price (a "Minimum Overbid").  Bidding Procedures § IX(B)(2).

(m)    **Overbid Alterations**:    An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.  Bidding Procedures § IX(B)(4).

(n)    **Backup Bidder**:    The Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.  The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors, at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder  If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  Bidding Procedures § IX(E).

(o)    **Stalking Horse and Bid Protections**:    Upon entry of the Order, at any time until two (2) business days prior to the Auction, the Debtors shall be authorized, but not obligated, in an exercise of their business judgment and upon consultation with the Consenting Term Lenders and the DIP Agents to (a) select one or more Acceptable Bidders to act as a stalking horse bidder (the "Stalking Horse Bidder") in connection with the Auction and (b) in connection with any staking horse

agreement with a stalking horse bidder, provide Bid Protections.[6]  Any such stalking horse Bid Protections are authorized pursuant to the Order.  Bidding Procedures § VIII.

(p)    **Fiduciary Out**:  Nothing in these Bidding Procedures shall require the Debtors' (or any other debtors') management or board of directors to take any action or to refrain from taking any action with respect to these Bidding Procedures when the Debtors' management or board of directors (or other debtors' management or board of directors) determine, based on the advice of their counsel, that taking such action or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary obligations under applicable law.  Bidding Procedures § XVII.

18.    Most importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize value for the benefit of their estates, and, as such, do not impair the Debtors' ability to consider all potential bids, and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

### Summary of the Auction Notice Procedures[7]

19.    The Debtors propose the following notice procedures to be implemented in connection with the Sale process.

### A.    Auction Notice.

20.    Within three (3) business days of the entry of the Order, or as soon thereafter as practicable, the Debtors shall cause the Auction Notice to be served upon the Notice Parties (as defined herein).  The Auction Notice will indicate that copies of this Motion and any future sale

---

[6]    Prior to giving Bid Protections to Stalking Horse Bidder, the Debtors shall consult with the Office of the United States Trustee for the Eastern District of Virginia, as well as counsel for an official committee of unsecured creditors should one be appointed in these chapter 11 cases, one (1) day prior to providing Bid Protections pursuant to this Order.

[7]    Approval of the Sale of the Debtors' Assets to the Successful Bidder(s), and any objections thereto, will be heard in connection with of confirmation of the Debtors' Plan, for which the Debtors will seek approval of notice in the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures With Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices In Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief.*

documents, if applicable, can be obtained on the website of the Debtors' claims and noticing agent, Epiq Corporate Restructuring, LLC ("Epiq"), http://dm.epiq11.com/pier1 (the "Case Website").

21.     Similarly, within three (3) business days after entry of the Order, or as soon as practicable thereafter, the Debtors will place a publication version of the Auction Notice for one day in *The New York Times (National Edition)* and *USA Today (National Edition)* and post it onto the Case Website.

22.     The Auction Notice will include, among other things, the proposed date, time, and place of the Auction and the deadline for filing any objections to the relief requested in this motion, and, will therefore, comply with Bankruptcy Rule 2002(c).  The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Assets.

23.     The Debtors request that such notice be deemed sufficient and proper notice of the Sales with respect to known interested parties.

**B.**     **Sale and Auction Dates and Deadlines.**

24.     The Bidding Procedures contemplate the following Sale Dates and Deadlines:

| Event | Date |
|---|---|
| Indication of Interest Deadline | **Friday, February 28, 2020, at 5:00 p.m. (prevailing Eastern Time)** |
| Bid Deadline | **Monday, March 23, 2020, at 5:00 p.m. (prevailing Eastern Time)** |
| Notice of Qualified Bidder Deadline | **No later than 11:59 p.m. (prevailing Eastern time) on the date that is four (4) business days following the Bid Deadline** |
| Auction | **Tuesday, March 31, 2020, at [●]:00 a/p.m. (prevailing Eastern Time),** or as may be adjourned to such later date by the Debtors |

| Notice of Successful Bidder | **As soon as reasonably practicable after the conclusion of the Auction** |
|---|---|
| Sale/Confirmation Hearing | **Thursday, April 23, 2020, at [●]:00 a/p.m. (prevailing Eastern Time)**, or such other date and time that the Court may later direct and as agreed upon by the Debtors |

25.     The Sale/Confirmation Hearing shall be an evidentiary hearing on matters relating to the Sales and confirmation of a chapter 11 plan, and there will be no further bidding at the Sale/Confirmation Hearing.    In the event that the Successful Bidder cannot or refuses to consummate the Sales, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Court.

**C.      Notice of Successful Bidder.**

26.     As soon as reasonably practicable after the conclusion of the Auction, the Debtors will file on the docket, but not serve, a notice identifying the Successful Bidder(s) (the "Notice of Successful Bidder"), identifying the applicable Successful Bidder(s), Asset(s), and key terms of the agreement, substantially in the form attached to the Order as Exhibit 3.

**Assumption of the Plan Support Agreement**

27.     The Plan Support Agreement is the Debtors' roadmap to facilitate a timely and efficient process that will maximize the value of the Debtors' estates for the benefit of all stakeholders.  The Plan Support Agreement also contains provisions that are integral to the bidding and auction process, including the Reserve Price and Lender Election (each, as described below).

**A.      Key Provisions of the Plan Support Agreement.**

28.     The Plan Support Agreement contains the Milestones which tee up an approximately 2 month timeline to confirmation, thereby minimizing administrative expenses and

14

maximizing recoveries for the Debtors' stakeholders.  Accordingly, assumption of the Plan

Support Agreement will provide important structure and stability to the chapter 11 process and

establish a framework for the Debtors to negotiate and consummate the Plan with their key

constituencies.  The Milestones provide that the Debtors shall implement the Restructuring

Transactions on the following timeline:[8]

(a)     no later than 11:59 p.m. (prevailing Eastern time) on February 17, 2020, the
        Company Parties shall have commenced the Chapter 11 Cases in the Bankruptcy
        Court and shall have filed a motion for approval of the Bidding Procedures and
        assumption of this Agreement, consistent in all respects with this Agreement;

(b)     no later than 11:59 p.m. (prevailing Eastern time) on February 18, 2020, the Debtors
        will have sought first day relief and the Bankruptcy Court shall have entered an
        order (i) providing interim approval of the applicable DIP Documents,
        (ii) approving the Bidding Procedure and (iii) approving assumption of this
        Agreement;

(c)     as soon as reasonably practicable, but in no event later than seven (7) days after the
        Petition Date, the Company Parties shall have filed the Plan, the Disclosure
        Statement, and the Disclosure Statement Motion, each in form and substance
        reasonably acceptable to the Required Consenting Term Lenders;

(d)     as soon as reasonably practicable, but in no event later than March 13, 2020, the
        Bankruptcy Court shall have entered the final order approving the applicable DIP
        Documents;

(e)     as soon as reasonably practicable, but in no event later than three (3) Business Days
        prior to the first scheduled hearing on the Disclosure Statement Motion, the
        Company Parties and the Required Consenting Term Lenders shall agree to the
        Administrative Claims Cap;

(f)     as soon as reasonably practicable, but in no event later than March 20, 2020, the
        Bankruptcy Court shall have entered the Disclosure Statement Order;

(g)     the Bid Deadline in the Bidding Procedures shall be no later than 5:00 p.m.
        (prevailing Eastern time) on March 23, 2020;

(h)     in the event that the Company Parties do not receive a Qualified Bid greater than
        or equal in value to the Reserve Price, then no later than 11:59 p.m. (prevailing
        Eastern time) on the date that is four (4) Business Days following the Bid Deadline,

---

[8]     For the avoidance of doubt, nothing in these Milestones shall prevent the Debtors from exercising their respective
        fiduciary duties under applicable law.

the Consenting Term Lenders shall notify the Company Parties (via electronic mail through applicable counsel) of their Lender Election;

(i)     if applicable, as soon as reasonably practicable, but in no event later than March 31, 2020, the Auction shall have occurred;

(j)     as soon as reasonably practicable, but in no event later than five (5) Business Days following selection of a Successful Bidder, the Company Parties and the Required Consenting Term Lenders shall agree to a Wind-Down Budget reasonably acceptable to the Required Consenting Term Lenders;

(k)     as soon as reasonably practicable, but in no event later than April 23, 2020, the Bankruptcy Court shall have entered the Confirmation Order;  and

(l)     as soon as reasonably practicable, but in no event later than May 30, 2020, the Plan Effective Date shall have occurred.[9]

Failure to meet a Milestone, subject to a cure period, results in a termination right for either the Debtors or the Consenting Term Lenders, as applicable.[10]  The Debtors may extend a Milestone with the prior written consent of the Required Consenting Term Lenders.  The Plan Support Agreement sets forth additional events that may trigger termination of the Plan Support Agreement.  Such termination events generally mandate that the Debtors comply with the terms of the Plan Support Agreement, diligently pursue confirmation and consummation of the Plan and the documentation necessary to consummate the transactions contemplated by the Plan Support Agreement using commercially reasonable efforts, and that the Debtors' chapter 11 cases are not converted or dismissed.[11]

29.     Importantly, the Consenting Term Lenders support confirmation of a chapter 11 process that includes an Auction and potential sale of some, all, or substantially all of the Debtors'

---

[9]     Plan Support Agreement § 4.

[10]    For the avoidance of doubt, no Party may terminate the Plan Support Agreement on account of failure to satisfy a Milestone to the extent that such failure is caused by or resulting from such Party's own action (or failure to act). Plan Support Agreement §§ 13.01(c), 13.02(b).

[11]    Plan Support Agreement § 13.01–02.

assets and provides for the possibility of an Equitization Restructuring[12] by the Consenting Term Lenders under certain conditions.[13]  The Consenting Term Lenders have agreed to a "Reserve Price" for the auction.  This means that should the Debtors receive a Qualified Bid greater than or equal to the Reserve Price,[14] the Consenting Term Lenders will automatically consent to and support the sale of the Debtors' Assets (including a release and discharge of liens, encumbrances, and interests, subject to receipt of proceeds).[15]  If no Qualified Bid exceeds the Reserve Price, then the Consenting Term Lenders will inform the Debtors as to whether they wish to either: (a) pursue an Equitization Restructuring pursuant to the Plan; or (b) proceed with an auction at which the Consenting Term Lenders may only credit bid up to the Reserve Price.[16]  If the Lenders are the Successful Bidder, they will inform the Debtors whether they wish to equitize their term loan debt claims or direct an orderly wind-down of the Debtors' chapter 11 estates, in either case pursuant to the Plan.[17]

30.    Additionally, pursuant to the Plan Support Agreement, the Debtors have agreed to reimburse all reasonable and documented fees incurred after the Petition Date for Brown Rudnick LLP as primary counsel, one local counsel, and FTI Consulting as financial advisor for all Consenting Term Lenders, in addition to the fees and expenses of the Term Loan Agent, as provided for in the Term Loan Credit Agreement (collectively, the "Professional Fees").  By

---

[12] "Equitization Restructuring" means any Transaction whereby the New Pier 1 Interests are distributed to holders of existing Term Loan Claims pursuant to the Plan.  Plan Support Agreement § 1.01.

[13] Plan Support Agreement §§ XXX, 5.02(a), (e).

[14] "Reserve Price" means the value, taking into account the Claims Estimation, at which the Term Loan Lenders would receive a cash recovery of $104.7 million2 (*i.e.* 55 cents on the dollar) on account of the Term Loan Claims.  Plan Support Agreement § 1.01.

[15] Plan Support Agreement § 5.02(e)(i).

[16] Plan Support Agreement §§ 1.01 "Lender Election" 5.02(e)(ii)–(iv).

[17] Plan Support Agreement § 5.02(e)(iii).

securing the support and cooperation of the Consenting Term Lenders, the Debtors have significantly reduced the potential cost and duration of their chapter 11 cases.  Payment of the Professional Fees pursuant to the Plan Support Agreement was a negotiated component of the agreements and a material inducement for the Consenting Term Lenders' various concessions and commitments thereunder.  Accordingly, the payment of the Professional Fees is reasonable and appropriate under the circumstances.

### B.    Board Consideration

31.    The Board of Directors (the "Board") has been kept apprised of the negotiations throughout the process leading to entry into the Plan Support Agreement.  The Board met regularly and consistently over the course of multiple months to receive updates, discuss, and authorize various actions.  Prior to entry into the Plan Support Agreement, the Board met to receive a comprehensive presentation from the Debtors' advisors regarding the final terms of the Plan Support Agreement, the relative benefits of the transactions contemplated thereby, the legal and financial ramifications of entry therein, and the chapter 11 process generally.

32.    Importantly, the Plan Support Agreement provides that the Debtors may terminate the Plan Support Agreement in the event that the Debtors determine that proceeding with any transaction contemplated by the Plan Support Agreement would be inconsistent with the exercise of their fiduciary duties (the "Fiduciary Out").  The Plan Support Agreement expressly clarifies that:

> Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 15.10 hereof upon the occurrence of any of the following events . . . the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Transactions would be

inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an alternative proposal . . .[18]

Upon significant deliberation and considered analysis of the material terms of the Plan Support Agreement, and upon rigorous review of the Plan Support Agreement, Plan, and Bidding Procedures by the Board—including the Disinterested Directors as members of the Restructuring Committee—and in consultation with its advisors, the Board determined that entry into the Plan Support Agreement was in the best interests of Pier 1.  Ultimately, on February 16, 2020, the Board unanimously authorized the Debtors' entry into the Plan Support Agreement and commencement of these chapter 11 cases.

## **Basis for Relief**

## I.    **The Bidding Procedures are Fair, Designed to Maximize the Value Received for the Assets, and an Exercise of the Debtors' Reasonable Business Judgment.**

33.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in disposing of an estate's assets.  *See, e.g.*, *In re Trilogy Dev. Co., LLC*, 2010 Bankr. LEXIS 5636, at *3–4 (Bankr. W.D. Mo. 2010) (holding that section 363 of the Bankruptcy Code permits the debtor to sell their assets if a sound business purpose exists); *In re Channel One Commc'ns, Inc.*, 117 BR 493 (Bankr. E.D. Mo. 1990) (same); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification.'") (citations omitted); *see also In re Farmland Indus., Inc.*, 294 B.R 855, 881 (Bankr. W.D. Mo. 2003) (holding that courts in this district are reluctant to interfere with corporate decisions unless "it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information

---

[18]    Plan Support Agreement § 13.02(c).

or study, are made in bad faith, or are in violation of the Bankruptcy Code"); *In re Integrated Res., Inc.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

34.     The paramount goal in any proposed disposition of property of the estate is to maximize the proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (citations omitted).

35.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

36.     The Debtors believe that the Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offer available for the Assets offered for sale.  The Bidding Procedures will allow the Debtors to conduct the Sales in a

controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction.  In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

37.    At the same time, the Bidding Procedures provide the Debtors with a robust, final opportunity to consider competing bids and select the highest or otherwise best offer related to the Sales, while preserving the Debtors' right to not sell any particular Asset if the Debtors do not believe that such a sale on the terms received at Auction would maximize the value of such Asset. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable in light of the circumstances and at or above market-value.

38.    The Debtors submit that the Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this Court.  Moreover, similar procedures in complex chapter 11 cases have been previously approved by the Court.  *See, e.g.*, *In re Toys "R" Us, Inc.*, No. 17–34665 (KLP) (Bankr. E.D. Va. Mar. 23, 2018); *In re Alpha Nat. Res., Inc.*, No. 15–33896 (KRH) (Bankr. E.D. Va. Nov. 6, 2015); *In re Patriot Coal Corp.*, No. 15–32450 (KLP) (Bankr. E.D. Va. June 25, 2015); *In re James River Coal Co.*, No. 14–31848 (KRH) (Bankr. E.D. Va. May 8, 2014); *In re RoomStore, Inc.*, No. 11–37790 (DOT) (Bankr. E.D. Va. Jan. 3, 2012).[19]

39.    The Debtors also seek authority, but not direction, pursuant to the Bidding Procedures to offer Bid Protections to a Stalking Horse Bidder in the event that the Debtors elect

---

[19]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

to enter into a stalking horse arrangement with a non-insider third-party bidder.  The Debtors seek

to utilize such authority only in their discretion if the Debtors determine in their business judgment

that any such Bid Protection will facilitate a competitive bidding and Auction process.  Payment

of expense reimbursements and work fees, like those proposed here, in a bidding process for sales

is appropriate so long as such payment is a valid exercise of the Debtors' business judgment.

Under section 363(b), the Debtors may use, sell, or lease estate property outside of the ordinary

court of business so long as they articulate a sound business reason for doing so.  *See, e.g.*,

*In re Culp*, 550 B.R. 683, 697 (D. Del. 2015); *In re Network Access Corp.*, 330 B.R. 67, 74-75

(Bankr. D. Del. 2005).  Further, "[b]reak-up fees are important tools to encourage bidding and to

maximize the value of the debtor's assets . . . . [i]n fact, because the . . . corporation has a duty to

encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value."

*In re Integrated Res., Inc.*, 147 B.R. 650, 659–60 (Bankr. S.D.N.Y. 1992) (emphasis added).

Specifically, bid protections like a breakup fee "may be legitimately necessary to convince a 'white

knight' bidder to enter the bidding by providing some form of compensation for the risks it is

undertaking."  *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989)

(quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (bid protections can prompt

bidders to commence negotiations and "ensure that a bidder does not retract its bid").

40.     Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . .

that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  In

essence, the Court may enter any order safeguarding the value of the debtor's estate if doing so is

consistent with the Bankruptcy Code.  *See, e.g., Chinichian v. Campolongo (In re Chinichian)*,

784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to

fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper*

*Props. Liquidating Tr., Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the

[b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").  To the extent that approval of the Bid Protections are necessary to effectuate consummation of a chapter 11 plan—which, in the Debtor's view, represents the best means of maximizing the value of its estate—the Debtor believes that the Court's application of section 105(a) of the Bankruptcy Code here is appropriate. *See, e.g.*, *In re Patriot Coal Corporation*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 25, 2015) (authorizing designation of one or more stalking horse bidders, including the provision of bid protections); *In re High Ridge Brands Co.*, No. 19-12689 (BLS) (Bankr. D. Del. Feb. 7, 2020) (authorizing selection of a stalking horse bidder and approving bid procedures for such stalking horse bidder, subject to approval by the bankruptcy court); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Feb. 4, 2020) (approving bid protections in connection with approval of bidding procedures); *In re Bumble Bee Parent, Inc.*, No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) (approving a breakup fee and expense reimbursement in conjunction with approval of a stalking horse bidder); *In re Ditech Holding Corporation*, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 23, 2019) (authorizing designation of one or more stalking horse bidders, including the provision of bid protections).[20]

41.    Accordingly, for all of the foregoing reasons, the Debtors believe that the Bidding Procedures:  (a) will encourage robust bidding for the Assets; (b) are consistent with other procedures previously approved by courts in this district; and (c) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and should be approved.

---

[20] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

**II.    Assumption of the Plan Support Agreement Should Be Approved as an Exercise of Sound Business Judgment.**

42.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). "Unlike many other sections of the Bankruptcy Code, § 365(a) of the Bankruptcy Code does not require a showing of 'cause' to support a Debtors decision to assume or reject an executory contract." *In re Circuit City Stores, Inc.*, No. 08-35653, 2010 WL 2425957, at *3 (Bankr. E.D. Va. June 9, 2010). "Rather, the debtor's determination to [assume or] reject an executory contract is governed by the 'business judgment' standard." *Id.* (citing *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1046–47 (4th Cir.1985)); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (business judgment is the "traditional" standard); *In re US Airways Grp., Inc.*, 287 B.R. 643, 645 (Bankr. E.D. Va. 2002) ("The standard in [the Fourth] Circuit for approving a request to [assume or reject an executory contract] is whether the trustee or debtor in possession has exercised sound business judgment."). In addition, courts outside this district have specifically held that decisions to assume restructuring support agreements are governed by the business judgment standard. *See, e.g.*, *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2014); *In re Caribbean Petroleum Corp.*, 444 B.R. 263, 268 (Bankr. D. Del. 2010).

43.    The business judgment standard is exceedingly deferential—"[o]nce the Debtors articulate a valid business justification, '[t]he business judgment rule becomes a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action taken was in the best interests of the company.'" *Circuit City*, 2010 WL 2425957, at *3 (quoting *Integrated Res.*, 147 B.R. at 656). "The Court should defer to the business judgment of the Debtors, unless 'the decision of the [Debtors] that [assumption or] rejection will be advantageous is so manifestly unreasonable that it could not be

based on sound business judgment, but only on bad faith, or whim or caprice.'" *Id.* (quoting *Lubrizol,* 756 F.3d at 1047).

44.      The Debtors' assumption of the Plan Support Agreement is a reasonable exercise of their business judgment.   The Transactions contemplated by the Plan Support Agreement position the Debtors to negotiate the precise terms of any deal to maximize the value of the Debtors' estates for all stakeholders.   As set forth in the PSA Declaration, the Plan Support Agreement is the product of good-faith, arm's length negotiations among the Debtors and the Consenting Term Lenders, who had separate, sophisticated legal counsel and financial advisors and who, collectively, represent sixty-three point eight (63.8) percent of the holders of the Debtors' prepetition Term Loan, and are committed to reach sixty-six and two thirds (66 2/3) precent.[21]

45.      Without the benefits and protections provided by the Plan Support Agreement, the Debtors could potentially face a prolonged stay in bankruptcy or struggle to develop a path out of chapter 11.   In light of the Debtors' liquidity concerns, and based on all of the Debtors' prepetition negotiations, the Debtors likely could not have navigated a soft landing in chapter 11 absent the Consenting Term Lenders' support.   The swift, consensual process contemplated by the Plan Support Agreement presents far less execution risk than any available alternative, accomplishes a critical deleveraging, and better preserves estate Assets for the benefit of the Debtors' stakeholders.

46.      Preserving value for the benefit of the Debtors' estates depends in large part on the Debtors proceeding swiftly to confirmation of the Plan and minimizing the effects of the Debtors' chapter 11 cases on the value of the Debtors' "brand"—a critical component of the value of the Debtors' businesses.   Based on the Debtors' intensive prepetition negotiations and in consultation with their advisors, the Debtors believe that the swift, consensual process contemplated by the

---

[21]   Plan Support Agreement § 5.01(a)(ix).

Plan Support Agreement presents far less execution risk than any available alternative and better preserves estate Assets for the benefit of the Debtors' stakeholders.

47.    As discussed above and in the PSA Declaration, the Debtors entered into the Plan Support Agreement only after a robust review process by the Board, including the Disinterested Directors as members of the Restructuring Committee in consultation with their advisors.  The Debtors engaged in a thorough analysis of the Plan Support Agreement and determined that the Plan Support Agreement represents a value-maximizing transaction.  Further, as set forth above, the obligations of the Debtors under the Plan Support Agreement are subject to a full fiduciary out, thus preserving the Debtors' flexibility to pursue an alternative value-maximizing transaction, should one arise.

48.    Courts in this and other districts have approved similar relief specifically with respect to prepetition restructuring support agreements, including approval of the payment of Professional Fees under the plan support agreement as a market-based term.  *See, e.g.*, *In re Penn Virginia Corporation*, No. 16-32395 (KLP) (Bankr. E.D. Va. June 16, 2016) (approving assumption of a Restructuring Support Agreement); *In re Dex Media, Inc.*, No. 16-11200 (KG) (Bankr. D. Del. June 8, 2016) (same); *In re Magnum Hunter Resources Corp., et al.*, No. 15-12533 (KG) (Bankr. D. Del. Feb. 9, 2016) (same); *In re New Gulf Resources, LLC, et al*., No. 15-12566 (BLS) (Bankr. D. Del. Feb. 4, 2016) (same); *In re Hercules Offshore, Inc., et al.*, No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015) (same).[22]

49.    Further, courts have approved assumption of prepetition plan support agreements on an expedited basis.  *See, e.g.*, *In re Roust Corporation*, No. 16-23786 (RDD) (Bankr. S.D.N.Y. Jan. 10, 2017) (authorizing assumption of a restructuring support agreement at the first day

---

[22]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

hearing); *In re Eastgate Tower Hotel Associates, L.P.*, No. 12-13539 (SCC) (Bankr. S.D.N.Y. Aug. 21, 2012) (same); *In re Satelites Mexicanos, S.A. de C.V.*, No. 11-11035 (CSS) (Bankr. D. Del. Apr. 13, 2011) (same).  Courts have also granted similar relief on an expedited basis of other contracts.  *See In re LeClairRyan*, No. 19-34574 (KRH) (Bankr. E.D. Va. Sept. 6, 2019) (granting first day motion to assume executory contracts on an interim basis); *In re Magnum construction Management LLC f/k/a Munilla Construction Management, LLC*, No. 19-12821 (AJC) (Bankr. S.D. Fla. Mar. 8, 2019) (authorizing assumption of an auctioneer contract on the first day); *In re All American Oil & Gas Incorporated*, No. 18-52693 (RBK) (Bankr. W.D. Tex. Nov. 19, 2018) (authorizing assumption of a purchase and installation agreement for a generator stator on the first day).[23]

50.    The Debtors therefore respectfully submit, as set forth above, that they have satisfied the deferential business judgment standard applicable to assumption of executory contracts such as the Plan Support Agreement.  Accordingly, the Debtors request the Court enter the Plan Support Agreement Assumption Order authorizing the Debtors to assume the Plan Support Agreement.

## III.    The Form and Manner of the Auction Notice Should Be Approved.

51.    As noted above, within three days of entry of the Order or as soon as reasonably practicable thereafter, the Debtors will serve the Auction and Hearing Notice upon the Notice Parties, and also publish an abbreviated version of the Auction and Hearing Notice in *The New York Times (National Edition)* and *USA Today (National Edition)* and post it onto the Case Website.

---

[23] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

52.     The Debtors submit that notice of this Motion and the related hearing to consider entry of the Order, coupled with service of the Auction Notice constitutes good and adequate notice of the Auction.  Accordingly, the Debtors request that the Court approve the form and manner of the Auction Notice.

## IV.    The Sale of Personally Identifiable Information Should be Allowed Without Appointment of a Consumer Privacy Ombudsman.

53.     Section 101(41A) of the Bankruptcy Code defines "personally identifiable information" ("Personally Identifiable Information") as an individual's name, residence address, email address, telephone number, social security number, or credit card number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual.  11 U.S.C. $ 101(4lA). Section 332 of the Bankruptcy Code requires the appointment of a consumer privacy ombudsman (an "Ombudsman") when a debtor seeks to sell or transfer Personally Identifiable Information notwithstanding restrictions in the debtor's privacy policy with respect to the transfer of such Personally Identifiable Information.  *See* 11 U.S.C. § 363 (b)(1)(A).

54.     As set forth in the Frejka Declaration, the Debtors' privacy policy—available on the Company's website—in effect on the Petition Date provides for the sale of Personally Identifiable Information:[24]

> We may share your information with our parent, subsidiaries and affiliates. We also reserve the right to disclose and transfer all such information: (i) to a subsequent owner, co-owner or operator of the Site and/or our Stores; or (ii) in connection with a merger, consolidation, restructuring, the sale of substantially all of our interests and/or assets or other corporate change, including during the course of any due diligence process.[25]

---

[24]    *See* Frejka Decl. ¶ 9.

[25]    *See* https://www.pier1.com/privacy_policy.html.

Further, the Debtors, with the consent of the consumer, has maintained optionality with respect to the permitted disclosure of customer records and Personally Identifiable Information to third parties pursuant to its privacy policy since 2007.[26]

55.    As set forth in the Frejka Declaration, the Debtors' data collection and processing is transparent and consumers are required to affirmatively consent or opt-in to receive marketing and other promotional materials from the Debtors.  For example, in front of each cash register in a Pier 1 store there is a placard that not only describes the Debtors' return and exchange policy but contains a section entitled "Why We Ask for Customer Information" that explains that providing the information is voluntary, the information is used for, among other things, marketing purposes, and there is a reference to the privacy policy for consumers wanting additional information. Importantly, if a consumer decides to provide Personally Identifiable Information at the point of sale, the mechanism for signup is automated and confirms consumer consent with an additional reference to the Privacy Policy.  Likewise, any consumer opting into the SMS Program must affirmatively enroll and then confirm the enrollment via return text message.  Finally, before joining the Rewards Program, consumers are advised that by clicking "sign up" they have agreed to receive offers and other materials and there is a hyperlink to the Privacy Policy.[27]  Further, consumer consent to receive marketing or other materials can be revoked at any time, and all emails and text messages provide a clear road map for consumers to opt-out of communications from the Debtors or limit marketing offers.  The Debtors processes opt-out requests upon receipt of either an email requesting to unsubscribe or following the opt-out instructions contained in any marketing material.[28]

---

[26]   *See* Frejka Decl. ¶¶ 9–10.

[27]   *Id.* at ¶ 11.

[28]   *Id.* at ¶ 12.

56.     Finally, consistent with the Privacy Policy and the Motion, the Debtors do not intend to transfer the Personally Identifiable Information of any consumer who opted-out of receiving communications and such information will be transferred only to the extent it can be aggregated or anonymized.[29]   Accordingly, as set forth in the Frejka Declaration, the Debtors submit that a sale of Personally Identifiable Information is consistent with the Debtors' privacy policy and the appointment of an Ombudsman is not required.[30]

## Waiver of Memorandum of Law

57.     The Debtors respectfully request that this Court treat this Motion as a written memorandum of law or waive any requirement that this Motion be accompanied by a written memorandum of law as described in Local Bankruptcy Rule 9013-1(b).

