Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
AnnElyse Scarlett Gains (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

-and-

Joshua M. Altman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) APPROVING THE PRIVATE SALE FREE AND CLEAR OF LIENS,**
**CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) APPROVING THE**
**PAYMENT OF BID PROTECTION OBLIGATIONS TO THE STALKING**
**HORSE BIDDER, (III) APPROVING THE PAYMENT OF BROKERAGE**
**FEES TO JONES LANG LASALLE, AND (IV) GRANTING RELATED RELIEF**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 76]. The location of the Debtors' service address is PO BOX 961020, Fort Worth, TX 76161-0020. Or, for delivery by Airborne, Federal Express & other Courier Services: 685 John B. Sias Memorial Parkway Suite 255, Fort Worth, TX 76134.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")[2] respectfully state as follows in support of this motion (this "<u>Motion</u>"):

**<u>Relief Requested</u>**

1.     By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Order</u>"):  (a) approving the sale of all of Debtors' right, title, and interest in and to that certain real property, together with that certain building, improvements, easements, hereditaments, fixtures, furniture, equipment (including office furniture, forklifts, racks, and racking), and appurtenances thereunto located in the City of Mansfield, County of Tarrant, and State of Texas (and more particularly described in Exhibit 2 attached to the Order) (the "<u>Property</u>" or "<u>Mansfield</u>"), free and clear of all liens, claims, encumbrances, leases, tenancies, and other interests for total consideration of $18,005,250 million in cash (the "<u>Sale</u>") pursuant to that certain contract of sale agreement by and between Pier 1 Imports (U.S.), Inc. (the "<u>Seller</u>") and Lonejack II LLC (the "<u>Buyer</u>"), as amended by that certain first amendment to contract of sale (collectively, the "<u>Purchase Agreement</u>") attached to the Order as Exhibit 1, (b) approving the payment of a 2% breakup fee (the "<u>Breakup Fee</u>") and $25,000 due diligence expense reimbursement (the "<u>Expense Reimbursement</u>" and together with the Breakup Fee,

---

[2]     A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Robert J. Riesbeck, Chief Executive Officer of Pier 1 Imports, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 30] (the "<u>First Day Declaration</u>") filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on February 17, 2020 (the "<u>Petition Date</u>").  Contemporaneously herewith, the Debtors filed the *Declaration of Todd Burnette in Support of Debtors' Motion for Entry of an Order (I) Approving the Private Sale Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Approving the Payment of Bid Protection Obligations to the Stalking Horse Bidder, (III) Approving the Payment of Brokerage Fees to Jones Lang LaSalle, and (IV) Granting Related Relief* (the "<u>Burnette Declaration</u>") and the *Declaration of Robert J. Riesbeck in Support of Debtors' Motion for Entry of an Order (I) Approving the Private Sale Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Approving the Payment of Bid Protection Obligations to the Stalking Horse Bidder, (III) Approving the Payment of Brokerage Fees to Jones Lang LaSalle, and (IV) Granting Related Relief* (the "<u>Riesbeck Declaration</u>"). Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the Burnette Declaration, the Riesbeck Declaration, or as later defined herein, as applicable.

the "Bid Protections") to 2200 Heritage Owner LLC (the "Stalking Horse Bidder"), (c) approving

the payment of the standard brokerage fee (the "Brokerage Fee") earned by Jones Lang LaSalle

Brokerage, Inc. ("JLL") in connection with the Sale, and (d) granting related relief.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Eastern District of Virginia

(the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

Standing Order of Reference from the United States District Court for the Eastern District of

Virginia, dated August 15, 1984.  The Debtors confirm their consent, pursuant to Rule 7008 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by

the Court in connection with this Motion to the extent that it is later determined that the Court,

absent consent of the parties, cannot enter final orders or judgments in connection herewith

consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105 and 363 of

the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and rule 9013-1 of the Local Rules of the

United    States    Bankruptcy    Court    for    the    Eastern    District    of    Virginia

(the "Local Bankruptcy Rules").

## Background

### I.      General Background.

5.      On the Petition Date, each Debtor filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their

properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On February 27, 2020, the United States Trustee for the Eastern District of Virginia appointed an

official committee of unsecured creditors (the "Committee").  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

6.     Pursuant to the *Order (I) Establishing Bidding Procedures, (II) Scheduling Bid Deadlines and an Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Form of Asset Purchase Agreement, (V) Authorizing Assumption of the Plan Support Agreement and (VI) Granting Related Relief* [Docket No. 102], the Debtors, in the exercise of their reasonable business judgment may elect to exclude any Assets (as defined therein) from the bidding procedures and sell such Assets at either a private or public sale, subject to Court approval of any alternative sale.

7.     The Debtors believe that entry into the Purchase Agreement and approval of the Sale and Bid Protections will maximize the value of the Property.  Specifically, the Purchase Agreement is not only the highest standalone offer for the Property, but also includes an additional offer for personal property (including furniture, fixtures and equipment) that the Debtors would need to otherwise sell (at an additional cost) or abandon.  No other bidder wanted any of such property.  Accordingly, and as further described below, the Debtors submit in their sound business judgment that the process they ran to seek a Sale was robust and any further process is unlikely to yield higher or better offers.  In addition, the Buyer would like to close the transaction shortly after receiving Court approval of the transaction.

8.     **The Broker**.  The Debtors have historically used JLL for assistance with disposition of their real property assets.  JLL was originally engaged[3] for the sale of Mansfield prior to September 2019.  The terms of the contract provided the Broker with a standard Brokerage

---

[3]     The Property was never included in the Debtors' agreement with A&G Real Estate Partners as JLL is a commercial real estate broker who has been handling the Property in the ordinary course of business.

Fee of 4% upon consummation of the Sale, consistent with other agreements between the parties. The Debtors seek approval to pay the Brokerage Fee earned by JLL in connection with the Sale on the grounds that it was reasonable and necessary to maximize the value of the property in the Debtors' business judgment, and so as to avoid any statutory liens that may attach to Property under state law, should the Brokerage Fee be unpaid. If the Debtors do not pay the Brokerage Fee, and the Broker's Lien does attach, the Buyer will not close the Sale and it will negatively affect the Debtors' estates.[4]

9.    **The Stalking Horse Bid**. Following several months of standard market outreach, JLL received initial indications of interest from more than 30 parties. Based on these indications of interest, the Debtors determined that the bid of the Stalking Horse Bidder (the "Stalking Horse Bid") was the best available bid, and determined to enter into an agreement with the Stalking Horse bidder to ensure that their bid would set a price floor of $15 million for Mansfield. The Stalking Horse Bid was contingent upon the receipt of the Bid Protections (and subject to the post-facto court approval sought by this Motion). The Debtors believe that the Bid Protections are reasonable, provided a price floor for the Sealed Bid Auction, were appropriate under the circumstances, and benefitted the Debtors' estate.

10.    **The Auction**. The Debtors, in consultation with JLL, determined that the most value-maximizing auction style to utilize under the circumstances was a sealed bid auction, whereby parties submit a highest and best bid to the Debtors, and the Debtors can choose from among such bids, call for additional rounds of bids, and/or negotiate with bidders to improve their

---

[4]    Alternatively, the Buyer may consider a purchase price adjustment such that JLL's fees would be paid by the Buyer to satisfy the lien. The corresponding purchase price would still exceed the value of all other bids.

bids (the "Sealed Bid Auction").  Ultimately, the Debtors ran a multi-round Sealed Bid Auction, resulting in the eventual selection of the Winning Bidder.

## II.   The Proposed Sale.

### A.   The Sale Process.

(i)   Sale Process Overview.

11.     As part of the Sealed Bid Auction, JLL marketed the Property for several months, circulated a marketing package that was listed on CoStar Commercial Real Estate's online listing database, and completed a survey of comparable building sales to evaluate the fair market value of the Property.  Prior to the conclusion of the Sealed Bid Auction, the online listing received an average of 2,800+ views per week.

12.     **Offers**.  The Debtors utilized the following procedures to procure offers from prospective buyers:

- Buyers (and/or their agents) were asked to submit written offers to JLL on or before 5:00 p.m., Fort Worth, Texas time on May 25, 2020.  The written offer must have included Buyers' (i) maximum bid amount and (ii) acknowledgement that Buyer will execute Seller's form (x) Contract and (y) Commercial Lease.

- Offers remain subject to Seller confirmation at all times and must have been in full compliance with all other terms and conditions.[5]

- If multiple bids were submitted in the same basic value band, Seller may elect to extend the deadline for 72 hours and call for a 'highest and best' offer from each bidder to determine the winning bid.  Alternatively, Seller may have elected to invite bidders to place their highest and best bids in a private email request format.

- All high Bidders were required to execute the Contract.  The executed Contract included the specific sales terms that are included on the Property Page.  The Contract only constitutes an offer to purchase the subject Property and did not

---

[5]   To the extent any party has a higher and better offer for the Property, they may reach out to Debtors' counsel to submit the terms of such an offer on or before the objection deadline for this Motion.

become a binding contract unless and until it had been accepted and executed by the Seller.  If an offer was accepted by the Seller, the High Bidder would become the "Winning Bidder."

- If no Bidders met the Reserve Price, the Seller was under no obligation to entertain any offer for the Property; however, each Seller has the right to entertain and accept an offer from a High Bidder whose bid is lower than the Reserve Price.

13.     **Payment of Earnest Money and Remaining Balance.**  The Winning Bidder was to wire its Earnest Money Deposit in a sum to be set forth on the Property Page to the Title Company within 24 hours from receipt of the Contract signed by Seller.  If the Winning Bidder failed or refused to deliver the Earnest Money Deposit within such two day period, the offer would be deemed withdrawn.  The balance of the Total Purchase Price, along with all other costs and/or fees, must be paid as required in the Purchase Agreement.

14.     **Closing.**  All sales were to close through the Title Company as set forth in the Contract.  The actual scheduled closing date would be set by the Title Company pursuant to the terms and conditions of the Contract.  The Winning Bidder was required to pay customary and normal closing costs, including, but not limited to, closing/escrow fees, recording fees, pro-rations of property taxes and assessments, lender's title insurance premium and fees, loan fees, document preparation fees, and all documentary transfer taxes customarily paid by buyers, if applicable.

15.     The Debtors reserved the right to remove its Property from the Sealed Bid Auction at any time, either before or after bidding has been completed.  In the event the Property was removed after bidding was completed, the Winning Bidder's sole remedy shall be the refund of all sums actually paid as Earnest Money Deposit.  Neither the Debtors nor JLL shall have any further obligation whatsoever to any Bidder in respect of the Property withdrawn by any Seller.

(ii) <u>The Stalking Horse Bid</u>.

16.      As set forth above, JLL selected the Stalking Horse Bid to set the baseline price on June 4, 2020, improving JLL and the Debtors' bargaining position throughout the Sealed Bid Auction.

17.      The Stalking Horse Bid offered $15 million as the purchase price for the Property, contingent upon the receipt of Bid Protections and subject to court approval.  Although the Stalking Horse Bid ultimately was not selected through the Sealed Bid Auction, as set forth below, the Debtors seek, in their business judgment, court approval to pay the Bid Protections owing under the Stalking Horse Bid.

(iii) <u>Bids Received</u>.

18.      Over the course of the Sealed Bid Auction, JLL narrowed down a "short list" of buyers to 31, completed a detailed bid process for three rounds of bids with a binding contract, terms of sale, short-term leaseback and hard earnest money package that was sent to the "short list" of potential buyers.  A summary of bids received is set forth in **Exhibit C** attached hereto. Further, JLL completed multiple tours with a short list of buyers and brokers.

19.      Over the course of the three rounds of bidding, JLL created market competition to end at a high bid of $18,005,250[6] submitted by the Buyer, which was ultimately selected as the winning bid.

---

[6]      The $18,005,250 high bid is inclusive of the FF&E purchase price of $881,587.

B.    **Key Provisions of the Purchase Agreement.**

20.    The following chart summarizes the key terms and conditions of the Purchase Agreement.

| Summary Description of the Purchase Agreement[7] | |
|---|---|
| **Seller** | Pier 1 Imports (U.S.), Inc. |
| **Buyer** | Lonejack II LLC |
| **Property** | That certain tract of land located at 2200 Heritage Parkway, Mansfield, Texas 76063, and more particularly described or depicted on <u>Exhibit A</u> attached thereto and incorporated herein by reference for all purposes. <br><br> Purchase Agreement, § 1. |
| **Purchase Price; Earnest Money** | Purchase price: 18,005,250 00/100 Dollars; <br><br> a.    $18,005,250 purchase price includes $17,123,663 for Mansfield and $881,587 for the FF&E therein. <br><br> b.    $200,000 00/100 Dollars earnest money to be timely deposited (in immediately available funds) by Buyer into escrow. |

**Basis for Relief**

I.    **The Debtors' Entry into the Purchase Agreement Should Be Approved as an Exercise of Sound Business Judgment.**

21.    Section 363(b)(1) of the Bankruptcy Code authorizes a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve a use, sale or lease of property other than in the ordinary course of business, the court must find "some sound business purpose" that satisfies the business judgment test.  *See In re W.A. Mallory Co.*, 214 B.R. 834, 836

---

[7]    Any description of the terms of the Purchase Agreement contained herein is a summary provided for convenience purposes only.  In the event of any inconsistency between the summary set forth herein and the Purchase Agreement, the Purchase Agreement shall control.  Capitalized terms not otherwise defined herein have the meanings set forth in the Purchase Agreement.

(Bankr. E.D. Va. 1997); *see also In re Glover*, No. 09-74787 at *4 (SCS) (Bankr. E.D. Va. Mar. 31, 2010) ("The standard in this Circuit is whether the debtor in possession has exercised sound business judgment.") (citing *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985)).  Courts generally show great deference to a debtor's decisions when applying the business judgment standard.  *See In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("Courts apply the deferential business judgment test when analyzing transactions under § 363(b)(1).").  Deference to a debtor's business judgment is inappropriate only if such business judgment is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice."  *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985).

22.     Once the debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company."  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a Debtor's management decisions.").  In addition, the Debtors are open to all other bids through the hearing.

23.     As set forth above, the Sealed Bid Auction was reasonably calculated to realize the maximum value for the Property and should be approved as an exercise of the Debtors' sound business judgment.