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

58.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing the Debtors to proceed expeditiously in pursuing a sale of the Debtors' Assets is necessary to prevent deterioration in the value of the Debtors' Assets and maximize the value of the Debtors' estates for the benefit of all stakeholders.   Moreover, pursuant to the DIP Facility, the DIP Credit Agreement, and the proposed final order approving the DIP Facility, the Debtors must satisfy certain milestones with respect to these chapter 11 cases. These Milestones are satisfied by the proposed Bidding Procedures.   Access to the DIP Facility is critical to the Debtors' ability to operate throughout these chapter 11 cases.   Failure to adhere to the Milestones would have severe consequences and threaten the Debtors' ability to continue along

---

[29]   *Id.*

[30]   *Id.* at ¶ 14.

the best path for the Debtors and maximize the value of their estates. The relief requested herein is necessary in order for the Debtors to maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## **Reservation of Rights**

59.     Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code, any foreign bankruptcy or insolvency law, or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

## **Notice**

60.     The Debtors will provide notice of this Motion via first class mail, facsimile or email (where available) to: (a) the Office of the United States Trustee for the Eastern District of Virginia, Attn: Kenneth N. Whitehurst III and Shannon F. Pecoraro; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the DIP Agents and their respective counsel thereto; (e) the indenture trustee to the Debtors' industrial revenue bonds; (f) counsel to the ad hoc group of term loan lenders; (g) the lenders under certain Company-owned life insurance policies; (h) the Debtors' Canadian counsel; (i) the United States Attorney's Office for the Eastern

District of Virginia; (j) the Internal Revenue Service; (k) the office of the attorneys general for the states in which the Debtors operate; (l) the Securities and Exchange Commission; (m) any party that asserts a lien on the Debtors' assets; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

61.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

Richmond, Virginia
Dated:   February 17, 2020

*/s/ Jeremy S. Williams*

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192
Email:      Michael.Condyles@KutakRock.com
            Peter.Barrett@KutakRock.com
            Jeremy.Williams@KutakRock.com
            Brian.Richardson@KutakRock.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
(*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains
(*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      joshua.sussberg@kirkland.com
            emily.geier@kirkland.com
            annelyse.gains@kirkland.com

-and-

Joshua M. Altman (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      josh.altman@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Exhibit A**

**Proposed Order**

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:          (212) 446-4800
Facsimile:          (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:          (312) 862-2000
Facsimile:          (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:          (804) 644-1700
Facsimile:          (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## ORDER (I) ESTABLISHING BIDDING
## PROCEDURES, (II) SCHEDULING BID DEADLINES AND
## AN AUCTION, (III) APPROVING THE FORM AND MANNER
## OF NOTICE THEREOF, (IV) APPROVING THE FORM OF ASSET
## PURCHASE AGREEMENT, (V) AUTHORIZING ASSUMPTION OF THE
## PLAN SUPPORT AGREEMENT AND (VI) GRANTING RELATED RELIEF

Upon the *Debtors' Motion for Entry of an Order (I) Establishing Bidding Procedures,*

*(II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice*

*Thereof, (IV) Approving the Form of Asset Purchase Agreement, (V) Authorizing Assumption of*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

*the Plan Support Agreement, and (VI) Granting Related Relief* (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order"):, (a) authorizing and approving the proposed auction and bid procedures, attached hereto as **Exhibit 1** (the "Bidding Procedures"), including the form asset purchase agreement attached to the Bidding Procedures as Exhibit 1 (the "Form Purchase Agreement"), by which the Debtors will solicit and select the highest or otherwise best offer(s) for the sale, or sales (the "Sales"), of any portion, all, or substantially all of the Debtors' Assets; (b) establishing an indication of interest deadline by which all potential bidders must provide the Debtors and their advisors with a non-binding indication of interest (the "Indication of Interest Deadline"); (c) scheduling an auction or auctions to sell the Assets detailed in the Bidding Procedures (the "Auction") and a hearing to approve the Sale at Plan confirmation (the "Sale/Confirmation Hearing"); (d) approving the form and manner of notice of the Auction attached hereto as **Exhibit 2** (the "Auction Notice"); (e) approving the form and manner of notice of the successful bidder at the Auction attached hereto as **Exhibit 3** (the "Notice of Successful Bidder"); (f) authorizing the Debtors to assume that certain plan support agreement, dated as of February 16, 2020, a copy of which is attached to the Order as **Exhibit 4** (together with all exhibits and schedules attached thereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Plan Support Agreement"); and (g) granting related relief; it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties in interest; the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and1334 and the *EDVA District Court Order Granting Original Jurisdiction to EDVA Bankruptcy Judges* dated

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

August 15, 1984; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b) and that this Court may enter a final order consistent with Article III of the United States Constitution; venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the circumstances; and upon consideration of the Savini Declaration, the Frejka Declaration, and the PSA Declaration in support of the Motion, and after due deliberation and sufficient cause appearing therefor, **THE COURT FINDS THAT:**

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    The bases for the relief requested in the Motion are: (i) sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"); (ii) Rules 2002(a)(2), 6006, 9007 , and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (iii) rule 9013-1 of the Local Bankruptcy Rules of United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

D.    Notice of the Motion has been given to: (a) the Office of the United States Trustee for the Eastern District of Virginia, Attn: Kenneth N. Whitehurst III and Shannon F. Pecoraro; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis);

(c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the DIP Agents and counsel thereto; (e) the indenture trustee to the Debtors' industrial revenue bonds; (f) counsel to the ad hoc group of term loan lenders; (g) the lenders under certain Company-owned life insurance policies; (h) the Debtors' Canadian counsel; (i) the United States Attorney's Office for the Eastern District of Virginia; (j) the Internal Revenue Service; (k) the office of the attorneys general for the states in which the Debtors operate; (l) the Securities and Exchange Commission; (m) any party that asserts a lien on the Debtors' Assets; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").

E.      The Debtors have articulated good and sufficient reasons for this Court to: (i) approve the Bidding Procedures, and (ii) schedule the Auction and Sale/Confirmation Hearing and approve the manner of notice of the Auction and Sale/Confirmation Hearing.

F.      The Auction Notice, substantially in the form attached hereto as **Exhibit 2**, is reasonably calculated to provide interested parties with timely and proper notice of the proposed sale, including, without limitation:  (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures; (iii)  reasonably specific identification of the Assets to be sold; and (v) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests (except as set forth in the applicable Purchase Agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds, and no other or further notice of the sale shall be required.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein.

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to this Court at the hearing on the Motion or by stipulation filed with this Court, are overruled.

**I.      Important Dates and Deadlines.**

3.      The following dates and deadlines are hereby approved (and may be adjourned from time to time by the Debtors):

| Event | Date |
|---|---|
| Indication of Interest Deadline | **Friday, February 28, 2020, at 5:00 p.m. (prevailing Eastern Time)** |
| Bid Deadline | **Monday, March 23, 2020, at 5:00 p.m. (prevailing Eastern Time)** |
| Notice of Qualified Bidder Deadline | **No later than 11:59 p.m. (prevailing Eastern Time) on the date that is four (4) business days following the Bid Deadline** |
| Auction | **Tuesday, March 31, 2020, at [●]:00 a/p.m. (prevailing Eastern Time),** or as may be adjourned to such later date by the Debtors |
| Notice of Successful Bidder | **As soon as reasonably practicable after the conclusion of the Auction** |
| Sale/Confirmation Hearing | **Thursday, April 23, 2020, at [●]:00 a/p.m. (prevailing Eastern Time)**, or such other date and time that the Court may later direct and as agreed upon by the Debtors |

4.      **Indication of Interest Deadline**:  **Friday, February 28, 2020, at 5:00 p.m., prevailing Eastern Time**, as the deadline by which all Potential Bidders must provide the Debtors and their advisors with a non-binding indication of interest.

5.      **Bid Deadline**: **Monday, March 23, 2020, at 5:00 p.m., prevailing Eastern Time**, is the deadline by which all bids must be actually received pursuant to the Bidding Procedures.

6.      **Notice of Qualified Bidder Deadline**:  **The date that is no later than four (4) business days following the Bid Deadline, at 11:59 p.m., prevailing Eastern Time**, is the date and time by which the Debtors shall notify the Bidders whether their Bids are Qualified Bids.

7.      **Auction**:  **Tuesday, March 31, 2020, at [●]:00 a/p.m., prevailing Eastern Time**, is the date and time by which the Auction, if needed, will be held at the offices of Kirkland & Ellis LLP, located at:  601 Lexington Avenue, New York, NY 10022.  The Debtors shall send written notice of the date, time, and place of the Auction to the Qualified Bidders no later than one (1) business day before such Auction, and file a notice of the date, time, and place of the Auction with the Court no later than two business days before such Auction and post such notice on the Debtors' Case Website:  http://dm.epiq11.com/pier1.  The Debtors may modify the date, time, and place of the Auction by providing written notice to Qualified Bidders and filing a notice with the Court so long as such notice is no later than one (1) business day before the Auction.

8.      **Notice of Successful Bidder**:  if applicable, as soon as reasonably practicable after the Auction, the Debtors shall file the Notice of Successful Bidder.

9.      **Sale/Confirmation Hearing**:  **Thursday, April 23, 2020, at [●] a/p.m., prevailing Eastern Time**, as the date by which the Debtors shall seek confirmation of the Debtors' plan, including approval of the Sale(s) of the Debtors' Assets to the designated Successful Bidders in connection with the Auction.  The Sale/Confirmation Hearing may be adjourned by announcement in open Court or on the Court's calendar without any further notice required.

10.     **Transaction Fee**.  Any Restructuring Transaction Fee[3] due to Guggenheim Securities as a result of the closing of any Sale Transaction shall be segregated and escrowed

---

[3]     Capitalized terms used in this paragraph shall have the meanings ascribed to such terms in that certain engagement letter between Guggenheim Securities, LLC ("Guggenheim Securities") and the Debtors, dated as of August 21,

(for the exclusive benefit of Guggenheim Securities) from the proceeds of such Sale Transaction (including, without limitation, from the proceeds of any liquidation or other disposition of the Debtors' Assets), as an express carve-out from the collateral of the Debtors' pre- and postpetition secured lenders, prior to any other use or distribution of such proceeds.  If any Sale Transaction is the result of a successful credit bid without a cash component sufficient to pay any Restructuring Transaction Fee due to Guggenheim Securities in full, then any resulting unpaid portion of the Restructuring Transaction Fee due to Guggenheim Securities shall be segregated and escrowed (for the exclusive benefit of Guggenheim Securities) at the closing of such Sale Transaction from the available cash of the Debtors, as an express carve-out from the collateral of the Debtors' pre- and postpetition secured lenders; *provided* that if the Debtors do not have sufficient cash to pay the unpaid portion of such Restructuring Transaction Fee in full, or any portion thereof, then the successful bidder shall immediately segregate and escrow (for the exclusive benefit of Guggenheim Securities) such unpaid portion of the Restructuring Transaction Fee at the closing of such Sale Transaction.  For the avoidance of doubt, nothing in this Order shall prohibit or be construed to prohibit the use of any unencumbered Assets of the Debtors or the proceeds thereof to pay any fees and expenses of Guggenheim Securities or the assertion or allowance of an administrative priority claim under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, if applicable, on account of any fees or expenses of Guggenheim Securities.  Notwithstanding anything to the contrary, any Restructuring Transaction Fee payable by the Debtors to Guggenheim Securities is hereby approved and allowed on an interim basis, *provided* that Guggenheim Securities shall seek retention as the Debtors' investment banker pursuant to sections

---

2019, as amended, a copy of which is being filed in connection with the Debtors' application to retain Guggenheim Securities, LLC.

327(a) and 328(a) of the Bankruptcy Code and file a fee application for approval of its fees on a final basis; *provided*, that any such fee application shall be subject to the U.S. Trustee's rights to object to Guggenheim Securities' monthly, interim and final fee applications on all grounds including, but not limited to, the reasonableness standard provided for in section 330 of the Bankruptcy Code, and the Court retains the right to review any such objection by the U.S. Trustee to the interim and final applications pursuant to section 330 of the Bankruptcy Code.

## II.    Auction and Bidding Procedures.

11.    The Bidding Procedures and any exhibits attached thereto, attached as **Exhibit 1** hereto, are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all bids related to any Sales. Any party desiring to submit a bid shall comply with the Bidding Procedures and this Order. The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

12.    If the Debtors do not receive any Qualified Bids as to the Debtors' Assets, the Auction shall be cancelled. If the Debtors receive one or more Qualified Bids, the Debtors will conduct the Auction in accordance with the Bidding Procedures and the Plan Support Agreement.

13.    At the Auction, each Qualified Bidder will be entitled, but will not be obligated, to submit overbids and will be entitled in any such overbids to credit bid all or a portion of the value of the secured portion of its claims, if any, within the meaning of section 363(k) of the Bankruptcy Code.

14.    At or following the Auction, the Debtors may:  (a) select, in its business judgment, pursuant to the Bidding Procedures, (i) the highest or otherwise best bid as the Successful Bidder and (ii) the second highest or otherwise second-best bid as the Backup Bidder; and (b) reject any bid (regardless of whether such bid is a Qualified Bid) that, in such Debtor's business judgment,

is (i) inadequate, insufficient, or not the highest or best bid, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, or the Bidding Procedures, or (iii) contrary to, or otherwise not in the best interests of the Debtors' estates, affected stakeholders, or other parties in interest, in each case subject to and in accordance with the Bidding Procedures. For the avoidance of doubt, the Debtors are not required to name a Successful Bidder for any given Asset or group thereof and may elect to not sell such asset to the highest or otherwise best bidder.

15.     The Debtors shall be authorized, but not obligated, in an exercise of their business judgment, to select one or more Acceptable Bidders to act as a Stalking Horse Bidder for all or any portion of the Assets and may agree to provide such Stalking Horse Bidder(s) certain bid protections, including an expense reimbursement, work fee, and/or a break-up fee (the "Bid Protections"); *provided* that Bid Protections for any Stalking Horse Bidder(s) that may be selected shall not exceed three percent of any cash amount of any proposed purchase price; *provided* further that such Stalking Horse Bidder shall not be an insider.  Prior to giving Bid Protections to a Stalking Horse Bidder, the Debtors shall consult with the Office of the United States Trustee for the Eastern District of Virginia, as well as counsel for an official committee of unsecured creditors should one be appointed in these chapter 11 cases, one (1) day prior to providing Bid Protections pursuant to this Order.

16.     No person or entity, subject to further order from this Court (other than a Stalking Horse Bidder selected pursuant to the Bidding Procedures and this Order), shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

### III. Auction Notice.

17.     The Auction Notice, substantially in the form attached to this Order **Exhibit 3**, is approved.   Within three (3) business days of the entry of the Order or as soon thereafter as reasonably practicable, the Debtors shall cause the Auction Notice to be served upon the Notice Parties.   The Auction Notice will indicate that copies of this Motion and any future sale documents, if applicable, can be obtained on the Debtors' case website:  http://dm.epiq11.com/pier1.

18.     Within three (3) business days after entry of the Order, or as soon as practicable thereafter, the Debtors shall place a publication version of the Auction Notice for one day in the *The New York Times (National Edition)* and *USA Today (National Edition)* and post it onto the Case Website.   Such notice shall be deemed sufficient and proper notice of the Sales with respect to known interested parties.

19.     As soon as reasonably practicable after the conclusion of the Auction, the Debtors will file on the docket, but not serve on any party other than the parties listed in Paragraph 21, a notice identifying the Successful Bidder(s), Asset to be sold, and the key terms of the agreement (the "Notice of Successful Bidder") substantially in the form attached to this Order as **Exhibit 3**.

### IV. Assumption of the Plan Support Agreement.

20.     The Debtors are authorized to (a) assume the Plan Support Agreement in its entirety and any exhibits attached thereto, attached as **Exhibit 4** hereto, (b) comply with the terms of the Plan Support Agreement, (c) effect the relief granted herein, and (d) take any and all actions necessary to implement the terms of the Plan Support Agreement, except for actions that require further orders of the Court.

21.     Effective as of the date of entry of this Order, the Plan Support Agreement is hereby assumed pursuant to section 365(a) of the Bankruptcy Code.

22.    The Plan Support Agreement shall be binding and specifically enforceable against the parties thereto in accordance with its terms.

23.    The failure to describe specifically or include any particular provision of the Plan Support Agreement in the Motion or this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan Support Agreement be assumed by the Debtors in its entirety.

24.    So long as the Plan Support Agreement is in effect and has not been terminated in accordance with its terms, the Debtors are authorized to pay all of the Professional Fees in accordance with the terms of the Plan Support Agreement.  Under no circumstances shall such fees and expenses be subject to any otherwise applicable setoff, counterclaim or recoupment.  None of such fees and expenses shall be subject to further approval of the Court and no recipient of any such fees and expenses shall be required to file any interim or final application with the Court as a condition precedent to the Debtors' obligation to pay such fees and expenses.  None of such fees and expenses shall be subject to avoidance under sections 542, 547, or 548 of the Bankruptcy Code.

25.    The Debtors are authorized, but not directed, to enter into amendments to the Plan Support Agreement from time to time as necessary, subject to the terms and conditions set forth in the Plan Support Agreement and without further order of the Court.  Within two (2) business days of the effective date of each such amendment, the Debtors will file a notice attaching a copy of any such amendments with the Court.

26.    Notice of the Motion as provided therein is good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

27.     The Plan Support Agreement shall be solely for the benefit of the parties thereto and no other person or entity shall be a third-party beneficiary thereof.  No entity, other than the parties to the Plan Support Agreement shall have any right to seek or enforce specific performance of the Plan Support Agreement.

28.     For the avoidance of doubt, to the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, such provisions are vacated and modified to effectuate all of the terms and provisions of the Plan Support Agreement and this Order, including permitting the parties to the Plan Support Agreement to exercise all rights and remedies under the Plan Support Agreement in accordance with each of their respective terms, and deliver any notice contemplated thereunder, in each case, without further order of the Court.

29.     The failure of any party to seek relief or otherwise exercise its rights and remedies under this Order, the Plan Support Agreement, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of any of the Parties.

**V.     Miscellaneous.**

30.     The failure to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness or enforceability of such a provision in the Bidding Procedures.

31.     The Debtors shall properly file reports of sale for all Sales, regardless of whether the Sale is pursuant to the Bidding Procedures or the Subsequent Sale Procedures.

32.     The Debtors are authorized to establish an escrow account to accept deposits from Qualified Bidders and may pay any reasonable fees related to such account.  Any deposits made by Qualified Bidders into the Escrow Account shall not be property of the Debtors.

33.     In the event of any inconsistencies between this Order and the Motion, this Order shall govern.  In the event of any inconsistencies between this Order and the Bidding Procedures, the Bidding Procedures shall govern.

34.     The requirement under Local Bankruptcy Rule 9013-1(b) to file a memorandum of law in connection with the Motion is waived.

35.     Notice of the Motion as provided therein shall be deemed good and sufficient notice as to such Motion and the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules for the Eastern District of Virginia are satisfied by such notice, including with respect to any Sale entered pursuant to the Subsequent Sale Procedures.

36.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

37.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

38.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  _____                            _____
Richmond, Virginia                              United States Bankruptcy Judge

13

WE ASK FOR THIS:

 /s/ *Jeremy S. Williams*
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

- and -

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

Joshua M. Altman (*pro hac vice* admission pending)
300 North LaSalle Street
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

     /s/ *Jeremy S. Williams*

## **Exhibit 1**

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**BIDDING PROCEDURES FOR THE DISPOSITION OF THE DEBTORS' ASSETS**

On [●], the United States Bankruptcy Court for the Eastern District of Virginia entered the *Order (I) Establishing Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Asset Purchase Agreement, (V) Authorizing Assumption of the Plan Support Agreement, and (VI) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized to solicit bids for and conduct an auction (the "Auction") for a sale or disposition (collectively, the "Sale," and each, a "Sale Transaction") of all or substantially all of the Debtors' Assets (as defined herein) or any portion thereof, either as a going-concern or as a liquidation (the "Bidding Procedures").

## I.    DESCRIPTION OF THE ASSETS.

The Debtors are seeking to sell all of their assets, or any portion thereof, either as a going-concern or as a liquidation.  These assets include, but are not limited to, the Debtors' going-concern business, unexpired leases, executory contracts, equipment, inventory, supplies, intellectual property, insurance proceeds, receivables, prepaid expenses and deposits, and books and records, in each case, free and clear of all liens, claims, interests, or other encumbrances (collectively, the "Assets").

## II.    SOLICITATION PROCESS; DISTRIBUTION OF BIDDING PROCEDURES

For any sale of the Assets in these chapter 11 cases (the "Bankruptcy Case"), the Debtors and/or any agent of the Debtors shall, at the Debtors' direction, distribute these Bidding Procedures to any potential interested bidders.  The Debtors, in the exercise of their reasonable business judgment may elect to exclude any Assets from these Bidding Procedures and sell such

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

Assets at either a private or public sale, subject to Court approval of any alternative sale method. Furthermore, the Debtors may determine in their discretion (upon consultation with the Consenting Term Lenders (as defined in the Plan Support Agreement, defined below) and the DIP Agents (as defined in the *Declaration of Robert J. Riesbeck, Chief Executive Officer, of Pier 1 Imports, Inc., in Support of Chapter 11 Petitions and First Day Motions*, the "First Day Declaration")), whether to proceed with a sale of any Asset pursuant to these Bidding Procedures.

Notwithstanding anything herein to the contrary, all consultation, notification, or other rights of the Consenting Term Lenders and the DIP Agents are subject to, and expressly qualified by, any confidentiality obligation or agreement entered with the Potential Bidders (as defined herein).

## III.    PLAN SUPPORT AGREEMENT

In connection with approval of these Bidding Procedures, the Debtors are also seeking Court approval of that certain plan support agreement (the "Plan Support Agreement") entered into on February 16, 2020 by and between the Debtors and Consenting Term Lenders.   The Plan Support Agreement provides, among other items, that the Consenting Term Lenders have consented to the sale of Assets as outlined herein.

## IV.    PARTICIPATION REQUIREMENTS.

### A.    Potential Bidders.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Assets or part of the Assets (a "Potential Bidder") must deliver to each of the Debtors' advisors the following documents and information (unless the Debtors, in their business judgment, choose to waive any of the following requirements for any Potential Bidder):

1.  an executed confidentiality agreement to the extent the Potential Bidder has not already executed a confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement");

2.  identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale Transaction(s); and

3.  proof by the Potential Bidder of its financial capacity to close a proposed Sale Transaction(s), which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors (including in consultation with their advisors).

2

The Debtors, in consultation with their advisors, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed to conduct due diligence and submit a bid (such Potential Bidder, an "Acceptable Bidder").  Notwithstanding anything herein to the contrary, the Debtors, reserve the right to work with a Potential Bidders to aggregate bids into a consolidated Qualified Bid prior to the Bid Deadline (each as defined below).

## B.  Obtaining Due Diligence.

The Debtors, with their advisors, shall establish an electronic data room (the "Data Room") that provides standard and customary diligence materials, including the necessary information to allow Acceptable Bidders to submit a Qualified Bid (as defined below) and to seek and obtain commitments for debt financing.

Only Acceptable Bidders shall be eligible to receive diligence materials and access to the Debtors' Data Room and to additional non-public information regarding the Debtors and the Assets.  The Debtors (with the assistance of their advisors) shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that (i) the Debtors shall have the right to reasonably limit the information and due diligence provided to competitors and (ii) the Debtors may decline to provide such information to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate a proposed Sale Transaction.  The due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.  Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors.  The Debtors, their representatives and advisors are not responsible for, and will bear no liability with respect to, any information obtained by any Acceptable Bidder in connection with any Sale or Sale Transaction.

## C.  Non-Binding Indications of Interest.

Any Potential Bidder interested in a Transaction (regardless of whether such party has been determined to be an Acceptable Bidder) shall submit a non-binding indication of interest (an "Indication of Interest") by [**February 28], 2020, at 5:00 p.m. (prevailing Eastern Time)** (as may be extended without notice or hearing by the Debtors, the "Indication of Interest Deadline"). The indication of interest should (i) identify whether the party is interested in acquiring some or all of the Assets (and which Assets with reasonable specificity), (ii) set forth a proposed purchase price for the proposed Transaction, including by identifying separately any cash and non-cash components of the proposed Transaction consideration, including, for example, certain liabilities to be assumed, and (iii) identify any proposed conditions to closing the Transaction.

Indications of Interest should be submitted to the Debtors' advisors by the Indication of Interest Deadline:

(i)    proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua Sussberg (joshua.sussberg@kirkland.com), Emily Geier (emily.geier@kirkland.com), and AnnElyse Scarlett Gains (annelyse.gains@kirkland.com) and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Joshua M. Altman (josh.altman@kirkland.com);

(ii)   proposed co-counsel to the Debtors, Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia, 23219, Attn: Michael Condyles (michael.condyles@kutakrock.com), Peter Barrett (peter.barrett@kutakrock.com), Jeremy Williams (jeremy.williams@kutakrock.com), and Brian Richardson (brian.richardson@kutakrock.com); and

(iii)  the Debtors' proposed investment banker, Guggenheim Securities, LLC, 330 Madison Avenue, New York, New York 10017, Attn: Durc Savini (durc.savini@guggenheimpartners.com), Adam Rifkin (adam.rifkin@guggenheimpartners.com), and Hend Abdallah (hend.abdallah@guggenheimpartners.com).

The Debtors will provide copies of all Indications of Interest via electronic mail as soon as reasonably practicable to counsel for the Consenting Term Lenders and to counsel for the DIP Agents subject to any confidentiality obligation or agreement entered with the Potential Bidders.

Note that submitting an indication of interest by the Indication of Interest Deadline does not obligate the Potential Bidder to submit a formal bid or to participate in the sale process and does not exempt the Potential Bidder from also having to submit a Qualified Bid by the Bid Deadline to participate in the Auction (each as defined below). For the avoidance of doubt, the submission of an Indication of Interest by the Indication of Interest Deadline is not a prerequisite for Potential Bidders to submit a Qualified Bid.

### D. Bid Deadline.

An Acceptable Bidder that desires to make a bid must transmit via email (in .pdf or similar format) **or** deliver written copies of its bid to the following parties so as to be received not later than **5:00 p.m. (prevailing Eastern Time) on [Monday, March 23], 2020** (the "Bid Deadline"):

(i)    proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua Sussberg (joshua.sussberg@kirkland.com), Emily Geier (emily.geier@kirkland.com), and AnnElyse Scarlett Gains (annelyse.gains@kirkland.com) and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Joshua M. Altman (josh.altman@kirkland.com); and

(ii)   proposed co-counsel to the Debtors, Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia, 23219, Attn: Michael Condyles

4

(michael.condyles@kutakrock.com),                    Peter            Barrett
(peter.barrett@kutakrock.com),            Jeremy            Williams
(jeremy.williams@kutakrock.com),    and    Brian    Richardson
(brian.richardson@kutakrock.com); and

(iii)    the Debtors' proposed investment banker, Guggenheim Securities, LLC, 330
Madison Avenue, New York, New York 10017, Attn:    Durc Savini
(durc.savini@guggenheimpartners.com),            Adam            Rifkin
(adam.rifkin@guggenheimpartners.com),    and    Hend    Abdallah
(hend.abdallah@guggenheimpartners.com).

The Debtors will provide copies of all Bids via electronic mail as soon as reasonably practicable to the Office of the United States Trustee for the Eastern District of Virginia (the "U.S. Trustee") and to counsel for the Consenting Term Lenders and to counsel for the DIP Agents subject to any confidentiality obligation or agreement entered with the Potential Bidders.

## V.    QUALIFIED BIDS.

### A.    Requirements for Qualified Bids.

Any proposal, solicitation, or offer (each, a "Bid") will be considered a qualified bid only if the Bid is submitted in writing by an Acceptable Bidder, by the Bid Deadline, and is deemed to comply with all of the following in the Debtors' business judgment (a "Qualified Bid" and such bidder a "Qualified Bidder"):

1.    **Assets.**    The Bid must clearly identify the following:    (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the Acceptable Bidder intends to operate the Debtors' business as a going concern, or to liquidate the business.

2.    **Purchase Price.**    The Bid must (a) clearly set forth the purchase price to be paid (the "Purchase Price"), (b) identify separately the cash and non-cash components of the Purchase Price, (c) use commercially reasonable efforts to indicate the allocation of the Purchase Price between ABL Priority Collateral and Term Priority Collateral (each as defined in the Intercreditor Agreement), and (d) with respect to the Purchase Price attributable to the sale of the ABL Priority Collateral, include a cash component in an amount sufficient to pay in full in cash all outstanding obligations owed by the Debtors under the DIP Documents (as defined in the DIP Orders) and all obligations under the Prepetition ABL Documents (as defined in the DIP Order), to the extent that any Prepetition ABL Obligations (as defined in the DIP Order) are still outstanding.

3.    **Deposit.**    Each Bid must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate Purchase Price of the Bid to be held in an interest-bearing escrow account to be identified and established by the

Debtors (the "Deposit"), *provided* that if a Qualified Bidder increases its Bid at the Auction and is the Successful Bidder or Backup Bidder (each as defined herein), such bidder must increase its Qualified Bidder Deposit to match the proposed Purchase Price submitted at the Auction within three (3) business days after the Auction.

4. ***Bid Documents.***  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents").  The Bid Documents shall include:  (a) a clearly marked version of the form purchase agreement attached hereto as **Exhibit 1** (the "Form Purchase Agreement") showing all changes requested by the Acceptable Bidder, (b) a schedule of Assumed Contracts to the extent applicable to the Bid, (c) any other material documents integral to such Bid, and (d) a statement from the Acceptable Bidder that:  (y) it is prepared to enter into and consummate the Transactions contemplated in the Form Purchase Agreement no later than fifteen (15) business days after the conclusion of the Auction (or, if no Auction is held, the Bid Deadline) and (z) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or the Backup Bid) until the consummation of the Sale Transaction.