10

24.     Further, the Debtors have a sound business justification for entering into the Purchase Agreement.  The Debtors believe the Purchase Agreement will maximize the value of the Property.  In consideration of the foregoing, the Debtors' advisors and JLL have evaluated the terms of the Sale and believe that an auction process other than that set forth above would be highly unlikely to generate higher proceeds than the contemplated Sale.  The Purchase Agreement will yield, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Property and will provide a greater recovery for their estates than any known or practicably available alternative.  *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (a "section 363(b) sale transaction does not require an auction procedure").

25.     The Debtors should be authorized to pay the Brokerage Fee associated with the Sale as an exercise of reasonable business judgment and so as to avoid the costs incurred in connection with a Broker's Lien.

26.     Thus, the Debtors submit that: the Sealed Bid Auction is reasonably calculated to maximize the value realized from the Property and was implemented in the Debtors' business judgment; the Purchase Agreement constitutes the highest or otherwise best offer for the Property and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative; and payment of the Brokerage Fee is both an exercise of the Debtors' business judgment and necessary to avoid added costs to the Sale.  Therefore, the Debtors request that the Court make a finding that utilizing the Sealed Bid Auction, entry into the Purchase Agreement, and payment of the Brokerage Fee is a proper exercise of the Debtors' business judgment and is rightly authorized.

A.      **The Sale Is Proposed in Good Faith and Without Collusion, and the Buyer Is a Good-Faith Purchaser.**

27.     The Debtors request that the Court find that the Buyer is entitled to the benefits and

protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

28.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

29.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser

leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good

faith," courts have held that a purchaser shows its good faith through the integrity of its conduct

during the course of the sale proceedings, finding that where there is a lack of such integrity, a

good-faith finding may not be made.  *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143,

147 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at

a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the

trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Paulson*, 276 F.3d

389, 392 (8th Cir. 2002); *In re Trism, Inc.*, 328 F.3d 1003, 1006 (8th Cir. 2003); *In re Sasson

Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).  The Debtors submit that the Buyer is a

"good faith purchaser[s]" within the meaning of section 363(m) of the Bankruptcy Code.

30.     First, as set forth in more detail above, the consideration to be received by the

Debtors pursuant to the Sale is substantial, fair, and reasonable.  Second, there exists no indication

of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to

take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the

Sale to be avoided under section 363(n) of the Bankruptcy Code.  *In re Abbotts Dairies of Pa.,*

*Inc.,* 788 F.2d at 147.  The Sale was negotiated at arms' length and in good faith, and accordingly,

the Debtors believe that the Sale and Buyer are entitled to the full protections of section 363(m) of

the Bankruptcy Code.

### B.      The Sale Should be Approved "Free and Clear" Under Section 363(f).

31.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and

clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such

a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale

price of the property exceeds the value of all liens on the property; (d) the interest is the subject of

a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable

proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

32.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the

requirements enumerated therein will suffice to warrant the sale of the Debtors' Assets free and

clear of all liens, claims, encumbrances, leases, tenancies, and other interests ("Interests").  *See*

*In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five

conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

33.     The Debtors submit that any interest that will not be an assumed liability satisfies

at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such

interest will be adequately protected by either being paid in full at the time of closing, or by having

it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess

with respect thereto.  The Debtors accordingly request authority to sell the Property free and clear

of all interests, with any such interests to attach to the proceeds of the Sale.[8]

## II.    The Proposed Sales are Appropriate Pursuant to Bankruptcy Rule 6004(f).

34.    Bankruptcy Rule 6004(f) authorizes a debtor to sell estate property outside of the

ordinary course of business by private sale or public auction.  Private sales are appropriate where

the debtor demonstrates that the proposed sale is permissible pursuant to section 363 of the

Bankruptcy Code.    *See In re Cypresswood Land Partners, I,* 409 B.R. 396, 436

(Bankr. S.D. Tex. 2009) ("there is no prohibition against a private sale. . . [and] there is no

requirement that the sale be by public auction"); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC),

2007 WL 7728109, at *88 (Bankr. D. Del. Aug. 15, 2007) ("[S]ales of property rights outside the

ordinary course of business may be by private sale or public auction.").  Additionally, courts have

held that a debtor has broad discretion to determine the manner in which its assets are sold.  *See*

*Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981); *In re Bakalis*, 220

B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has ample authority to conduct a sale

of estate property through private sale).

35.    A public auction for the Property at this time is logistically impractical given that

the Buyer would like to close the Sale on an expedited timeline and would be unlikely to yield a

higher Purchase Price.  Further, the Sealed Bid Auction followed an extensive marketing process

with a short list of 31 bidders, constituting a more robust process than a private sale to a single

interest party.

---

[8]    The Debtors do not seek authority to sell any non-Debtor property free and clear pursuant to section 363(f) of the
Bankruptcy Code, but rather will assign such interests consistent with their underlying property documents.

**III.     Payment of the Bid Protections to the Stalking Horse Bidder is a Sound Exercise of the Debtors' Business Judgment.**

36.     The Debtors also seek authority to pay the Bid Protections to the Stalking Horse Bidder as a result of the Debtors electing to ultimately select another bidder's offer as the winning bid.  The Debtors have determined in their business judgment that the Bid Protections facilitated a competitive bidding process.  Payment of expense reimbursements and work fees, like those proposed here, in a bidding process for sales is appropriate so long as such payment is a valid exercise of the Debtors' business judgment.  Under section 363(b), the Debtors may use, sell, or lease estate property outside of the ordinary court of business so long as they articulate a sound business reason for doing so.  See, e.g., *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015); *In re Network Access Corp*., 330 B.R. 67, 74-75 (Bankr. D. Del. 2005).  Further, "[b]reak-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . [i]n fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value."  *In re Integrated Res., Inc.*, 147 B.R. 650, 659–60 (Bankr. S.D.N.Y. 1992) (emphasis added).  Specifically, bid protections like a breakup fee "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking."  *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotations omitted); see also *Integrated Res.*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").  Here, the Stalking Horse Bid improved the quality and increased the number of bids received over the course of the Sealed Bid Auction.  Ultimately, the price floor set by the Stalking Horse Bid directly resulted in higher price for the Property and, thus, it was a reasonable use of estate assets in the Debtors' business judgment.

37.     Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  In essence, the Court may enter any order safeguarding the value of the debtor's estate if doing so is consistent with the Bankruptcy Code.  See, e.g., *Chinichian v. Campolongo* (*In re Chinichian*), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Tr., Inc*., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").  To the extent that approval of the Bid Protections are necessary to effectuate the Sale—which, in the Debtor's view, represents the best means of maximizing the value of its estate—the Debtor believes that the Court's application of section 105(a) of the Bankruptcy Code here is appropriate.  See, e.g., *In re Patriot Coal Corporation*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 25, 2015) (authorizing designation of one or more stalking horse bidders, including the provision of bid protections); *In re High Ridge Brands Co.*, No. 19-12689 (BLS) (Bankr. D. Del. Feb. 7, 2020) (authorizing selection of a stalking horse bidder and approving bid procedures for such stalking horse bidder, subject to approval by the bankruptcy court); *In re Forever 21, Inc*., No. 19 12122 (KG) (Bankr. D. Del. Feb. 4, 2020) (approving bid protections in connection with approval of bidding procedures); *In re Bumble Bee Parent, Inc.*, No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) (approving a breakup fee and expense reimbursement in conjunction with approval of a stalking horse bidder); *In re Ditech Holding Corporation,* No. 19 10412 (JLG) (Bankr. S.D.N.Y. Apr. 23, 2019) (authorizing designation of one or more stalking horse bidders, including the provision of bid protections).

16

**IV.     Payment of the Brokerage Fee is Necessary and Appropriate Under the
Circumstances.**

38.     The Debtors request authority to pay the Brokerage Fee owed to JLL for services

rendered in connection with the Sale, pursuant to the standard listing agreement between the

Debtors and JLL, attached hereto as **Exhibit B**.  Under Texas law, the *Broker's and Appraiser's*

*Lien on Commercial Real Estate Act*, codified in Chapter 62 of the Texas Property Code,

establishes a statutory lien on the subject property of a commercial transaction in favor of the

broker in order to provide security for payment of their commission arising therefrom (a "Broker's

Lien").  Tex. Prop. Code Ann. § 62 *et seq.*  Payment of the Brokerage Fee avoids any costs

associated with a Broker's Lien attaching to the Property as a result of the Sale.  Should the lien

attach to the Property, the Buyer will not close the Sale to the detriment of the Debtors' estates.

**V.     Relief Under Bankruptcy Rules 6004(h) Is Appropriate.**

39.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease

of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless

the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  The Debtors request that the Order be

effective immediately upon its entry by providing that the fourteen-day stay under Bankruptcy

Rule 6004(h) is waived.

40.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an

objecting party to appeal before an order can be implemented.  See Advisory Committee Note to

Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Note

are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day

stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be

eliminated to allow a sale or other transaction to close immediately "where there has been no

objection to procedure."  10 Collier on Bankr. ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, if an

17

objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id*.

41.    To maximize the value received for the assets, the Debtors seek to close the Sale as soon as possible after the Hearing. Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rule 6004(h).

## Waiver of Memorandum of Law

42.    The Debtors respectfully request that this Court treat this Motion as a written memorandum of law or waive any requirement that this Motion be accompanied by a written memorandum of law as described in Local Bankruptcy Rule 9013-1(b).

## Notice

43.    The Debtors will provide notice of this Motion via first class mail, facsimile or email (where available) to: (a) the United States Trustee for the Eastern District of Virginia, Attn: Kenneth N. Whitehurst III and Shannon F. Pecoraro; (b) counsel to the official committee of unsecured creditors; (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the DIP Agents and their respective counsel thereto; (e) the indenture trustee to the Debtors' industrial revenue bonds; (f) counsel to the ad hoc group of term loan lenders; (g) the lenders under certain Company-owned life insurance policies; (h) the Debtors' Canadian counsel; (i) the United States Attorney's Office for the Eastern District of Virginia; (j) the Internal Revenue Service; (k) the office of the attorneys general for the states in which the Debtors operate; (l) the Securities and Exchange Commission; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**<u>No Prior Request</u>**

44.     No prior request for the relief sought in this Motion has been made to this or any other court.


[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Richmond, Virginia
Dated:   July 8, 2020

*/s/ Jeremy Williams*

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192
Email:       Michael.Condyles@KutakRock.com
              Peter.Barrett@KutakRock.com
              Jeremy.Williams@KutakRock.com
              Brian.Richardson@KutakRock.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
AnnElyse Scarlett Gains (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:       joshua.sussberg@kirkland.com
              emily.geier@kirkland.com
              annelyse.gains@kirkland.com

**-**and-

Joshua M. Altman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:       josh.altman@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

## **Exhibit A**

**Proposed Order**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
AnnElyse Scarlett Gains (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Joshua M. Altman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PIER 1 IMPORTS, INC., *et al.*,[1] | ) | Case No. 20-30805 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER (I) APPROVING
## THE PRIVATE SALE FREE AND
## CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
## AND INTERESTS, (II) APPROVING THE PAYMENT
## OF BID PROTECTION OBLIGATIONS TO THE STALKING
## HORSE BIDDER, (III) APPROVING THE PAYMENT OF BROKERAGE
## FEES TO JONES LANG LASALLE, AND (IV) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion")[2] of the above captioned debtors and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 76]. The location of the Debtors' service address is 100 Pier 1 Place, Fort Worth, Texas 76102.

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion.

debtors in possession (the "Debtors") for the entry of an order (this "Order"):  (a) approving the

sale of all of Debtors' right, title, and interest in and to that certain real property, together with that

certain building, improvements, easements, hereditaments, fixtures, furniture, equipment

(including office furniture, forklifts, racks, and racking), and appurtenances thereunto belonging

located in the City of Mansfield, County of Tarrant, and State of Texas (and more particularly

described in **Exhibit 2** attached hereto) (the "Property" or "Mansfield"), free and clear of all liens,

claims, encumbrances, leases, tenancies, and other interests for total consideration of $18,005,250

million in cash (the "Sale") pursuant to that certain contract of sale agreement by and between Pier

1 Imports (U.S.), Inc. (the "Seller") and Lonejack II LLC (the "Buyer"), as amended by that certain

first amendment to contract of sale (collectively, the "Purchase Agreement") attached hereto as

**Exhibit 1**, (b) approving the payment of a 2% breakup fee (the "Breakup Fee") and $25,000 due

diligence expense reimbursement (the "Expense Reimbursement" and together with the Breakup

Fee, the "Bid Protections") to 2200 Heritage Owner LLC (the "Stalking Horse Bidder"), (c)

approving the payment of the standard brokerage fee earned by Jones Lang LaSalle Brokerage,

Inc. ("JLL") in connection with the Sale, and (d) granting related relief; and upon the First Day

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Standing Order of Reference from the United States District Court for the Eastern

District of Virginia*, dated August 15, 1984; and this Court having found that it may enter a final

order consistent with Article III of the United States Constitution; and this Court having found that

venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408

and 1409; and this Court having found that the relief requested in the Motion is in the best interests

of the Debtors' estates, their creditors, and other parties in interest; and this Court having found

that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were

appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon the [Burnette] Declaration; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY:

FOUND AND DETERMINED THAT:[3]

A.    The Debtors have articulated good and sufficient reason for this Court to grant the relief requested in the Motion, specifically, without limitation, entry into the Purchase Agreement.

B.    JLL is not a professional under the circumstances, but rather a broker dealing only with respect to the Property in the ordinary course of business.

C.    The Debtors have articulated good and sufficient reason for this Court to ratify the use of the Sealed Bid Auction.

D.    The Debtors have articulated good and sufficient reason for this Court to authorize the payment of the Brokerage Fee.

E.    To the extent any inconsistency arises between this Order and the Purchase Agreement, this Order shall control.

F.    Under the facts and circumstances of these cases, the purchase price for the Property is fair and reasonable.

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  *See* Fed. R. Bankr. P. 7052.

G.      The Buyer is a purchaser in good faith with respect to the Purchase Agreement, as

that term is used in section 363(m) on the Bankruptcy Code and, as such, is entitled to the

protections offered thereby.

H.      The Buyer is not a mere continuation of, or successor to, the Debtors in any respect,

and there is no continuity of enterprise between the Debtors or the Buyer.

I.      All the requirements of sections 363 of the Bankruptcy Code have been met with

respect to the sale of the Property.

J.      The Purchase Agreement is an arm's-length, negotiated transaction between

unrelated parties, in which the Buyer has at all times acted in good faith;

ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The Sealed Bid Auction is hereby approved.