5. ***Legal Capacity.***  Each Bid must demonstrate to the Debtors' satisfaction that the Acceptable Bidder has the legal capacity to consummate the transaction it is proposing.

6. ***Committed Financing.***  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtors (upon consultation with the Consenting Term Lenders and the DIP Agents) that demonstrates that the Acceptable Bidder has received sufficient unconditional debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid, including providing adequate assurance of future performance under all contracts proposed to be Assumed Contracts by such Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with their advisors, and upon consultation with the Consenting Term Lenders and the DIP Agents.

7. ***Contingencies.***  The Bid must not contain any contingencies as to the validity, effectiveness, and/or binding nature of the Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance,

6

conditions, or prospects) and all diligence must be completed before the Bid Deadline.

8. ***Identity.***  The Bid must fully disclose the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the Acceptable Bidder if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed transaction(s) contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Potential Bidder, Acceptable Bidder, or Qualified Bidder, and/or any officer or director of the foregoing.  Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.

9. *Irrevocable.* ALL BIDS SHALL BE DEEMED IRREVOCABLE, NOTWITHSTANDING ANY CONDITIONS LISTED IN THE APPLICABLE AGREEMENT. IN THE EVENT THAT AN ACCEPTABLE BIDDER SEEKS TO REVOKE SUCH BID, THE DEBTORS SHALL BE ENTITLED TO KEEP SUCH BIDDER'S DEPOSIT AND PURSUE ALL OTHER CONTRACTUAL REMEDIES UNDER LAW OR EQUITY.

10. ***Backup Bidder.***  By submitting a Bid, each Acceptable Bidder agrees to be a Backup Bidder, should the Bid be so selected.

11. ***As-Is, Where-Is.***  The Bid must include the following representations and warranties (or the Acceptable Bidder otherwise agrees that such representations and warranties may be incorporated into the applicable Bid Documents should the Bid be selected as the Successful Bid): (a) expressly state that the Acceptable Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its Bid; and (b) a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its Bid and did not rely on any of the Debtors' or any of their advisors' written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith, except (with respect to the Debtors only) as expressly stated in the representations and warranties contained in the Acceptable Bidder's Form Purchase Agreement ultimately accepted and executed by the Debtors.

12. ***Authorization.***  The Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors with respect to the submission, execution, and delivery of its Bid, participation in the

Auction, and closing of the proposed transaction(s) contemplated in such Bid.  The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder.

13. ***Disclaimer of Fees.***  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder   will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

14. ***Adherence to Bid Procedures.***  Each Bid must include (a) a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, and (b) that the Bid constitutes a *bona fide* offer to consummate the proposed transactions, and agrees to be bound by these Bidding Procedures.

15. ***No Collusion.***  The Acceptable Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code  with respect to any Bids, the Auction, or the Sale.

16. ***Other Information.*** The Bid contains such other information as may be reasonably requested by the Debtors.

**B.  Rejection of "Qualified Bid" Status for Non-Conforming Bids.**

The Debtors shall determine in their discretion (including in consultation with their advisors and with the Consenting Term Lenders and the DIP Agents) which bids qualify as Qualified Bids and which bids shall be rejected as non-confirming bids.  In addition, the Debtors shall have the right to negotiate with any Acceptable Bidder with respect to clarification of any Bid.

**C.  No Representation; Qualified Bidder's Duty to Review.**

Neither the Debtors nor any of their advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental

8

laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing regarding the Assets.  All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the Assets, except to the extent expressly provided in the Bankruptcy Court's order approving the Sale. Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Assets or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Bankruptcy Court's order approving the Sale.

## VI.    QUALIFICATION OF BIDDERS.

No later than 11:59 p.m. (prevailing Eastern Time) on the date that is four (4) business days following the Bid Deadline, the Debtors shall notify each Acceptable Bidder whether such party is a Qualified Bidder.

If any Bid is determined by the Debtors (after consultation with the Consenting Term Lenders and the DIP Agents) not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit on or before the date that is five (5) business days after the Bid Deadline.

The Debtors may, in consultation with the Consenting Term Lenders and the DIP Agents, accept as a single Qualified Bid, multiple Bids for non-overlapping material portions of the Assets such that, when taken together in the aggregate, such Bids would otherwise meet the standards for a single Qualified Bid. The Debtors may permit otherwise Qualified Bidders who submitted Bids by the Bid Deadline for less than a substantial (but nevertheless a material) portion of the Assets but who were not identified as a component of a single Qualified Bid consisting of such multiple Bids, to participate in the Auction and to submit higher or otherwise better Bids that in subsequent rounds of bidding may be considered, together with other Bids for non-overlapping material portions of the Assets, as part of such a single Qualified Bid for Overbid (as defined herein) purposes.

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors (in consultation with the Consenting Term Lenders and the DIP Agents), a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Notwithstanding anything herein to the contrary, the Debtors reserve the right  (in consultation with the Consenting Term Lenders and the DIP Agents) to work with (a) Acceptable Bidders to aggregate two or more Bids into a single consolidated Qualified Bid prior to the Bid

Deadline or (b) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualifying Bid prior to the conclusion of the Auction.  The Debtors reserve the right to cooperate with any Acceptable Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.  The Debtors may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Assets such that, if the multiple Bids were taken together in the aggregate, they would otherwise meet the standards for a single Qualified Bid (in which event those multiple Acceptable Bidders shall be treated as a single Qualified Bidder for purposes of the Auction).

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of such Qualified Bidder to consummate its contemplated transaction.  Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such Acceptable Bidder is no longer a Qualified Bidder or that a Bid made by such Acceptable Bidder is not a Qualified Bid.

## VII.    RIGHT TO CREDIT BID.

Any Qualified Bidder who has a valid and perfected lien on any Assets of the Debtors' estates (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured.

Notwithstanding anything to the contrary herein, the Term Agent or its designee, the DIP Administrative Agent, and the Prepetition ABL Administrative Agent (each as defined in the First Day Declaration), on behalf of those Term Loan Lenders, DIP Lenders, and Prepetition ABL Lenders (each as defined in the First Day Declaration), shall be deemed to be a Qualified Bidder and, subject to section 363(k) of the Bankruptcy Code, may submit a credit bid of all or any portion of the aggregate amount of such Term Loan Lenders', DIP Lenders', or Prepetition ABL Lenders' secured claims pursuant to section 363(k) at any time during the Auction and any such credit bid will be considered a Qualified Bid, unless otherwise ordered by the Court for cause; *provided* that in accordance with the Plan Support Agreement, the Consenting Term Lenders shall not submit a bid that exceeds the value of the Reserve Price (as defined in the Plan Support Agreement) in accordance with the Plan Support Agreement.

Any credit bid submitted by a Secured Creditor shall be subject in each case to the rights and duties of the parties under the Intercreditor Agreement and Prepetition Documents (as defined in the DIP Orders) and to the provision of consideration sufficient to pay in full in cash all claims for which there are any senior liens on the collateral Assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment)that is subject to the credit bid.

## VIII.    STALKING HORSE BID AND BID PROTECTIONS.

Upon entry of the Order, at any time until two (2) business days prior to the Auction, the Debtors shall be authorized, but not obligated, in an exercise of their business judgment, and in

consultation with the Consenting Term Lenders and the DIP Agents, to (a) select one or more Acceptable Bidders to act as a stalking horse bidder in connection with the Auction (the "Stalking Horse Bidder") and (b) in connection with any stalking horse agreement with a Stalking Horse Bidder, (x) provide a breakup fee, (y) agree to reimburse the reasonable and documented out of pocket fees and expenses and/or (z) agree to pay a "work fee" or other similar cash fee ((x)-(z) collectively, the "Bid Protections"); *provided*, however, that any Bid Protections are reasonably acceptable to the Consenting Term Lenders and the DIP Agents.[3]   Any such stalking horse Bid Protections are authorized pursuant to the Order.

## IX.    THE AUCTION.

If the Debtors receive more than one Qualified Bid for any particular Asset or portion of Assets, the Debtors shall conduct the Auction to determine the Successful Bidder with respect to such Assets or portion of Assets.  If the Debtors do not receive a Qualified Bid for any particular Asset, the Debtors will not conduct the Auction with respect to such Asset in accordance with the Plan Support Agreement.

Absent the Debtors selection of a stalking horse bid pursuant to Section VIII above, no later than two days prior to the Auction, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the Debtors' reasonable business judgment and in consultation with the Consenting Term Lenders and the DIP Agents (the "Baseline Bid"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders.  The determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, but not limited to, among other things:  (a) the number, type, and nature of any changes to the Form Purchase Agreement requested by the Qualified Bidder, including the type and portion of the Assets sought and Assumed Obligations to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the net economic effect of any changes to the value to be received by the Debtors' estates from the transactions contemplated by the Bid Documents; (d) the tax consequences of such Qualified Bid; and (e) the ability and likelihood to close the transaction contemplated by the Qualified Bid (collectively, the "Bid Assessment Criteria").

### D.  Auction Participation

1. Time, Date and Location of Auction; Adjournment of Auction; Appearance of Qualified Bidders at Auction.  The Auction shall take place at [●] a/p.m. (prevailing Eastern Time) on [Tuesday, March 31], 2020, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such later date, time, and location as designated by the Debtors, after providing notice to the Notice Parties and Qualified Bidders and posting notice of such change on the Debtors' case website: https://dm.epiq11.com/pier1.  The Debtors shall have the right to conduct

---

[3]   Prior to giving Bid Protections to Stalking Horse Bidder, the Debtors shall consult with the U.S. Trustee, as well as counsel for an official committee of unsecured creditors should one be appointed in these chapter 11 cases, one (1) day prior to providing Bid Protections pursuant to the Order.

any number of Auctions on that date to accommodate multiple bids that comprise a single Qualified Bid, if the Debtors determine, in their reasonable business judgment and upon consultation with the Consenting Term Lenders and the DIP Agents, that conducting such auctions would be in the best interests of the Debtors' estates.

2.  *Participants and Attendees.*[4]   Only Qualified Bidders are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures.  Qualified Bidders participating in the Auction must appear in person at the Auction, or through a duly authorized representative.  The Auction will be conducted openly and all creditors may be permitted to attend; *provided* that the Debtors may, in their sole and exclusive discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder or creditor at the Auction.  Any creditor wishing to attend the Auction may do so by contacting, no later than three (3) business days prior to the start of the Auction, the Debtors' advisors.

**E.  Auction Procedures.**

The Debtors (in consultation with their advisors) shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis in the presence of all other Qualified Bidders, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  All Qualified Bidders shall have the right to submit additional bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their bids; *provided* that any Overbid made by a Qualified Bidder (including with respect to any Backup Bid (as defined below) must remain open and binding on the Qualified Bidder until and unless the Debtors accept a higher or otherwise better Qualified Bid as the Leading Bid.  The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders participating in the Auction.  The Debtors shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid (as defined below).

The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment:

---

[4]    Permitted Attendees.   Unless the Bankruptcy Court orders or directs otherwise, only the Debtors' representatives, any other parties that the Debtors have invited specifically, and any Qualified Bidders and the professionals for each of the foregoing shall be entitled to attend the Auction; *provided* that only Qualified Bidders shall be entitled to bid at the Auction.  Any permitted attendee may attend the Auction telephonically; provided, further, that such permitted attendee must provide actual notice to Guggenheim, in its capacity as the Debtors' proposed investment banker, that it will make a telephonic appearance at least three (3) business day prior to the Auction.  Notwithstanding any of the foregoing, the Consenting Term Lenders, the DIP Agents, and their professionals shall be entitled to attend the Auction.

1. ***Baseline Bid as Price Floor***.  Bidding shall commence at the amount of the Baseline Bid.

2. ***Minimum Overbid***.  Qualified Bidders may submit successive Bids higher than the previous Bid, based on and increased from the Baseline Bid for the relevant Assets (each such Bid, an "Overbid").  Any Qualified Bidder's initial Overbid and each subsequent Overbid shall be at least a 2% increase in cash, cash equivalents, or such other consideration that the Debtors deem equivalent, over the previous price (the "Minimum Overbid").  The Debtors may, in their reasonable business judgment, announce increases or reductions to the Minimum Overbid at any time during the Auction.  For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at the Auction must contain a Purchase Price in cash, cash equivalents, or such other consideration that the Debtors deem equivalent that exceeds the then existing highest Bid by at least the Minimum Overbid Amount.

3. ***Announcement of Rules***.  At commencement of the Auction, the Debtors may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s).

4. ***Overbid Alterations***.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

5. ***Highest or Best Offer***.  After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid that they believe in their reasonable business judgment and upon consultation with their advisors and the Consenting Term Lenders and the DIP Agents to be the highest or otherwise best offer for the relevant Assets (the "Leading Bid").  Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent Bid with full knowledge of the Leading Bid.

6. ***Rejection of Bids***.  The Debtors, in their reasonable business judgment may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders.

7. ***Additional Information***.  The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable

determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction.

8. **_Modification of Procedures_**.  The Debtors may (in consultation with the Consenting Term Lenders and the DIP Agents) announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures.

9. **_No Collusion_**.  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding and (ii) its Qualified Bid is a good-faith _bona fide_ offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

### F.  Adjournment of the Auction.

The Debtors reserve the right, in their reasonable business judgment and upon consultation with the Consenting Term Lenders and the DIP Agents, to adjourn the Auction one or more times to, among other things (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Sale Transaction(s) at the prevailing Bid amount.

### G.  Successful Bidder.

Immediately prior to the conclusion of the Auction, the Debtors shall  (i) determine, consistent with these Bidding Procedures and upon consultation with their advisors and the Consenting Term Lenders and the DIP Agents, which Bid constitutes the highest or otherwise best bid(s) for the applicable Assets (each such Bid, a "Successful Bid") using the Bid Assessment Criteria; and (ii) notify all Qualified Bidders at the Auction for the applicable Assets of the identity of the Qualified Bidder that submitted the Successful Bid (each such Qualified Bidder, the "Successful Bidder") and the amount of the Purchase Price and other material terms of the Successful Bid.  The terms of the Successful Bid shall be acceptable to the DIP Agents and shall, among other things, provide for cash proceeds in an amount sufficient to repay in full in cash the outstanding DIP Obligations under the DIP Documents (each as defined in the DIP Orders) and all of the Prepetition ABL Obligations (as defined in the DIP Orders), to the extent any Prepetition ABL Obligations are still outstanding; _provided_ that if more than one Bid provides for payment in full in cash of the outstanding DIP Obligations, then the Debtors shall not be required to consult with the DIP Agents in selecting the Successful Bid.

The Debtors shall file a notice identifying the Successful Bidder and Backup Bidder (if selected) by 11:59 p.m. (prevailing Eastern Time) on the date that is one business day following the date the Auction is closed.

### H.  Backup Bidder.

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment (the "Backup Bid"), shall be required to serve as a backup bidder and upon consultation with the Consenting Term Lenders  and the DIP Agents (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.  The terms of the Backup Bid shall be acceptable to the DIP Agents and shall, among other things, provide for cash proceeds in an amount sufficient to repay in full in cash the outstanding DIP Obligations under the DIP Documents (each as defined in the DIP Orders) and all of the Prepetition ABL Obligations (as defined in the DIP Orders), to the extent any Prepetition ABL Obligations are still outstanding.

The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.

If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

### X.    ACCEPTANCE OF SUCCESSFUL BID.

The Debtors' presentation of a particular Successful Bid to the Court for approval does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale/Confirmation Hearing (as defined below) and in accordance with the Plan.  The Debtors shall seek approval by the Court to consummate the Backup Bid, solely in the event the Successful Bidder fails to close the transaction as required and with all rights reserved against the Successful Bidder.

### XI.    FREE AND CLEAR OF ANY AND ALL ENCUMBRANCES.

Except as provided for in a Successful Bidder's Form Purchase Agreement, all rights, titles and interests in and to the Assets subject thereto shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "Encumbrances"), subject only to the Assumed Liabilities (as defined in the Successful Bidder's purchase agreement), if any, in accordance with Bankruptcy Code section 363(f), with such Encumbrances to attach to the net proceeds (if any) received by the Debtors from the Sale of the Assets in accordance with the Bankruptcy Code, applicable non-bankruptcy law and any prior orders of the Court.

## XII.    DIP ORDERS.

Notwithstanding anything to the contrary contained in these Bidding Procedures or otherwise: (i) the right of the DIP Agents to consent to the sale of any portion of their collateral, including, without limitation, any Assets, on terms and conditions acceptable to the DIP Agents, are hereby expressly reserved and not modified, waived or impaired in any way by these Bidding Procedures; (ii) unless otherwise ordered by the Court, all cash proceeds generated from the sale of any Assets shall be paid to the DIP Administrative Agent upon the closing of such sale for permanent application against the obligations owing by the Debtors under the DIP Documents in accordance with the terms and conditions of the DIP Order and the DIP Documents and thereafter, against the obligations owing by the Debtors under the Prepetition ABL Documents (to the extent any such obligations are still outstanding), in accordance with the terms and conditions of the Prepetition ABL Documents, until such time as all DIP Obligations and Prepetition ABL Obligations have been paid in full in cash in accordance with the terms and conditions of the DIP Documents, the DIP Order and the Prepetition ABL Documents, as applicable; and (iii) nothing in these Bidding Procedures shall amend, modify, or impair any provision of the DIP Order, or the rights of the Debtors or the DIP Agents or DIP Lenders thereunder.

## XIII.    COMMISSIONS.

The Debtors shall be under no obligation to pay commission to any agent(s), advisor(s), or broker(s), except, with respect to Guggenheim Securities, LLC ("Guggenheim"), as investment banker. All commissions, fees, or expenses for agents, other than Guggenheim, may be paid by bidders at such bidder's discretion. In no case shall any commissions, fees, or expenses be deducted from any proceeds derived from the Sale of the Assets or the agreed Successful Bid other than to the extent set forth in the Order.

## XIV.    NOTICE PARTIES.

The term "Notice Parties" as used in these Bidding Procedures shall mean:

(i)     proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua Sussberg (joshua.sussberg@kirkland.com), Emily Geier (emily.geier@kirkland.com), and AnnElyse Scarlett Gains (annelyse.gains@kirkland.com) and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Joshua M. Altman (josh.altman@kirkland.com);

(ii)     proposed co-counsel to the Debtors, Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia, 23219, Attn: Michael Condyles (michael.condyles@kutakrock.com), Peter Barrett (peter.barrett@kutakrock.com), Jeremy Williams (jeremy.williams@kutakrock.com), and Brian Richardson (brian.richardson@kutakrock.com);

(iii)     the Debtors' proposed investment banker, Guggenheim Securities, LLC, 330 Madison Avenue, New York, New York 10017, Attn: Durc Savini

16

(durc.savini@guggenheimpartners.com),                    Adam              Rifkin
(adam.rifkin@guggenheimpartners.com),                    Stuart           Erickson
(stuart.erickson@guggenheimpartners.com),      and      Hend      Abdallah
(hend.abdallah@guggenheimpartners.com);

(iv)    co-counsel to the DIP Agents, Morgan Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie S. Crider (Marjorie.crider@morganlewis.com);

(v)     co-counsel to the DIP Agents, Hunton Andrews Kurth LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, Attn: Tyler P. Brown (tpbrown@huntonAK.com) and Justin Paget (jpaget@huntonAK.com);

(vi)    co-counsel to the DIP Agents, Choate Hall & Stewart, Two International Place, Boston, MA 02110, Attn: Mark D. Silva (msilva@choate.com), John F. Ventola (jventola@choate.com), and Jonathan D. Marshall (jmarshall@choate.com);

(vii)   counsel to the Consenting Term Lenders, Brown Rudnick LLP, Seven Times Square, New York, New York 10036, Attn: Robert J. Stark (rstark@brownrudnick.com), and Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attn: Sharon I. Dwoskin (sdwoskin@brownrudnick.com); and

(viii)  the U.S. Trustee.

## XV.    SALE/CONFIRMATION HEARING.

A hearing to consider confirmation of a plan, including approval of the sale of the Debtors' Assets to the Successful Bidder(s), or Backup Bidder(s) (if applicable) (the "Sale/Confirmation Hearing") is currently scheduled to take place on **Thursday, April 23, 2020**, at [●], (prevailing Eastern Time), before the Honorable [●], at the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, Suite 4000, Richmond, Virginia 23219, or such other date and time that the Court may later direct and as agreed upon by the Debtors.

**The Sale/Confirmation Hearing may be continued to a later date by the Debtors (in consultation with the Consenting Term Lenders and the DIP Agents) by sending notice prior to, or making an announcement at, the Sale/Confirmation Hearing.  No further notice of any such continuance will be required to be provided to any party.**

## XVI.    RETURN OF DEPOSIT.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of such transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or before the date that is five business days after the Auction.

The Backup Bidder's Deposit shall be held in escrow until the closing of the Sale with the Successful Bidder.   In the event the Successful Bidder fails to consummate the Sale Transaction(s) set forth in the Successful Bid and the Debtors opt to close on the Sale Transaction(s) set forth in the Backup Bid, the Backup Bidder's Deposit shall be applied to the Purchase Price of such transaction(s) at closing.   In the event of a breach or failure to consummate a Sale by the Successful Bidder or the Backup Bidder, as applicable, the defaulting Successful Bidder's Deposit or Backup Bidder's Deposit, as applicable, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder or Backup Bidder, as applicable.

## XVII.    RESERVATION OF RIGHTS.

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment and upon consultation with the Consenting Term Lenders and the DIP Agents in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation:   (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale/Confirmation Hearing without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids.

## XVIII.   CONSENT TO JURISDICTION.

All Potential Bidders, Acceptable Bidders, and Qualified Bidders shall be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XIX.    FIDUCIARY OUT.

Nothing in these Bidding Procedures shall require the Debtors' (or any other debtors') management or board of directors to take any action or to refrain from taking any action with respect to these Bidding Procedures when the Debtors' management or board of directors (or other debtors' management or board of directors) determine, based on the advice of their counsel, that taking such action or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary obligations under applicable law.

## **Exhibit 1**

**Form Purchase Agreement**

**Auction Draft**
**Confidential**

**FOR DISCUSSION PURPOSES ONLY**

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF [●], 2020**

**BY AND BETWEEN**

**[●], AS PURCHASER,**

**AND**

**PIER 1 IMPORTS, INC., AS THE COMPANY,**

**AND**

**THE OTHER SELLERS NAMED HEREIN[1]**

---

*This is a draft agreement only, and delivery or discussion of this draft agreement is not, and will not be deemed or construed to be, an offer or commitment with respect to the proposed transaction to which this draft agreement relates. Notwithstanding the delivery of this draft agreement or any other past, present or future written or oral indications of assent, or indications of the result of negotiations or agreements, no party to the proposed transaction (and no person or entity related to any such party) will be under any legal obligation whatsoever unless and until the definitive agreement providing for the transaction has been executed and delivered by all parties thereto;* <u>*provided*</u>*,* <u>*however*</u>*, that any party who submits a marked up version of this draft agreement as part of a binding Qualified Bid pursuant to the Bidding Procedures will be subject to the legal obligation related thereto, as set forth in the Bidding Procedures Order.[2]*

---

[1]    NTD: Seller entities to be confirmed.

[2]    Capitalized terms in this paragraph have the meaning ascribed to such terms in the Bidding Procedures Order.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

**Article I Purchase and Sale of the Acquired Assets; Assumption of Assumed Liabilities** ...............................................................................................**2**

    1.1    Purchase and Sale of the Acquired Assets ...............................................2
    1.2    Excluded Assets .......................................................................................2
    1.3    Assumption of Certain Liabilities ...........................................................2
    1.4    Excluded Liabilities ................................................................................2
    1.5    Assumption/Rejection of Certain Contracts ...........................................2

**Article II Consideration; Payment; Closing** .............................................**2**

    2.1    Consideration; Payment ..........................................................................2
    2.2    Deposit ....................................................................................................2
    2.3    Closing ....................................................................................................2
    2.4    Closing Deliveries by Sellers .................................................................2
    2.5    Closing Deliveries by Purchaser .............................................................2
    2.6    Withholding ............................................................................................2

**Article III Representations and Warranties of Sellers**..............................**2**

    3.1    Organization and Qualification ...............................................................2
    3.2    Authorization of Agreement ...................................................................2
    3.3    Conflicts; Consents .................................................................................2
    3.4    Financial Statements ...............................................................................2
    3.5    Absence of Certain Developments...........................................................2
    3.6    Title to Properties ...................................................................................2
    3.7    Insurance .................................................................................................2
    3.8    Contracts .................................................................................................2
    3.9    Litigation ................................................................................................2
    3.10   Permits; Compliance with Laws .............................................................2
    3.11   Environmental Matters............................................................................2
    3.12   Intellectual Property ...............................................................................2
    3.13   Tax Matters .............................................................................................2
    3.14   Seller Plans .............................................................................................2
    3.15   Employees...............................................................................................2
    3.16   Affiliate Transactions.............................................................................2
    3.17   Brokers....................................................................................................2
    3.18   No Other Representations or Warranties ...**Error! Bookmark not defined.**

**Article IV Representations and Warranties of Purchaser** ...................**2**

    4.1    Organization and Qualification................................................................2
    4.2    Authorization of Agreement ...................................................................2
    4.3    Conflicts; Consents .................................................................................2
    4.4    Financing.................................................................................................2

4.5     Brokers ................................................................................................2
4.6     No Litigation .......................................................................................2
4.7     No Additional Representations or Warranties ....................................2
4.8     No Outside Reliance ...........................................................................2

**Article V BANKRUPTCY COURT MATTERS** .................................................**2**

5.1     Bankruptcy Actions ............................................................................2
5.2     Cure Costs ...........................................................................................2
5.3     Confirmation Order .............................................................................2
5.4     Approval ..............................................................................................2

**Article VI COVENANTS AND AGREEMENTS** ...............................................**2**

6.1     Conduct of Business of Sellers ..........................................................2
6.2     Access to Information .........................................................................2
6.3     Employee Matters ...............................................................................2
6.4     Regulatory Approvals .........................................................................2
6.5     Antitrust Notification ..........................................................................2
6.6     Reasonable Efforts; Cooperation .......................................................2
6.7     Notification of Certain Matters ..........................................................2
6.8     Further Assurances ..............................................................................2
6.9     Insurance Matters ...............................................................................2
6.10    Receipt of Misdirected Assets ...........................................................2
6.11    Acknowledgment by Purchaser ..........................................................2

**Article VII CONDITIONS TO CLOSING** .......................................................**2**

7.1     Conditions Precedent to the Obligations of Purchaser and Sellers ............2
7.2     Conditions Precedent to the Obligations of Purchaser ......................2
7.3     Conditions Precedent to the Obligations of the Company ..................2
7.4     Waiver of Conditions ..........................................................................2

**Article VIII Termination** ..........................................................................**2**

8.1     Termination of Agreement ..................................................................2
8.2     Effect of Termination .........................................................................2

**Article IX TAXES** ......................................................................................**2**

9.1     Transfer Taxes ....................................................................................2
9.2     Allocation of Purchase Price ..............................................................2
9.3     Cooperation .........................................................................................2
9.4     Preparation of Tax Returns and Payment of Taxes ...........................2

**Article X MISCELLANEOUS** .......................................................................**2**

10.1    Non-Survival of Representations and Warranties and Certain Covenants;
        Certain Waivers ..................................................................................2
10.2    Expenses ..............................................................................................2
10.3    Notices .................................................................................................2

10.4     Binding Effect; Assignment ....................................................................2
10.5     Amendment and Waiver ........................................................................2
10.6     Third Party Beneficiaries .....................................................................2
10.7     Non-Recourse .......................................................................................2
10.8     Severability ...........................................................................................2
10.9     Construction ..........................................................................................2
10.10   Schedules ...............................................................................................2
10.11   Complete Agreement ............................................................................2
10.12   Specific Performance ............................................................................2
10.13   Jurisdiction and Exclusive Venue ........................................................2
10.14   Governing Law; Waiver of Jury Trial ..................................................2
10.15   No Right of Set-Off ..............................................................................2
10.16   Counterparts and PDF ..........................................................................2
10.17   Publicity ................................................................................................2
10.18   Bulk Sales Laws ...................................................................................2
10.19   Fiduciary Obligations ...........................................................................2
10.20   No Solicitation ......................................................................................2

**Article XI  ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ............................2**

11.1     Certain Definitions ...............................................................................2
11.2     Index of Defined Terms ........................................................................2
11.3     Rules of Interpretation .........................................................................2

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
                      AGREEMENT

EXHIBIT B    FORM OF IP ASSIGNMENT AGREEMENTS

EXHIBIT C    FORM OF ESCROW AGREEMENT

Auction Draft

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of [●], 2020, by and among [●], a [●] ("Purchaser"),[3] Pier 1 Imports, Inc., a Delaware corporation (the "Company"), and the Subsidiaries of the Company that are indicated on the signature pages attached hereto (together with the Company, each a "Seller" and collectively "Sellers"). Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used in herein shall have the meanings set forth herein or in Article XI.