3.      The Debtors are authorized, but not directed, to make payments on account of the

Brokerage Fee.

4.      The Purchase Agreement is hereby approved, and the Debtors are authorized and

directed to take any and all actions necessary or appropriate to consummate the Purchase

Agreement.

5.      The fee interest in the Property shall be transferred to Buyer free and clear of all:

a.      liens, claims, encumbrances, and interests pursuant to Section 363(f) of the

        Bankruptcy Code, with all such liens, claims, encumbrances, and interests

        to attach to the proceeds of the sale in the same order, priority and validity

        that presently exists; *provided however*, the Property shall be transferred

        subject to all non-delinquent real estate taxes and assessments, all zoning

4

and building ordinances, all easements, right of ways, covenants, restrictions of record; and

b.    leases and tenancies, specifically including rights or claims of parties in possession and not shown by public record.

6.    Pursuant to section 363(m) of the Bankruptcy Code, the Buyer shall be, and hereby is, deemed to have purchased the Properties in good faith.

7.    The Debtors are hereby authorized and directed to take such actions as are reasonably necessary to implement and effectuate the terms of this Order and the Purchase Agreement.

8.    Notwithstanding any reference in the Purchase Agreement to "successors and assigns" and the like, Buyer shall not have the right to assign the Purchase Agreement, without the prior written consent of Seller and the Court (if applicable), in each of their sole (and individual) discretion.  Notwithstanding the foregoing, Buyer shall have the right, upon ten (10) days prior written notice to Seller, to assign Buyer's rights, obligations and requirements to one or more nominees at Closing without the need for further approval from the Court or consent of the Debtors; *provided, however*, that each such nominee (a) is an entity controlling, controlled by, or under common control with Buyer and (b) shall, by written instrument executed by Buyer and each such nominee and delivered to Seller, accept and assume, jointly and severally with Buyer, all of the Buyer's obligations and agreements under the Purchase Agreement.  Each such nominee shall receive the Property subject to all of the terms and conditions of the Purchase Agreement.  No assignment of the Purchase Agreement of any kind shall be deemed to release Buyer from Buyer's obligations under the Purchase Agreement.

9.      Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order and any and all other documents and instruments necessary and appropriate to consummate the Purchase Agreement.

10.      This Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing officers, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Property.  In particular, the Recorder's Office of Tarrant County, TX (the "Recorder's Office") is authorized to discharge any liens of record encumbering the Property as of the Closing Date; alternatively, Buyer is hereby authorized to execute a release for any lien, claim, encumbrance, or interest of which the Property is to be transferred free and clear.

11.      This Order and the terms and provisions of the Purchase Agreement shall be binding on all of the Debtors' creditors (whether known or unknown), the Debtors, each respective landlord, and their respective affiliates, successors, and assigns, and any affected third parties.

12.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

13.      This Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

14.      To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Order shall govern.

15.     To the extent any of the deadlines set forth in this Order do not comply with the

Local Bankruptcy Rules, such Local Bankruptcy Rules are waived and the terms of this Order

shall govern.

16.     Notwithstanding the possible applicability of Bankruptcy Rules 4001, 6004(h),

7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions

of this Order shall be immediately effective and enforceable upon its entry.

17.     This Court shall retain jurisdiction with respect to all matters arising from or related

to the implementation, interpretation, or enforcement of this Order.

Dated: _____

Richmond, Virginia                                          United States Bankruptcy Judge

7

WE ASK FOR THIS:

 /s/ Jeremy S. Williams
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

- and -

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
AnnElyse Scarlett Gains (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

Joshua M. Altman (admitted *pro hac vice*)
300 North LaSalle Street
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT
UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

 /s/ Jeremy S. Williams

## <u>Exhibit 1</u>

**Purchase Agreement**

## CONTRACT OF SALE

THIS CONTRACT OF SALE (this "Contract") is made by and between the undersigned Seller and Purchaser.

WHEREAS, Seller desires to sell and convey, and Purchaser desires to purchase and pay for, the Property (hereinafter defined) upon, subject to and conditioned upon the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the premises, and the covenants, conditions and agreements hereinafter contained, the parties hereto agree as follows:

1.   Certain Definitions.     As used herein, the following terms shall have the following definitions:

|  |  |  |
|---|---|---|
| (i) | Seller: | **Pier 1 Imports (U.S.), Inc.,** a Delaware corporation, formally known as Pier 1 Imports-Texas, Inc., a Delaware corporation |
| (ii) | Seller's Address: | For Certified Mail by the U.S. Postal Service return receipt requested: |

Pier 1 Imports (U.S.), Inc.
Attention: Real Estate Department
P. O. Box 961020
Fort Worth, Texas 76161-0020
Copy: Legal Department

For delivery by Federal Express & other courier services:

Pier 1 Imports (U.S.), Inc.
Attention: Real Estate Department
100 Pier 1 Place
Fort Worth, Texas 76102
Copy: Legal Department

With a Copy to:

Chaiken Legal Group, P.C.
Heritage Square II
5001 LBJ Freeway, Suite 850
Dallas, TX 75244
Attention: Matt Bethancourt
Tel No.: (214) 751-3433, ext. 227
Fax No.: (214) 751-3438
mbethancourt@chaikenlegalgroup.com

|  |  |  |
|---|---|---|
| (iii) | Purchaser: | Lonejack II LLC, a Texas limited liability company |
| (iv) | Purchaser's Address: | 2201 Heritage Parkway Mansfield TX 76063 Attention: James Sellers Tel No.: (214) 682-4754 Fax No.: (817) 394-1628 |

Email: *tx/onejack@yahoo.com*

| | | |
|---|---|---|
| (v) | Land: | That certain tract of land (the "Land") located at **2200 Heritage Parkway, Mansfield, Texas 76063**, and more particularly described or depicted on <u>Exhibit "A"</u> attached hereto and incorporated herein by reference for all purposes. |
| (vi) | Purchase Price: | _$17,123,663_ and _00_/100 Dollars ($ _17,123,663.00_) |
| (vii) | Earnest Money Deposit: | **$200,000.00,** in cash or by a certified or cashier's check payable to the order of the Title Company and delivered along with Purchaser's executed Contract. |
| (viii) | Due Diligence Materials: | Purchaser acknowledges that upon the execution of this Contract, Seller has provided to Purchaser copies of all due diligence materials relating to the Property which are in Seller's possession. |
| (ix) | Closing Date: | Within ten (10) days after Seller receives approval and consent to this Contract from the Bankruptcy Court (as defined below). |
| (x) | Title Company: | Rattikin Title<br>Attn: Megan Newburn<br>201 Main Street, Suite 800<br>Fort Worth, TX 76102<br>Tel No.: 817-332-1171<br>Fax No.: 817-882-9886 |

2.    <u>Purchase and Sale.</u>  Upon and subject to and conditioned upon the terms and conditions set forth herein, Seller hereby agrees to sell and convey, and Purchaser hereby agrees to purchase and pay for the Land; together with all of Seller's right, title and interest in and to the rights and appurtenances pertaining solely to such Land, including any right, title and interest of Seller in and to any buildings or improvements located upon the Land, and any right, title and interest of Seller in and to the centerline of adjacent roads, streets, alleys or rights-of-way to the extent (but only to the extent) that the same relate to the Land (all of such Land, rights and appurtenances being hereinafter collectively referred to as the "Property").

3.    <u>Earnest Money.</u>  Purchaser shall timely deposit with Title Company as earnest money (the "Earnest Money"), the Earnest Money Deposit contemporaneously with its executed Contract. Title Company shall promptly negotiate for cash any such check and hold the proceeds thereof as Earnest Money hereunder in an interest bearing demand account, insured by the Federal Deposit Insurance Corporation, or another governmental agency providing insurance of accounts and backed by the full faith and credit of the United States government. The interest accruing or paid may be reported under Seller's tax identification number. All interest accruing on the Earnest Money shall be added to the account and shall constitute a part of the Earnest Money for the purposes of this Contract. In the event that this Contract is actually closed and consummated in accordance with the terms hereof, the Earnest Money shall be applied toward the cash payment due at Closing (hereinafter defined) by Purchaser to Seller in accordance with the terms of Paragraph 4 below. In the event that this Contract is not actually closed and consummated in accordance with the terms hereof, the Earnest Money shall be disbursed by Title Company to Seller or Purchaser (as

appropriate) in accordance with the terms of this Contract. In the event that Purchaser shall fail to timely deposit the Earnest Money or any additional Earnest Money (or, if in the form of a Check, the bank on whom such Check is drawn refuses to fully honor such Check when negotiated and presented for payment by the Title Company), this Contract shall by written notice from Seller to Purchaser prior to deposit of the Earnest Money, or additional Earnest Money, as applicable, terminate, whereupon any Earnest Money previously deposited with the Title Company, less the option fee specified in Paragraph 13(f) hereof, shall be returned to Purchaser by the Title Company, and neither party shall have any further obligations or liabilities hereunder, except as otherwise expressly set forth herein. In any and all events, except where otherwise expressly provided by this Contract, the Earnest Money Deposit, and any additional Earnest Money, shall be non-refundable to Purchaser and shall be held for the account of Seller and distributed to Seller in accordance with this Contract.

4.      Payment of Purchase Price.  The Purchase Price shall be paid by Purchaser delivering to the Title Company at Closing, in cash or by current wire transfer of federal funds or other evidence of current funds acceptable to Title Company for immediate disbursement by Title Company to Seller at Closing, the amount of the entire Purchase Price.

5.      Title.

(a)      Seller has delivered to Purchaser (i) a current Commitment for an Owner Policy of Title Insurance in favor of Purchaser (hereinafter referred to as the "Title Commitment") issued by the Title Company, and (ii) legible copies of all recorded instruments shown as exceptions in the Title Commitment (the "Title Documents").

(b)      The Title Commitment describes the Land as set forth in Exhibit "A" attached hereto.

(c)      Purchaser is deemed to have accepted all exceptions to title referenced in the Title Commitment, and such accepted exceptions shall be included in the term "Permitted Exceptions" as used herein; provided, however, Seller agrees to remove any mechanics liens, judgment liens, delinquent tax liens and/or loans secured by mortgages or deed of trusts (collectively, the "Required Cure Matters", it being understood and agreed that in no event shall any matters arising by, through or under Purchaser constitute a Required Cure Matter) and in no event will the Required Cure Matters be deemed to be "Permitted Exceptions".  In the event any exceptions, other than the Permitted Exceptions, arise  on title after execution of the Contract and prior to Closing ("New Title Matters"), Purchaser may object to such New Title Matters within five (5) days of receipt of same. Seller shall have five (5) days from receipt of notice of such objections within which to eliminate or modify (or agree in writing to so eliminate or modify) any such unacceptable exceptions or items to the reasonable satisfaction of Purchaser, but Seller shall have no obligation whatsoever to so eliminate or modify any such unacceptable exceptions or items except for the Required Cure Matters. In the event that Seller is unable or unwilling to eliminate or modify (or agree in writing to so eliminate or modify) such unacceptable items to the reasonable satisfaction of Purchaser on or before the expiration of said five (5) day period, Seller shall notify Purchaser in writing of such fact within said five (5) day period or be deemed to have so notified with respect to all such unacceptable items not theretofore cured upon the fifth (5th) day of said period.  In such event, Purchaser shall, on or before three (3) days following the first to occur of (i) receipt of such written notice or (ii) the expiration of such five (5) days, either (I) waive such objections and accept title to the Property subject to such unacceptable items (which items shall then be deemed to constitute part of the "Permitted Exceptions"), or (II) terminate this Contract by written notice to Seller and be entitled to an immediate refund from Title Company of all Earnest Money previously deposited by Purchaser with Title Company, less the option fee specified in Paragraph 13(f) hereof, whereupon this Contract shall automatically be terminated and of no further force and effect, except as otherwise expressly set forth herein.  Purchaser's failure to terminate this Contract pursuant to clause (ii) above shall be deemed to constitute Purchaser's waiver of such objections and acceptance of title to the Property subject to the Permitted Exceptions.

6.    **Inspection.** Purchaser has made all desired inspections or investigations with respect to the Property or any portion thereof. As a result of those inspections and investigations, Purchaser has approved the condition of the Property. In the event this Contract is terminated for any reason or Purchaser fails to close this transaction, Purchaser agrees to thereafter immediately return to Seller copies of all of the Due Diligence Materials which Purchaser has been provided under this Contract, and in no event shall Purchaser be entitled, if applicable and warranted under the terms of the Contract, to the return of the Earnest Money, unless and until such Due Diligence Materials have been returned to Seller.

7.    Condemnation, Casualty.

(a)    If, prior to Closing, proceedings in eminent domain are threatened or instituted with respect to a material portion of the Property, Seller shall immediately give Purchaser written notice thereof (including a reasonably detailed description of the portion of the Property affected thereby), and Purchaser may either terminate this Contract (in which case, the Earnest Money previously deposited by Purchaser with the Title Company shall be returned by Title Company to Purchaser, less the option fee set forth in Paragraph 13(f) below) by written notice to Seller on or before the date which is ten (10) days following discovery by Purchaser of such proceedings (and if necessary the Closing Date shall be automatically extended to give Purchaser the full 10-day period to make such election), or Purchaser shall be conclusively deemed to have accepted such proceedings and waived any right to terminate this Contract as a result thereof. If Purchaser elects (or is deemed to have elected) to accept such proceedings and waive any right to terminate this Contract as a result thereof, despite said proceedings, Purchaser shall (despite such proceedings) close (subject to extension of Closing as provided above) and consummate the purchase of the portion of the Property still remaining (after any such condemnation) without any reduction in the Purchase Price and Seller shall at Closing assign to Purchaser any and all condemnation proceeds, if any, theretofore received by Seller in connection with such condemnation and all rights of Seller, if any, in and to any and all claims therefor existing on the part of Seller and applicable to such condemnation (less and except any and all reasonable costs and expenses paid or incurred by Seller in connection therewith) and Purchaser shall have the sole right after the Closing to negotiate and otherwise deal with the condemning authority in regards to such matter. For purposes of this Paragraph 7 (a), a material portion of the Property shall be deemed to have been the subject of proceedings if (i) any portion of the building located upon the Land shall be the subject of proceedings, (ii) the current means of ingress and egress to the Property by way of curb cut exits and entrances shall be the subject of proceedings, (iii) more than ten percent (10%) of the Land (excluding the portion of the Land upon which any building may be located) is the subject of proceedings, or (iv) as a result of, and after, such proceedings, the Property will be in violation of applicable laws, including, without limitation, zoning ordinances and parking codes.