WHEREAS, the Company and the other Sellers filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division) (the "Bankruptcy Court"), which chapter 11 cases will be jointly administered for procedural purposes (collectively, the "Bankruptcy Case"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and the Plan and subject to entry of the Confirmation Order and consummation of the Plan.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1    Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Confirmation Order and subject to the consummation of the Plan, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of the properties, rights, interests and other assets of Sellers, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet

---

[3]    NTD: In the event that Purchaser is a newly formed or undercapitalized entity, Purchaser will be required to provide a guarantee of its obligations under the Purchase Agreement from a creditworthy Affiliate. In addition, if Purchaser presents enforceability concerns or regulatory risk (including, e.g., regarding ability to deliver cash to the U.S.), the Purchase Agreement will include further provisions mitigating, or compensating Seller for, such Purchaser risks.

prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by Sellers after the date hereof and prior to the Closing, and including the following assets of Sellers (but excluding in all cases the Excluded Assets):

(a)     all Contracts to which any Seller is a party, including the Contracts listed on Schedule 1.1(a) and all purchase orders, to the extent assignable under applicable Law (the "Assigned Contracts");

(b)     all accounts receivable, negotiable instruments and chattel paper owing from Persons that are not Sellers;

(c)     all Documents;

(d)     the Owned Real Property listed on Schedule 1.1(d) (the "Acquired Owned Real Property");

(e)     the Leased Real Property listed on Schedule 1.1(e) (the "Acquired Leased Real Property"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto;

(f)     all tangible assets (including Equipment and machinery) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property or Acquired Owned Real Property and any tangible assets on order to be delivered to any Seller;

(g)     to the extent transferable under applicable Law, all of the rights, interests and benefits accruing under all Permits, and all pending applications therefor;

(h)     the sponsorship of each Assumed Benefit Plan and all right, title and interest in any assets thereof or relating thereto;

(i)     all Intellectual Property, all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

(j)     all goodwill, payment intangibles and general intangible assets and rights of Sellers; and

(k)     all Inventory of Sellers.

1.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, or convey, and Sellers shall retain all right, title and interest to, in and under the following assets, properties, interests and rights of such Seller (collectively, the "Excluded Assets"):

(a)     all assets expressly excluded from the definition of Acquired Assets pursuant to Section 1.1;

(b)    all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

(c)    all Contracts of Sellers listed on Schedule 1.2(c) (the "Excluded Contracts");

(d)    all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of any Seller); (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers) and any other Tax information or records, corporate seal, checkbooks, and canceled checks; (iii) that any Seller is required by Law to retain; or (iv) constituting personal data or information that are governed under any applicable Canadian Privacy Law, or collected from natural persons with addresses, e-mails, or phone numbers in Canada; provided that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(e)    all Documents prepared or received by any Seller or any of its Affiliates in connection with the sale of the Acquired Assets, this Agreement, or the transactions contemplated hereby, including (i) all records and reports prepared or received by Sellers, any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets; (iii) all privileged materials, documents and records of a Seller or any of its Affiliates; and (iv) copies of the documents, materials and data to the extent related to the Acquired Assets prior to the Closing Date;

(f)    all current and prior insurance policies of any of Sellers that are not Assumed Benefit Plans or International Seller Plans, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(g)    all membership interests or other equity interests of any Seller or any of their respective Subsidiaries or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(h)    the sponsorship of all United States Seller Plans, other than the Assumed Benefit Plans, and any right, title or interest in any of the assets thereof or relating thereto;

(i)    (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case,

7

arising out of or relating to events occurring on or prior to the Closing Date, and (iii) all claims that any of Sellers may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(j)    Sellers' claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(k)    all Tax refunds and Tax attributes that are not transferred by the operation of applicable Tax Law;

(l)    all real estate and all interests in real estate other than the Acquired Owned Real Property and the Acquired Leased Real Property, including any Leasehold Improvements thereon;

(m)    all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date; and

(n)    the properties and assets set forth on Schedule 1.2(n).

1.3    Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Confirmation Order and subject to the consummation of the Plan, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, Purchaser shall irrevocably assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)    all Liabilities of Sellers under the Assigned Contracts that become due from and after the Closing;

(b)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)    all Liabilities arising out of the conduct of the business or the ownership of the Acquired Assets, in each case, by Purchaser from and after the Closing Date;

(d)    all current Liabilities, including all accounts payable and trade payables existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable), of Sellers;

(e)     all Liabilities, including, for the avoidance of doubt, Taxes other than income Taxes of Sellers, relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes;

(f)     all Taxes with respect to which "responsible person" claims may be made against any individual employee, manager, officer, director, or similar person ("Responsible Person Taxes"); provided that such Liabilities shall constitute Assumed Liabilities solely to the extent Sellers are unable to discharge Responsible Person Taxes due to the operation of the Bankruptcy Code or a lack of available funds; provided, further, that (i) Sellers shall take all commercially reasonable steps to discharge Responsible Person Taxes in a way that avoids such Taxes becoming Assumed Liabilities and (ii) Sellers shall promptly notify Purchaser in the event they become aware of a material possibility that any Responsible Person Taxes will become Assumed Liabilities;

(g)     the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with the United States Seller Plans set forth on Schedule 1.3(g)[4] (the "Assumed Benefit Plans") and all Liabilities for compliance with the requirements of Section 4980B of the Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in Treasury Regulation Section 54.4980B-9;

(h)     all Liabilities relating to, arising out of, with respect to, or otherwise resulting from, the employment or engagement of or termination of employment or engagement of any applicant, employee, director, officer, independent contractor, consultant, agent, or other service provider of Sellers at, prior to or in connection with the Closing;

(i)     all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be responsible in accordance with this Agreement;

(j)     all Liabilities owed to vendors and customers that are providing goods or services to, or purchasing products or services from, the Company or are reasonably expected to, after the Closing, provide goods or services to, or purchase products or services from, the Company;

(k)     Liabilities arising under section 503(b)(9) of the Bankruptcy Code; and

(l)     all Liabilities set forth on Schedule 1.3(l).

1.4     Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed

---

[4]     NTD: Purchaser to confirm which plans, if any, will be taken.

Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").

      1.5    Assumption/Rejection of Certain Contracts.

      (a)    Assumption and Assignment of Executory Contracts. Sellers shall provide timely and proper written notice of the motion seeking entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, Sellers shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to either the Plan Supplement, a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on Sellers' books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Plan, the Confirmation Order, and the Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

      (b)    Excluding or Adding Assigned Contracts Prior to Closing. Purchaser shall have the right to notify Sellers in writing of any Assigned Contract (other than any purchase orders) that it does not wish to assume or a Contract to which any Seller is a party that Purchaser wishes to add as an Assigned Contract up to one (1) Business Day prior to the Bid Deadline (as defined in the Bidding Procedures Order), and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Sellers to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

      (c)    Non-Assignment. Notwithstanding the foregoing, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent

that such Contract (i) is rejected by a Seller or terminated by a Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption or (ii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of the applicable Seller's rights under such Contract, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder. In addition, a Permit shall not be assigned to, or assumed by, Purchaser to the extent that such Permit requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of the applicable Seller's rights under such Permit, and no such Consent or Governmental Authorization has been obtained prior to the Closing. In the event that any Assigned Contract is deemed not to be assigned pursuant to clause (ii) of the first sentence of this <u>Section 1.5(b)</u>, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six (6) months following the Closing (or the remaining term of such Contract or the closing of the Bankruptcy Case, if shorter), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Assigned Contract, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates) under such Assigned Contract with respect to which the Consent and/or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation (including performance) with respect to such Assigned Contract. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Assigned Contract after the Closing, such Assigned Contract shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Plan, the Confirmation Order and the Bankruptcy Code.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1     <u>Consideration; Payment</u>.

(a)     The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) a cash payment of $[●] (the "<u>Cash Payment</u>").

(b)     At the Closing, Purchaser shall deliver, or cause to be delivered, to the Company the Cash Payment <u>less</u> the Deposit (the "<u>Closing Date Payment</u>"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two Business Days prior to the date such payment is to be made.

2.2    <u>Deposit</u>.

(a)    Purchaser has, on or prior to the date hereof, made an earnest money deposit with [SRS Acquiom, Inc.] (the "<u>Escrow Agent</u>") in the amount of ten percent (10%) of the Cash Payment (the "<u>Deposit</u>"), by wire transfer of immediately available funds for deposit into a separate escrow account (the "<u>Deposit Escrow Account</u>"), established pursuant to the escrow agreement, dated as of the date hereof, by and among the Company, Purchaser and the Escrow Agent, substantially in the form attached hereto as <u>Exhibit E</u> (the "<u>Escrow Agreement</u>"). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any of Sellers or Purchaser and shall be applied against payment of the Cash Payment on the Closing Date.

(b)    If this Agreement has been terminated by the Company pursuant to <u>Section 8.1(f)</u> or <u>8.1(h)</u> (or by Purchaser pursuant to <u>Section 8.1(b)</u>, <u>8.1(c)</u>, <u>8.1(d)</u> or <u>8.1(e)</u>, in each case in circumstances where the Company would be entitled to terminate this Agreement pursuant to <u>Section 8.1(f)</u> or <u>8.1(h)</u>), then the Company shall retain the Deposit together with all received investment income, if any.

(c)    If this Agreement has been terminated by any Party, other than as contemplated by <u>Section 2.2(b)</u>, then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five (5) Business Days after such termination.

(d)    The Parties agree that the Company's right to retain the Deposit, as set forth in <u>Section 2.2(b)</u>, is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their respective efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e)    If the Closing occurs, the Deposit shall be transferred to the Company.

2.3    <u>Closing</u>. The closing of the purchase and sale of the Acquired Assets, the delivery of the Cash Payment, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "<u>Closing</u>") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 300 North LaSalle, Chicago, Illinois 60654) at 8:00 a.m. Chicago time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in <u>Article VII</u> (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree. The date on which the Closing actually occurs is referred to herein as the "<u>Closing Date</u>."

2.4    <u>Closing Deliveries by Sellers</u>. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of <u>Exhibit A</u> (the "<u>Assignment and Assumption Agreement</u>") duly executed by Sellers;

(b)   each IP Assignment Agreement substantially in the form of Exhibit B, duly executed by the Sellers party thereto;

(c)   a copy of the Confirmation Order, as entered by the Bankruptcy Court;

(d)   a duly executed IRS Form W-9 with respect to each Seller (or, in the case of any disregarded entity, the regarded parent entity of such Seller);

(e)   an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in Sections 7.2(b) and 7.2(c) have been satisfied; and

(f)   a joint written instruction, duly executed by Sellers, instructing the Escrow Agent to release to the Company by wire transfer of immediately available funds, the Deposit.

2.5   Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) the Company:

(a)   the Closing Date Payment;

(b)   the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)   an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a), 7.3(b) and 7.3(c) have been satisfied; and

(d)   a joint written instruction, duly executed by Purchaser, instructing the Escrow Agent to release to the Company by wire transfer of immediately available funds, the Deposit.

2.6   Withholding. Purchaser shall not be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from Seller's failure to satisfy its obligations under Section 2.4(d).

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with (or furnished to) the United States Securities and Exchange Commission by the Company to the extent publicly available on the SEC's Electronic Data Gathering Analysis and Retrieval System, (ii) disclosed in any forms, statements or other documents filed with the Bankruptcy Court or (iii) set forth in the Schedules delivered by the Company concurrently herewith and Sections 6.7(a) and 10.10, the Sellers represent and warrant to Purchaser as follows as of the date hereof and as of the Closing Date.

3.1   Organization and Qualification. Each of the Company and its Subsidiaries (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the

jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

3.2    <u>Authorization of Agreement</u>. The execution, delivery, and performance of this Agreement by each Seller, and the consummation by such Seller of the transactions contemplated hereby, subject to requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by such Seller. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly and validly executed and delivered by such Seller, and, assuming this Agreement is a valid and binding obligation of Purchaser, this Agreement constitutes a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except as limited by the application of bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium, or other Laws relating to or affecting creditors' rights or general principles of equity (whether considered in a proceeding in equity or at law) (the "<u>Enforceability Exceptions</u>").

3.3    <u>Conflicts; Consents</u>.

(a)    Except as set forth on <u>Schedule 3.3(a)</u> and assuming that (w) requisite Bankruptcy Court approvals are obtained, (x) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3(b)</u> are made, given or obtained (as applicable), (y) the requirements of the HSR Act and any other applicable antitrust, competition or merger control Laws promulgated by any Governmental Body ("<u>Foreign Competition Laws</u>") are complied with, and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Sellers of this Agreement and the consummation by Sellers of the transactions contemplated hereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of the Company or any of its Subsidiaries; (ii) violate any Law applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any property or asset of the Company or any of its Subsidiaries under, any Lease or Contract listed on <u>Schedule 3.8(a)</u>; except, in each case, for any such violations, breaches, defaults or other occurrences that are not material to the Company and its Subsidiaries taken as a whole.

(b)    Except as set forth on <u>Schedule 3.3(b)</u>, Sellers are not required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Body in connection with the execution, delivery and performance by Sellers of this Agreement or the consummation by Sellers of the transactions contemplated hereby, except (i) requisite Bankruptcy Court approvals, (ii) any filings required to be made under the HSR Act

14

and any Foreign Competition Laws, (iii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, (iv) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, is not material to the Company and its Subsidiaries taken as a whole, or (v) as may be necessary as a result of any facts or circumstances relating to Purchaser or any of its Affiliates.

3.4    Financial Statements. Attached to Schedule 3.4 are: (a) the Company's unaudited consolidated balance sheet as of November 30, 2019 (the "Latest Balance Sheet"), and the related statements of income and cash flows for the six (6)-fiscal month period then ended, and (b) the Company's audited consolidated balance sheet as of, and the related statements of income and cash flows for the fiscal year ended, February 2, 2019 (collectively, the "Financial Statements"). Except as set forth on Schedule 3.4, the Financial Statements have been prepared, in each case, in conformity in all material respects with GAAP consistently applied and present fairly in all material respects, in accordance with GAAP consistently applied, the consolidated financial condition and results of operations of the Company and its Subsidiaries as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto and subject, in the case of the unaudited financial statements, to (y) the absence of footnote disclosures and other presentation items and (z) changes resulting from normal year-end adjustments (which are expected to be consistent with past practice).

3.5    Absence of Certain Developments. Since the Latest Balance Sheet through the date of this Agreement except (a) for the execution of this Agreement and consummation of the transactions contemplated hereby, and the discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Acquired Assets, the negotiation and execution of this Agreement and (b) for the preparation and commencement of the Bankruptcy Case and Sellers' debtor-in-possession financing in the Bankruptcy Case, the business of the Company and its Subsidiaries has been carried on and conducted in all material respects in the Ordinary Course, and there has not been any Material Adverse Effect or any effect, change, event or occurrence that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.6    Title to Properties.

(a)    Schedule 3.6(a) contains a list of all real property leased by the Company and its Subsidiaries (the "Leased Real Property") and the agreements pursuant to which such Leased Real Property is leased (the "Leases"), in each case as of the date hereof. Except as set forth on Schedule 3.6(a), subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Lease in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, the Company or its Subsidiaries have a valid leasehold estate in all of the Acquired Leased Real Property, free and clear of all Encumbrances, other than Permitted Encumbrances. The Company has made available to Purchaser a correct and complete copy of each of the Leases (including all amendments thereto) governing the Acquired Leased Real Property. Except as set forth in Schedule 3.6(a), neither the Company nor its Subsidiaries has leased or otherwise granted to any Person rights to use or occupy any of the Acquired Leased Real Property that would reasonably be expected to materially impair the use or occupancy of the Acquired Leased Real Property in the operation of the business of the Company and its Subsidiaries taken as a whole.

(b)    Except as set forth on Schedule 3.6(b) (the "Owned Real Property"), neither the Company nor any of its Subsidiaries owns any real property.  Except as set forth on Schedule 3.6(b), (i) the Company or its Subsidiaries have fee title to all Owned Real Property, free and clear of all Encumbrances, other than Permitted Encumbrances, (ii) neither the Company nor any of its Subsidiaries has leased or otherwise granted to any Person rights to use or occupy the Owned Real Property that would reasonably be expected to materially impair the use or occupancy of the Owned Real Property in the operation of the business of the Company and its Subsidiaries taken as a whole, and (iii) there are no outstanding options, rights of first offer or rights of first refusal to purchase the Owned Real Property.  Neither the Company nor its Subsidiaries is a party to any agreement or option to purchase any real property or interest therein.

(c)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, the Company and its Subsidiaries own good title to, or hold a valid leasehold interest in, all of the material tangible property necessary in the conduct of their business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to the Company and its Subsidiaries taken as a whole.

3.7    Insurance. Schedule 3.7 lists, as of the date hereof, each material insurance policy maintained by the Company and its Subsidiaries on their properties, assets, products, business or personnel. With respect to each such insurance policy the policy is legal, valid, binding, enforceable on the Company or its Subsidiaries, as applicable, and in full force and effect, and all premiums with respect thereto covering all periods up to and including the date hereof have been paid, and no notice of cancellation, termination or denial of coverage for any material claim has been received with respect to any such insurance policy.

3.8    Contracts.

(a)    Except as set forth on Schedule 3.8(a), neither the Company nor any of its Subsidiaries is a party to any (each a "Material Contract"):

(i)    collective bargaining agreement with any labor union;

(ii)    agreement for the employment of any officer, individual employee or other person on a full-time or consulting basis providing for base compensation in excess of $250,000 per annum that is not terminable by the Company or such Subsidiary upon notice of sixty (60) days or less for a cost of $250,000 or less;

(iii)    agreement under which the Company or one of its Subsidiaries has borrowed any money or issued any note, indenture or other evidence of similar indebtedness or guaranteed such indebtedness of others (other than intercompany indebtedness among the Company and its Subsidiaries, guarantees of indebtedness of the Company or any of its Subsidiaries, endorsements for the purpose of collection or purchases of equipment or materials made under conditional sales agreements, in each case

16

in the Ordinary Course), in each case, having an outstanding principal amount in excess of $1,500,000;

(iv)    material license of any material Intellectual Property that involves payments (by or to the Company or any of its Subsidiaries) in excess of $500,000 per annum and is not terminable by the Company or such Subsidiary upon notice of sixty (60) days or less for a cost of $500,000 or less (other than licenses of commercially available, off-the-shelf software and other than licenses entered into in the Ordinary Course);

(v)    lease or other agreement under which the Company or any of its Subsidiaries is lessee of, or holds or operates any personal property owned by any third party, for which the annual rental exceeds $200,000 that is not terminable by the Company or such Subsidiary upon notice of sixty (60) days or less for a cost of $200,000 or less;

(vi)    lease or other agreement under which the Company or any of its Subsidiaries is lessor of or permits any third party to hold or operate any property, real or personal, for which the annual rental exceeds $200,000 that is not terminable by the Company or such Subsidiary upon notice of sixty (60) days or less for a cost of $200,000 or less;

(vii)    agreement or group of related agreements with the same party for the purchase of products or services, in either case, under which the aggregate undelivered balance of such products and services has a selling price in excess of $1,000,000 and which is not terminable by the Company or such Subsidiary upon notice of sixty (60) days or less for a cost of $1,000,000 or less (other than purchase orders entered into in the Ordinary Course);

(viii)    agreement that materially prohibits the Company or any of its Subsidiaries from freely engaging in business anywhere in the world;

(ix)    agreement relating to any acquisition or disposition by the Company of any business (whether by asset or stock purchase or otherwise) or any merger, consolidation or similar business combination transaction, in each case, pursuant to which the Company has an outstanding obligation to pay any purchase price thereunder or other material obligation;

(x)    agreement that involves any take-or-pay or requirements arrangement other than in the Ordinary Course;

(xi)    agreement relating to any joint venture or partnership; or

(xii)    agreement in writing to enter into any of the foregoing.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, each of the agreements listed on <u>Schedule 3.8(a)</u> and each of the Leases is in full force and effect and is a valid, binding and enforceable obligation of the Company and its

Subsidiaries and, to the knowledge of the Company, each of the other parties thereto, except as may be limited by the Enforceability Exceptions. Except as set forth on Schedule 3.8(b), as a result of the commencement of the Bankruptcy Case or as would not reasonably be expected to be material to the Company and its Subsidiaries taken as a whole, neither the Company nor any of its Subsidiaries, as applicable, is in material default, or is alleged in writing by the counterparty thereto to have materially breached or to be in material default, under any Lease or agreement listed on Schedule 3.8(a), and, to the knowledge of the Company, the other party to each Lease or each of the agreements listed on Schedule 3.8(a) is not in material default thereunder. The Company has made available to Purchaser complete and correct copies of all agreements required to be listed on Schedule 3.8(a) and all Leases, each as amended to the date hereof. None of the agreements listed on Schedule 3.8(a) or any of the Leases has been canceled or otherwise terminated, and neither the Company, nor its Subsidiaries, has received any written notice from any Person regarding any such cancellation or termination.

3.9     Litigation. Except as set forth on Schedule 3.9 and other than the Bankruptcy Case, there are, and during the prior two (2) years there have been, no Actions pending against or by the Company or any of its Subsidiaries, at law or in equity, or before or by any Governmental Body, other than any Action pursuant to which no injunctive or equitable relief is sought and where the monetary damages are covered by insurance or would not reasonably be expected to be material to the Company and its Subsidiaries taken as a whole. Except as set forth on Schedule 3.9 and other than in connection with the Bankruptcy Case, neither the Company nor any of its Subsidiaries is, or during the prior two (2) years has been, subject to any outstanding Order, other than any such Order where no injunctive or equitable relief was granted and where the monetary damages were covered by insurance or were not be material to the Company and its Subsidiaries taken as a whole

3.10     Permits; Compliance with Laws. Except as set forth on Schedule 3.10:

(a)     Each of the Company and its Subsidiaries holds and is in compliance, in all material respects, with all permits, certificates, licenses, approvals, registrations and authorizations that are material to the Company and its Subsidiaries taken as a whole and required in connection with the conduct of its business under Laws (the "Permits"). All of the Permits are valid and in full force and effect.

(b)     The Company and its Subsidiaries are, and have been during the prior two (2) years, in compliance, in all material respects, with all applicable Laws, and during the prior two (2) years neither the Company nor any of its Subsidiaries has received any written notice of any action or proceeding against it alleging any failure to comply in any material respect with any such Laws, except in each case as would not reasonably be expected to be material to the Company and its Subsidiaries taken as a whole. No investigation by any Governmental Body with respect to the Company or any of its Subsidiaries is pending or, to the Company's knowledge, threatened, and during the prior two (2) years neither the Company nor any of its Subsidiaries has received any written notice of any such investigation, except, in each case, for any such investigation that would not reasonably be expected to be material to the Company and its Subsidiaries taken as a whole.

18

3.11    <u>Environmental Matters</u>. Except as set forth on <u>Schedule 3.11</u>:

(a)    The Company and each of its Subsidiaries are in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining all permits, licenses and authorizations required under applicable Environmental Laws that are material to the operations of the Company and its Subsidiaries taken as a whole as currently conducted, except in each case as would not reasonably be expected to be material to the Company and its Subsidiaries taken as a whole;

(b)    Neither the Company nor any of its Subsidiaries has during the prior two (2) years received written notice from any Governmental Body regarding any actual or alleged violation of or liability under Environmental Laws that is material to the Company and its Subsidiaries taken as a whole;

(c)    To the knowledge of the Company, no Hazardous Substance has been released at any Owned Real Property or any Leased Real Property by the Company or its Subsidiaries in violation of, and in a manner that would result in liability for the Company or its Subsidiaries under, any Environmental Law, except as would not reasonably be expected to be material to the Company and its Subsidiaries taken as a whole;

(d)    The Company has made available to Purchaser copies of all material environmental audits, assessments and reports in its possession relating to the Company, the Owned Real Property or the Leased Real Property prepared within the last three (3) years.

(e)    This <u>Section 3.11</u> contains the sole and exclusive representations and warranties of the Company with respect to any environmental, health or safety matters, including any arising under any Environmental Law or with respect to any Hazardous Substance.

3.12    <u>Intellectual Property</u>.

(a)    <u>Schedule 3.12(a)</u> sets forth a correct and complete list of all Intellectual Property that is registered, filed or issued under the authority of any Governmental Body, and all applications for Intellectual Property filed with any Governmental Body, in each case that is owned by the Company or one or more of its Subsidiaries (collectively, "<u>Company Intellectual Property</u>"). Except as set forth on <u>Schedule 3.12(a)</u>, the Company or one or more of its Subsidiaries owns the Company Intellectual Property, free and clear of all Encumbrances, other than Permitted Encumbrances.

(b)    To the knowledge of the Company, neither the Company's nor any of its Subsidiaries' respective businesses infringes, misappropriates or otherwise violates any Intellectual Property of any other Person, except where such infringement, misappropriation or violation is not material to the Company and its Subsidiaries taken as a whole.

(c)    To the knowledge of the Company no third party infringes, misappropriates or otherwise violates any Intellectual Property owned by the Company or any of its Subsidiaries, except where such infringement, misappropriation or violation is not material to the Company and its Subsidiaries taken as a whole. The Company and its Subsidiaries have used efforts that are reasonable under the circumstances to maintain the secrecy of their material trade secrets, except

19

where such failure to maintain such material trade secrets would not be material to the Company and its Subsidiaries taken as a whole.

(d)     To the knowledge of the Company, all of the issued patents and registered trademarks that constitute material Company Intellectual Property are valid, subsisting and enforceable. Except for office actions issued in the ordinary course of prosecution by the United States Patent and Trademark Office or analogous foreign Governmental Body, during the prior two (2) years, no claim by any third party contesting the validity or enforceability of any of the material Company Intellectual Property has been made or has been threatened against the Company or any of its Subsidiaries, in each case in writing.

(e)     This Section 3.12 contains the sole and exclusive representations and warranties of the Company with respect to Intellectual Property.

3.13    Data Security. The Company and its Subsidiaries maintain commercially reasonable policies and procedures regarding data privacy, protection and security designed to protect any personally identifiable information from any individuals, including any customers, prospective customers, employees and/or other third parties (collectively "Personal Information") collected by it.  To the knowledge of the Company, the Company and its Subsidiaries and the conduct of their business is in material compliance with, and at all times since December 31, 2017, have been in material compliance with, all applicable Privacy Laws and its applicable published privacy policies.  To the knowledge of the Company, the transactions contemplated by this Agreement will not result in a breach of the Company's published privacy policies in effect as of the date hereof. This Section 3.13 contains the sole and exclusive representations and warranties of the Company with respect to data privacy, protection, and security

3.14    Tax Matters. (a) All material Tax Returns required to be filed under applicable Law by Sellers with respect to the Acquired Assets have been filed and such Tax Returns are complete in all material respects, (b) all material Taxes payable by Sellers with respect to the Acquired Assets (whether or not shown to be due on such Tax Returns) have been paid, except to the extent nonpayment of which is permitted or required by the Bankruptcy Code, (c) no material claims have been asserted in writing with respect to any such Taxes and (d) there are no Encumbrances for Taxes (other than any Encumbrance for Taxes that is a Permitted Encumbrance) on any of the Acquired Assets. The representations and warranties in this Section 3.14 and in Sections 3.15(b), 3.15(d) and 3.15(f) are the sole and exclusive representations and warranties of Sellers relating to Taxes. No representation or warranty is made in this Agreement with respect to (i) the amount, sufficiency or usability of any net operating loss, capital loss, Tax basis or other Tax attribute of the Company or any of its Subsidiaries, or otherwise (ii) Taxes or the availability of any Tax position in any taxable period (or portion thereof) beginning after the Closing Date.

3.15    Seller Plans.

(a)     Except as set forth on Schedule 3.15(a), and other than the "multiemployer plans" (as defined in Section 3(37) of ERISA) (the "Multiemployer Plans") set forth on Schedule 3.15(e), neither the Company nor any of its Subsidiaries maintains or contributes to any (i) nonqualified deferred compensation or retirement plans, (ii) qualified "defined contribution plans" (as such term is defined under Section 3(34) of ERISA), (iii) qualified "defined benefit

plans" (as such term is defined under Section 3(35) of ERISA) (the plans set forth in (ii) and (iii) are collectively referred to herein as the "<u>Pension Plans</u>"), (iv) "welfare benefit plans" (as such term is defined under Section 3(1) of ERISA) (the "<u>Welfare Plans</u>") or (v) severance, incentive or bonus, stock purchase, stock option or equity incentive or any other material employee benefit plans, programs or arrangements (collectively, the "<u>Seller Plans</u>").

(b)      Each Pension Plan that is intended to meet the requirements of a "qualified plan" under Section 401(a) of the Code, has either (i) received a favorable determination letter from the Internal Revenue Service that such Pension Plan is so qualified or has requested such a favorable determination letter within the remedial amendment period of Section 401(b) of the Code or (ii) may rely on a favorable opinion letter issued by the Internal Revenue Service.

(c)      The Seller Plans comply in form and in operation in all material respects with their terms and applicable Laws, including the requirements of the Code and ERISA, except as would not reasonably be expected to be material to the Company and its Subsidiaries taken as a whole.

(d)      With respect to the Seller Plans, (i) all material contributions required to be made by the Company or any of its Subsidiaries have been made or properly accrued, (ii) there are no Actions pending or, to the Company's knowledge, overtly threatened that are material to the Company and its Subsidiaries taken as a whole other than routine claims for benefits, (iii) to the Company's knowledge, there have been no "prohibited transactions" (as that term is defined in Section 406 of ERISA or Section 4975 of the Code) and (iv) all material reports, returns and similar documents required to be filed with any Governmental Body or distributed to any Seller Plan participant have been timely filed or distributed in all material respects. The Company and its Subsidiaries have timely made the contributions required to be made by them with respect to employees located outside the United States to any plan that is sponsored by, or to which contributions are mandated by, a Governmental Body, except as would not reasonably be expected to be material to the Company and its Subsidiaries taken as a whole.