(b)    If, prior to Closing, the Property is damaged by fire or other casualty, Seller shall immediately give Purchaser written notice thereof (including a reasonably detailed description of the damage to the Property), and Seller shall estimate the cost to repair and the time required to complete repairs and will provide Purchaser written notice of Seller's estimation (the "Casualty Notice") as soon as reasonably possible after the occurrence of the casualty. If, prior to Closing, the Property shall be damaged by fire or other casualty to a material extent, Purchaser may either terminate this Contract (in which case, the Earnest Money previously deposited by Purchaser with the Title Company shall be returned by Title Company to Purchaser, less the option fee set forth in Paragraph 13(f) below) by written notice to Seller on or before the date which is ten (10) days following receipt of the Casualty Notice (and if necessary the Closing Date shall be automatically extended to give Purchaser the full 10-day period to make such election and to obtain insurance settlement agreements with Seller's insurers), or Purchaser shall be conclusively deemed to have accepted such fire or other casualty and waived any right to terminate this Contract as a result thereof. If Purchaser elects (or is deemed to have elected) to accept such fire or other casualty and waive any right to terminate this Contract as a result thereof, despite said material fire or other casualty, Purchaser shall (despite such fire or other casualty) close and consummate the purchase of the Property

(subject to extension of Closing as provided above) without any reduction in the Purchase Price and Seller shall at Closing assign to Purchaser any and all insurance proceeds, if any, theretofore received by Seller in connection with such fire or other casualty and all rights of Seller, if any, in and to any and all claims therefor existing on the part of Seller and applicable to such fire or other casualty (less and except any and all reasonable costs and expenses paid or incurred by Seller in connection therewith) and Purchaser shall receive a credit at Closing for any deductible under such insurance policies. Unless otherwise provided herein, the term "material" shall mean a fire or other casualty resulting in a loss equal to or greater than $100,000.00 or which, in the reasonable estimation of Seller's architect, will take longer than ninety (90) days to repair. If, prior to Closing, the Property shall be damaged by fire or other casualty to less than a material degree, Purchaser shall (despite such fire or other casualty) close and consummate the purchase of the portion of the Property (after any such fire or other casualty) without any reduction in the Purchase Price and Seller shall at Closing assign to Purchaser any and all insurance proceeds, if any, theretofore received by Seller in connection with such fire or other casualty and all rights of Seller in and to any and all claims therefor existing on the part of Seller and applicable to such fire or other casualty (less and except any and all reasonable costs and expenses paid or incurred by Seller in connection therewith) and Purchaser shall receive a credit at Closing for any deductible under such insurance policies.

8.    Closing.

    (a)    The consummation of the transaction evidenced by this Contract (the "Closing") shall be held on or before the Closing Date at the offices of the Title Company, or at such other date and location as may be agreed to by Seller and Purchaser in writing. Neither party shall be required to physically attend the Closing; and it shall be permissible for Closing to occur by delivery of each party's required deliveries to the Title Company on or before the Closing Date.

    (b)    At the Closing, Seller shall furnish and deliver to Title Company for delivery to Purchaser: (i) a Special Warranty Deed (the "Deed") dated as of the Closing Date, conveying the Land according to the legal description attached hereto as Exhibit "A", the Deed being subject to the Permitted Exceptions and in substantially the form set forth on Exhibit "B" attached hereto; (ii) the Lease Agreement executed by Seller as Tenant thereunder in the form attached hereto as Exhibit "C" (the "Lease"); (iii) at Purchaser's sole cost and expense, an Owner Policy of Title Insurance in the full amount of the Purchase Price, containing no exceptions to title other than the standard printed exceptions, the Permitted Exceptions and any other exceptions which have been approved by Purchaser in writing or deemed approved pursuant to the provisions hereof; (iv) a certificate stating that Seller is not a "foreign person" as defined in the federal Foreign Investment in Real Property Tax Act (the "Act") on a form complying with the Act; and (v) such other instruments and documents as are reasonably appropriate, necessary and required by the Title Company to complete and evidence the transactions contemplated hereby or to evidence the authority of Seller to consummate the purchase and sale transaction contemplated hereby and to execute and deliver the closing documents.

    (c)    At or prior to Closing, Purchaser shall deliver to the Title Company for delivery to Seller: (i) the cash payment due in accordance with Paragraph 4 hereof and the other terms and provisions of this Contract; (ii) the Lease executed by Purchaser as Landlord thereunder and (iii) such other instruments and documents as are reasonably appropriate, necessary and required by Seller or the Title Company to complete and evidence the transaction contemplated hereby or to evidence the authority of Purchaser to consummate the purchase and sale transaction contemplated hereby and to execute and deliver the closing documents.

    (d)    Purchaser shall pay the costs of the issuance of the Owner Policy of Title Insurance. Purchaser shall also pay the costs of any extended coverage and/or other modifications or endorsements thereto, should the same be requested by Purchaser. Each party shall pay its own attorneys' fees; provided, however, in the event of any litigation arising hereunder, the prevailing party shall be entitled to recover,

as part of any judgment rendered, reasonable attorneys' fees and costs of suit. Any escrow fee charged by the Title Company shall be shared equally by Seller and Purchaser. Purchaser shall pay for and transfer tax and fees to record the Deed. Except as otherwise expressly set forth herein, each party hereto shall pay its share of the closing costs which are normally assessed against a seller or purchaser in other transactions similar to the transaction contemplated hereby in the county in which the Property is located.

(e)    Real property, ad valorem taxes, sewer rents and charges, and other state, county and municipal taxes (special or otherwise) for the then current tax year, whether actually then due and payable as of the Closing Date, owner's association assessments, and utilities (if any) for the then current month, shall be prorated between Seller and Purchaser at Closing effective as of the Closing Date. If Closing shall occur before the tax rate is fixed for the then current tax year, or before utility bills are received for the then current month, the apportionment of the taxes and utilities shall be upon the basis of the tax rate and/or utilities for the preceding year and/or month, as applicable. Any difference in actual and estimated taxes and assessments shall be adjusted in cash between the parties following receipt of information confirming the actual amounts thereof and Purchaser or Seller, as applicable, shall be responsible for, and indemnify Purchaser or Seller, as applicable, against, any and all liability arising out of, or related to, such taxes and assessments. The terms and provisions of this paragraph shall expressly survive the Closing and not be merged therein.

(f)    All taxes imposed because of a change of use or ownership of the Property after or in connection with the Closing attributable to periods on or after Closing shall be for the account of Purchaser and Purchaser shall indemnify and hold Seller harmless of, from and against any and all costs, damages, expenses, claims, or liability arising from the imposition of any such taxes. **If for the current ad valorem tax year the taxable value of the land that is the subject of this Contract is determined by a special appraisal method that allows for appraisal of the land at less than its market value, the person to whom the land is transferred may not be allowed to qualify the land for that special appraisal in a subsequent tax year and the land may then be appraised at its full market value. In addition, the transfer of the land or a subsequent change in the use of the land may result in the imposition of an additional tax plus interest as a penalty for the transfer or the change in the use of the land. The taxable value of the land and the applicable method of appraisal for the current tax year is public information and may be obtained from the tax appraisal district established for the county in which the land is located.** The terms and provisions of this paragraph shall expressly survive the Closing and not be merged therein.

9.    Representations, Warranties and Covenants of Seller.

(a)    Seller represents and warrants to Purchaser that, subject to the terms and provisions hereof, Seller has full right, power and authority to enter into this Contract and, at Closing, will have full right, power and authority to consummate the sale provided for herein, all required corporate, partnership or other action necessary to authorize Seller to enter into and to consummate the sale provided herein has been, or upon the Closing will have been, taken, and the joinder of no person or entity other than Seller will be necessary to execute and deliver such documents and instruments at Closing and to perform all of the obligations of Seller hereunder.

(b)    IT IS UNDERSTOOD AND AGREED THAT, EXCEPT AS EXPRESSLY PROVIDED IN THIS CONTRACT AND IN THE DEED TO BE DELIVERED AT CLOSING, SELLER IS NOT MAKING ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS AS TO MATTERS OF TITLE, ZONING, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITION, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE

PROPERTY. PURCHASER AGREES THAT WITH RESPECT TO THE PROPERTY, PURCHASER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY REPRESENTATION OR WARRANTY OF SELLER, EXCEPT AS EXPRESSLY PROVIDED IN THIS CONTRACT AND IN THE DEED TO BE DELIVERED AT CLOSING. PURCHASER WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AND RELY UPON SAME, AND, UPON CLOSING, SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INSPECTIONS AND INVESTIGATIONS. PURCHASER AGREES TO TAKE WHATEVER ACTION AND PERFORM WHATEVER INVESTIGATIONS AND STUDIES PURCHASER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY AND THE EXISTENCE OR NONEXISTENCE OF, OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO, ANY HAZARDOUS AND/OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE PROPERTY. PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS", WITH ALL FAULTS AND THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS, COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER OR ANY THIRD PARTY. **PURCHASER HEREBY ACKNOWLEDGES TO SELLER THAT PURCHASER AND SELLER ARE NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.** THE TERMS AND CONDITIONS OF THIS PARAGRAPH SHALL EXPRESSLY SURVIVE THE CLOSING AND NOT MERGE THEREIN.

10.    <u>Representations and Warranties of Purchaser.</u> Purchaser represents, warrants and covenants to Seller that Purchaser has full right, power and authority to enter into this Contract and, at Closing, will have full right, power and authority to consummate the sale provided for herein, all required corporate, partnership or other action necessary to authorize Purchaser to enter into and to consummate the purchase provided herein has been, or upon the Closing will have been, taken, and the joinder of no person or entity other than Purchaser will be necessary to execute and deliver such documents and instruments at Closing and to perform all of the obligations of Purchaser hereunder.

Purchaser further represents, warrants and covenants to Seller that Purchaser is not a foreign corporation, foreign partnership, foreign trust, or foreign estate, or non-resident alien for purposes of US income taxation, pursuant to Section 1445 of the Internal Revenue Code and Purchaser is currently in compliance with and shall at all times during the term of this Contract remain in compliance with the regulations of the Office of Foreign Asset Control ("*OFAC*") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto.

Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price and to consummate all of the other transactions contemplated by this Contract.

11.    <u>Right of Assignment.</u> Purchaser may not assign this Contract or any of its rights hereunder without the express prior written consent of Seller, which consent will not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Purchaser shall have the right, without Seller's prior written consent, exercisable by no later than five (5) days prior to the Closing, to assign its rights under this Contract to a limited partnership, limited liability company, family trust or other legal entity fifty one percent (51%) or more of the equity interests of which are owned by Purchaser. Any permitted assignee of Purchaser's rights under this Contract shall expressly assume in writing each and every obligation of Purchaser hereunder. In the case of any permitted assignment under this Paragraph 11, Purchaser shall not be released

from any of the obligations of Purchaser under this Contract. Notwithstanding anything to the contrary contained herein, Purchaser may, to the extent necessary to conduct this transaction as part of a like kind exchange under Section 1031 of the Internal Revenue Code and the regulations promulgated thereunder, assign this Agreement to a qualified intermediary as defined in Treas. Reg. §1.1031(k)-1(g)(4).

12.    Defaults and Remedies.

(a)    Seller's Defaults; Purchaser's Remedies.

(i)    Seller's Defaults. Seller shall be deemed to be in default hereunder in the event that Seller shall fail to meet, comply with, or perform any covenant, agreement or obligation on its part required within the time limits and in the manner required in this Contract for any reason other than a default by Purchaser hereunder or termination of this Contract by either Seller or Purchaser pursuant to the terms and provisions hereof, and such failure shall continue for ten (10) business days after Seller's receipt of written notice of such default from Purchaser.

(ii)    Purchaser's Remedies. In the event Seller shall be deemed to be in default hereunder, Purchaser may, as Purchaser's sole and exclusive remedy for such default, at Purchaser's option, do either of the following:

(A)    terminate this Contract by written notice delivered to Seller on or before the earlier to occur of (1) the time period specifically set forth in any Paragraph of this Contract with respect to the particular default in question, or (2) the Closing, whereupon (i) all Earnest Money previously deposited by Purchaser with the Title Company shall promptly be returned to Purchaser, less the option fee specified in Paragraph 13(f) hereof, and the parties hereto shall have no further liabilities or obligations to the other hereunder, except as otherwise expressly set forth herein; or

(B)    intentionally deleted.

(b)    Purchaser's Default; Seller's Remedies.

(i)    Purchaser's Default. Purchaser shall be deemed to be in default hereunder in the event that Purchaser shall fail to meet, comply with or perform any covenant, agreement or obligation on its part required within the time limits and in the manner required in this Contract for any reason other than a default by Seller hereunder or termination of this Contract by either Seller or Purchaser pursuant to the terms and provisions hereof, and such failure shall continue for three (3) days after Purchaser's receipt of written notice of such default from Seller.

(ii)    Seller's Remedies. In the event Purchaser shall be deemed to be in default hereunder, Seller may,

(A)    terminate this Contract by written notice delivered to Purchaser whereupon Seller shall be entitled to receive (and Title Company is hereby authorized and directed to deliver to Seller, without further direction) the Earnest Money, it being agreed between Purchaser and Seller that such sum shall be liquidated damages (and not a penalty) for such default of Purchaser hereunder because of the difficulty, inconvenience, and uncertainty of ascertaining actual damages for such default, and upon the delivery by the Title Company to Seller of the Earnest Money the parties hereto shall have no further liabilities or obligations to the other hereunder, except as otherwise expressly set forth herein; or

(B)    enforce specific performance of this Contract against Purchaser.

13.    Miscellaneous.

(a)    <u>Notices.</u>  Any notices, consents or other communications required or permitted to be given pursuant to this Contract must be in writing and must be given by hand delivery, facsimile transmission, overnight delivery service, or certified mail (postage prepaid, return receipt requested), and shall (except to the extent otherwise expressly provided herein) be deemed to have been given and received upon the earlier to occur of actual receipt or refusal if addressed to the parties hereto at the respective addresses for such parties set forth in paragraph 1 hereof, or to such other substitute address and/or addressee as any party hereto shall designate by written notice to the other party in accordance with the terms of this Paragraph 13(a).