(e)      Except as set forth on <u>Schedule 3.15(e)</u>, neither the Company nor any of its Subsidiaries contributes to any Multiemployer Plan that is material to the Company and its Subsidiaries taken as a whole.

(f)      None of the Welfare Plans obligates the Company or its Subsidiaries to provide a current or former employee (or any dependent thereof) any material life insurance or medical or health benefits after his or her termination of employment with the Company or any of its Subsidiaries, other than as required under Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code or any similar state or local Law.

3.16    <u>Employees</u>. Except as set forth on <u>Schedule 3.15(f)</u>:

(a)      To the knowledge of the Company, the Company and its Subsidiaries are in compliance in all material respects with all applicable Laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining, layoffs and immigration compliance, except for such non-compliance that is not material to the Company and its Subsidiaries taken as a whole. There are no administrative charges or court

complaints pending or, to the Company's knowledge, threatened against the Company or any of its Subsidiaries before the U.S. Equal Employment Opportunity Commission or any other Governmental Body concerning alleged employment discrimination or any other matters relating to the employment of labor, in each case, that would reasonably be expected to be material to the Company and its Subsidiaries taken as a whole.

(b)      There is no unfair labor practice charge or complaint pending or, to the Company's knowledge, threatened against the Company before the National Labor Relations Board or any similar foreign, state or local body. To the knowledge of the Company, during the prior two (2) years, the Company has not experienced any union organizing or decertification activities, work stoppage, slowdowns or other material labor disputes, and, to the knowledge of the Company, no such activities or disputes are underway or threatened.

(c)      During the prior two (2) years, the Company has not implemented any employee layoffs that to the Company's knowledge would trigger a notice requirement under the Worker Adjustment and Retraining Notification Act or any similar Law (collectively, the "WARN Act").

3.17    Affiliate Transactions. Except as set forth on Schedule 3.17, to the knowledge of the Company, no Affiliate of the Company (other than any Seller or any of their Subsidiaries), or any officer or director of the Company or any of its Subsidiaries (a) is a party to any agreement or transaction with the Company or its Subsidiaries having a potential or actual value or a contingent or actual liability exceeding $250,000, other than (i) loans and other extensions of credit to directors and officers of the Company and its Subsidiaries for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans, (b) has any material ownership interest in any material property used by the Company or its Subsidiaries or (c) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a material supplier or customer of the Company or any of its Subsidiaries.

3.18    Brokers. Except as set forth on Schedule 3.18, there is no investment banker, broker, finder or other such intermediary that has been retained by, or has been authorized to act on behalf of, the Company or any of its Subsidiaries and is entitled to a fee or commission in connection with the transactions contemplated by this Agreement from the Company or any of its Subsidiaries.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Company as follows as of the date hereof and as of the Closing Date.

4.1    Organization and Qualification. Purchaser (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, and (c) is qualified to do

business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

4.2     Authorization of Agreement. The execution, delivery and performance of this Agreement by Purchaser, and the consummation by Purchaser of the transactions contemplated hereby, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by Purchaser. This Agreement has been duly and validly executed and delivered by Purchaser, and, assuming this Agreement is a valid and binding obligation of Sellers, this Agreement constitutes a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as limited by the Enforceability Exceptions.

4.3     Conflicts; Consents.

(a)     Except as set forth on Schedule 4.3(a) and assuming that (x) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3(b) are made, given or obtained (as applicable), (y) the requirements of the HSR Act are complied with and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of Purchaser; (ii) violate any Law applicable to Purchaser or by which any property or asset of Purchaser is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance on any property or asset of Purchaser under, any Lease or Contract; except, in each case, for any such violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

(b)     Except as set forth on Schedule 4.3(a),[5] Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the transactions contemplated hereby, except (i) any filings required to be made under the HSR Act, (ii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, or (iii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

---

[5]     NTD: Purchaser to schedule any Foreign Competition Law requirements to which Purchaser is subject in connection with the transaction.

4.4    Financing.[6] Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the transactions contemplated by this Agreement. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5    Brokers. Except for [_____], all of whose fees and expenses will be borne solely by Purchaser, there is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.6    No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

4.7    Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management or board of directors (or applicable governing body) of the Company or its Subsidiaries, any holder of equity or debt securities of the Company or its Subsidiaries, or any lender or creditor of the Company or its Subsidiaries, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the other transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of the Company to entertain, negotiate or participate in any such transactions.

4.8    No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, each of Sellers acknowledges that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to any Seller by Purchaser.

4.9    No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the representations and warranties made by Sellers to Purchaser in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the transactions contemplated by this Agreement. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (other than solely to the extent expressly set forth in the Express Representations) all other

---

[6]    NTD: Purchaser to provide detail of its financing resources and commitments.

representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) with respect to the completeness or accuracy of, or any omission to state or to disclose, any information, including in the Projections, the confidential information presentation prepared by Guggenheim Securities, LLC (the "Information Presentation"), in that certain datasite administered by [●] (the "Dataroom"), any Projections or in any meetings, calls or correspondence with management of the Company and its Subsidiaries or any other Person on behalf of the Company, its Subsidiaries or any of their respective Affiliates or Advisors and (b) the historical, current or future business, financial condition, results of operations, assets, liabilities, properties, contracts, or prospects of the Company or any of its Subsidiaries, or the quality, quantity or condition of the Company's or its Subsidiaries' assets, in each case, are specifically disclaimed by Sellers, and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, liabilities, properties, contracts and prospects of the Company and its Subsidiaries, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, the Information Presentation, any Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or the Company, its Subsidiaries or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except to the extent express set forth in the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations).

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1   Bankruptcy Actions.

(a)   The bidding procedures to be utilized with respect to this Agreement shall be those approved in the Bidding Procedures Order. Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals, or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

(b)   From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, the Company shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Bidding Procedures Order and Confirmation Order.

(c)   The Parties shall use their respective commercially reasonable efforts to (i) obtain entry by the Bankruptcy Court of the Plan Solicitation Order, (ii) commence solicitation of the Plan, and (iii) (A) facilitate the solicitation, confirmation, and consummation of the Plan and

the transactions contemplated thereby and hereby, (B) obtain entry of the Confirmation Order, and (C) consummate the Plan and the transactions contemplated thereby as promptly as practicable and in any case prior to the Outside Date.

(d)    Purchaser shall promptly take all actions as are reasonably requested by the Company to assist in obtaining the Bankruptcy Court's entry of the Plan Solicitation Order, the Confirmation Order, and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement and the Plan, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)    Each of the Company and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement or the Plan and (ii) keep the other reasonably apprised of the status of material matters related to the Plan (solely as the Plan relates to the transactions contemplated by this Agreement), including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by any Seller from the Bankruptcy Court or any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement or the Plan.

(f)    If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "Backup Bidder") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and the Company may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement as such terms may have been improved upon in the Auction.

(g)    The Company and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. The Company and Purchaser acknowledge that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about the Company to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction. The bidding procedures to be employed with respect to this Agreement and any Auction shall be those approved in the Bidding Procedures Order.

(h)    Notwithstanding any other provision of this Agreement to the contrary, Purchaser acknowledges that Sellers and their Affiliates and Advisors are and may continue soliciting inquiries, proposals, or offers for the Acquired Assets in connection with any Alternative Transaction.

(i)    Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information, and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(j)    Nothing in this Section 5.1 shall prevent Sellers from modifying the bidding procedures as necessary or appropriate to maximize value for Sellers' estates in accordance with each Seller's fiduciary obligations.

5.2    Cure Costs. Subject to entry of the Confirmation Order and consummation of the Plan, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Transferred Contracts and Assumed Leases so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.3    Confirmation Order. Sellers will take all reasonable efforts to ensure that the Confirmation Order shall, among other things, (a) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their respective obligations under this Agreement; (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts; (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code; (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts; and (f) find that Purchaser shall have no Liability for any Excluded Liability. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Company to assist in obtaining Bankruptcy Court approval of the Confirmation Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and

(y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

5.4     Approval. Sellers' obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Plan Solicitation Order and the Confirmation Order). Nothing in this Agreement shall require the Company or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1     Conduct of Business of Sellers. Until the earlier of the termination of this Agreement and the Closing, except (w) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or the Sellers' debtor-in-possession financing, (x) as required by applicable Law, (y) as otherwise required by or reasonably necessary to carry out the terms of this Agreement or as set forth on Schedule 6.1 or (z) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), the Sellers shall conduct their business only in the Ordinary Course and shall not:

(a)     take any action to the extent that such action would, if such action had taken place after the date of the Latest Balance Sheet and prior to the date hereof, have resulted in disclosure being made pursuant to the terms of Section 3.5;

(b)     terminate (other than by expiration), or amend or modify (other than by automatic extension or renewal) in any material respect the terms of any Assigned Contract (other than any purchase orders);

(c)     issue any notes, bonds or other debt securities, or otherwise incur any indebtedness for borrowed money or otherwise become liable for any such indebtedness of any other Person, in each case, other than Excluded Liabilities;

(d)     settle or compromise any pending or threatened Action that could give rise to liabilities that are not Excluded Liabilities;

(e)     sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any material portion of the Acquired Assets, other than (i) sales of Inventory in the Ordinary Course, (ii) licenses of Intellectual Property granted on a non-exclusive basis, (iii) the expiration of Intellectual Property at the end of the governing terms thereof, or (iv) pursuant to existing Contracts;

(f)     subject any portion of the Acquired Assets that is material to the Company and its Subsidiaries taken as a whole to any Encumbrance, except for Permitted Encumbrances;

(g)     change or modify any material accounting practice, policy or procedure, except as required by GAAP or applicable Law;

(h)      enter into any commitment for capital expenditures or otherwise make any capital expenditures in excess of $[_____], except to the extent permitted under the terms of Sellers' debtor-in-possession financing;

(i)      authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the business of the Sellers prior to the Closing.

6.2      Access to Information.

(a)      From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), the Company (in its discretion) will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of the Company and its Subsidiaries, in order for Purchaser and its authorized Advisors to access such information regarding the Company and its Subsidiaries as Purchaser reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement; provided that (i) such access does not unreasonably interfere with the normal operations of the Company and its Subsidiaries, (ii) such access will occur in such a manner as the Company reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to [_____] or such other Person(s) as the Company may designate in writing from time to time and (iv) nothing herein will require the Company to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to the Company or any of its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (B) would require the Company or any of its Subsidiaries to disclose any financial or proprietary information of or regarding the Affiliates of the Company (other than the Subsidiaries of the Company) or otherwise disclose information regarding the Affiliates of the Company (other than the Subsidiaries of the Company) that the Company deems to be commercially sensitive, (C) would waive any legal privilege or (D) would be in violation of applicable Laws (including the HSR Act and Foreign Competition Laws) or the provisions of any agreement to which the Company or any of its Subsidiaries is bound or would violate any fiduciary duty; provided that, in the event that the Company withholds access or information in reliance on the foregoing clause (C) or (D), the Company shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Purchaser that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

(b)      The information provided pursuant to this Section 6.2 will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Neither the Company nor any of Sellers makes any representation or warranty as to the accuracy

of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by the Company, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of the books and records without first offering to surrender to the Company such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (e.g., helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)     Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of the Company or its Subsidiaries prior to the Closing with respect to the Company, its Subsidiaries, their business or the transactions contemplated by this Agreement without the prior written consent of the Company for each such contact.

6.3     Employee Matters.

(a)     Purchaser shall extend to all employees of Sellers (the "Employees") an offer of employment in a position that is comparable to such Employee's position immediately prior to the Closing (including level of responsibility, primary location of employment, and authority) on the terms set forth in this Section 6.3 ("Transfer Offer") that, if accepted, shall become effective immediately after the Closing; provided, however, that to the extent any Employees are on leave or otherwise not actively employed as of the Closing Date, their employment with Purchaser shall become effective only upon their presenting themselves to Purchaser to commence active employment within 6 months of the Closing Date (or such later date with respect to which they have reemployment rights under Law). Employees who accept such Transfer Offers and begin active employment with Purchaser in accordance with this Section 6.3(a) shall be referred to herein as "Transferred Employees." Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the Employees will accept the offer of employment from Purchaser or will continue in employment with Purchaser following the Closing. Purchaser shall carry out all actions necessary under applicable Law to effect the transfer of employment to it of each such Transferred Employee who has accepted that offer. Effective as of the Closing (or, with respect to employees who are on leave or otherwise not actively employed as of the Closing Date, as of such later date

that such employees begin their active employment with Purchaser as described above), each Transferred Employee shall cease to be an employee of Sellers or their Affiliates and shall cease to participate in any Seller Plan. The Sellers intend that for purposes of any Seller Plan providing severance or termination benefits, or any comparable plan, program, policy, agreement or arrangement of the Sellers, the transactions contemplated by this Agreement shall not constitute a termination of employment of any Transferred Employee prior to or upon the consummation of such transactions.

(b)    For a period of one year from and after the Closing Date, Purchaser shall provide each Transferred Employee with (i) base compensation/wage rate that is no lower than that provided to such Transferred Employees as of the date hereof; (ii) short-term cash bonus opportunity that is no less favorable than that provided to such Transferred Employee as of the date hereof; and (iii) other employee benefits (other than equity incentive, retention or change in control arrangements) that are substantially comparable in the aggregate to those provided by the Sellers to such Transferred Employees under the Seller Plans as of the date hereof. For purposes of eligibility and vesting (other than vesting of future equity awards) under the benefit plans and programs maintained by Purchaser to provide employee benefits to Transferred Employees after the Closing Date (the "Purchaser Plans"), each Transferred Employee shall be credited with his or her years of service with the Sellers before the Closing Date to the same extent as such Transferred Employee was entitled, before the Closing Date, to credit for such service under substantially similar Seller Plans in which such Transferred Employees participated before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)    Without limiting the generality of any other provision of this Agreement, to the extent permitted under each applicable Purchaser Plan: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans; (ii) for purposes of each Purchaser Plan providing medical, dental, hospital, pharmaceutical or vision benefits to any employee, Purchaser shall cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) Purchaser shall cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)    Without limiting the generality of any other provision of this Agreement, as soon as reasonably practicable on or after the Closing Date, Purchaser shall have in effect one or more defined contribution plans that include a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (and a related trust exempt from tax under Section 501(a) of the Code) (as applicable, the "Purchaser 401(k) Plan"). Each Transferred Employee who is eligible to participate in a 401(k) plan maintained by any Seller immediately prior to the Closing Date (a "Seller 401(k) Plan") shall be eligible to participate in Purchaser 401(k) Plan as soon as reasonably practicable following the Closing Date. Purchaser shall cause Purchaser 401(k) Plan to accept a "direct rollover" to such Purchaser 401(k) Plan of the account balances of each Transferred Employee (including promissory notes evidencing outstanding loans) under any Seller

401(k) Plan, if such direct rollover is elected in accordance with applicable Law by such Transferred Employee. The Sellers shall cause each Seller 401(k) Plan to permit rollovers of Transferred Employees' account balances (including promissory notes evidencing outstanding loans) and shall not place any Transferred Employees' plan loans into default until the end of the calendar quarter following the calendar quarter in which the Closing Date occurs.

(e)     Purchaser shall assume and honor all vacation days and other paid-time-off accrued or earned, but not yet taken, by each Transferred Employee as of the Closing Date.

(f)     The provisions of this Section 6.3 are for the sole benefit of the Parties to this Agreement and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any Employees or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement, (ii) shall alter or limit Purchaser's or the Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(g)     Purchaser will, or will cause its Affiliates to, provide any required notice under the WARN Act and to otherwise comply with the WARN Act with respect to any "plant closing" or "mass layoff" (as defined in the WARN Act) or group termination or similar event affecting Employees (including as a result of the consummation of transactions contemplated by this Agreement) occurring from and after the Closing. Purchaser will not, and will cause its affiliates not to, take any action on or after the Closing Date that would cause any termination of employment of any Employees by Sellers or their respective Affiliates occurring prior to the Closing to constitute a "plant closing," "mass layoff" or group termination or similar event under the WARN Act or any similar federal, state, local or foreign Law, or to create any liability or penalty to Sellers or any of their respective Affiliates for any employment terminations under Law.

6.4     Regulatory Approvals.

(a)     Subject to Section 6.5, the Company will (i) make or cause to be made all filings and submissions required to be made by the Company or its Subsidiaries under any applicable Laws for the consummation of the transactions contemplated by this Agreement set forth on Schedule 6.4, (ii) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with the foregoing and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)     Subject to Section 6.5, Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the

32

transactions contemplated by this Agreement, (ii) cooperate with the Company in exchanging such information and providing such assistance as the Company may reasonably request in connection with all of the foregoing, and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

6.5    Antitrust Notification.[7]

(a)    The Company and Purchaser will, as promptly as practicable and no later than ten (10) Business Days following the date hereof, (i) file with the United States Federal Trade Commission and the United States Department of Justice, the notification form required pursuant to the HSR Act for the transactions contemplated by this Agreement, which form will specifically request early termination of the waiting period prescribed by the HSR Act and (ii) make all notifications, filings, registrations or other materials required or necessary under the Foreign Competition Laws set forth on Schedule 6.5(a). Each of the Company and Purchaser will (and shall cause their respective Affiliates to) furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act or such Foreign Competition Laws and will provide any supplemental information requested by any Governmental Body as promptly as practicable. Purchaser will use all reasonable best efforts to comply as promptly as practicable with any requests made for any additional information in connection with such filings. Purchaser will be responsible for all filing fees payable in connection with such filings.

(b)    Subject to the immediately following sentence, the Company and Purchaser will use their reasonable best efforts to promptly obtain any clearance required under the HSR Act or such Foreign Competition Laws for the consummation of this Agreement and the transactions contemplated hereby and will keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Body and will comply promptly with any such inquiry or request. Purchaser will take, and will cause its Affiliates to take, any and all steps necessary to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Body or any other Person so as to enable the Parties to expeditiously close the transactions contemplated by this Agreement, including (i) opposing any motion or action for a temporary, preliminary or permanent injunction or Order against or preventing or delaying the consummation of the transactions contemplated by this Agreement, (ii) entering into a consent decree, consent agreement or other agreement or arrangement containing Purchaser's agreement to hold separate, license, sell or divest (pursuant to such terms as may be required by any Governmental Body) such assets or businesses of Purchaser and its Affiliates after the Closing (including entering into customary ancillary agreements relating to any such sale, divestiture, licensing or disposition of such assets or businesses), and (iii) agreeing to such limitations on conduct or actions of members of Purchaser and its Affiliates after the Closing as may be required in order to obtain satisfaction of the closing conditions set forth in Section 7.1(a) prior to the Outside Date.

---

[7]    NTD: Purchaser to confirm any Foreign Competition Laws filings and CFIUS.

(c)     The Parties commit to instruct their respective counsel to cooperate with each other and use reasonable best efforts to facilitate and expedite the identification and resolution of any issues arising under the HSR Act or such Foreign Competition Laws at the earliest practicable dates. Such reasonable best efforts and cooperation include counsel's undertaking (i) to keep each other appropriately informed of communications from and to personnel of the reviewing Governmental Bodies and (ii) to confer with each other regarding appropriate contacts with and response to personnel of such Governmental Bodies and the content of any such contacts or presentations. Neither the Company nor Purchaser will participate in any meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, the opportunity to attend and participate in such meeting or discussion (which, at the request of either Purchaser or the Company, will be limited to outside antitrust counsel only). The Company will have the right to review (subject to appropriate redactions for confidentiality and attorney-client privilege concerns) and approve the content of any presentations, white papers or other written materials to be submitted to any Governmental Body in advance of any such submission.

(d)     Purchaser will not, and will not permit any member of the Purchaser Group or their respective Affiliates to, acquire or agree to acquire (by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner), any Person or portion thereof, or otherwise acquire or agree to acquire any assets, if the entering into a definitive agreement relating to, or the consummation of, such acquisition, merger or consolidation could reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any permits, Orders or other approvals of any Governmental Body necessary to consummate the transactions contemplated by this Agreement or the expiration or termination of any applicable waiting period, (ii) increase the risk of any Governmental Body entering an Order prohibiting the consummation of the transactions contemplated by this Agreement or (iii) delay the consummation of the transactions contemplated by this Agreement.

6.6     <u>Reasonable Efforts; Cooperation</u>.

(a)     Subject to the other terms of this Agreement provisions hereof, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, advisable or permitted under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of the Company will not require the Company or any of its Subsidiaries, Affiliates or Advisors to expend any money, to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)     The obligations of the Company pursuant to this Agreement, including this <u>Section 6.6</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Sellers' debtor-in-possession financing, and each of Sellers' obligations as

a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Confirmation Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.7    <u>Notification of Certain Matters</u>.

(a)    The Company will promptly notify Purchaser of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body related to or in connection with the transactions contemplated by this Agreement; and (iii) promptly upon discovery thereof, any variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause, any of the representations and warranties contained in <u>Article III</u> to be untrue or inaccurate such that the condition set forth in <u>Section 7.2(b)</u> not to be satisfied. If the subject matter of any such notification required by the previous sentence requires any change in the Schedules, the Company shall deliver to Purchaser prior to the Closing a supplement to such Schedule (the "<u>Updated Schedules</u>") with such change; <u>provided</u> that in no event will any Updated Schedule serve to amend, supplement or modify the Schedules for purposes of <u>Section 7.2(b)</u>; <u>provided</u> <u>further</u> that if the Closing occurs, the Updated Schedules will be considered and deemed to be part of the Schedules for all purposes under this Agreement, and each reference in this Agreement to a particular Schedule will mean such Schedule in, or as updated by, the Updated Schedules.

(b)    Purchaser will promptly notify the Company of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body related to or in connection with the transactions contemplated by this Agreement; (iii) any Actions relating to or involving or otherwise affecting Purchaser or its Affiliates that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to <u>Section 4.6</u> or that relate to the transactions contemplated by this Agreement; and (iv) any breach or inaccuracy of any representation or warranty contained in this Agreement at any time during the term hereof that could reasonably be expected to cause the conditions set forth in <u>Article VII</u> not to be satisfied; <u>provided</u> that the delivery of any notice pursuant to this <u>Section 6.7(a)</u> will not limit the remedies available to Sellers under or with respect to this Agreement.

6.8    <u>Further Assurances</u>. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

6.9    <u>Insurance Matters</u>. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Sellers and the Acquired Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired

Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.10    <u>Receipt of Misdirected Assets</u>. From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the Company, and such right, property or asset will be deemed the property of the Company held in trust by Purchaser for the Company until so transferred.

6.11    <u>Acknowledgment by Purchaser</u>.

(a)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, Liabilities, properties, Contracts and prospects of the Company and its Subsidiaries and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except to the extent expressly set forth in the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the transactions contemplated by this Agreement; and (ii) (other than solely to the extent expressly set forth in the Express Representations) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (1) with respect to the completeness or accuracy of, or any omission to state or to disclose, any information including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of the Company and its Subsidiaries, any of the Seller Parties or any other Person on behalf of the Company, its Subsidiaries or any of the Seller Parties or any of their respective Affiliates or Advisors and (2) the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, or prospects of the Company or any of its Subsidiaries, or the quality, quantity or condition of the Company's or its Subsidiaries' assets, in each case, are specifically disclaimed by the Company, on its behalf and on behalf of the Seller Parties, and each Seller. Purchaser, on its own behalf and

on behalf of the Purchaser Group: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither the Company, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A) any potentially material information regarding the Company, its Subsidiaries or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (B) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of the Company's or its Subsidiaries' business, operations, assets, Liabilities, prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)    Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of the Company and its Subsidiaries, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of the Company, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of the Company and its Subsidiaries, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.11, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures or materials in the Information Presentation, the Dataroom or Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information.

(d)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this Section 6.11 (i) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years; and (ii) are an integral part of the transactions contemplated by this Agreement and that, without these agreements set forth in this Section 6.11, Sellers would not enter into this Agreement.

# ARTICLE VII

# CONDITIONS TO CLOSING

7.1     <u>Conditions Precedent to the Obligations of Purchaser and Sellers</u>. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     the waiting period (and any extension thereof), or any necessary approval, as applicable, related to the transactions contemplated by this Agreement under the HSR Act or under the Foreign Competition Laws or other regulations set forth in <u>Schedule 7.1</u> shall have been received, terminated or shall have expired, as applicable;

(b)     no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; and

(c)     the Bankruptcy Court shall have entered the Confirmation Order and the Plan shall become effective in accordance with its terms.

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     Sellers shall have delivered to Purchaser a certified copy of the Confirmation Order;

(b)     the representations and warranties made by Sellers in <u>Article III</u> shall be true and correct as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" (other than the use of "Material Adverse Effect" in the first sentence of <u>Section 3.5</u>) and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date), except where the failure of such representations and warranties to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; <u>provided</u> that the representations set forth in <u>Sections 3.1</u>, <u>3.2</u>, and <u>3.18</u> will be true and correct in all material respects;

(c)     Sellers shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by Sellers by the Closing; and

(d)     Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u>.

7.3    <u>Conditions Precedent to the Obligations of the Company</u>. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby;

(b)    Purchaser shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by Purchaser by the Closing; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 2.5</u>.

7.4    <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

## ARTICLE VIII

## TERMINATION

8.1    <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of the Company and Purchaser;

(b)    by written notice of either Purchaser or the Company, upon the issuance by any Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by the breach or action or inaction of such Party;

(c)    by written notice of either Purchaser or the Company, if the Closing shall not have occurred on or before [●] (the "<u>Outside Date</u>"); <u>provided</u> that a Party shall not be

permitted to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

(d)    by written notice of either Purchaser or the Company, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Bankruptcy Case;

(e)    by written notice from Purchaser to the Company, if Sellers announce any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other party), other than the Plan or a wind-down plan of Sellers' estates post-Closing;

(f)    by written notice from the Company to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in <u>Section 7.3(a)</u> or <u>7.3(b)</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser then the Company may not terminate this Agreement under this <u>Section 8.1(f)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after the Company notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(f)</u> will not be available to the Company at any time that the Company is in material breach of, any covenant, representation or warranty hereunder;

(g)    by written notice from Purchaser to the Company, upon a breach of any covenant or agreement on the part of any Seller, or if any representation or warranty of any Seller will have become untrue, in each case, such that the conditions set forth in <u>Section 7.2(b)</u> or <u>7.2(c)</u>; <u>provided</u> that (i) if such breach is curable by such Seller then Purchaser may not terminate this Agreement under this <u>Section 8.1(g)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchaser notifies the Company of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(g)</u> will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(h)    by written notice from the Company to Purchaser, if all of the conditions set forth in <u>Sections 7.1</u> and <u>7.2</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by <u>Section 2.3</u>;

(i)    by written notice from the Company to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(j)    by written notice of either Purchaser or the Company, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; or

(k)       by written notice from Purchaser to the Company, if Purchaser is not the Successful Bidder or the Backup Bidder at the Auction; provided that Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 8.1(k) until after the twenty-fifth (25th) day following entry by the Bankruptcy Court of an Order authorizing and approving an Alternative Transaction with the Successful Bidder at the Auction (and, notwithstanding Purchaser not having been the Successful Bidder or the Backup Bidder at the Auction, until such time (if any) as Purchaser terminates this Agreement pursuant to this Section 8.1(k), the obligations of Purchaser to consummate the transactions contemplated by this Agreement shall remain unaffected by Purchaser's right to terminate this Agreement pursuant to this Section 8.1(k)).

8.2     Effect of Termination. In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party or any of its partners, officers, directors or shareholders; provided that Section 2.2, this Section 8.2, and Article X shall survive any such termination; provided further that no termination will relieve Purchaser from any Liability for damages (including damages based on the loss of the economic benefits of the transactions contemplated by this Agreement, including the Cash Payment, to Sellers), losses, costs, or expenses (including reasonable legal fees and expenses) resulting from any willful breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder).

## ARTICLE IX

## TAXES

9.1     Transfer Taxes. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes. Sellers and Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes.

9.2     Allocation of Purchase Price. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other items treated as part of the purchase price for applicable income Tax purposes) among the Acquired Assets in accordance with the methodology set forth in Schedule 9.2 (the "Allocation Methodology"). As soon as commercially practicable, but no later than forty-five (45) days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price (and other amounts treated as Purchase Price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "Allocation"). If Sellers deliver a written objection within thirty (30) days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Sellers shall negotiate in good faith to resolve any such objection, and, if Sellers and Purchaser cannot resolve such dispute within thirty (30) days of Purchaser's receipt of Sellers' objection, then a nationally recognized accounting firm mutually acceptable to Purchaser and

Sellers shall resolve such dispute and the resolution of such dispute shall be final and binding on the Parties. The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

9.3    Cooperation. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.4    Preparation of Tax Returns and Payment of Taxes.

(a)    Except as otherwise provided by Section 9.1, Sellers shall prepare and timely file (i) all Tax Returns for any Tax period ending on or before the date hereof and (ii) all income Tax Returns of Sellers. Except to the extent any Tax reflected on a return required to be prepared and filed by Sellers pursuant to this Section 9.4 is otherwise reflected as an adjustment to Purchase Price or constitutes an Assumed Liability, Sellers shall be responsible for paying any Taxes reflected on any Tax Return that Sellers are obligated to prepare and file under this Section 9.4(a).

(b)    Purchaser shall prepare and timely file all other Tax Returns with respect to the Acquired Assets that are not addressed by Section 9.4(a). With respect to any Straddle Period, Purchaser shall prepare such Tax Returns consistent with past practice, and shall provide Sellers with a draft of such Tax Returns at least thirty days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Sellers with respect to such Tax Returns. Purchaser shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 9.4(b).