(b)    <u>Entire Agreement; Modifications.</u>  This Contract embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements (oral or written) are merged into this Contract.  Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

(c)    <u>Applicable Law.</u>  **<u>THIS CONTRACT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.  THIS CONTRACT IS PERFORMABLE AND VENUE FOR ANY ACTION HEREUNDER SHALL BE IN TARRANT COUNTY, TEXAS.</u>**

(d)    <u>Captions.</u>  The captions in this Contract are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent of this Contract or any of the provisions hereof.

(e)    <u>Binding Effect.</u>  This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and permitted assigns.

(f)    <u>Irrevocable Option.</u>  To the extent that this Contract is ever construed as an option agreement, Seller and Purchaser hereby acknowledge that independent consideration for such option in the sum of $100.00 shall be delivered to Seller out of the Earnest Money should this Contract terminate for any reason whatsoever excepting the Closing of this Contract, in which event said option consideration shall be applied to the Purchase Price; and based on such consideration and the mutual covenants of Seller and Purchaser contained herein, Seller hereby agrees that any such option granted Purchaser is irrevocable and Seller shall not terminate said option without the prior written consent of Purchaser except as may be expressly provided for herein.

(g)    <u>Time is of the Essence.</u>  With respect to all provisions of this Contract, time is of the essence; provided, however, if the final date of any period set forth herein (including, but not limited to, the Closing Date) falls on a Saturday, Sunday or legal holiday under the laws of the State of Texas or the United States of America, the final date of such period shall be extended to the next day that is not a Saturday, Sunday or legal holiday.  The term "days" as used herein shall mean calendar days, with the exception of "business days," which term shall mean each day except for any Saturday, Sunday or legal holiday under the laws of the State of Texas or United States of America.

(h)    <u>Date of Contract.</u>  All references to the "date of this Contract" or similar references as used herein shall be deemed to mean the later of the two dates on which this Contract is signed by the Seller or Purchaser, as indicated by their signatures below, which later date shall be the date of final execution and agreement by the parties hereto.

(i)     Attorneys' Fees.  If either party shall employ an attorney to enforce or define the rights of such party hereunder, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs of suit.

(j)     Partial Invalidity.  If any term, provision, condition or covenant of this Contract or  the application thereof to any party or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this Contract, or the application of such term, provision, condition  or covenant to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law, and said invalid or unenforceable term, provision, condition or covenant shall be substituted by a term, provision, condition or covenant as near in substance as may be valid and enforceable.

(k)     Brokerage Commissions.  Each party hereto represents to the other that it has not authorized any broker or finder to act on its behalf in connection with the sale and purchase transaction contemplated hereby and that it has not dealt with any broker or finder purporting to act for any other party except that Seller has employed Jones Lange LaSalle Brokerage Inc., a Texas corporation ("Broker") and will pay Broker a commission per separate written agreement.  Each party agrees to indemnify and hold the other harmless from and against any and all liability and cost which the indemnified party may suffer in connection with any real estate brokers claiming by, through, or under the indemnifying party seeking any commission, fee or payment in connection with this Contract.

(l)     Counterparts.  This Contract may be executed in several counterparts, each of which shall be deemed an original, and all of which counterparts together shall constitute one and the same instrument.

(m)     Survival of Terms.  Any and all warranties, representations, covenants, and agreements set forth herein shall not, except to the extent contained in any document executed and delivered at Closing, survive Closing.

(n)     1031 Exchange.  In the event Seller determines to close this Contract as part of a like kind exchange in accordance with Internal Revenue Code Section 1031, then Purchaser agrees to reasonably cooperate with Seller in so doing so long as Purchaser incurs no cost, expense, delay or liability in connection with the same and the Closing Date is not delayed.

(o)     Approval of Seller's Board of Directors and Bankruptcy Court.  Seller, by and through its parent company, Pier 1 Imports, Inc., commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), which is now pending in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") under Case No. 20-30805, et al (the "Bankruptcy Proceeding"). Seller's obligation to consummate the transaction contemplated by this Contract is conditioned on, and subject to, the consent and approval of the (i) Bankruptcy Court and (ii) Board of Directors of Seller. If either the applicable Bankruptcy Court and/or Seller's Board of Directors fail to consent to and approve this Contract, then any Earnest Money previously deposited with the Title Company, less the option fee specified in Paragraph 13(f) hereof, shall be returned to Purchaser by the Title Company, and neither party shall have any further obligations or liabilities hereunder, except as otherwise expressly set forth herein.

(p)     Higher and Better Bids.  Purchaser acknowledges that this Contract and the sale of the Land is subject to higher and better bids and Bankruptcy Court approval. Purchaser further acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Land, including giving notice thereof to the creditors of Seller and other interested parties, providing information about the Land to prospective bidders, entertaining higher and better offers from such prospective bidders. Notwithstanding anything to the contrary herein, Seller has the right, in its sole and absolute discretion, to extend any current bid deadlines and/or pre-inspection periods to allow time for prospective bidders to submit additional bids for the Land.

(q)    Alternative Transaction. Notwithstanding any other provision of this Contract to the contrary, Purchaser acknowledges that Seller may continue soliciting inquiries, proposals, or offers for the Land in connection with any alternative transaction it deems reasonable under the current circumstances.

(r)    Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, Seller retain the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estates.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each of the parties hereto has signed and executed this Contract or has caused the same to be signed and executed by its authorized representatives.

Signed and delivered this _____ day of _____, 2020.

SELLER:

**Pier 1 Imports (U.S.), Inc.,**
a Delaware corporation

By: _____

Robert J. Riesbeck
Chief Executive Officer and Chief Financial Officer

Signed and delivered this _11th_ day of _June_, 2020.

PURCHASER:

_Lonejack II LLC_,
a _Texas limited liability company_

By: _____
Name: _James Seller_
Title: _Member, Manager_

The undersigned hereby acknowledges the receipt from Purchaser of the **$200,000** Earnest Money and a fully executed copy of this Contract this _15_ day of _June_, 2020 and agrees to comply with all of the terms hereof, including, but not limited to, those regarding such Earnest Money and any additional Earnest Money hereafter deposited with the undersigned pursuant to the terms and provisions hereof.

**TITLE COMPANY:**

Rattikin Title

By: _____
Name: _Aricia Newburn_
Title: _Escrow Officer & Assistant_

## FIRST AMENDMENT TO
## CONTRACT OF SALE

THIS FIRTST AMENDMENT TO CONTRACT OF SALE ("**Amendment**") is entered into on this ___ day of June, 2020 (the "Effective Date"), by and between PIER 1 IMPORTS (U.S.), INC., a Delaware corporation ("**Seller**") and LONEJACK II, LLC, a Texas limited liability company ("**Purchaser**").

WHEREAS, Seller and Purchaser entered into that certain Contract of Sale dated June ___, 2020 (the "**Contract**"), relating to certain real property in Mansfield, Texas, as further described therein; and

WHEREAS, Purchaser and Seller desire to (i) amend the Purchase Price, and (ii) include all furniture, equipment and other tangible personal property identified on Exhibit A attached hereto and made a part hereof (the "**Tangible Personal Property**") as part of the Property to be transferred to Purchaser pursuant to the Agreement.

NOW THEREFORE, in consideration of their mutual covenants and agreements contained in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party, Seller and Purchaser hereby agree:

1.      RECITALS AND DEFINITIONS. Seller and Purchaser incorporate the above recitals into this Amendment and affirm such recitals are true and correct.  All capitalized terms used in this Amendment, unless specifically defined herein, have the same meanings attributed to them in the Contract.

2.      NO FURTHER AMENDMENTS. Except as amended by this Amendment, the Contract remains unchanged and in full force and effect.  If there is any conflict between the provisions of the Contract and the provisions of this Amendment, the provisions of this Amendment shall control.

3.      PURCHASE PRICE. In consideration of including the Tangible Personal Property as part of the Property to be transferred to Purchase at Closing, the Purchase Price is hereby increased to Eighteen Million Five Thousand Two Hundred Fifty Dollars and No/100 Dollars ($18,005,250.00).    The Purchase Price is payable in cash or immediately available funds at Closing.

4.      TANGIBLE PERSONAL PROPERTY. (a) Subject to and conditioned upon the terms and conditions set forth in the Contract, Seller hereby agrees to sell and convey, and Purchaser hereby agrees to purchase and pay for, in addition to the Land as set forth in the Contract, the Tangible Personal Property identified on Exhibit "A" attached hereto and made a part hereof. The defined term "Property" shall include the Land, the rights and appurtenances thereto and the

1

Tangible Personal Property.  Purchaser acknowledges and agrees that Tangible Personal Property expressly excludes any and all inventory (i.e. merchandise) located at the Property.

(b)    Purchaser acknowledges and agrees that upon Closing Seller shall sell and convey to Purchaser and Purchaser shall accept the Tangible Personal Property "AS IS, WHERE IS", with all faults and there are no oral agreements, warranties or representations, collateral to or affecting the Tangible Personal Property by Seller or any third party.  **Purchaser hereby acknowledges to Seller that Purchaser and Seller are not in a significantly disparate bargaining position.**  The terms and conditions of this paragraph and those set forth in Section 9(b) of the Contract shall expressly survive the closing, not merge therein and be included in the Bill of Sale to be delivered at Closing.

5.    SELLER'S DELIVERIES AT CLOSING. In addition to the items set forth in Section 8(b) of the Contract, Seller shall furnish and deliver to Title Company at Closing an original Bill of Sale (the "**Bill of Sale**") in the form attached hereto as Exhibit "B" conveying title to the Tangible Personal Property, duly executed by Seller.

6.    BUYER'S DELIVERIES AT CLOSING. In addition to the items set forth in Section 8(c) of the Contract, Purchaser shall furnish and deliver to Title Company the Bill of Sale duly executed by Purchaser.

7.    COUNTERPARTS. This Amendment may be executed in multiple counterparts, each of which taken together shall constitute one and the same agreement binding upon the parties. Signatures transmitted by facsimile or via e-mail in a "PDF" format may be used in place of original signatures on this Amendment.

[Intentional Blank; Signatures on Following Page]

2

IN WITNESS WHEREOF, each of the parties hereto has signed and executed this Contract or has caused the same to be signed and executed by its authorized representatives.

Signed and delivered this _____ day of _____, 2020.

<u>SELLER:</u>

**Pier 1 Imports (U.S.), Inc.,**
a Delaware corporation

By: _____
      Robert J. Riesbeck
      Chief Executive Officer and Chief Financial Officer

Signed and delivered this _12th_ day of _June_, 2020.

<u>PURCHASER:</u>

**Lonejack II, LLC,**
a Texas limited liability company

By: _____
Name: James Seller
Title: Member and Manager

3

## **Exhibit 2**

**Commitment for Title Insurance**

THE FOLLOWING COMMITMENT FOR TITLE INSURANCE IS NOT VALID UNLESS YOUR NAME AND THE POLICY AMOUNT ARE SHOWN IN **SCHEDULE A**, AND OUR AUTHORIZED REPRESENTATIVE HAS COUNTERSIGNED BELOW.

## COMMITMENT FOR TITLE INSURANCE

### Issued By

## CHICAGO TITLE INSURANCE COMPANY

We (Chicago Title Insurance Company) will issue our title insurance policy or policies (the Policy) to You (the proposed insured) upon payment of the premium and other charges due, and compliance with the requirements in Schedule C.  Our policy will be in the form approved by the Texas Department of Insurance at the date of issuance, and will insure your interest in the land described in Schedule A.  The estimated premium for our Policy and applicable endorsements is shown on Schedule D.  There may be additional charges such as recording fees, and expedited delivery expenses.

This Commitment ends ninety (90) days from the effective date, unless the Policy is issued sooner, or failure to issue the Policy is our fault.  Our liability and obligations to you are under the express terms of this Commitment and end when this Commitment expires.

Authorized

RATTIKIN TITLE COMPANY

By:

CHICAGO TITLE INSURANCE COMPANY

By:

ATTEST                                      President

Secretary

# TEXAS TITLE INSURANCE INFORMATION

Title insurance insures you against loss resulting from certain risks to your title.

The commitment for Title Insurance is the title insurance company's promise to issue the title insurance policy.
The commitment is a legal document.  You should review it carefully to completely understand it before your closing date.

El seguro de título le asegura en relación a perdidas resultantes de ciertos riesgos que pueden afectar el título de su propiedad. El Compromiso para Seguro de Título es la promesa de la compañía aseguradora de títulos de emitir la póliza de seguro de título. El Compromiso es un documento legal. Usted debe leerlo cuidadosamente y entenderlo complemente antes de la fecha para finalizar su transacción.

Your Commitment for Title Insurance is a legal contract between you and us.  The Commitment is not an opinion or report of your title. It is a contract to issue you a policy subject to the Commitment's terms and requirements.

Before issuing a Commitment for Title Insurance (the Commitment) or a Title Insurance Policy (the Policy), the title Insurance Company (the Company) determines whether the title is insurable.  This determination has already been made. Part of that determination involves the Company's decision to insure the title except for certain risks that will not be covered by the Policy.  Some of these risks are listed in Schedule B of the attached Commitment as Exceptions.  Other risks are stated in the Policy as Exclusions.  These risks will not be covered by the Policy. The Policy is not an abstract of title nor does a Company have an obligation to determine the ownership of any mineral interest.

**MINERALS AND MINERAL RIGHTS** may not be covered by the Policy.  The Company may be unwilling to insure title unless there is an exclusion or an exception as to Minerals and Mineral Rights in the Policy.  Optional endorsements insuring certain risks involving minerals, and the use of improvements (excluding laws, shrubbery and trees) and permanent buildings may be available for purchase.  If the title insurer issues the title policy with an exclusion or exception to the minerals and mineral rights, neither this Policy, nor the optional endorsements, ensure that the purchaser has title to the mineral rights related to the surface estate.

Another part of the determination involves whether the promise to insure is conditioned upon certain requirements being met. Schedule C of the Commitment lists these requirements that must be satisfied or the Company will refuse to cover them.  You may want to discuss any matters shown in Schedules B and C of the Commitment with an attorney.  These matters will affect your title and your use of the land.

When your Policy is issued, the coverage will be limited by the Policy's Exception, Exclusions and Conditions, defined below.

> **EXCEPTIONS** are title risks that a Policy generally covers but does not cover in a particular instance. Exceptions are shown on Schedule B or discussed in Schedule C of the Commitment.  They can also be added if you do not comply with the Conditions section of the Commitment.  When the Policy is issued, all Exceptions will be on Schedule B of the Policy.

> **EXCLUSIONS** are title risks that a Policy generally does not cover. Exclusions are contained in the Policy but not shown or discussed in the Commitment.