(c)    Purchaser shall not file any Tax Return, file an amendment to any previously-filed Tax Return, or otherwise take any Tax position that has the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing, unless Purchaser receives an opinion from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than forty-five (45) days' notice of such position before filing any such Tax Return. In the event Sellers disagree with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser, on the one hand, and Sellers, on the other hand. The determination of such independent national accounting firm or law firm shall be binding on all Parties and any Tax Return shall be filed consistently with such resolution.

9.5    Wage Reporting. Purchaser and Sellers agree to utilize, or cause their respective Affiliates to utilize, the "alternate procedure" set forth in Revenue Procedure 2004-53 with respect to wage reporting.

# ARTICLE X

# MISCELLANEOUS

10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in Contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Sellers Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. Purchaser Group, on its own behalf and on behalf of (after the Closing) the Company, hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or any other Environmental Laws, relating to this Agreement or the transactions contemplated hereby.

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all fees and expenses in connection with any filing or submission that is necessary under the HSR Act and any Foreign Competition Laws will be allocated pursuant to <u>Section 6.4</u>, (b) all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (c) all Cure Costs will be allocated pursuant to <u>Section 5.2</u>.

10.3    <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

[_____]
[_____]
[_____]
Attention:       [_____]
Email:           [_____]

with a copy to (which shall not constitute notice):

[_____]
[_____]
[_____]
Attention:       [_____]
Email:           [_____]

Notices to Sellers:

[_____]
[_____]
[_____]
Attention:       [_____]
Email:           [_____]

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:       Steve Toth
                 Mariska S. Richards
                 Joshua M. Altman
Email:           steve.toth@kirkland.com
                 mariska.richards@kirkland.com
                 josh.altman@kirkland.com


and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:       Joshua A. Sussberg, P.C.
                 Emily E. Geier
Email:           jsussberg@kirkland.com
                 emily.geier@kirkland.com

10.4    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Confirmation Order and consummation of the Plan, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; <u>provided</u> that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and the Company, and any attempted assignment or delegation without such prior written consent shall be null and void.

10.5    <u>Amendment and Waiver</u>. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and the Company or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    <u>Third Party Beneficiaries</u>. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party or any Subsidiary of Sellers will have any liability (whether in Contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>however</u>, each section of the Schedules will be deemed to incorporate by reference all information disclosed in

any other section of the Schedules, and any disclosure in the Disclosure Statement will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, Updated Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11  <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12  <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise,

this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with Section 10.12, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such action is pending, plus ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be. In no event will this Section 10.12 be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty of any Seller made herein.

10.13    Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to this agreement to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of

the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Cash Payment or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a facsimile machine, .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or

communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17    Publicity. Neither the Company nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or the Company, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or the Company lists securities, provided that the Party intending to make such release shall use its best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.18    Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order and the Plan. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.19    Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

10.20    No Solicitation. This Agreement, the Plan and the transactions contemplated herein and therein are the product of negotiations among the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder, or the Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, and none of the Company, the other Sellers, nor their Subsidiaries will solicit acceptances of the Plan from any party until such party has been provided with copies of a Disclosure Statement containing adequate information as required by section 1125 of the Bankruptcy Code.

# ARTICLE XI[8]

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    Certain Definitions.

(a)    "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

(b)    "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)    "Alternative Transaction" means any transaction (or series of transaction), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of any Seller or any portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise); provided, however, that the foregoing shall not include sales of Inventory in the Ordinary Course.

(e)    "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(f)    Bidding Procedures Order" means the *Order (I) Establishing Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) (A) Approving the Asset Purchase Agreement, (B) Authorizing the Sale of Assets, and (C) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, (V) Authorizing the Assumption of the Plan Support Agreement, and (VI) Granting Related Relief* [Docket No. ●] entered by the Bankruptcy Court.

---

[8]    NTD: Applicable definitions to be updated to conform to Plan, as necessary.

(g)      "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(h)      "Cash and Cash Equivalents" means all of the Company's cash (including petty cash and checks received on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(i)      "Code" means the United States Internal Revenue Code of 1986.

(j)      "Confidentiality Agreement" means that certain letter agreement, dated as of [_____], by and between the Company and [_____].

(k)      "Confirmation Order" means an Order of the Bankruptcy Court reasonably acceptable to the Parties (i) pursuant to section 1129 of the Bankruptcy Code confirming the Plan in a form reasonably acceptable to Purchaser and the Company, as may have been amended, supplemented or otherwise modified with the consent of Purchaser (such consent not to be unreasonably withheld, delayed, or conditioned); (ii) approving this Agreement; and (iii) authorizing Sellers to undertake the transactions contemplated hereunder, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

(l)      "Consent" means any approval, consent, ratification, permission, waiver or other authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(m)      "Contract" means any contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, purchase order, license or other agreement that is binding upon a Person or its property.

(n)      "Disclosure Statement" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

(o)      "Documents" means all of the Company's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(p)      "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code),

charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, encroachments, Orders and conditional sale or other title retention agreements.

(q)    "Environmental Laws" all applicable Laws concerning pollution or protection of the environment.

(r)    "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, supply inventory, vehicles and all other fixed assets.

(s)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(t)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(u)    "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(v)    "Governmental Body" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(w)    "Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(x)    "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

(y)    "Intellectual Property" means all of the following: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, trade dress and corporate names, registrations and applications for any of the foregoing, together with all goodwill associated with each of the foregoing; (iii) copyright registrations and copyright applications; (iv) Internet domain names; (v) trade secrets; (vi) rights in computer software; (vii) rights in drawings, schematics and other technical plans; (viii) right of publicity; and (ix) all other intellectual property arising under the laws of any jurisdiction.

(z)    "International Seller Plan" means each Seller Plan maintained with respect to any Non-Debtor Subsidiary.

(aa)    "Inventory" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) maintained or held by, stored by or on behalf of, or in transit to, any of Sellers.

(bb)    "Knowledge of the Company", "Company's Knowledge" and words of similar import mean the actual knowledge of [_____].

(cc)    "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(dd)    "Leasehold Improvements" means all buildings, structures, improvements and fixtures which are owned by a Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Leased Real Property.

(ee)    "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(ff)    "Material Adverse Effect" means any event, change, occurrence, or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, has had, or would reasonably be expected to have, a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or economic conditions affecting the industry in which the Company and its Subsidiaries operate, (ii) Effects in, arising from or relating to national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States, (iii) Effects in, arising from or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement), (iv) Effects in, arising from or relating to changes in, GAAP, (v) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body (including, for the avoidance of doubt, any such items related to Section 6.5), (vi) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1 or

(D) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of Purchaser, including the impact thereof on the relationships, contractual or otherwise, of the business of the Company or any of its Subsidiaries with employees, customers, lessors, suppliers, vendors or other commercial partners, (vii) Effects in, arising from or relating to any existing event, occurrence, or circumstance with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Schedules, (viii) Effects that arise from any seasonal fluctuations in the business, (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (x) the effect of any action taken by Purchaser or its Affiliates with respect to the transactions completed by this Agreement or the financing thereof or any breach by Purchaser of the Agreement, (xi) the matters set forth on the Schedules and any changes or developments in, or effects or results arising from or relating to, matters expressly set forth on the Schedules, or (xii) (A) the commencement or pendency of the Bankruptcy Case; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the reorganization of Sellers, the Plan or the Disclosure Statement, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract; (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers or their Subsidiaries in compliance therewith; except in the case of the clauses (i), (ii) or (iii), to the extent such Effects have a materially disproportionate impact on the Acquired Assets, as compared to other participants engaged in the industries and geographies in which Sellers operate.

(gg)    "Order" means any order, injunction, order, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Confirmation Order).

(hh)    "Ordinary Course" means the ordinary and usual course of operations of the business of the Company and its Subsidiaries taken as a whole consistent with past practice and taking into account the commencement and pendency of the Bankruptcy Case.

(ii)    "Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Leased Real Property, as applicable, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis, (vi) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (vii) any Encumbrances set forth on

Schedule 11.1(ii), and (viii) any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan.

(jj)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(kk)    "Plan" means the Joint Chapter 11 Plan of Pier 1 Imports, Inc. and its Debtor Affiliates [Docket No. _____] in the chapter 11 cases captioned *In re Pier 1 Imports, Inc., et al.*, Case No. [_____] (including any plan supplement documents and any schedules and exhibits attached thereto), as may be amended or supplemented from time to time.

(ll)    "Plan Solicitation Order" means an Order entered by the Bankruptcy Court, which Order shall, among other things, approve (i) the Disclosure Statement; and (ii) the commencement of a solicitation of votes to accept or reject the Plan.

(mm)    "Plan Supplement" has the meaning set forth in the Plan.

(nn)    "Pre-Closing Tax Period" means any Tax period ending on or before the Closing.

(oo)    "Privacy Laws" means all applicable Laws concerning data protection, privacy, security or other similar applicable Laws.

(pp)    "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(qq)    "SEC" means the U.S. Securities and Exchange Commission.

(rr)    "Seller Parties" means Sellers and the Company's Subsidiaries and each of their respective former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(ss)    "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), other than any plan which is a "multiemployer plan" (as defined in Section 3(37) or 4001(a)(3) of ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance, retention or other similar agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by the Company or any of its Subsidiaries or to which the Company or any of its Subsidiaries contributes or is obligated to contribute to or has any Liability, in all cases, other than any plan or arrangement sponsored or maintained by a Governmental Body.

(tt)  "Straddle Period" means any Tax period beginning before, and ending after, the Closing.

(uu)  "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(vv)  "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(ww)  "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(xx)  "United States Seller Plan" means each Seller Plan maintained with respect to the Company and its Subsidiaries other than any Non-Debtor Subsidiary.

11.2   Index of Defined Terms.

Acquired Assets .............................................5
Acquired Leased Real Property .................6
Agreement.....................................................5
Allocation ...................................................42
Allocation Methodology............................42
Assigned Contracts .....................................6
Assignment and Assumption Agreement ..13
Assumed Benefit Plans ...............................9
Assumed Liabilities .....................................8
Backup Bidder ...........................................27
Bankruptcy Case ..........................................5
Bankruptcy Code ..........................................5
Bankruptcy Court.........................................5
Bankruptcy Rules.........................................5
Cash Payment .............................................12
Chosen Courts.............................................48
Closing ........................................................13
Closing Date ...............................................13
Closing Date Payment ...............................12

Company.......................................................5
Company Intellectual Property .................20
Cure Costs.....................................................8
Dataroom ....................................................23
Deposit.........................................................12
Deposit Escrow Account ...........................12
Employees....................................................31
Enforceability Exceptions..........................14
Escrow Agent..............................................12
Escrow Agreement......................................12
Excluded Assets............................................6
Excluded Contracts.......................................7
Excluded Liabilities ...................................10
Express Representations.............................25
Financial Statements...................................15
Foreign Competition Laws ........................15
Latest Balance Sheet...................................15
Leased Real Property ..................................16
Leases ...........................................................16

| | | | |
|---|---|---|---|
| Material Contract | 17 | Seller | 5 |
| Multiemployer Plans | 21 | Seller 401(k) Plan | 32 |
| Outside Date | 40 | Seller Plans | 21 |
| Parties | 5 | Sellers | 5 |
| Party | 5 | Successful Bidder | 27 |
| Pension Plans | 21 | Transfer Offer | 31 |
| Permits | 19 | Transfer Taxes | 42 |
| Projections | 38 | Transferred Employees | 31 |
| Purchase Price | 12 | Updated Schedules | 36 |
| Purchaser | 5 | WARN Act | 22 |
| Purchaser 401(k) Plan | 32 | Welfare Plans | 21 |
| Purchaser Plans | 32 | | |

11.3   <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)     Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)     The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)     The words "to the extent" shall mean "the degree by which" and not "if."

(e)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)     Any document or item will be deemed "delivered," "provided" or "made available" by the Company, within the meaning of this Agreement if such document or item (a) is included in the Dataroom, (b) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (c) made available upon request, including at the Company's or any of its Subsidiaries' offices.

(k)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)     All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(n)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

*[Signature page(s) follow.]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**[PURCHASER]**

By: _____
Name:
Title:

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PIER 1 IMPORTS, INC.**

By: _____
Name:
Title:

**PIER 1 ASSETS, INC.**

By: _____
Name:
Title:

**PIER 1 LICENSING, INC.**

By: _____
Name:
Title:

**PIER 1 HOLDINGS, INC.**

By: _____
Name:
Title:

**PIER 1 IMPORTS (U.S.), INC.**

By: _____
Name:
Title:

**PIER 1 SERVICES COMPANY**


By: _____
Name:
Title:



**PIR TRADING, INC.**


By: _____
Name:
Title:



**PIER 1 VALUE SERVICES, LLC**


By: _____
Name:
Title:

## **Exhibit 2**

**Auction Notice**

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## NOTICE OF AUCTION FOR THE SALE OF THE DEBTORS' ASSETS

**PLEASE TAKE NOTICE** that on [●], 2020, the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered the *Order (I) Establishing Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Asset Purchase Agreement, (V) Authorizing Assumption of the Plan Support Agreement, and (VI) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to conduct an auction (the "Auction") to select the party or parties to purchase the Debtors' Assets. The Auction

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith. The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

will be governed by the bidding procedures approved pursuant to the Order (attached to the Order as <u>Exhibit 1</u>, the "<u>Bidding Procedures</u>").

Copies of the Order, the Bidding Procedures, or other documents related thereto are available upon request to Epiq Corporate Restructuring, LLC by calling (866) 977-0883 (toll free) or (503) 520-4412 (international) or visiting the Debtors' restructuring website at <u>https://dm.epiq.com/pier1/</u>.

**PLEASE TAKE FURTHER NOTICE** that the Bid Deadline is **Monday, March 23, 2020, at 5:00 p.m. (prevailing Eastern Time)**, and that any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to conduct the Auction, at which they will consider Bids submitted to the Debtors and their advisors, by and pursuant to the Bidding Procedures as set forth in the Order, on **Tuesday, March 31, 2020 at [●] a/p.m. (prevailing Eastern Time)**, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022.

**PLEASE TAKE FURTHER NOTICE** that notwithstanding anything to the contrary in the Opening Bidder's Proposed Agreement, a Qualified Bidder may provide for the assumption of the Employee Obligations, and in considering whether a bid is a Qualified Bid or a Successful Bid, the Debtors will take into consideration whether the Potential Bidder or Qualified Bidder proposes to assume the Employee Obligations.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to modify the Bidding Procedures, in their reasonable business judgment in accordance with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that approval of the Sale of the Debtors' Assets to the Successful Bidder(s), and any objections thereto, will be heard in connection with confirmation of the Plan.

*[Remainder of page intentionally left blank]*

Richmond, Virginia
Dated:   February 17, 2020

*/s/ Jeremy S. Williams*

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192
Email:      Michael.Condyles@KutakRock.com
            Peter.Barrett@KutakRock.com
            Jeremy.Williams@KutakRock.com
            Brian.Richardson@KutakRock.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
(*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains
(*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      joshua.sussberg@kirkland.com
            emily.geier@kirkland.com
            annelyse.gains@kirkland.com

-and-

Joshua M. Altman (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      josh.altman@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

## **Exhibit 3**

**Notice of Successful Bidder**

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PIER 1 IMPORTS, INC., *et al.*,[36] | ) | Case No. 20-30805 (KRH) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## NOTICE OF SUCCESSFUL AND BACKUP BIDDER WITH RESPECT TO
## THE AUCTION OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

On [●], 2020 the United States Bankruptcy Court for the Eastern District of Virginia
(the "Court") entered the *Order (I) Establishing Bidding Procedures, (II) Scheduling the Bid
Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof,
(IV) Approving the Asset Purchase Agreement, (V) Authorizing Assumption of the Plan Support
Agreement, and (VI) Granting Related Relief* [Docket No. [●]] (the "Order"),[37] by which the Court

---

[36]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter
11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service
address is 100 Pier 1 Place, Fort Worth, Texas 76102.

[37]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding
Procedures Order or the Bidding Procedures Motion, as applicable.

approved procedures setting forth the process by which the Debtors are authorized to conduct an auction (the "<u>Auction</u>") for the sale of any portion, all, or substantially all of the Debtors' Assets.

**PLEASE TAKE FURTHER NOTICE** that, on **Tuesday, March 31, 2020, at [●]:00 a/p.m. (prevailing Eastern Time)**, pursuant to the Order, the Debtors conducted the Auction with respect to certain of the Assets at [the offices of Kirkland & Ellis, LLP, located at 601 Lexington Avenue, New York, New York, 10022].

**PLEASE TAKE FURTHER NOTICE** that, at the conclusion of the Auction, the Debtors, in consultation with their professionals, selected the following Successful Bidder and Backup Bidder with respect to the Debtors' Assets:

| Asset(s) | Successful Bidder | Backup Bidder | Proposed Expense Reimbursement and/or Breakup Fee | Key Terms of Proposed Sale |
|---|---|---|---|---|
|  |  |  |  |  |

**PLEASE TAKE FURTHER NOTICE** that the Sale/Confirmation Hearing to consider confirmation of a plan, including approval of the Sale of the Debtors' Assets to the Successful Bidder(s) at the Auction will be held before the Honorable Judge Keith L. Phillips, at the Court, 701 East Broad Street, 5th Floor, Courtroom No. 5100, Richmond, Virginia 23219, **on Thursday, April 23, 2020, at [●] a/p.m.** (prevailing Eastern Time).

**PLEASE TAKE FURTHER NOTICE**, that at the Sale/Confirmation Hearing, the Debtors will seek the Court's approval of the Successful Bids and the Backup Bids (if any). Unless the Court orders otherwise, the Sale/Confirmation Hearing shall be an evidentiary hearing on matters relating to the Sale and there will be no further bidding at the Sale/Confirmation Hearing. In the event that the Successful Bidder cannot or refuses to consummate the Sale following entry of a Sale Order because of the breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not required, to close with the Backup Bidder on the Backup Bid without further order of the Court.

**PLEASE TAKE FURTHER NOTICE** that this Notice of Successful Bidder and Backup Bidder is subject to the terms and conditions of the Motion and the Order, with such Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale or other disposition of the Assets may make a written request to: Epiq Corporate Restructuring, LLC ("Epiq") (the notice and claims agent retained in these chapter 11 cases) by calling (866) 977-0883 (toll free) or (503) 520-4412 (international).

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Procedures Motion, the Order, this Notice, and any other related documents are available: (a) upon request to Epiq by calling (866) 977 0883 (toll free) or (503) 520-4412 (international); (b) by visiting the website maintained in these chapter 11 cases at http://dm.epiq11.com/pier1; or (c) for a fee via PACER by visiting http://www.vaeb.uscourts.gov.

Richmond, Virginia
Dated:   February 17, 2020

*/s/ Jeremy S. Williams*
_____

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192
Email:      Michael.Condyles@KutakRock.com
                 Peter.Barrett@KutakRock.com
                 Jeremy.Williams@KutakRock.com
                 Brian.Richardson@KutakRock.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
(*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
AnnElyse Scarlett Gains
(*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      joshua.sussberg@kirkland.com
                 emily.geier@kirkland.com
                 annelyse.gains@kirkland.com

-and-

Joshua M. Altman (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      josh.altman@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## Exhibit 4

**Plan Support Agreement**

THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.    ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *PLAN SUPPORT AGREEMENT*

This PLAN SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 14.02, this "**Agreement**") is made and entered into as of February 16, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (ii) of this preamble, collectively, the "**Parties**"):[1]

i.  Pier 1 Imports, Inc. a company incorporated under the Laws of Delaware ("**Pier 1**"), and each of its direct subsidiaries listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Term Lenders (the Entities in this clause (i), collectively, the "**Company Parties**"); and

ii. the undersigned holders of Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Term Lenders**").

---

[1]  Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

*RECITALS*

**WHEREAS**, the Company Parties and the Consenting Term Lenders have negotiated certain transactions with respect to the Company Parties on the terms set forth in this Agreement and as will be specified in a chapter 11 plan to be negotiated as set forth herein (the "**Plan**"), and in the bidding procedures related to a potential sale of assets, attached as **Exhibit B** hereto (as may be amended, modified, waived, or supplemented in accordance herewith, the "**Bidding Procedures**," such transactions as described in this Agreement, the Plan, and the Bidding Procedures the "**Transactions**");

**WHEREAS**, the Company Parties intend to implement the Transactions, including through the commencement of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Transactions on the terms and conditions set forth in this Agreement, the Plan, and the Bidding Procedures;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.** *Definitions and Interpretation.*

1.01.  Definitions.  The following terms shall have the following definitions:

"**Administrative Claims Cap**" means the dollar amount of payments of Administrative and Priority Claims (as defined in the Plan) the Consenting Term Lenders will consent to be paid pursuant to the Plan.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Transaction**" means any transaction not described by this Agreement, the Plan, and the Bidding Procedures proposed to the Company related to a debt or operational restructuring of the Company by any party.

2

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bidding Procedures**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement or confidentiality agreement provided for in the Term Loan Credit Agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure, or disclosure to the "Private Side" lender site, as defined in the Term Loan Credit Agreement, of material non-public information, in connection with any proposed Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Motion**" means a motion filed with the Bankruptcy Court seeking, among other relief, approval of (i) the Disclosure Statement, (ii) a schedule of hearings related to the Plan confirmation process, and (iii) certain notices related thereto, and granting related relief.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equitization Restructuring**" means any Transaction whereby the New Pier 1 Interests are distributed to holders of existing Term Loan Claims pursuant to the Plan.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits

interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**Interim Period DIP Budget**" means that portion of the budget contemplated in the DIP Documents covering the period of time between the Petition Date and March 23, 2020.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Lender Election**" means, in the event the Company Parties do not receive Qualified Bids (as defined in the Bidding Procedures) greater than or equal in value to the Reserve Price, the Required Consenting Term Lenders' election to pursue (a) an Equitization Restructuring and cancellation of the Auction (as defined in the Bidding Procedures), or (b) an Auction as contemplated in Section 4 of this Agreement.

"**New Pier 1 Interests**" means equity interests in Reorganized Pier 1.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Term Loan Claims who meets the requirements of Section 8.05.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" has the meaning set forth in the recitals to this Agreement.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Term Loan Claims), in its capacity as a dealer or market maker in Term

Loan Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Reorganized Pier 1**" means the Company, as reorganized pursuant to and under the Plan, or any successor thereto.

"**Required Consenting Term Lenders**" means, as of the relevant date, Consenting Term Lenders holding more than 50.00% of the aggregate outstanding principal amount of Term Loan Claims that are held by Consenting Term Lenders.

"**Reserve Price**" means the value, taking into account the Claims Estimation, at which the Term Loan Lenders would receive a cash recovery of $104.7 million[2] (*i.e.* 55 cents on the dollar) on account of the Term Loan Claims.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale Transaction**" means a sale of some or all of the Debtors' assets in accordance with the Bidding Procedures and Plan.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Term Loan**" means loans outstanding under the Term Loan Credit Agreement.

"**Term Loan Agent**" means any administrative agent, collateral agent, or similar Entity under the Term Loan, including any successors thereto.

"**Term Loan Claims**" means any Claim on account of the Term Loan.

"**Term Loan Credit Agreement**" means that certain Term Loan Credit Agreement, dated April 30, 2014, between Pier 1 Imports (U.S.), Inc., as lead borrower, the other facility guarantors party thereto, Wilmington Savings Fund Society, FSB, as successor administrative agent, and certain financial institutions, as lenders, as may be amended, supplemented, modified, refinanced, replaced, or extended.

"**Term Loan Credit Documentation**" means collectively, the Term Loan Credit Agreement and the other documents and instruments related thereto (including, without limitation, the notes, guarantees, collateral documents, amendments, and fee letters entered into in connection therewith).

"**Term Loan Lenders**" means the lenders to the Term Loan Credit Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, or 11.04.

"**Transactions**" has the meaning set forth in the recitals to this Agreement.

---

[2]    **Note to Draft**: Subject to ongoing review and discussions among Guggenheim and FTI.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**Wind-Down Budget**" shall have the meaning set forth in the Plan and be reasonably acceptable to both the Company Parties and the Required Consenting Term Lenders. For the avoidance of doubt, the Wind-Down Budget (and any provisions in this Agreement with respect thereto) shall (i) only be of any force and effect with respect to the actual costs associated with winding down the Company's chapter 11 estate, (2) shall be determined on the timeline set forth herein, and (c) once in place, shall replace any then-existing applicable 13-week cash forecast.

1.02.    Interpretation.  For purposes of this Agreement:

This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof shall not be effective in regard to the interpretation hereof.

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not;

(j)      the phrase "counsel to the Consenting Term Lenders" refers in this Agreement to each counsel specified in Section 14.10 other than counsel to the Company Parties; and

(k)      unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

**Section 2.**      ***Effectiveness of this Agreement.***   This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties; and

(b)      holders of at least sixty-three point eight (63.8) percent of the aggregate outstanding principal amount of Term Loans shall have executed and delivered counterpart signature pages of this Agreement.

**Section 3.**      ***Definitive Documents.***

3.01.   The Definitive Documents governing the Transactions shall include the following:  (a) the Plan; (b) the Confirmation Order; (c) the Disclosure Statement; (d) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (e) the First Day Pleadings and all orders sought pursuant thereto; (f) the Plan Supplement, (g) any motion seeking approval of the Company Parties' incurrence of postpetition financing and all agreements, documents, budgets, interim and final orders, and/or amendments in connection therewith (collectively, the "**<u>DIP Documents</u>**" and the budget(s) provided in the DIP Documents (and all amendments thereto), the "**<u>DIP Budget</u>**"); (h) the Wind-Down Budget; and (i) any motion seeking approval of bidding procedures and/or a sale of some or all of the Company Parties' assets and all agreements, documents, orders, and/or amendments in connection therewith, including the Bidding Procedures, (collectively, the "**<u>Sale Documents</u>**").

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or

instrument related to the Transactions, or any amendments thereto, shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 13. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date (including, for the avoidance of doubt, the DIP Documents and any and all updated budgets related thereto) shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Term Lenders.

**Section 4.**        *Milestones*[3]

On and after the Agreement Effective Date, the Company Parties shall use commercially reasonable efforts to implement the Transaction in accordance with the following milestones (the "**Milestones**"), as applicable, unless extended or waived in writing (which may be by electronic mail between applicable counsel) by the Company Parties and the Required Consenting Term Lenders. For the avoidance of doubt, nothing in these Milestones shall prevent the Debtors from exercising their respective fiduciary duties under applicable law:

(a)        no later than 11:59 p.m. (prevailing Eastern time) on February 17, 2020, the Company Parties shall have commenced the Chapter 11 Cases in the Bankruptcy Court and shall have filed a motion for approval of the Bidding Procedures and assumption of this Agreement, consistent in all respects with this Agreement;

(b)        no later than 11:59 p.m. (prevailing Eastern time) on February 18, 2020, the Debtors will have sought first day relief and the Bankruptcy Court shall have entered an order (i) providing interim approval of the applicable DIP Documents, (ii) approving the Bidding Procedure and (iii) approving assumption of this Agreement;

(c)        as soon as reasonably practicable, but in no event later than seven (7) days after the Petition Date, the Company Parties shall have filed the Plan, the Disclosure Statement, and the Disclosure Statement Motion, each in form and substance reasonably acceptable to the Required Consenting Term Lenders;

(d)        as soon as reasonably practicable, but in no event later than March 13, 2020, the Bankruptcy Court shall have entered the final order approving the applicable DIP Documents;

(e)        as soon as reasonably practicable, but in no event later than three (3) Business Days prior to the first scheduled hearing on the Disclosure Statement Motion, the Company Parties and the Required Consenting Term Lenders shall agree to the Administrative Claims Cap[4];

---

[3]    The date of each Milestone provided for in this <u>Section 4</u> shall be calculated in accordance with Rule 9006 of the Federal Rules of Bankruptcy Procedure. Each Milestone may be extended or modified by agreement (which may be via e-mail) between counsel to the Company Parties and counsel to the Consenting Term Lenders.

[4]    For the avoidance of doubt, notwithstanding anything in this Agreement, the Debtors' professionals, and any professionals of the official committee of unsecured creditors appointed in the Chapter 11 Cases, shall be required to file retention papers and fee applications with the Bankruptcy Court, and the Consenting Term Lenders reserve all rights to review and object to any such retentions or payments in accordance with applicable laws.

8

(f)     as soon as reasonably practicable, but in no event later than March 20, 2020, the Bankruptcy Court shall have entered the Disclosure Statement Order;

(g)     the Bid Deadline in the Bidding Procedures shall be no later than 5:00 p.m. (prevailing Eastern time) on March 23, 2020;

(h)     in the event that the Company Parties do not receive a Qualified Bid greater than or equal in value to the Reserve Price, then no later than 11:59 p.m. (prevailing Eastern time) on the date that is four (4) Business Days following the Bid Deadline, the Consenting Term Lenders shall notify the Company Parties (via electronic mail through applicable counsel) of their Lender Election;

(i)     if applicable, as soon as reasonably practicable, but in no event later than March 31, 2020, the Auction shall have occurred;

(j)     as soon as reasonably practicable, but in no event later than five (5) Business Days following selection of a Successful Bidder, the Company Parties and the Required Consenting Term Lenders shall agree to a Wind-Down Budget reasonably acceptable to the Required Consenting Term Lenders;

(k)     as soon as reasonably practicable, but in no event later than April 23, 2020, the Bankruptcy Court shall have entered the Confirmation Order;[5] and

(l)     as soon as reasonably practicable, but in no event later than May 30, 2020, the Plan Effective Date shall have occurred.