> **CONDITIONS** are additional provisions that qualify or limit your coverage.  Conditions include your responsibilities and those of the Company.  They are contained in the Policy but not shown or discussed in the Commitment.  The Policy Conditions are not the same as the Commitment Conditions.

## TEXAS TITLE INSURANCE INFORMATION
(Continued)

You can get a copy of the policy form approved by the Texas Department of Insurance by calling the Title Insurance Company at (800)925-0965 or by calling the title insurance agent that issued the Commitment.  The Texas Department of Insurance may revise the policy form from time to time.

You can also get a brochure that explains the policy from the Texas Department of Insurance by calling (800)252-3439.

Before the Policy is issued, you may request changes in the policy. Some of the changes to consider are:

Request amendment of the "area and boundary" exception (Schedule B, paragraph 2).  To get this amendment, you must furnish a survey and comply with other requirements of the Company.  On the Owner's Policy, you must pay an additional premium for the amendment. If the survey is acceptable to the Company and if the Company's other requirements are met, your Policy will insure you against loss because of discrepancies or conflicts in boundary lines, encroachments or protrusions, or overlapping of improvements.  The Company may then decide not to insure against specific boundary or survey problems by making special exceptions in the Policy.  Whether or not you request amendment of the "area and boundary" exception, you should determine whether you want to purchase and review a survey if a survey is not being provided to you.

Allow the Company to add an exception to "rights of parties in possession".  If you refuse this exception, the Company or the title insurance agent may inspect the property.  The Company may except to and not insure you against the rights of specific persons, such as renters, adverse owners or easement holders who occupy the land.  The company may charge you for the inspection.  If you want to make your own inspection, you must sign a Waiver of Inspection form and allow the Company to add this exception to your Policy.

The entire premium for a Policy must be paid when the Policy is issued.  You will not owe any additional premiums unless you want to increase your coverage at a later date and the Company agrees to add an Increased Value Endorsement.



**COMMITMENT FOR TITLE INSURANCE (FORM T-7)**
**SCHEDULE A**

**Issued By**

# CHICAGO TITLE INSURANCE COMPANY

Effective Date:  April 1, 2020                                          GF No.:  20-1925

Commitment No. 20-1925, issued May 4, 2020, 8:00 AM

1.  The policy or policies to be issued are:

   a.  OWNER'S POLICY OF TITLE INSURANCE (Form T-1)
      (Not applicable for improved one-to-four family residential real estate)

      Policy Amount:            $0.00
      PROPOSED INSURED:  TBD

   b.  TEXAS RESIDENTIAL OWNER'S POLICY OF TITLE INSURANCE
      ONE-TO-FOUR FAMILY RESIDENCES (Form T-1R)

      Policy Amount:
      PROPOSED INSURED:

   c.  LOAN POLICY OF TITLE INSURANCE (Form T-2)

      Policy Amount:            $0.00
      PROPOSED INSURED:
      Proposed Borrower:      TBD

   d.  TEXAS SHORT FORM RESIDENTIAL LOAN POLICY OF TITLE INSURANCE (Form T-2R)

      Policy Amount:
      PROPOSED INSURED:
      Proposed Borrower:

   e.  LOAN TITLE POLICY BINDER ON INTERIM CONSTRUCTION LOAN (Form T-13)

      Binder Amount:
      PROPOSED INSURED:
      Proposed Borrower:

   f.  OTHER

      Policy Amount:
      PROPOSED INSURED:

2.  The interest in the land covered by this Commitment is:

   Fee Simple

3.  Record title to the land on the Effective Date appears to be vested in:

   PIER 1 IMPORTS-TEXAS, INC., a Delaware corporation

## SCHEDULE A

(Continued)

4. Legal description of land:

Lot 1, Block 1, HERITAGE BUSINESS PARK ADDITION, an Addition to the City of Mansfield, Tarrant County, Texas, according to plat recorded in Volume 388-205, Page 66, Deed Records of Tarrant County, Texas.

SAVE AND EXCEPT those protions conveyed to the City of Mansfield by deeds recorded under Clerk's File Nos. D211083045 and D214204081, Deed Records of Tarrant County, Texas.

## SCHEDULE B

Commitment No.:  20-1925                                                                       GF No.:  20-1925

### EXCEPTIONS FROM COVERAGE

In addition to the Exclusions and Conditions and Stipulations, your Policy will not cover loss, costs, attorney's fees, and expenses resulting from:

1.  The following restrictive covenants of record itemized below:

   Covenants as recorded in Volume 8805, Page 1821, and in Volume 8810, Page 2022, Deed Records of Tarrant County, Texas, but omitting any covenant or restriction based on race, color, religion, sex, handicap, familial status or national origin unless and only to the extent that said covenant (a) is exempt under Chapter 42, Section 3607 of the United States Code or (b) related to the handicap but does not discriminate against handicapped persons.

2.  Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.

3.  Homestead or community property or survivorship rights, if any of any spouse of any insured.  (Applies to the Owner's Policy only.)

4.  Any titles or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,

   a.    to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or

   b.    to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or

   c.    to filled-in lands, or artificial islands, or

   d.    to statutory water rights, including riparian rights, or

   e.    to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area.

   (Applies to the Owner's Policy only.)

5.  Standby fees, taxes and assessments by any taxing authority for the year 2020, and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership, but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax year. (If Texas Short form Residential Loan Policy (T-2R) is issued, that policy will substitute "which become due and payable subsequent to Date of Policy" in lieu of "for the year 2020, and subsequent years.")

6.  The terms and conditions of the documents creating your interest in the land.

# SCHEDULE B

(Continued)

7.  Materials furnished or labor performed in connection with planned construction before signing and delivering the lien document described in Schedule A, if the land is part of the homestead of the owner.  (Applies to the Loan Title Policy Binder on Interim Construction Loan only, and may be deleted if satisfactory evidence is furnished to us before a binder is issued.)

8.  Liens and leases that affect the title to the land, but that are subordinate to the lien of the insured mortgage. (Applies to Loan Policy (T-2) only.)

9.  The Exceptions from Coverage and Express Insurance in Schedule B of the Texas Short Form Residential Loan Policy of Title Insurance (T-2R). (Applies to Texas Short Form Residential Loan Policy of Title Insurance (T-2R) only.)  Separate exceptions 1 through 8 of this Schedule B do not apply to the Texas Short Form Residential Loan Policy of Title Insurance (T-2R).

10. The following matters and all terms of the documents creating or offering evidence of the matters:

    a.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the title that would be disclosed by an accurate and complete land survey of the land.
        (Note: Upon receipt of a survey acceptable to Company, this exception will be deleted. Company reserves the right to add additional exceptions per its examination of said survey.)

    b.  All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges and immunities relating thereto, appearing in the Public Records whether listed in Schedule "B" or not. There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

    c.  Rights of parties in possession. (Owners Policy Only)

    d.  A 15 foot wide utility easement along the Northeast and Northwest side(s) of the property, as shown by plat recorded in Volume 388-205, Page 66, Deed Records of Tarrant County, Texas.

    e.  A 10 foot wide utility easement along the Southwest and Southeast side(s) and in the most Westerly corner of the property, as shown by plat recorded in Volume 388-205, Page 66, Deed Records of Tarrant County, Texas.

    f.  A 50 foot wide drainage and utility easement along the Northeast side(s) of the property, as shown by plat recorded in Volume 388-205, Page 66, Deed Records of Tarrant County, Texas.

    g.  The following building setback lines, as shown by plat recorded in Volume 388-205, Page 66, Deed Records of Tarrant County, Texas:
        1) 10 foot on the Southeast side(s);
        2) 15 foot on the Northeast and Northwest side(s); and
        3) 30 foot on the Southwest side(s) and in the most Westerly corner.

    h.  Easement for right-of-way recorded in Volume 2131, Page 131, Deed Records of Tarrant County, Texas.

    i.  Easement for pipeline recorded in Volume 3796, Page 47, Deed Records of Tarrant County, Texas.

# SCHEDULE B

(Continued)

j.      Assignment of easement for right-of-way granted to TEXAS ELECTRIC SERVICE COMPANY by instrument recorded in Volume 4878, Page 736, Deed Records of Tarrant County, Texas.

k.      Terms, conditions, stipulations, obligations of, and easements granted by Agreement to Build Improvements, recorded in Volume 8799, Page 1999, Deed Records of Tarrant County, Texas.

l.      Terms, conditions, stipulations and obligations of instrument recorded in Volume 8814, Page 1163, Deed Records of Tarrant County, Texas.

m.      Easement for right-of-way granted to TXU ELECTRIC COMPANY by instrument recorded in Volume 8956, Page 1725, Deed Records of Tarrant County, Texas.

n.      Easement for right-of-way granted to TEXAS ELECTRIC SERVICE COMPANY by instrument recorded in Volume 9045, Page 1043, Deed Records of Tarrant County, Texas.

o.      Terms, conditions, and stipulations of Oil, Gas and Mineral Lease dated October 5, 2007, filed for record under Clerk's File No. D207365829, Deed Records of Tarrant County, Texas. Title to said Lease has not been checked subsequent to the date of recording of said Lease.

p.      Terms, conditions, stipulations, obligations of, and easements granted by EASEMENT AND RIGHT OF WAY AGREEMENT filed for record under Clerk's File No. D210081072, Deed Records of Tarrant County, Texas.

q.      Easement for drainage filed for record under Clerk's File No. D211083046, Deed Records of Tarrant County, Texas.

r.      Easement for slope filed for record under Clerk's File No. D214204082, Deed Records of Tarrant County, Texas.

s.      Rights of tenants in possession, as tenants only, under any unrecorded leases or rental agreements.

# SCHEDULE C

Commitment No.:  20-1925                                                           GF No.:  20-1925

Your Policy will not cover loss, costs, attorney's fees, and expenses resulting from the following requirements that will appear as Exceptions in Schedule B of the Policy, unless you dispose of these matters to our satisfaction, before the date the Policy is issued:

1.      Documents creating your title or interest must be approved by us and must be signed, notarized and filed for record.

2.      Satisfactory evidence must be provided that:

   a.      no person occupying the land claims any interest in that land against the persons named in paragraph 3 of Schedule A,

   b.      all standby fees, taxes, assessments and charges against the property have been paid,

   c.      all improvements or repairs to the property are completed and accepted by the owner, and that all contractors, sub-contractors, laborers and suppliers have been fully paid, and that no mechanic's, laborer's or materialmen's liens have attached to the property,

   d.      there is legal right of access to and from the land,

   e.      (on a Loan Policy only) restrictions have not been and will not be violated that affect the validity and priority of the insured mortgage.

3.      You must pay the seller or borrower the agreed amount for your property or interest.

4.      Any defect, lien or other matter that may affect title to the land or interest insured, that arises or is filed after the effective date of this Commitment.

5.      **OTHER SPECIFIC EXCEPTIONS:**

   a.

      i.      Unless otherwise requested in writing prior to closing of the subject transaction, all Endorsements to each Loan Policy of Title Insurance issued pursuant to this Commitment able to be incorporated by reference will be so incorporated in each said Loan Policy.

      ii.     The Company shall follow the Rules as set out by the Texas Department of Insurance in disbursing the funds provided by the Assured and/or Insured on Schedule A of this Commitment.  Good Funds shall be as defined in Rule P-27; however, the Company requires that such funds be "collected funds" prior to disbursement, except for funds delivered to the Company by bank wire, cashier's check or cash.  The Company does not accept any ACH (Automated Clearing House) funds of any type or form.  The Company's wire transfer instructions are attached to this commitment.

      iii.    Your policy will contain an arbitration provision.  It allows you or the Company to require arbitration if the amount of insurance is $2,000,000 or less.  If you want to retain your right to sue the Company in case of a dispute over a claim, you must request deletion of the arbitration provision before the policy is issued.  You can do this by signing the enclosed form and returning it to the Company at or before the closing of your real estate transaction. (Not applicable to Residential Owner Policy)

# SCHEDULE C

(Continued)

iv.    The Contract you entered into agreeing to purchase the property described in Schedule A of this Commitment may provide that the standard Owner Title Policy contains an exception as to "discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping of improvements", and that Buyer, at Buyer's expense or at the expense of the party designated in the Contract, may have the exception amended to read, "shortages in area", thereby giving you  coverage for these matters.

Also, the Texas Title Insurance Information portion of this Commitment for Title Insurance advises the Insured that the Policy will insure against loss because of such discrepancies or conflicts in boundary lines, encroachment or protrusions, or overlapping of improvements, so long as a survey is provided that is acceptable to the Company, and an additional premium for the coverage is paid.

The Owner Policy of Title Insurance to be issued in this transaction will contain the coverage described in the above paragraph, and, unless the Contract provides otherwise, the Insured will be charged the additional premium promulgated by the Texas Department of Insurance, unless an acceptable survey is not furnished, or, on or before the date of closing, the Insured advises the Company in writing that the Insured rejects this coverage.
(Applies to the Owner Title Insurance Policy only)

v.    The Texas Title Insurance Information portion of this Commitment advises the Insured that the Policy is not an abstract of title and that the Company does not have an obligation to determine the ownership of any mineral interest(s).  In addition, it states that minerals and mineral rights may not be covered by the Policy and that the Company may include an exclusion or exception as to minerals and mineral rights in the Policy.  In the event the Company issues the Policy with an exclusion or exception to mineral and mineral rights, optional endorsements insuring certain risks involving minerals and the use of improvements (excluding lawns, shrubbery and trees) and permanent buildings, as applicable for the nature of the property to be insured, may be available upon payment of an additional premium.  However, if the Policy is issued with an exclusion or exception as to minerals and mineral rights, neither this Policy, nor the optional endorsements insure that the Insured has title to the minerals or mineral rights related to the surface estate.

The Owner's Policy of Title Insurance to be issued in this transaction will contain the coverage described in the above paragraph, and the Insured will be charged the additional premium promulgated by the Texas Department of Insurance, unless, on or before the date of closing, (i) the Company chooses not to issue such coverage or, (ii) the Insured advises the Company in writing that the Insured rejects this coverage.
(Applies to the Owner's Policy of Title Insurance only.)

vi.    **All oil, gas, and/or other reservations created at closing of the subject transaction shall be included as an exception in the Policy/Policies issued.**

vii.    This transaction may be subject to a confidential order issued pursuant to the Bank Secrecy Act. Information necessary to comply with the confidential order must be provided prior to the closing. This transaction will not be insured until this information is submitted, reviewed and found to be complete.