**Section 5.     *Commitments of the Consenting Term Lenders.***

5.01.   <u>General Commitments, Forbearances, and Waivers</u>.

(a)     During the Agreement Effective Period, each Consenting Term Lender agrees (severally and not jointly), in respect of all its Term Loan Claims, to:

(i)     use its commercially reasonable efforts to support the Transaction and to act in good faith and take all reasonable actions necessary to implement and consummate the Transaction in accordance with the terms, conditions, and applicable deadlines set forth in this Agreement, the Plan, and the Bidding Procedures, as applicable;

(ii)     negotiate in good faith the applicable Definitive Documents and use its commercially reasonable efforts to agree to the form and substance of such Definitive Documents consistent with the terms of this Agreement;

---

[5]   As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Successful Bid, and, as applicable, cause such definitive documentation to be filed with the Bankruptcy Court.

(iii)    support the Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Transactions;

(iv)    direct the Term Loan Agent (in accordance with the Term Loan Credit Documentation) to take all actions in furtherance of such Consenting Term Lender's respective obligations under this Agreement, and if the Term Loan Agent takes any action inconsistent with a Party's obligations under this Agreement, such Party shall promptly direct such Term Loan Agent to cease and refrain from taking any such action;

(v)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment; provided that this Section 5.01(a)(v) shall not require any Consenting Term Lender to take any action for which they will incur additional out of pocket or legal expenses unless reimbursed by the Company Parties;

(vi)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Transactions from the Company Parties' other stakeholders; provided that this Section 5.01(a)(vi) shall not require any Consenting Term Lender to take any action for which they will incur additional out of pocket or legal expenses unless reimbursed by the Company Parties;

(vii)    use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 5.02(b); provided that this Section 5.01(a)(vii) shall not require any Consenting Term Lender to take any action for which they will incur additional out of pocket or legal expenses unless reimbursed by the Company Parties;

(viii)    give any notice, order, instruction, or direction to the Term Loan Agent (in accordance with the Term Loan Credit Documentation) necessary to give effect to the Transactions;

(ix)    use commercially reasonable efforts to obtain sixty-six and two-thirds (66 2/3) percent of Term Loan Lenders to execute and deliver counterpart signature pages to this Agreement; and

(x)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)    During the Agreement Effective Period, each Consenting Term Lender agrees (severally and not jointly), in respect of all its Term Loan Claims, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions;

10

(ii)     direct the Term Loan Agent to take any action inconsistent with such Consenting Term Lender's respective obligations under this Agreement;

(iii)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties

(vi)     exercise, or direct the Term Loan Agent to exercise, any rights pursuant to section 363(k) of the Bankruptcy Code to credit bid an amount greater than the Reserve Price at any Auction; or

(vii)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

5.02.   <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)     During the Agreement Effective Period, each Consenting Term Lender that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Term Lender, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)     vote each of its Term Loan Claims to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)     support all the debtor and third-party releases, injunctions, discharge, and exculpation provisions provided in the Plan;

(iii)     to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iv)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) through (iii) above.

(b)     During the Agreement Effective Period, each Consenting Term Lender, in respect of each of its Term Loan Claims, will support, and will not directly or indirectly object to, delay,

11

impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is contemplated by this Agreement.

(c)       During the Agreement Effective Period, each Consenting Term Lender (severally, and not jointly) agrees, in its own discretion, to support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any action in furtherance of the Company Parties' ordinary course postpetition compensation and employee benefit, retention, or incentive programs as long as such program is approved by any interim of the Bankruptcy Court and the Company (i) complies with any caps set forth in such orders and (ii) complies with the Interim Period DIP Budget with respect to such programs. For the avoidance of doubt, any compensation and employee benefit, retention, or incentive programs not authorized by an interim order of the Bankruptcy Court shall not be implemented without the consent of the Required Consenting Term Lenders (such consent not to be unreasonably withheld).

(d)       During the Agreement Effective Period, each in its own discretion each Consenting Term Lender will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with, nor will any Consenting Term Lender direct the Term Loan Agent to object to, delay, impede, or take any action to interfere with, any DIP Document filed by any Company Party in the Bankruptcy Court.

(e)  During the Agreement Effective Period:

(i)       If the Company Parties receive a Qualified Bid greater than or equal in value to the Reserve Price, then the Consenting Term Lenders agree (severally and not jointly), and agree to direct the Term Loan Agent (as applicable and in accordance with the Term Loan Credit Documentation), with respect to any Qualified Bid selected as the Successful Bid (as defined in the Bidding Procedures) at Auction or with respect to another Transaction that constitutes the end of the Debtors' sale process, to (a) with respect to any and all liens, encumbrances, and interests in the assets of the Company Parties, including all Collateral (as defined in the Term Loan Credit Agreement), including on account of the Term Loan Credit Documentation automatically release and discharge such liens, encumbrances, and interests upon the closing of the Transaction, without any further action of such Consenting Term Lender, provided that such liens, encumbrances, and interests continue to attach to the proceeds of such Transaction until such proceeds are distributed as provided for in the Plan; (b) consent to the Sale Transaction pursuant to the Auction and Plan, and (c) otherwise support, negotiate in good-faith, and implement such Sale Transaction.  The Consenting Lenders agree to direct the Term Loan Agent (in accordance with the Term Loan Credit Documentation) to promptly execute and deliver any instruments, documentation and agreement necessary or desirable or reasonably requested by the Company Parties to evidence and confirm the release of all such liens, encumbrances, interests and claims pursuant to the forgoing Section 5.02(e)(i)(a).

(ii)      If the Successful Bidder at the Auction is not a Consenting Term Lender, the Consenting Term Lenders agree (severally and not jointly), and agree to direct the Term Loan Agent (as applicable and in accordance with the Term Loan Credit Documentation), to: (a) with respect to any and all liens, encumbrances, and interests in the assets of the Company Parties, including all Collateral (as defined in the Term Loan Credit Agreement), including on

12

account of the Term Loan Credit Documentation automatically release and discharge, upon the closing of the Transaction, such liens, encumbrances, and interests without any further action of such Consenting Term Lender, provided that such liens, encumbrances, and interests continue to attach to the proceeds of such Transaction until such proceeds are distributed as provided for in the Plan; (b) consent to the Sale Transaction pursuant to the Auction and Plan; and (c) otherwise support, negotiate in good-faith, and implement such Sale Transaction.  The Consenting Lenders agree to direct the Term Loan Agent (in accordance with the Term Loan Credit Documentation) to promptly execute and deliver any instruments, documentation and agreement necessary or desirable or reasonably requested by the Company Parties to evidence and confirm the release of all such liens, encumbrances, interests and claims pursuant to the forgoing Section 5.02(e)(ii)(b).

(iii)    If the Consenting Term Lenders are the Successful Bidder at the Auction, the Consenting Term Lenders and the Company Parties shall agree to support and implement a Plan that, at the election of the Required Consenting Term Lenders, provides for either (a) the liquidation of the Company pursuant to the Plan or (b) an Equitization Restructuring.  If a liquidation is pursued, , the Company Parties and the Required Consenting Term Lenders shall use commercially reasonably efforts to promptly implement a value-maximizing liquidation.  For the avoidance of doubt, in such a scenario, the store closings will be completed prior to the Plan Effective Date, but certain wind-down activities and asset sales may occur after the Plan Effective Date pursuant to any wind-down trust agreements, with proceeds and remaining cash to be distributed pursuant to the Plan.

(iv)    The Consenting Term Lenders agree (severally and not jointly) to not exercise, or direct the Term Loan Agent to exercise, any rights pursuant to section 363(k) of the Bankruptcy Code to credit bid an amount greater than the value of the Reserve Price at any Auction.

(v)    Each Consenting Term Lender will support, and will direct the Term Loan Agent (in accordance with the Term Loan Credit Documentation) to support, the Company Parties' Transactions and will not object to, delay, impede, or take any other action to interfere with entry of any Sale Document and/or consummation of any Sale Transaction, *provided* that such Sale Transaction complies with the Plan, the Bidding Procedures, and this Agreement.

(vi)    In determining whether any Qualified Bid reaches the Reserve Price, the Company Parties and the Required Consenting Term Lenders shall work in good faith to reach an  agreement on estimates of Claims and any and all other payments and obligations that are (i) required under the Plan or any other Definitive Document, including but not limited to the Wind-Down Budget and (ii) to be paid prior to the Term Loan Claims pursuant to the Plan, to the extent unknown and not already estimated as part of the Administrative Claims Cap, for the purpose of calculating the Reserve Price (collectively, the "**Claims Estimation**") and agree that such Claims Estimation shall be binding on the Parties so long as this Agreement remains in effect.

(vii)    To the extent that the Consenting Term Lenders do not agree with the Debtors' selection of the Successful Bidder at the Auction, the Consenting Term Lenders and the Company Parties agree to seek expedited relief from the Bankruptcy Court to resolve the dispute

13

with such relief to be heard by the Bankruptcy Court no later than five (5) days after the conclusion of the Auction; *provided* that the Consenting Term Lenders and Company Parties agree that any determination by the Bankruptcy Court shall be binding on the Parties and shall not result in or cause the termination of this Agreement or serve as a valid justification for breach of either Parties' rights and obligations under this Agreement.

5.03.    Additional Provisions Regarding the Consenting Term Lenders' Commitments.

(i)    Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:  (a) affect the ability of any Consenting Term Lender to consult with any other Consenting Term Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), subject to all applicable Confidentiality Agreements; (b) impair or waive the rights of any Consenting Term Lender to assert or raise any objection permitted under this Agreement in connection with the Transactions; and (c) prevent any Consenting Term Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 6.    *Commitments of the Company Parties.***

6.01.    General Commitments, Forbearances, and Waivers.

(a)    Except as set forth in 6.03, during the Agreement Effective Period, the Company Parties agree to:

(i)    support and take all steps reasonably necessary and desirable to consummate the Transactions in accordance with this Agreement including seeking Court approval of this Agreement pursuant to the motion to approve Bidding Procedures;

(ii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(iii)    use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Transactions;

(iv)    negotiate the Definitive Documents in good faith, provide counsel for the Consenting Term Lenders commercially reasonably time to review draft copies of all Definitive Documents before filing, and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Transactions as contemplated by this Agreement;

(v)    use commercially reasonable efforts to seek additional support for the Transactions from their other material stakeholders to the extent reasonably prudent;

(vi)    to the extent the Company becomes aware of any Alternative Transaction, notify the Consenting Term Lenders within (1) Business Day.

(vii)    provide counsel and advisors for the Consenting Term Lenders, upon reasonable advance notice to the Company Parties, timely and reasonable responses to all diligence requests; *provided* that the Company Parties shall not be required to distribute or share any documents that are or contain privileged materials, are otherwise subject to work-product or other attorney-client privilege, where applicable law restricts distribution, or is subject to confidentiality obligations of the Company Parties that prevent distribution; and

(viii)    timely file a formal objection to any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loan Claims.

(b)    Negative Commitments.    Except as set forth in 6.03, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions;

(ii)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Transactions described in, this Agreement or the Plan;

(iii)    modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(iv)    file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

6.02.    <u>Commitments with Respect to Chapter 11 Cases</u>

(i)    in determining whether any Qualified Bid reaches the Reserve Price, the Company Parties and the Required Consenting Term Lenders shall work in good faith to reach an   agreement on the Claims Estimation for the purpose of calculating the Reserve Price and agree that such Claims Estimation shall be binding on the Parties so long as this Agreement remains in effect;

(ii)    to the extent that the Required Consenting Term Lenders do not agree with the Debtors' selection of the Successful Bidder at the Auction, the Consenting Term Lenders and the Company Parties agree to seek expedited relief from the Bankruptcy Court to resolve the dispute with such relief to be heard by the Bankruptcy Court no later than five (5) days after the conclusion of the Auction; *provided* that the Consenting Term Lenders and Company Parties agree that any determination by the Bankruptcy Court shall be binding on the Parties and shall not result in or cause the termination of this Agreement or serve as a valid justification for breach of either Parties' rights and obligations under this Agreement;

(iii)    the Company Parties shall (i) provide counsel for the Consenting Term Lenders a commercially reasonable opportunity to review draft copies of all First Day Pleadings

15

and, (ii) to the extent reasonably practicable, provide a commercially reasonable opportunity to counsel to any Consenting Term Lenders materially affected by such filing to review draft copies of other documents that the Company Parties intend to file with Bankruptcy Court, as applicable;

(iv)    <u>Financial Reporting</u>. During the Agreement Effective Period, the Company Parties agree to:

(A)    provide counsel and advisors for the Consenting Term Lenders with any financial reporting provided to the DIP Lenders with regard to compliance with the DIP Budget (at the same time as such information is shared with the DIP Lenders);[6]

(B)    provide counsel and advisors for the Consenting Term Lenders with an email on the second Business Day of each week, up to the Bid Deadline, regarding outreach to Potential Bidders (subject to applicable confidentiality provision);

(C)    provide counsel and advisors for the Consenting Term Lenders with an email on the fourth Business Day of each week including a tracker of the status of going-out-of-business sales (with the understanding the reporting would cease if the going-out-of-business sales are completed);

(D)    provide counsel and advisors for the Consenting Term Lenders with an email on the fourth Business Day of each week including mutually agreed key performance indicators (including a comparison to the then-current business plan);

(E)    provide counsel and advisors for the Consenting Term Lenders with an email on the fourth Business Day of each week including mutually agreed information associated with inventory receipts outlook;

(F)    provide counsel and advisors for the Consenting Term Lenders with an email on the fourth Business Day of each week including mutually agreed information on actual and forecasted accounts payable balances;

(G)    provide counsel and advisors for the Consenting Term Lenders with an email on the fourth Business Day of each week including a

---

[6]    To the extent not included in the financial reporting to the DIP Lenders, provide counsel and advisors for the Consenting Term Lenders with an email each Thursday including a rolling thirteen (13) week budget ("Rolling Budget") including (i) a rolling weekly inventory roll forward in support of each Rolling Budget; (ii) a rolling accounts payable roll forward in support of each Rolling Budget; and (iii) estimated Administrative and Priority Claims, subject to satisfaction of covenants and reporting requirements in DIP Documents.

report summarizing all new purchase orders issued postpetition reflecting amount and target delivery date; and

(H)     host a weekly call (whether hosted by the Company Parties or by the Company Parties' advisors) for counsel and advisors for the Consenting Term Lenders on the first Business Day of each week to discuss questions related to the foregoing, provided that any questions to be raised on the weekly call are submitted in writing to the Company Parties' advisors on the last business day of the week prior to the weekly call.

6.03.   Additional Provisions Regarding Company Parties' Commitments.

*(i)*     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section (i) shall not be deemed to constitute a breach of this Agreement.

(ii)     Notwithstanding anything to the contrary in this Agreement (but subject to Section (i)), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate alternative proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to alternative proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of alternative proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Term Lender), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Transactions or alternative proposals.

(iii)     Nothing in this Agreement shall:  (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

## Section 7.     *Cooperation and Support*

Each Party hereby covenants and agrees to cooperate with the other Parties in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) with respect to, (i) all matters relating to their rights hereunder; (ii) all matters concerning the implementation of the Plan and the Transactions; and (iii) the pursuit, approval and support of the Transactions (including confirmation of the Plan). Furthermore, subject to the terms hereof,

17

each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, or to effectuate the solicitation of the Plan and/or the Transactions, including making and filing any required regulatory filings, executing and delivering any other necessary agreements or instruments, and voting any claims against or interests in the Company Parties in favor of the Plan, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**Section 8.** *Transfer of Interests and Securities.*

8.01.    During the Agreement Effective Period, no Consenting Term Lender shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Term Loan Claims to any person, including any affiliated or unaffiliated person in which it may hold a direct or indirect beneficial interest, unless the transferee either (i) executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Term Lender and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer. Notwithstanding the foregoing, compliance with this Section 10.01 shall not be required with respect to the acquisition of an indirect beneficial interest in a Consenting Term Lender's Term Loan Claims by an affiliate of such Consenting Term Lender.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Term Loan Claims.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Term Lenders from acquiring additional Term Loan Claims; provided, however, that (a) such additional Term Loan Claims shall automatically and immediately upon acquisition by a Consenting Term Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Term Lenders) and (b) such Consenting Term Lender must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties promptly and, in any event, within five (5) Business Days of such acquisition.

8.04.    This Section 10 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Term Lender to Transfer any of its Term Loan Claims.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

18

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Term Loan Claims with the purpose and intent of acting as a Qualified Marketmaker for such Term Loan Claims shall not be required to execute and deliver a Transfer Agreement in respect of such Term Loan Claims if (a) such Qualified Marketmaker subsequently transfers such Term Loan Claims (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is a Permitted Transfer under Section 8.01.  To the extent that a Consenting Term Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Term Loan Claims that the Qualified Marketmaker acquires from a holder of the Term Loan Claims who is not a Consenting Term Lender without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 10, the restrictions on Transfer set forth in this Section 10 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**    ***Representations and Warranties of Consenting Term Lenders.***  Each Consenting Term Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Term Lender executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Term Loan Claims or is the nominee, investment manager, or advisor for beneficial holders of the Term Loan Claims reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Term Loan Claims other than those reflected in, such Consenting Term Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 7);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Term Loan Claims;

(c)    such Term Loan Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, right of participation, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Term Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d)    it has the full power to vote, approve changes to, and transfer all of its Term Loan Claims referable to it as contemplated by this Agreement subject to applicable Law.

**Section 10.**    ***Mutual Representations, Warranties, and Covenants***.  Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Plan Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements regarding the Company Parties with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

## Section 11.    *Termination Events*.

11.01.  <u>Consenting Term Lender Termination Events</u>.   This Agreement may be terminated with respect to the Consenting Term Lenders, by the Required Consenting Term Lenders, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 14.10 hereof upon the occurrence of the following events:

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Term Lenders seeking termination pursuant to this provision and (ii) remains uncured for one (1) business day after such terminating Consenting Term Lenders transmit a written notice in accordance with Section 14.10 hereof detailing any such breach;

(b)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Transactions and (ii) remains in effect for twenty (20) Business Days after such terminating Consenting Term Lenders transmit a written notice in accordance with Section 14.10 hereof detailing any such issuance; <u>provided</u> that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)    the Milestones set forth in Section 4 have not been achieved, extended, or waived within one (1) Business Day after the date identified for completion of such Milestone (as such date may be extended or waived);[7]

(d)    the Company Parties fail to abide by the Wind-Down Budget unless waived by the Required Consenting Term Lenders by written notice in accordance with Section 16.10 hereof; provided however that for the purposes of this section, the Company Parties shall be entitled to a variance of [_]% from the Wind-Down Budget with respect to disbursements thereunder;

(e)    the Company Parties seek approval of DIP Documents to which the Consenting Term Lenders have not consented;

(f)    the Company Parties enter into or seek approval of exit financing to which the Consenting Term Lenders have not consented;

(g)    the Company Parties make any payments with respect to the Company Parties' compensation programs not contemplated by this Agreement without the prior written consent of the Consenting Term Lenders;

(h)    the Company Parties enter into a material executory contract, lease, or other arrangement outside of the ordinary course of business without the prior written consent of the Consenting Term Lenders;

(i)    there is a default under any debtor-in-possession financing governed by the DIP Documents;

(j)    the Company Parties withdraw the Plan or Disclosure Statement, file, propose, or otherwise support any plan of reorganization or liquidation other than the Plan, file any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement and such motion or pleading has not been withdrawn prior to the earlier of (i) two (2) Business Days after the Company Parties receive written notice in accordance with Section 16.10 hereof from the Consenting Term Lenders that such motion or pleading is inconsistent with this Agreement and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading;

(k)    the Bankruptcy Court grants relief that is inconsistent with this Agreement in any materially adverse respect;

(l)    the Bankruptcy Court enters an order denying confirmation of the Plan and the Company Parties are unable to obtain approval of the Plan within 15 Business Days; or

(m)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Term Lenders, not to be unreasonably withheld), (i) converting one or

---

[7]    For the avoidance of doubt, no Party may terminate this Agreement on account of failure to satisfy a Milestone to the extent that such failure is caused by or resulting from such Party's own action (or failure to act).

21

more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement.

11.02.  <u>Company Party Termination Events</u>. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

(a)    the breach in any material respect by one or more of the Consenting Term Lenders of any provision set forth in this Agreement that remains uncured for a period of one (1) Business Day after the receipt by the Consenting Term Lenders of notice of such breach, including:

(i)    Any direct or indirect objection, delay, impediment, or other action taken by a Consenting Term Lender against any action in furtherance of the Company Parties' employee compensation programs that are otherwise consistent with this Agreement;

(ii)    Any direct or indirect objection, delay, impediment, or other action taken by a Consenting Term Lender or Term Loan Agent against any DIP Document filed by any Company Party in the Bankruptcy Court;

(iii)    Any direct or indirect objection, delay, impediment, or other action taken by a Consenting Term Lender or Term Loan Agent opposing entry of any Sale Document and/or consummation of any Sale Transaction, <u>provided</u> that such Sale Transaction complies with this Agreement, the Plan, and the Bidding Procedures; or

(iv)    The failure of the Consenting Term Lenders to negotiate in good faith, support, and implement a Sale Transaction if the Reserve Price is triggered or such Sale Transaction is occurring pursuant to the Lender Election.

(b)    the Milestones set forth in Section 4 have not been achieved, extended, or waived within one (1) Business Days after the date identified for completion of such Milestone (as such date may be extended or waived);[8]

(c)    the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Transaction;

(d)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance

---

[8]    For the avoidance of doubt, no Party may terminate this Agreement on account of failure to satisfy a Milestone to the extent that such failure is caused by or resulting from such Party's own action (or failure to act).

with Section 14.10 hereof detailing any such issuance; provided that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(e)    the Bankruptcy Court enters an order denying confirmation of the Plan.

11.03.    Mutual Termination.    This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all the following: (a) the Required Consenting Term Lenders; and (b) each Company Party.

11.04.    Automatic Termination.    This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.05.    Effect of Termination.    Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action. Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Transactions and this Agreement or otherwise; provided, however, that any Consenting Term Lender withdrawing or changing its vote pursuant to this Section 11.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Term Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Term Lender, and (b) any right of any Consenting Term Lender, or the ability of any Consenting Term Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Term Lender. No purported termination of this Agreement shall be effective under this Section 11.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(c) or Section 11.02(e). Nothing in this Section 11.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(c).

**Section 12.    *Fees and Expenses.*** For as long as the Agreement is in full force and effect and the Consenting Term Lenders are not in default pursuant to its terms, and in accordance with and

subject to the DIP Documents (which orders shall provide for the payment of all of the fees and expenses described in this Agreement), the Company Parties shall pay or reimburse when due all reasonable and documented fees (incurred prior to or after the Petition Date) of the following: Brown Rudnick LLP ("Brown Rudnick") as primary counsel, one local counsel, and FTI Consulting ("FTI") as financial advisor, for all Consenting Term Lenders; in addition to the fees and expenses (including attorneys' fees) of the Term Loan Agent. The Company Parties' payment of fees and expenses owing to Brown Rudnick and FTI shall be in accordance with all applicable engagement letters executed between the Parties.

## Section 13.    *Amendments and Waivers.*

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (i) each Company Party and (ii) the Required Consenting Term Lenders, solely with respect to any modification, amendment, waiver or supplement that materially and adversely affects the rights of such Parties and unless otherwise specified in this Agreement; provided, however, that any waiver, modification, amendment, or supplement that materially adversely affects the economic recoveries or treatment of any Consenting Term Lender may not be made without the prior written consent of each such adversely affected Consenting Term Lender.

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

## Section 14.    *Miscellaneous.*

14.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Transactions, as applicable.

14.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court (and if the Chapter 11 Cases are not filed, in the courts of New York State), and solely in connection with claims arising under this Agreement:   (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Term Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation

25

for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting Term Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Pier 1 Imports, Inc.
Attention:  Ray McKown
E-mail address:  grmckown@pier1.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua A. Sussberg, P.C. and Emily Geier
E-mail address:  joshua.sussberg@kirkland.com
                emily.geier@kirkland.com

and

Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Attention:  AnnElyse Scarlett Gains
E-mail address:  <u>annelyse.gains@kirkland.com</u>

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60611
Attention:  Joshua Altman
E-mail address:  josh.altman@kirkland.com

26

(b)      if to a Consenting Term Lender, to:

Brown Rudnick LLP
7 Times Square
New York, New York 10036
Attention:  Robert J. Stark
E-mail address:  rstark@brownrudnick.com

and

Brown Rudnick LLP
One Financial Center
Boston, Massachusetts 02111
Attention:  Sharon I. Dwoskin
E-mail address:  sdwoskin@brownrudnick.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Term Lender hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  <u>Waiver</u>.  If the Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  Several, Not Joint, Claims.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16.  Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.  Remedies Cumulative.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18.  Capacities of Consenting Term Lenders.  Each Consenting Term Lender has entered into this agreement on account of all Term Loan Claims that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Term Loan Claims.

14.19.  Email Consents.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 13, or otherwise, including a written approval by the Company Parties or the Required Consenting Term Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**PIER 1 IMPORTS, INC.**
**PIER 1 IMPORTS (U.S.), INC.**
**PIER 1 HOLDINGS, INC.**
**PIER 1 ASSETS, INC.**
**PIER 1 LICENSING, INC.**
**PIER 1 SERVICES COMPANY**
**PIER 1 VALUE SERVICES, LLC**
**PIR TRADING, INC.**

By: _____
Name:  Robert J. Riesbeck
Authorized Signatory

**Consenting Term Lender Signature Page to
the Plan Support Agreement**

**[CONSENTING TERM LENDER]**

Signature: _____

Name:

Title:


Address:


E-mail address(es):


| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Term Loan | |
| Revolving Loan | |
| Equity Interests | |

## EXHIBIT A

**Company Parties**

**Pier 1 Imports, Inc.**

**Pier 1 Assets, Inc.**

**Pier 1 Licensing, Inc.**

**Pier 1 Imports Holdings, Inc.**

**Pier 1 Services Company**

**Pier 1 Imports (U.S.), Inc.**

**Pier 1 Value Services, LLC**

**PIR Trading, Inc.**

## EXHIBIT B

**Bidding Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### BIDDING PROCEDURES FOR THE DISPOSITION OF THE DEBTORS' ASSETS

On [●], the United States Bankruptcy Court for the Eastern District of Virginia entered the *Order (I) Establishing Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Asset Purchase Agreement, (V) Authorizing Assumption of the Plan Support Agreement, and (VI) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized to solicit bids for and conduct an auction (the "Auction") for a sale or disposition (collectively, the "Sale," and each, a "Sale Transaction") of all or substantially all of the Debtors' Assets (as defined herein) or any portion thereof, either as a going-concern or as a liquidation (the "Bidding Procedures").

### I.    DESCRIPTION OF THE ASSETS.

The Debtors are seeking to sell all of their assets, or any portion thereof, either as a going-concern or as a liquidation.  These assets include, but are not limited to, the Debtors' going-concern business, unexpired leases, executory contracts, equipment, inventory, supplies, intellectual property, insurance proceeds, receivables, prepaid expenses and deposits, and books and records, in each case, free and clear of all liens, claims, interests, or other encumbrances (collectively, the "Assets").

### II.    SOLICITATION PROCESS; DISTRIBUTION OF BIDDING PROCEDURES

For any sale of the Assets in these chapter 11 cases (the "Bankruptcy Case"), the Debtors and/or any agent of the Debtors shall, at the Debtors' direction, distribute these Bidding Procedures to any potential interested bidders.  The Debtors, in the exercise of their reasonable business judgment may elect to exclude any Assets from these Bidding Procedures and sell such

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

Assets at either a private or public sale, subject to Court approval of any alternative sale method. Furthermore, the Debtors may determine in their discretion (upon consultation with the Consenting Term Lenders (as defined in the Plan Support Agreement, defined below) and the DIP Agents (as defined in the *Declaration of Robert J. Riesbeck, Chief Executive Officer, of Pier 1 Imports, Inc., in Support of Chapter 11 Petitions and First Day Motions*, the "First Day Declaration")), whether to proceed with a sale of any Asset pursuant to these Bidding Procedures.

Notwithstanding anything herein to the contrary, all consultation, notification, or other rights of the Consenting Term Lenders and the DIP Agents are subject to, and expressly qualified by, any confidentiality obligation or agreement entered with the Potential Bidders (as defined herein).

## III.    PLAN SUPPORT AGREEMENT

In connection with approval of these Bidding Procedures, the Debtors are also seeking Court approval of that certain plan support agreement (the "Plan Support Agreement") entered into on February 16, 2020 by and between the Debtors and Consenting Term Lenders.   The Plan Support Agreement provides, among other items, that the Consenting Term Lenders have consented to the sale of Assets as outlined herein.

## IV.    PARTICIPATION REQUIREMENTS.

### A.  Potential Bidders.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Assets or part of the Assets (a "Potential Bidder") must deliver to each of the Debtors' advisors the following documents and information (unless the Debtors, in their business judgment, choose to waive any of the following requirements for any Potential Bidder):

1. an executed confidentiality agreement to the extent the Potential Bidder has not already executed a confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement");

2. identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale Transaction(s); and

3. proof by the Potential Bidder of its financial capacity to close a proposed Sale Transaction(s), which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors (including in consultation with their advisors).

2

The Debtors, in consultation with their advisors, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed to conduct due diligence and submit a bid (such Potential Bidder, an "Acceptable Bidder").  Notwithstanding anything herein to the contrary, the Debtors, reserve the right to work with a Potential Bidders to aggregate bids into a consolidated Qualified Bid prior to the Bid Deadline (each as defined below).