# SCHEDULE C

(Continued)

viii.   Notwithstanding any other requirements made herein - For entities purchasing, borrowing, refinancing, or selling real property, the Company will require evidence that verifies the entity's validity, good standing or ability to conduct business in the State of Texas. Further requirements will be made to verify who has authority to sign on behalf of the entity and that the proposed transaction has been authorized.

**ix**.   The Company requires a Satisfactory Gap Indemnity Affidavit and Indemnity from the seller(s), borrower(s) and buyer(s).

6.   No outstanding voluntary liens are found of record affecting the subject property. Inquire into the existence of any unrecorded liens or other indebtedness which could give rise to a security interest in the subject property.

7.   Company requires that a current survey with a metes and bounds legal description of the subject property be obtained and furnished for examination and possible further requirements.

8.   Pending Chapter 11 Bankruptcy proceedings appear filed by PIER 1 IMPORTS (U.S.), INC. on February 17, 2020, under Cause No. 20-30808. The subject property does not appear to have been abandoned by the Chapter 11 Trustee or deemed or approved as 'exempt' by said Trustee; or the Debtor's Chapter 11 Plan is not confirmed or prohibits a sale of the subject property. Obtain for examination, and possible further requirements, either a confirmation of Debtor's Chapter 11 Plan which does not prohibit a sale of the subject property, or a final, non-appealable order from the Bankruptcy Court authorizing the sale by the Chapter 11 Trustee or other party and directing distribution of the sales proceeds.

On day of closing, have Examination confirm status of bankruptcy proceedings prior to closing of the transaction.

9.   This Commitment is issued subject to the examination of a fully executed sales contract.

10.   Subject to search of Purchaser(s) full legal name(s) and partial Social Security number(s) and possible further requirements.  [NOTE: Full legal name includes first, middle, maiden and last names, if applicable.]

11.   Secure certified copy of resolution of PIER 1 IMPORTS-TEXAS, INC., a Delaware corporation, in recordable form, authorizing the proposed transaction and execution of necessary papers.

Ascertain that aforementioned is incorporated and that its charter has not been forfeited (canceled).

# SCHEDULE D

Commitment No.:  20-1925                                                              GF No.:  20-1925

Pursuant to the requirements of Rule P-21, Basic Manual of Rules, Rates and Forms for the writing of Title Insurance in the State of Texas, the following disclosures are made:

1.    The issuing Title Insurance Company, Chicago Title Insurance Company, is a corporation whose shareholders owning or controlling, directly or indirectly, 10% of said corporation, directors and officers are listed below:

Shareholders: Fidelity National Title Group, Inc. which is owned 100% by FNTG Holdings, LLC which is owned 100% by Fidelity National Financial, Inc.
Directors: Edson N. Burton, Jr., Marjorie Nemzura, Michael J. Nolan, Anthony J. Park, Raymond R. Quirk
Officers:   President, Raymond R. Quirk, Executive Vice President, Anthony J. Park, Secretary, Marjorie Nemzura, Treasurer, Daniel K. Murphy

2.    The following disclosures are made by the Title Insurance Agent issuing this commitment:

RATTIKIN TITLE COMPANY, a Texas corporation, Title Insurance Agent

The names of each shareholder, owner, partner, or other person having, owning or controlling one (1) percent or more of the Title Insurance Agent that will receive a portion of the premium are as follows: Jack Rattikin III, Alicia Rattikin Lindsey, Jeffrey Alan Rattikin and Allyson Rattikin Grona.

The names of the president, the executive or senior vice-president, the secretary and the treasurer of Rattikin Title Company:  Jack Rattikin, Jr., Chairman of the Board; Jack Rattikin III, President and CEO; Brian Grona, Senior Vice President; Richard M. Miles, Senior Vice President; Mellisa DeBlasi, Vice President and Controller; Diane Harris, Senior Vice President and Secretary; Jack Rattikin, Jr., Director; Jack Rattikin III, Director; Alicia Rattikin Lindsey, Director; Jeffrey Alan Rattikin, Director; and Allyson Rattikin Grona, Director

3.    You are entitled to receive advance disclosure of settlement charges in connection with the proposed transaction to which this commitment relates.  Upon your request, such disclosure will be made to you. Additionally, the name of any person, firm or corporation receiving any sum from the settlement of this transaction will be disclosed on the closing or settlement statement.

You are further advised that the estimated title premium* is:

| | | | |
|---|---|---|---|
| **Endorsement Charges** | | $ | 245.00 |
| | **Total** | $ | 245.00 |

Of this total amount:  15% will be paid to the policy issuing Title Insurance Company; 85% will be retained by the issuing Title Insurance Agent; and the remainder of the estimated premium will be paid to other parties as follows:

Amount                          To Whom                                    For Services


*The estimated premium is based upon information furnished to us as of the date of this Commitment for Title Insurance.  Final determination of the amount of the premium will be made at closing in accordance with the Rules and Regulations adopted by the Commissioner of Insurance.

This commitment is invalid unless the insuring provisions and Schedules A, B, and C are attached.

## DELETION OF ARBITRATION PROVISION

(Not applicable to the Texas Residential Owner's Policy)

Commitment No.:  20-1925                                                    GF No.:  20-1925

ARBITRATION is a common form of alternative dispute resolution.  It can be a quicker and cheaper means to settle a dispute with your Title Insurance Company.  However, if you agree to arbitrate, you give up your right to take the Title Insurance Company to court and your rights to discovery of evidence may be limited in the arbitration process.  In addition, you cannot usually appeal an arbitrator's award.

**Your policy contains an arbitration provision (shown below).  It allows you or the Company to require arbitration if the amount of insurance is $2,000,000 or less.  If you want to retain your right to sue the Company in case of a dispute over a claim, you must request deletion of the arbitration provision before the policy is issued.  You can do this by signing this form and returning it to the Company at or before the closing of your real estate transaction or by writing to the Company.**

**The arbitration provision in the Policy is as follows:**

"Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules").  Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons.  Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy.  All arbitrable matters when the Amount of Insurance is **$2,000,000** or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity).  All arbitrable matters when the Amount of Insurance is in excess of **$2,000,000** shall be arbitrated only when agreed to by both the Company and the Insured.  Arbitration pursuant to this policy and under the Rules shall be binding upon the parties.  Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction."

_____          _____
SIGNATURE                                                      DATE

**Rattikin Title Company**

# PRIVACY STATEMENT

Rattikin Title Company and its subsidiaries ("RTC") respect the privacy and security of your non-public personal information ("Personal Information") and protecting your Personal Information is one of our top priorities. This Privacy Statement explains RTC's privacy practices, including how we may use the Personal Information we receive from you and from other specified sources, and to whom it may be disclosed. RTC follows the privacy practices described in this Privacy Statement and, depending on the business performed, RTC companies may share information as described herein.

**Personal Information Collected**

We may collect Personal Information about you from the following sources:

- Information we receive from you on applications or other forms, such as your name, address, social security number, tax identification number, asset information, and income information;
- Information we receive from you through our Internet websites, such as your name, address, email address, Internet Protocol address, the website links you used to get to our websites, and your activity while using or reviewing our websites;
- Information about your transactions with or services performed by us, our affiliates, or others, such as information concerning your policy, premiums, payment history, information about your home or other real property, information from lenders and other third parties involved in such transaction, account balances, and credit card information; and
- Information we receive from consumer or other reporting agencies and publicly recorded documents.

**Disclosure of Personal Information**

We may provide your Personal Information (excluding information we receive from consumer or other credit reporting agencies) to various individuals and companies, as permitted by law, without obtaining your prior authorization. Such laws do not allow consumers to restrict these disclosures. Disclosures may include, without limitation, the following:

- To insurance agents, brokers, representatives, support organizations, or others to provide you with services you have requested, and to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure in connection with an insurance transaction;
- To third-party contractors or service providers for the purpose of determining your eligibility for an insurance benefit or payment and/or providing you with services you have requested;
- To an insurance regulatory authority, or a law enforcement or other governmental authority, in a civil action, in connection with a subpoena or a governmental investigation;
- To companies that perform marketing services on our behalf or to other financial institutions with which we have joint marketing agreements; and/or
- To lenders, lien holders, judgment creditors, or other parties claiming an encumbrance or an interest in title whose claim or interest must be determined, settled, paid or released prior to a title or escrow closing.

We may also disclose your Personal Information to others when we believe, in good faith, that such disclosure is reasonably necessary to comply with the law or to protect the safety of our customers, employees, or property and/or to comply with a judicial proceeding, court order or legal process.

Disclosure to Affiliated Companies - We are permitted by law to share your name, address and facts about your transaction with other RTC companies, such as insurance companies, agents, and other real estate service providers to provide you with services you have requested, for marketing or product development research, or to market products or services to you. We do not, however, disclose information we collect from consumer or credit reporting agencies with our affiliates or others without your consent, in conformity with applicable law, unless such disclosure is otherwise permitted by law.

Disclosure to Nonaffiliated Third Parties - We do not disclose Personal Information about our customers or former customers to nonaffiliated third parties, except as outlined herein or as otherwise permitted by law.

**Confidentiality and Security of Personal Information**

We restrict access to Personal Information about you to those employees who need to know that information to provide products or services to you.  We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard Personal Information.

**Access to Personal Information/**
**Requests for Correction, Amendment, or Deletion of Personal Information**

As required by applicable law, we will afford you the right to access your Personal Information, under certain circumstances to find out to whom your Personal Information has been disclosed, and request correction or deletion of your Personal Information.  However, RTC's current policy is to maintain customers' Personal Information for no less than your state's required record retention requirements for the purpose of handling future coverage claims.

For your protection, all requests made under this section must be in writing and must include your notarized signature to establish your identity.  Where permitted by law, we may charge a reasonable fee to cover the costs incurred in responding to such requests. Please send requests to:

Rattikin Title Company
201 Main Street, Suite 800
Fort Worth, Texas, 76102
Attn:  Diane Harris

**Changes to this Privacy Statement**

This Privacy Statement may be amended from time to time consistent with applicable privacy laws.  When we amend this Privacy Statement, we will post a notice of such changes on our website.  The effective date of this Privacy Statement, as stated above, indicates the last time this Privacy Statement was revised or materially changed.

IMPORTANT NOTICE

FOR INFORMATION, OR TO MAKE A COMPLAINT CALL OUR TOLL-FREE TELEPHONE NUMBER

(800)925-0965

ALSO YOU MAY CONTACT THE TEXAS DEPARTMENT OF INSURANCE AT

(800)252-3439

to obtain information on:
1.  filing a complaint against an insurance company or agent,
2.  whether an insurance company or agent is licensed,
3.  complaints received against an insurance company or agent,
4.  policyholder rights, and
5.  a list of consumer publications and services available through the Department.

YOU MAY ALSO WRITE TO THE TEXAS DEPARTMENT OF INSURANCE
P.O. BOX 149104
AUSTIN, TEXAS 78714-9104
FAX NO. (512)490-1007

_____

AVISO IMPORTANTE

PARA INFORMACIÓN, O PARA SOMETER UNA QUEJA LLAME AL NUMERO GRATIS

(800)925-0965

TAMBIEN PUEDE COMUNICARSE CON EL DEPARTAMENTO DE SEGUROS DE TEXAS AL

(800)252-3439

para obtener información sobre:
1.  como someter una queja en contra de una compañía de seguros o agente de seguros,
2.  si una compañía de seguros o agente de seguros tiene licencia,
3.  quejas recibidas en contra de una compañía de seguros o agente de seguros,
4.  los derechos del asegurado, y
5.  una lista de publicaciones y servicios para consumidores disponibles a través del Departamento.

TAMBIEN PUEDE ESCRIBIR AL DEPARTAMENTO DE SEGUROS DE TEXAS
P.O. BOX 149104
AUSTIN, TEXAS 78714-9104
FAX NO. (512)490-1007

**<u>Exhibit B</u>**

**Standard Listing Agreement**


JONES LANG
LASALLE

### EXCLUSIVE LISTING AGREEMENT

This EXCLUSIVE LISTING AGREEMENT ("Agreement") is made and entered into this __12__ day of __March__, 2009, by and between JONES LANG LASALLE – SOUTHWEST, INC., a corporation duly organized under the laws of the State of Texas ("Broker") and Pier 1 Imports (U.S.), Inc., a Delaware corporation ("Owner").

### W I T N E S S E T H:

WHEREAS, Owner is the owner of certain real property located at 2200 Heritage Parkway, Mansfield, Tarrant County, Texas, and more particularly described on Exhibit A attached hereto and made a part hereof (said real property together with all improvements being hereinafter referred to as the "Property");

WHEREAS, Owner desires to appoint Broker as its exclusive listing agent with respect to selling and/or leasing the Property and Broker desires to accept such appointment as exclusive listing agent subject to the terms and provisions hereof;

NOW THEREFORE, for and in consideration of the receipt of Ten and No/100 Dollars ($10.00), the mutual covenants herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged and confessed, Broker and Owner hereby agree as follows:

1.  **Appointment.**  Owner hereby appoints Broker as its sole and exclusive listing agent with sole authority to represent Owner during the term of this Agreement in the sale and/or leasing of the Property for a Commission (see section 6) payable pursuant to the terms and conditions found herein.

2.  **Effective Date.** This Agreement is effective as of the last date on which Broker or Owner executes this Agreement, and that date will be set forth in the first paragraph of this Agreement where indicated. Broker and Owner have no rights with respect to this Agreement until both Broker and Owner execute this Agreement.

3.  **Term.**  Broker's appointment as sole and exclusive listing agent shall commence as of the Effective Date and shall expire at midnight on December 31, 2009.

4.  **Broker's Duties.**  Broker and Owner hereby expressly acknowledge and agree that Broker shall provide the following services with respect to the Property:

    (a)   Broker shall provide periodic reports on a regular basis, but in no event less than once a month, setting forth a listing of prospective purchasers and/or tenants who have dealt with Broker concerning the Property, a summary of any ongoing negotiations and a copy

of all material correspondence which Broker may send or receive which relate to, or are made in connection with, the Property.

(b)     All costs and expenses incurred by Broker in marketing the Property shall be borne by Broker without reimbursement from Owner.

(c)     Broker will list and offer the Property for sale and/or lease in accordance with all applicable federal, state and local laws and regulations.

(d)     Broker shall not place a "For Sale" or similar sign on a Property without Pier 1's written consent, which may be withheld at Pier 1's sole discretion.