### B.  Obtaining Due Diligence.

The Debtors, with their advisors, shall establish an electronic data room (the "Data Room") that provides standard and customary diligence materials, including the necessary information to allow Acceptable Bidders to submit a Qualified Bid (as defined below) and to seek and obtain commitments for debt financing.

Only Acceptable Bidders shall be eligible to receive diligence materials and access to the Debtors' Data Room and to additional non-public information regarding the Debtors and the Assets.  The Debtors (with the assistance of their advisors) shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that (i) the Debtors shall have the right to reasonably limit the information and due diligence provided to competitors and (ii) the Debtors may decline to provide such information to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate a proposed Sale Transaction.  The due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.  Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors.  The Debtors, their representatives and advisors are not responsible for, and will bear no liability with respect to, any information obtained by any Acceptable Bidder in connection with any Sale or Sale Transaction.

### C.  Non-Binding Indications of Interest.

Any Potential Bidder interested in a Transaction (regardless of whether such party has been determined to be an Acceptable Bidder) shall submit a non-binding indication of interest (an "Indication of Interest") by [**February 28], 2020, at 5:00 p.m. (prevailing Eastern Time)** (as may be extended without notice or hearing by the Debtors, the "Indication of Interest Deadline"). The indication of interest should (i) identify whether the party is interested in acquiring some or all of the Assets (and which Assets with reasonable specificity), (ii) set forth a proposed purchase price for the proposed Transaction, including by identifying separately any cash and non-cash components of the proposed Transaction consideration, including, for example, certain liabilities to be assumed, and (iii) identify any proposed conditions to closing the Transaction.

Indications of Interest should be submitted to the Debtors' advisors by the Indication of Interest Deadline:

(i)     proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua Sussberg (joshua.sussberg@kirkland.com), Emily Geier (emily.geier@kirkland.com), and AnnElyse Scarlett Gains (annelyse.gains@kirkland.com) and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Joshua M. Altman (josh.altman@kirkland.com);

(ii)    proposed co-counsel to the Debtors, Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia, 23219, Attn: Michael Condyles (michael.condyles@kutakrock.com), Peter Barrett (peter.barrett@kutakrock.com), Jeremy Williams (jeremy.williams@kutakrock.com), and Brian Richardson (brian.richardson@kutakrock.com); and

(iii)   the Debtors' proposed investment banker, Guggenheim Securities, LLC, 330 Madison Avenue, New York, New York 10017, Attn: Durc Savini (durc.savini@guggenheimpartners.com), Adam Rifkin (adam.rifkin@guggenheimpartners.com), and Hend Abdallah (hend.abdallah@guggenheimpartners.com).

The Debtors will provide copies of all Indications of Interest via electronic mail as soon as reasonably practicable to counsel for the Consenting Term Lenders and to counsel for the DIP Agents subject to any confidentiality obligation or agreement entered with the Potential Bidders.

Note that submitting an indication of interest by the Indication of Interest Deadline does not obligate the Potential Bidder to submit a formal bid or to participate in the sale process and does not exempt the Potential Bidder from also having to submit a Qualified Bid by the Bid Deadline to participate in the Auction (each as defined below). For the avoidance of doubt, the submission of an Indication of Interest by the Indication of Interest Deadline is not a prerequisite for Potential Bidders to submit a Qualified Bid.

### D. Bid Deadline.

An Acceptable Bidder that desires to make a bid must transmit via email (in .pdf or similar format) **or** deliver written copies of its bid to the following parties so as to be received not later than **5:00 p.m. (prevailing Eastern Time) on [Monday, March 23], 2020** (the "Bid Deadline"):

(i)     proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua Sussberg (joshua.sussberg@kirkland.com), Emily Geier (emily.geier@kirkland.com), and AnnElyse Scarlett Gains (annelyse.gains@kirkland.com) and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Joshua M. Altman (josh.altman@kirkland.com); and

(ii)    proposed co-counsel to the Debtors, Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia, 23219, Attn: Michael Condyles

(michael.condyles@kutakrock.com),                    Peter                    Barrett
(peter.barrett@kutakrock.com),                    Jeremy                    Williams
(jeremy.williams@kutakrock.com),        and        Brian        Richardson
(brian.richardson@kutakrock.com); and

(iii)    the Debtors' proposed investment banker, Guggenheim Securities, LLC, 330
Madison Avenue, New York, New York 10017, Attn:    Durc Savini
(durc.savini@guggenheimpartners.com),                    Adam                    Rifkin
(adam.rifkin@guggenheimpartners.com),        and        Hend        Abdallah
(hend.abdallah@guggenheimpartners.com).

The Debtors will provide copies of all Bids via electronic mail as soon as reasonably practicable to the Office of the United States Trustee for the Eastern District of Virginia (the "U.S. Trustee") and to counsel for the Consenting Term Lenders and to counsel for the DIP Agents subject to any confidentiality obligation or agreement entered with the Potential Bidders.

## V.    QUALIFIED BIDS.

### A.    Requirements for Qualified Bids.

Any proposal, solicitation, or offer (each, a "Bid") will be considered a qualified bid only if the Bid is submitted in writing by an Acceptable Bidder, by the Bid Deadline, and is deemed to comply with all of the following in the Debtors' business judgment (a "Qualified Bid" and such bidder a "Qualified Bidder"):

1.    *Assets.*    The Bid must clearly identify the following:    (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the Acceptable Bidder intends to operate the Debtors' business as a going concern, or to liquidate the business.

2.    *Purchase Price.*    The Bid must (a) clearly set forth the purchase price to be paid (the "Purchase Price"), (b) identify separately the cash and non-cash components of the Purchase Price, (c) use commercially reasonable efforts to indicate the allocation of the Purchase Price between ABL Priority Collateral and Term Priority Collateral (each as defined in the Intercreditor Agreement), and (d) with respect to the Purchase Price attributable to the sale of the ABL Priority Collateral, include a cash component in an amount sufficient to pay in full in cash all outstanding obligations owed by the Debtors under the DIP Documents (as defined in the DIP Orders) and all obligations under the Prepetition ABL Documents (as defined in the DIP Order), to the extent that any Prepetition ABL Obligations (as defined in the DIP Order) are still outstanding.

3.    *Deposit.*    Each Bid must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate Purchase Price of the Bid to be held in an interest-bearing escrow account to be identified and established by the

Debtors (the "<u>Deposit</u>"), *provided* that if a Qualified Bidder increases its Bid at the Auction and is the Successful Bidder or Backup Bidder (each as defined herein), such bidder must increase its Qualified Bidder Deposit to match the proposed Purchase Price submitted at the Auction within three (3) business days after the Auction.

4.  ***Bid Documents.***  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "<u>Bid Documents</u>").  The Bid Documents shall include:  (a) a clearly marked version of the form purchase agreement attached hereto as **<u>Exhibit 1</u>** (the "<u>Form Purchase Agreement</u>") showing all changes requested by the Acceptable Bidder, (b) a schedule of Assumed Contracts to the extent applicable to the Bid, (c) any other material documents integral to such Bid, and (d) a statement from the Acceptable Bidder that:  (y) it is prepared to enter into and consummate the Transactions contemplated in the Form Purchase Agreement no later than fifteen (15) business days after the conclusion of the Auction (or, if no Auction is held, the Bid Deadline) and (z) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or the Backup Bid) until the consummation of the Sale Transaction.

5.  ***Legal Capacity.***  Each Bid must demonstrate to the Debtors' satisfaction that the Acceptable Bidder has the legal capacity to consummate the transaction it is proposing.

6.  ***Committed Financing.***  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtors (upon consultation with the Consenting Term Lenders and the DIP Agents) that demonstrates that the Acceptable Bidder has received sufficient unconditional debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid, including providing adequate assurance of future performance under all contracts proposed to be Assumed Contracts by such Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with their advisors, and upon consultation with the Consenting Term Lenders and the DIP Agents.

7.  ***Contingencies.***  The Bid must not contain any contingencies as to the validity, effectiveness, and/or binding nature of the Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance,

conditions, or prospects) and all diligence must be completed before the Bid Deadline.

8. ***Identity.***  The Bid must fully disclose the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the Acceptable Bidder if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed transaction(s) contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Potential Bidder, Acceptable Bidder, or Qualified Bidder, and/or any officer or director of the foregoing.  Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.

9. *Irrevocable.* ALL BIDS SHALL BE DEEMED IRREVOCABLE, NOTWITHSTANDING ANY CONDITIONS LISTED IN THE APPLICABLE AGREEMENT. IN THE EVENT THAT AN ACCEPTABLE BIDDER SEEKS TO REVOKE SUCH BID, THE DEBTORS SHALL BE ENTITLED TO KEEP SUCH BIDDER'S DEPOSIT AND PURSUE ALL OTHER CONTRACTUAL REMEDIES UNDER LAW OR EQUITY.

10. ***Backup Bidder.***  By submitting a Bid, each Acceptable Bidder agrees to be a Backup Bidder, should the Bid be so selected.

11. ***As-Is, Where-Is.***  The Bid must include the following representations and warranties (or the Acceptable Bidder otherwise agrees that such representations and warranties may be incorporated into the applicable Bid Documents should the Bid be selected as the Successful Bid): (a) expressly state that the Acceptable Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its Bid; and (b) a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its Bid and did not rely on any of the Debtors' or any of their advisors' written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith, except (with respect to the Debtors only) as expressly stated in the representations and warranties contained in the Acceptable Bidder's Form Purchase Agreement ultimately accepted and executed by the Debtors.

12. ***Authorization.***  The Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors with respect to the submission, execution, and delivery of its Bid, participation in the

Auction, and closing of the proposed transaction(s) contemplated in such Bid.  The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder.

13. ***Disclaimer of Fees.***  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder   will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

14. ***Adherence to Bid Procedures.***  Each Bid must include (a) a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, and (b) that the Bid constitutes a *bona fide* offer to consummate the proposed transactions, and agrees to be bound by these Bidding Procedures.

15. ***No Collusion.***  The Acceptable Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code  with respect to any Bids, the Auction, or the Sale.

16. ***Other Information.*** The Bid contains such other information as may be reasonably requested by the Debtors.

**B.  Rejection of "Qualified Bid" Status for Non-Conforming Bids.**

The Debtors shall determine in their discretion (including in consultation with their advisors and with the Consenting Term Lenders and the DIP Agents) which bids qualify as Qualified Bids and which bids shall be rejected as non-confirming bids.  In addition, the Debtors shall have the right to negotiate with any Acceptable Bidder with respect to clarification of any Bid.

**C.  No Representation; Qualified Bidder's Duty to Review.**

Neither the Debtors nor any of their advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental

8

laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing regarding the Assets.  All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the Assets, except to the extent expressly provided in the Bankruptcy Court's order approving the Sale. Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Assets or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Bankruptcy Court's order approving the Sale.

## VI.    QUALIFICATION OF BIDDERS.

No later than 11:59 p.m. (prevailing Eastern Time) on the date that is four (4) business days following the Bid Deadline, the Debtors shall notify each Acceptable Bidder whether such party is a Qualified Bidder.

If any Bid is determined by the Debtors (after consultation with the Consenting Term Lenders and the DIP Agents) not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit on or before the date that is five (5) business days after the Bid Deadline.

The Debtors may, in consultation with the Consenting Term Lenders and the DIP Agents, accept as a single Qualified Bid, multiple Bids for non-overlapping material portions of the Assets such that, when taken together in the aggregate, such Bids would otherwise meet the standards for a single Qualified Bid. The Debtors may permit otherwise Qualified Bidders who submitted Bids by the Bid Deadline for less than a substantial (but nevertheless a material) portion of the Assets but who were not identified as a component of a single Qualified Bid consisting of such multiple Bids, to participate in the Auction and to submit higher or otherwise better Bids that in subsequent rounds of bidding may be considered, together with other Bids for non-overlapping material portions of the Assets, as part of such a single Qualified Bid for Overbid (as defined herein) purposes.

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors (in consultation with the Consenting Term Lenders and the DIP Agents), a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Notwithstanding anything herein to the contrary, the Debtors reserve the right  (in consultation with the Consenting Term Lenders and the DIP Agents) to work with (a) Acceptable Bidders to aggregate two or more Bids into a single consolidated Qualified Bid prior to the Bid

Deadline or (b) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualifying Bid prior to the conclusion of the Auction.  The Debtors reserve the right to cooperate with any Acceptable Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.  The Debtors may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Assets such that, if the multiple Bids were taken together in the aggregate, they would otherwise meet the standards for a single Qualified Bid (in which event those multiple Acceptable Bidders shall be treated as a single Qualified Bidder for purposes of the Auction).

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of such Qualified Bidder to consummate its contemplated transaction.  Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such Acceptable Bidder is no longer a Qualified Bidder or that a Bid made by such Acceptable Bidder is not a Qualified Bid.

## VII.    RIGHT TO CREDIT BID.

Any Qualified Bidder who has a valid and perfected lien on any Assets of the Debtors' estates (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured.

Notwithstanding anything to the contrary herein, the Term Agent or its designee, the DIP Administrative Agent, and the Prepetition ABL Administrative Agent (each as defined in the First Day Declaration), on behalf of those Term Loan Lenders, DIP Lenders, and Prepetition ABL Lenders (each as defined in the First Day Declaration), shall be deemed to be a Qualified Bidder and, subject to section 363(k) of the Bankruptcy Code, may submit a credit bid of all or any portion of the aggregate amount of such Term Loan Lenders', DIP Lenders', or Prepetition ABL Lenders' secured claims pursuant to section 363(k) at any time during the Auction and any such credit bid will be considered a Qualified Bid, unless otherwise ordered by the Court for cause; *provided* that in accordance with the Plan Support Agreement, the Consenting Term Lenders shall not submit a bid that exceeds the value of the Reserve Price (as defined in the Plan Support Agreement) in accordance with the Plan Support Agreement.

Any credit bid submitted by a Secured Creditor shall be subject in each case to the rights and duties of the parties under the Intercreditor Agreement and Prepetition Documents (as defined in the DIP Orders) and to the provision of consideration sufficient to pay in full in cash all claims for which there are any senior liens on the collateral Assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment)that is subject to the credit bid.

## VIII.    STALKING HORSE BID AND BID PROTECTIONS.

Upon entry of the Order, at any time until two (2) business days prior to the Auction, the Debtors shall be authorized, but not obligated, in an exercise of their business judgment, and in

consultation with the Consenting Term Lenders and the DIP Agents, to (a) select one or more Acceptable Bidders to act as a stalking horse bidder in connection with the Auction (the "Stalking Horse Bidder") and (b) in connection with any stalking horse agreement with a Stalking Horse Bidder, (x) provide a breakup fee, (y) agree to reimburse the reasonable and documented out of pocket fees and expenses and/or (z) agree to pay a "work fee" or other similar cash fee ((x)-(z) collectively, the "Bid Protections"); *provided*, however, that any Bid Protections are reasonably acceptable to the Consenting Term Lenders and the DIP Agents.[3]   Any such stalking horse Bid Protections are authorized pursuant to the Order.

## IX.    THE AUCTION.

If the Debtors receive more than one Qualified Bid for any particular Asset or portion of Assets, the Debtors shall conduct the Auction to determine the Successful Bidder with respect to such Assets or portion of Assets.  If the Debtors do not receive a Qualified Bid for any particular Asset, the Debtors will not conduct the Auction with respect to such Asset in accordance with the Plan Support Agreement.

Absent the Debtors selection of a stalking horse bid pursuant to Section VIII above, no later than two days prior to the Auction, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the Debtors' reasonable business judgment and in consultation with the Consenting Term Lenders and the DIP Agents (the "Baseline Bid"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders.  The determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, but not limited to, among other things:  (a) the number, type, and nature of any changes to the Form Purchase Agreement requested by the Qualified Bidder, including the type and portion of the Assets sought and Assumed Obligations to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the net economic effect of any changes to the value to be received by the Debtors' estates from the transactions contemplated by the Bid Documents; (d) the tax consequences of such Qualified Bid; and (e) the ability and likelihood to close the transaction contemplated by the Qualified Bid (collectively, the "Bid Assessment Criteria").

### D.  Auction Participation

1. Time, Date and Location of Auction; Adjournment of Auction; Appearance of Qualified Bidders at Auction.  The Auction shall take place at [●] a/p.m. (prevailing Eastern Time) on [Tuesday, March 31], 2020, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such later date, time, and location as designated by the Debtors, after providing notice to the Notice Parties and Qualified Bidders and posting notice of such change on the Debtors' case website: https://dm.epiq11.com/pier1.  The Debtors shall have the right to conduct

---

[3]    Prior to giving Bid Protections to Stalking Horse Bidder, the Debtors shall consult with the U.S. Trustee, as well as counsel for an official committee of unsecured creditors should one be appointed in these chapter 11 cases, one (1) day prior to providing Bid Protections pursuant to the Order.

any number of Auctions on that date to accommodate multiple bids that comprise a single Qualified Bid, if the Debtors determine, in their reasonable business judgment and upon consultation with the Consenting Term Lenders and the DIP Agents, that conducting such auctions would be in the best interests of the Debtors' estates.

2. *Participants and Attendees.*[4]  Only Qualified Bidders are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures.  Qualified Bidders participating in the Auction must appear in person at the Auction, or through a duly authorized representative.  The Auction will be conducted openly and all creditors may be permitted to attend; *provided* that the Debtors may, in their sole and exclusive discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder or creditor at the Auction.  Any creditor wishing to attend the Auction may do so by contacting, no later than three (3) business days prior to the start of the Auction, the Debtors' advisors.

### E.  Auction Procedures.

The Debtors (in consultation with their advisors) shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis in the presence of all other Qualified Bidders, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  All Qualified Bidders shall have the right to submit additional bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their bids; *provided* that any Overbid made by a Qualified Bidder (including with respect to any Backup Bid (as defined below)) must remain open and binding on the Qualified Bidder until and unless the Debtors accept a higher or otherwise better Qualified Bid as the Leading Bid.  The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders participating in the Auction.  The Debtors shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid (as defined below).

The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment:

---

[4]    Permitted Attendees.   Unless the Bankruptcy Court orders or directs otherwise, only the Debtors' representatives, any other parties that the Debtors have invited specifically, and any Qualified Bidders and the professionals for each of the foregoing shall be entitled to attend the Auction; *provided* that only Qualified Bidders shall be entitled to bid at the Auction.  Any permitted attendee may attend the Auction telephonically; provided, further, that such permitted attendee must provide actual notice to Guggenheim, in its capacity as the Debtors' proposed investment banker, that it will make a telephonic appearance at least three (3) business day prior to the Auction.  Notwithstanding any of the foregoing, the Consenting Term Lenders, the DIP Agents, and their professionals shall be entitled to attend the Auction.

1. ***Baseline Bid as Price Floor***.  Bidding shall commence at the amount of the Baseline Bid.

2. ***Minimum Overbid***.  Qualified Bidders may submit successive Bids higher than the previous Bid, based on and increased from the Baseline Bid for the relevant Assets (each such Bid, an "<u>Overbid</u>").  Any Qualified Bidder's initial Overbid and each subsequent Overbid shall be at least a 2% increase in cash, cash equivalents, or such other consideration that the Debtors deem equivalent, over the previous price (the "<u>Minimum Overbid</u>").  The Debtors may, in their reasonable business judgment, announce increases or reductions to the Minimum Overbid at any time during the Auction.  For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at the Auction must contain a Purchase Price in cash, cash equivalents, or such other consideration that the Debtors deem equivalent that exceeds the then existing highest Bid by at least the Minimum Overbid Amount.

3. ***Announcement of Rules***.  At commencement of the Auction, the Debtors may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s).

4. ***Overbid Alterations***.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

5. ***Highest or Best Offer***.  After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid that they believe in their reasonable business judgment and upon consultation with their advisors and the Consenting Term Lenders and the DIP Agents to be the highest or otherwise best offer for the relevant Assets (the "<u>Leading Bid</u>").  Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent Bid with full knowledge of the Leading Bid.

6. ***Rejection of Bids***.  The Debtors, in their reasonable business judgment may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders.

7. ***Additional Information***.  The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable

13

determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction.

8. ***Modification of Procedures***.  The Debtors may (in consultation with the Consenting Term Lenders and the DIP Agents) announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures.

9. ***No Collusion***.  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding and (ii) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

### F.  Adjournment of the Auction.

The Debtors reserve the right, in their reasonable business judgment and upon consultation with the Consenting Term Lenders and the DIP Agents, to adjourn the Auction one or more times to, among other things (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Sale Transaction(s) at the prevailing Bid amount.

### G.  Successful Bidder.

Immediately prior to the conclusion of the Auction, the Debtors shall  (i) determine, consistent with these Bidding Procedures and upon consultation with their advisors and the Consenting Term Lenders and the DIP Agents, which Bid constitutes the highest or otherwise best bid(s) for the applicable Assets (each such Bid, a "Successful Bid") using the Bid Assessment Criteria; and (ii) notify all Qualified Bidders at the Auction for the applicable Assets of the identity of the Qualified Bidder that submitted the Successful Bid (each such Qualified Bidder, the "Successful Bidder") and the amount of the Purchase Price and other material terms of the Successful Bid.  The terms of the Successful Bid shall be acceptable to the DIP Agents and shall, among other things, provide for cash proceeds in an amount sufficient to repay in full in cash the outstanding DIP Obligations under the DIP Documents (each as defined in the DIP Orders) and all of the Prepetition ABL Obligations (as defined in the DIP Orders), to the extent any Prepetition ABL Obligations are still outstanding; *provided* that if more than one Bid provides for payment in full in cash of the outstanding DIP Obligations, then the Debtors shall not be required to consult with the DIP Agents in selecting the Successful Bid.

The Debtors shall file a notice identifying the Successful Bidder and Backup Bidder (if selected) by 11:59 p.m. (prevailing Eastern Time) on the date that is one business day following the date the Auction is closed.

### H.  Backup Bidder.

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment (the "Backup Bid"), shall be required to serve as a backup bidder and upon consultation with the Consenting Term Lenders  and the DIP Agents (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.  The terms of the Backup Bid shall be acceptable to the DIP Agents and shall, among other things, provide for cash proceeds in an amount sufficient to repay in full in cash the outstanding DIP Obligations under the DIP Documents (each as defined in the DIP Orders) and all of the Prepetition ABL Obligations (as defined in the DIP Orders), to the extent any Prepetition ABL Obligations are still outstanding.

The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.

If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

### X.    ACCEPTANCE OF SUCCESSFUL BID.

The Debtors' presentation of a particular Successful Bid to the Court for approval does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale/Confirmation Hearing (as defined below) and in accordance with the Plan.  The Debtors shall seek approval by the Court to consummate the Backup Bid, solely in the event the Successful Bidder fails to close the transaction as required and with all rights reserved against the Successful Bidder.

### XI.    FREE AND CLEAR OF ANY AND ALL ENCUMBRANCES.

Except as provided for in a Successful Bidder's Form Purchase Agreement, all rights, titles and interests in and to the Assets subject thereto shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "Encumbrances"), subject only to the Assumed Liabilities (as defined in the Successful Bidder's purchase agreement), if any, in accordance with Bankruptcy Code section 363(f), with such Encumbrances to attach to the net proceeds (if any) received by the Debtors from the Sale of the Assets in accordance with the Bankruptcy Code, applicable non-bankruptcy law and any prior orders of the Court.

## XII.   DIP ORDERS.

Notwithstanding anything to the contrary contained in these Bidding Procedures or otherwise: (i) the right of the DIP Agents to consent to the sale of any portion of their collateral, including, without limitation, any Assets, on terms and conditions acceptable to the DIP Agents, are hereby expressly reserved and not modified, waived or impaired in any way by these Bidding Procedures; (ii) unless otherwise ordered by the Court, all cash proceeds generated from the sale of any Assets shall be paid to the DIP Administrative Agent upon the closing of such sale for permanent application against the obligations owing by the Debtors under the DIP Documents in accordance with the terms and conditions of the DIP Order and the DIP Documents and thereafter, against the obligations owing by the Debtors under the Prepetition ABL Documents (to the extent any such obligations are still outstanding), in accordance with the terms and conditions of the Prepetition ABL Documents, until such time as all DIP Obligations and Prepetition ABL Obligations have been paid in full in cash in accordance with the terms and conditions of the DIP Documents, the DIP Order and the Prepetition ABL Documents, as applicable; and (iii) nothing in these Bidding Procedures shall amend, modify, or impair any provision of the DIP Order, or the rights of the Debtors or the DIP Agents or DIP Lenders thereunder.

## XIII.   COMMISSIONS.

The Debtors shall be under no obligation to pay commission to any agent(s), advisor(s), or broker(s), except, with respect to Guggenheim Securities, LLC ("Guggenheim"), as investment banker.  All commissions, fees, or expenses for agents, other than Guggenheim, may be paid by bidders at such bidder's discretion.  In no case shall any commissions, fees, or expenses be deducted from any proceeds derived from the Sale of the Assets or the agreed Successful Bid other than to the extent set forth in the Order.

## XIV.   NOTICE PARTIES.

The term "Notice Parties" as used in these Bidding Procedures shall mean:

(i)     proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua Sussberg (joshua.sussberg@kirkland.com), Emily Geier (emily.geier@kirkland.com), and AnnElyse Scarlett Gains (annelyse.gains@kirkland.com) and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Joshua M. Altman (josh.altman@kirkland.com);

(ii)    proposed co-counsel to the Debtors, Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia, 23219, Attn: Michael Condyles (michael.condyles@kutakrock.com), Peter Barrett (peter.barrett@kutakrock.com), Jeremy Williams (jeremy.williams@kutakrock.com), and Brian Richardson (brian.richardson@kutakrock.com);

(iii)   the Debtors' proposed investment banker, Guggenheim Securities, LLC, 330 Madison Avenue, New York, New York 10017, Attn: Durc Savini

(durc.savini@guggenheimpartners.com),          Adam          Rifkin
(adam.rifkin@guggenheimpartners.com),         Stuart         Erickson
(stuart.erickson@guggenheimpartners.com),     and     Hend     Abdallah
(hend.abdallah@guggenheimpartners.com);

(iv)    co-counsel to the DIP Agents, Morgan Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie S. Crider (Marjorie.crider@morganlewis.com);

(v)    co-counsel to the DIP Agents, Hunton Andrews Kurth LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, Attn: Tyler P. Brown (tpbrown@huntonAK.com) and Justin Paget (jpaget@huntonAK.com);

(vi)    co-counsel to the DIP Agents, Choate Hall & Stewart, Two International Place, Boston, MA 02110, Attn: Mark D. Silva (msilva@choate.com), John F. Ventola (jventola@choate.com), and Jonathan D. Marshall (jmarshall@choate.com);

(vii)    counsel to the Consenting Term Lenders, Brown Rudnick LLP, Seven Times Square, New York, New York 10036, Attn: Robert J. Stark (rstark@brownrudnick.com), and Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attn: Sharon I. Dwoskin (sdwoskin@brownrudnick.com); and

(viii)    the U.S. Trustee.

## XV.    SALE/CONFIRMATION HEARING.

A hearing to consider confirmation of a plan, including approval of the sale of the Debtors' Assets to the Successful Bidder(s), or Backup Bidder(s) (if applicable) (the "Sale/Confirmation Hearing") is currently scheduled to take place on **Thursday, April 23, 2020**, at [●], (prevailing Eastern Time), before the Honorable [●], at the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, Suite 4000, Richmond, Virginia 23219, or such other date and time that the Court may later direct and as agreed upon by the Debtors.

**The Sale/Confirmation Hearing may be continued to a later date by the Debtors (in consultation with the Consenting Term Lenders and the DIP Agents) by sending notice prior to, or making an announcement at, the Sale/Confirmation Hearing. No further notice of any such continuance will be required to be provided to any party.**

## XVI.    RETURN OF DEPOSIT.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of such transaction at closing. The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or before the date that is five business days after the Auction.

The Backup Bidder's Deposit shall be held in escrow until the closing of the Sale with the Successful Bidder. In the event the Successful Bidder fails to consummate the Sale Transaction(s) set forth in the Successful Bid and the Debtors opt to close on the Sale Transaction(s) set forth in the Backup Bid, the Backup Bidder's Deposit shall be applied to the Purchase Price of such transaction(s) at closing. In the event of a breach or failure to consummate a Sale by the Successful Bidder or the Backup Bidder, as applicable, the defaulting Successful Bidder's Deposit or Backup Bidder's Deposit, as applicable, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder or Backup Bidder, as applicable.

## XVII.    RESERVATION OF RIGHTS.

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment and upon consultation with the Consenting Term Lenders and the DIP Agents in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale/Confirmation Hearing without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids.

## XVIII.    CONSENT TO JURISDICTION.

All Potential Bidders, Acceptable Bidders, and Qualified Bidders shall be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XIX.    FIDUCIARY OUT.

Nothing in these Bidding Procedures shall require the Debtors' (or any other debtors') management or board of directors to take any action or to refrain from taking any action with respect to these Bidding Procedures when the Debtors' management or board of directors (or other debtors' management or board of directors) determine, based on the advice of their counsel, that taking such action or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary obligations under applicable law.

## **Exhibit 1**

**Form Purchase Agreement**

(Affixed to **Exhibit 1** to the Proposed Order)

**Exhibit C**

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Pier 1 Imports, Inc. and its affiliates and subsidiaries bound thereto and the Consenting Term Lenders, including the transferor to the Transferee of any Term Loan Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Term Lender" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

Signature: _____

Name:

Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Term Loan | |
| Revolving Loan | |
| Equity Interests | |

63652875 v9

---

[1] Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.