(e)     Broker will offer the Property for sale and/or lease at the sales price and/or rental rate set forth on Exhibit B attached hereto and made a part hereof. The parties agree that Owner may amend the price and/or rate by providing written notice to Broker of such amendment.

(f)     Upon the expiration or earlier termination of the Agreement or the sale or lease of the Property, whichever occurs first, Broker shall immediately return to Owner any and all material information pertaining to the Property that is in possession of Broker at is sole cost and expense.   This provision shall survive the expiration or earlier termination of this Agreement.

(g)     In the event Todd Burnette ceases to be employed by Broker, is no longer an independent contractor of Broker or is unable to serve in connection with this Agreement, Broker may substitute, subject to Owner's written approval, another salesperson of similar experience and credentials.

5.     <u>Broker's Representations, Warranties and Acknowledgments.</u>

(a)     Broker represents and warrants (i) it is a duly licensed real estate broker in the State of Texas, (ii) it will maintain its licenses in an active status, (iii) it will cause its agents and cooperating brokers and their agents to be duly licensed and maintain such licenses in an active status and (iv) that no member of Broker's Marketing Team will at anytime have an interest, financial or otherwise, in any prospective buyer and/or tenant presented to Owner. Notwithstanding the prior sentence, Broker shall inform Owner in writing in the event it discovers that Broker or any of its employees, agents or affiliates  have an interest, financial or otherwise, in any prospective buyer and/or tenant presented to Owner.

2

(b)  Broker acknowledges and agrees if it breaches any of the representations, warranties or covenants contained in this Agreement, including failure to honor its indemnities, Owner may offset the costs and damages Owner incurs as a result of Broker's breach against commissions owing under this Agreement.

(c)  Broker acknowledges and agrees that the Confidentiality Agreement dated February 25, 2009 remains effective and shall apply to this Agreement.  The provisions of this Section 5(c) shall survive the expiration of this Agreement.

(d)  Broker acknowledges and agrees it and its employees, agents and contractors are not employees of Owner and will at all times remain independent contractors.

(e)  Broker's represents that its representations made with respect to the Property will not vary from the information Owner gives Broker or the provisions of any recorded documents regarding the Property. Broker will indemnify and defend Owner from and against any damage, loss, claim, demand, action, cost or liability resulting from Broker's breach of its covenant set forth in this Section 5(e).

6.  **Commission.**  In consideration for Broker providing the above-mentioned services, and subject to the terms and conditions set forth in this Agreement, Owner hereby agrees to pay the following sums as compensation hereunder:

(a)  Upon Broker satisfying the conditions precedent listed in Section 4(b) or 4(c) below, Owner shall pay a Commission (herein so called) to Broker in an amount equal to the sum of

(i)  In the event of a sale, four percent (4%) of the gross selling price under the purchase and sale agreement by and between Owner and prospective buyer; or

(ii)  In the event of a lease, four and one-half percent 4.5% of the Base Rent of the lease.  "Base Rent" means the base rental to be paid by a prospective tenant during the initial term of a lease exclusive of additional rentals and charges, which additional rentals and charges include without limitation taxes, common area maintenance expenses, insurance premiums, maintenance charges, amortization of tenant finishout costs and repayment of any such costs by any party to Owner.

(b)  Broker is deemed to have earned a commission in connection with the sale of the Property only if each of the following conditions precedent is unconditionally satisfied:

3

(i)     Broker or Owner procure a prospective buyer that is ready, willing and able to purchase the Property on terms acceptable to Owner.

(ii)    The prospective buyer procured by Broker executes Owner's form of purchase and sale agreement or another form of purchase and sale agreement acceptable to Owner in Owner's sole discretion.

(iii)   All conditions precedent to closing set forth in the purchase and sale agreement occur and the closing and funding of the sale is completed.

(c)     Broker is deemed to have earned a commission in connection with the <u>lease</u> of the Property only if each of the following conditions precedent is unconditionally satisfied:

(i)     Broker or Owner procure a prospective tenant that is ready, willing and able to lease the Property on terms acceptable to Owner.

(ii)    The prospective tenant procured by Broker executes Owner's form of lease agreement or another form of lease agreement acceptable to Owner in Owner's sole discretion.

(iii)   All conditions precedent to the commencement of the lease term are satisfied, the prospective tenant has taken possession of the Property and the lease is in full force without default by the prospective tenant.

(d)     Owner's obligation to Broker relating to the payment of Commission shall survive the termination of this Agreement with respect to any contract of sale which is fully executed by both Owner and the Purchaser within one hundred twenty (120) days of the termination with a "registered prospect." For purposes hereof, the term "registered prospect" shall mean any person whose interest in the Property and contact with Broker has been disclosed to Owner in writing on or before the tenth (10th) day following termination of the Agreement. Broker and Owner each covenant and agree one to the other to operate in good faith with respect to the registration of prospects.

(e)     Broker will cooperate with any other brokers in selling and/or leasing the Property. Broker is not entitled to a greater commission than stated in this Agreement even though a cooperating broker procures a prospective buyer and/or tenant. It is Broker's and Owner's intent that Broker is solely responsible for and will pay any

4

cooperating broker commissions owed from the commission received by Broker under this Agreement.

(f) If Broker works with a cooperating broker in the sale and/or lease of the Property and Broker earns a commission in accordance with this Agreement, Owner will pay the applicable commission solely and directly to Broker. Broker will indemnify and defend Owner from and against any claim of any cooperating broker, including without limitation attorneys' fees and costs Owner incurs in defending against any such claim.

(g) No Commission shall be payable to Broker unless the Property is actually sold or leased. Additionally, Broker shall only be entitled to Commission on the sale of the Property in the event Broker negotiates and closes a sale-leaseback transaction.

(h) Owner will pay the applicable commission for selling the Property to Broker upon closing and funding. Owner will pay the applicable commission for leasing the Property to Broker in two (2) equal installments; one-half (1/2) within thirty (30) days after Section 12(b) above is satisfied and one-half (1/2) within thirty (30) days after the prospective tenant commences paying rent.

(i) Notwithstanding anything in this Agreement to the contrary, should the Property sell to Walter Floyd or a partnership formed by Mr. Floyd, Broker will only receive a sales commission if (i) Broker adds value by increasing the sales price from Mr. Floyd's initial offer of $8,500,000.00 and (ii) Seller makes a determination that in fact Broker's services added value to such transaction. In the event items (i) and (ii) above are satisfied, Broker will earn a fee equal to five percent (5%) of the increase above Mr. Floyd's initial offer.

However, if in the sole opinion of Seller, Broker has not provided value, Broker will waive all or part of the fee pursuant to the potential buyer.

7.    **Termination Privilege.**  Notwithstanding anything to the contrary herein, either party shall have the right to terminate this Agreement at any time, without cause, upon thirty (30) days prior written notice to the other.  Upon any termination hereof, regardless of how such termination has arisen, Broker, if requested in writing to do so, shall promptly deliver to Owner copies of all marketing materials and other related matters in Broker's possession, or subject to Broker's custody or control, which relate solely to the Property.  Despite any such termination, Broker shall continue to be entitled to the Commission if the conditions set forth in subparagraph 4(c) hereof are satisfied.

5

8.    **Limitations on Broker's Authority.**  It is hereby agreed and acknowledged that the sales price and other terms and conditions of any contract to sell and/or lease the Property are within the Owner's sole and absolute discretion and Broker shall not represent to anyone that Broker is authorized to bind the Owner with respect to the sale and/or lease of the Property, without first obtaining the prior express written consent of Owner to do so.

9.    **Notices.**  All notices required or permitted to be given hereunder shall be sent by certified mail, return receipt requested, postage prepaid, addressed to the parties hereto at the following addresses, or at such other addresses as shall be specified by written notice delivered in accordance herewith:

If to Owner:        Pier 1 Imports (U.S.), Inc.
                    Attention: Senior Director of Real Estate

                    100 Pier 1 Place

                    Fort Worth, Texas, 76102


With a copy to:     Pier 1 Imports Legal Department

                    Attention: Ray McKown

                    100 Pier 1 Place

                    Fort Worth, Texas, 76102

If to Broker:       Jones Lang LaSalle – Southwest
                    Attention:  Todd Burnette
                    201 Main Street, Suite 1440
                    Fort Worth, Texas 76102

All notices delivered in accordance herewith shall be deemed to have been delivered three (3) days after deposited as aforesaid in a duly authorized depository of the United States Postal Service.

10.   **Modification.**  This Agreement shall inure to the benefit of the Parties hereto, their successors and assigns, and no modification hereto shall be valid or binding unless such is made in a writing signed by the parties hereto, their successors or assigns, as the case may be.

11.   **Binding Law.**  This Agreement shall be construed and interpreted in accordance with the laws of the State of Texas and the obligations of the parties hereto are, and shall be, performable in Tarrant County, Texas.  Where required for proper interpretation, words in the singular shall include the plural, masculine gender shall include the neuter and the feminine, and vice versa.

6

12.     **Headings.** The descriptive headings of the several paragraphs contained in this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

13.     **Attorney's Fees.** In the event it becomes necessary for either party hereto to file a suit to enforce this Agreement or any provisions contained herein, the party prevailing in such action shall be entitled to recover, in addition to all other remedies or damages, reasonable attorney's fees incurred in such suit.

14.     **Indemnification.** Broker and Owner will indemnify and defend the other from and against any damage, loss, claim, demand, action, cost or liability arising directly or indirectly from the negligent acts or omissions of the indemnifying party and its agents or employees in performing the provisions of this Agreement. For each indemnity provision in this Agreement, the indemnifying party may choose counsel and may defend or settle any such indemnified claim. The indemnified party will cooperate with the indemnifying party in all such respects.

15.     **Complete Agreement.** This Agreement and that certain Confidentiality Agreement dated February 25, 2009 constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith.

16.     **Counterparts.** The parties agree that this Agreement may be executed in multiple counterparts and that signatures transmitted via fax or PDF shall be considered the same as originals.

7

This document is executed effective as of the ___12___ day of __March__, 2009.

BROKER:

**JONES LANG LASALLE – SOUTHWEST, INC.**

By: _____

Name: Todd Burnette
Title:  Managing Director

OWNER:

**Pier 1 Imports (U.S.), Inc.**

By: _____

Name: Charles H. Turner
Title:  Executive Vice President and CFO

8

Exhibit A
(Legal Description)

To be attached.

Exhibit B

Sales Price: TBD

Rental Rate: TBD

## AMENDMENT TO EXCLUSIVE LISTING AGREEMENT

JONES LANG LASALLE BROKERAGE, INC.

This is First Amendment to the Exclusive Listing Agreement ("Listing") dated
__March 12th, 2009__ between **Pier 1 Imports (U.S.), Inc.**("Owner"), and **Jones Lang LaSalle Brokerage, Inc.** ("Broker").

Owner and Broker hereby agree to amend the Listing as follows:

1. Extend the Term to expire 12/31/2020

Except as expressly set forth in this Amendment, the Listing shall remain in full force and effect.

BROKER:                                              OWNER:

**Jones Lang LaSalle Brokerage, Inc.**

By: _____                         By: _____

Title: __Managing Director__                         Title: __Sr. Vice President__

Address: __201 Main Street, Suite 500__              Address: __100 Pier 1 Place__

_____Fort Worth, Texas 76102_____              _____Fort Worth, Texas, 76102_____

Telephone: __817 334 8100__                          Telephone: __817 252 8552__

Date: __March 3rd, 2020__                            Date: __3/3/2020__

**Exhibit C**
**Bids Received**

| Bidder | Round 1 Bids | Round 2 Bids | Round 3 Bids |
|---|---|---|---|
| Stalking Horse Bidder: 2200 Heritage Owner LLC | $15 million (2% breakup fee; $25k due diligence reimbursement); Stalking horse bid "As-is" condition | $15 million (2% breakup fee; $25k due diligence reimbursement); Stalking horse bid "As-is" condition | $15 million (2% breakup fee; $25k due diligence reimbursement); Stalking horse bid "As-is" condition |
| Winning Bidder | | | $18 million Includes FF&E valued at $881K "As-is" condition |
| Bidder 1 | $18.4 million; Inspection: 30 days; Closing: 10 Days after the conclusion of Due Diligence Period or 10 Days after Seller has cured or Purchaser has waived any objections by Purchaser related to survey and title; Leaseback: 5 Years @ $3.25/SF with 3% annual bumps | | |
| Bidder 2 | $16 million; Inspection: 60 days; Closing: 30 days; Leaseback: 5 Years @ $3.15/SF with 2% annual bumps | $16 million; Inspection: 45 days; Closing: 30 days; Leaseback: 6 months @ $3.15/SF NNN with 3% annual bumps | $15.25 million "As-is" condition |
| Bidder 3 | $13.1 million; Inspection: 45 days Closing: 30 days; Leaseback: 3 Years @ $3.50/SF with 3% annual bumps | | |
| Bidder 4 | $13.1 million; Inspection: 7 days; Closing: 23 days after inspection; Leaseback: 3 Years @ $3.65/SF NNN with 1% annual bumps + 10-1 year options | $13.1 million; Inspection: 30 days; Closing: 15 days after inspection; Leaseback: Option A: Month-to-month term, for up to 3 years, at $2.65/SF NNN | |

| | | | |
|---|---|---|---|
| | | in Year 1, increasing by 2% annually (tenant may terminate upon 30 days' written notice)<br>Option B: 3 years @ $2.65/SF NNN with 2% annual bumps;<br>Option C: vacant | |
| Bidder 5 | $11.5 million;<br>Inspection: 15 days;<br>Closing: 15 days;<br>Leaseback: 5 Years @ $2.85 NNN | | |
| Bidder 6 | $10.12 million;<br>Inspection: 30 days;<br>Closing: 30 days after inspection;<br>Leaseback: 2 Years @ $3.00/SF NNN | $13.8 million/$12.3 million (vacant);<br>Inspection 60 days; Closing: 30 days after inspection;<br>Leaseback:<br>Option A: 1 year @ $3.00/SF NNN with 3% annual bumps;<br>Option B: 2 years @ $2.75/SF NNN with 3% annual bumps;<br>Option C: 3 years @ $2.50/SF NNN with 3% annual bumps | |
| Bidder 7 | | | $15 million<br>"As-is" condition |
| Bidder 8 | | | $13.1 million<br>"As-is" condition |
| Bidder 9 | | | $11.04 million<br>"As-is" condition |
| Bidder 10 | | | $16.55 million<br>"As-is" condition |

13